# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

STANDING TREES, INC.

     *Plaintiff,*

v.

UNITED STATES FOREST SERVICE;
DEREK IBARGUEN, in his official
capacity as Supervisor of the White
Mountain National Forest; BROOKE
BROWN, in her official capacity as the
District Ranger for the Pemigewasset
Ranger District; JOSHUA SJOSTROM, in
his official capacity as the District Ranger
for the Androscoggin Ranger District

     *Defendants*.

Case No.:

**COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF**

## INTRODUCTION

1.     Plaintiff Standing Trees challenges the U.S. Forest Service's (Service) Tarleton Integrated Resource Project and Peabody West Integrated Resource Project, which collectively authorize nearly 3,000 acres of commercial logging and nearly a dozen miles of road construction in the White Mountain National Forest without the required environmental review.

2.     Both projects target publicly owned forests traversed by the Appalachian Trail and enjoyed by thousands of visitors each year. The Tarleton project targets mature forests encircling Lake Tarleton, one of the largest, cleanest, and least developed lakes in the region. The forests surrounding Lake Tarleton were added to the White Mountain National Forest by citizen initiative in the late 1990s to stop the threat of future logging and development, including the

1

very activities proposed by the Tarleton project. Similarly, the Peabody West project targets mature and roadless forests in the iconic Presidential Range, home of the Great Gulf Wilderness and Great Gulf Inventoried Roadless Area. Stately white pines, massive hemlocks, and mature hardwoods have taken decades to grow in the two project areas. Like old friends, they are irreplaceable components of the White Mountain National Forest.

3.      To approve the two projects, the Forest Service bypassed the required environmental review. The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, requires review of "the environmental impacts of the proposed action and alternatives[.]" 40 C.F.R. § 1508.9; *see also* 36 C.F.R. § 220.7(b)(2); 42 U.S.C. § 4332(2)(H). The point of reviewing impacts in this comparative form is to define them sharply and provide a clear basis for choice among the actions available to the Forest Service. Here, the Service refused to review *any* alternatives and thus failed to compare the impacts of its projects alongside alternatives with less or no logging of mature trees. This violates NEPA.

4.      The Forest Service likewise failed to follow NEPA's command to take a "hard look" at each project's environmental impacts, especially the impacts on climate, water quality, endangered species, and scenic and other resources. Nor did the Forest Service take the requisite hard look at the cumulative impacts of the two projects together, much less in combination with other projects in the White Mountain National Forest.

5.      Regarding climate impacts, the Forest Service approved both projects without quantifying the greenhouse gas (GHG) emissions that would result from logging nearly 3,000 acres of maturing forest or disclosing the resulting adverse environmental impacts. Instead, the Service concluded that project-specific emissions were too small to matter in comparison to global emissions and that the projects would yield net benefits for climate change and climate

resilience. But these conclusions are arbitrary, given the evidence before the Service establishing that project-specific emissions are quantifiable and instructive for evaluating climate impacts, and that preserving maturing forests leads to a net climate benefit.

6.      Regarding forest health and water quality impacts, Standing Trees underscored—but the Forest Service disregarded—years' worth of science and executive guidance identifying that preserving maturing forests leads to benefits, especially in inventoried roadless areas.

7.      Regarding endangered species impacts, the Forest Service arbitrarily relied on not knowing locations of the northern long-eared bat's roosts and hibernacula to claim that the projects "may affect, [but are] not likely to adversely affect" the bat.

8.      Regarding scenic and recreational impacts, the Forest Service arbitrarily disregarded logging's negative impacts on visitors in the project areas.

9.      The Forest Service made no effort to consider the climate, forest health, water quality, species, scenic, or recreational impacts of these projects together, much less combined with other projects the Forest Service is conducting in the White Mountain National Forest.

10.     The Forest Service cannot claim to know whether each proposed project—individually or cumulatively—would have significant environmental impacts. Thus, the Service cannot proceed until it fully discloses these impacts in environmental reviews that comply with NEPA's requirements and ultimate purpose: to protect and promote environmental quality. *See Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285–87 (1st Cir. 1996).

11.     The Forest Service also violated the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq.*, which requires the projects to comply with the 2005 White Mountain National Forest Plan (Forest Plan). The projects do not. They violate Forest Plan directives that protect endangered species' habitat, water quality, and forest scenic integrity.

3

12.     Because the Forest Service's authorizations of the Tarleton and Peabody West projects violate federal law, this Court should declare them unlawful, vacate the final decisions, and enjoin the authorized logging and road construction.

## JURISDICTION

13.     This Court has jurisdiction over this case under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (United States as defendant), as well as 5 U.S.C. §§ 701–06 (Administrative Procedure Act's judicial review provisions).

14.     The Court may order relief under 28 U.S.C. §§ 2201 (declaratory judgment), 2202 (further relief), and 2412 (costs and fees), as well as 5 U.S.C. § 706 (vacatur).

15.     Venue is proper in this Court under 28 U.S.C. § 1391 because the lands at issue are in Grafton County and Coos County, New Hampshire, and because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

## PARTIES

### Plaintiff

16.     Plaintiff Standing Trees is a grassroots membership organization. Its mission is to protect and restore New England's forests, with a focus on public lands in New Hampshire and Vermont. Consistent with its mission, Standing Trees advocates just and equitable policies and practices for managing public lands and thereby achieving clean water, clean air, forest health, public health, and unfragmented habitat in the region.

17.     Over the past three years, Standing Trees has participated in available public processes for the Tarleton and Peabody West projects, including filing comments on the Forest Service's draft environmental assessments (EAs) for each project and filing objections to the

4

proposed decision for each project. Thus, Standing Trees has exhausted its administrative remedies to challenge these projects.

18.     Likewise, Standing Trees has participated in available public processes for similar, contemporaneous projects in the White Mountain National Forest (National Forest) because each suffers from similar, legally deficient environmental review.

19.     Standing Trees brings this case on behalf of itself and its members, including those who live near and regularly visit the Tarleton and Peabody West project areas.

20.     In both project areas, Standing Trees members recreate year-round: hiking, skiing, camping, backpacking, swimming, fishing, and observing wildlife. The members plan to continue visiting these areas for the foreseeable future. However, as detailed below, the projects' adverse environmental impacts threaten their ability to do so.

21.     Similarly, Standing Trees members have related nature-based business interests, such as the youth outdoors camp, Kingswood Camp, that would be directly harmed by the Tarleton project's adverse environmental impacts.

22.     Debris and runoff from commercial logging will harm the water quality of waters in both project areas. Upon reaching these waters, logging debris and runoff increases the risk of algal blooms, which may degrade water quality to the point where it is no longer safe to recreate in or on these waters.

23.     Logging mature trees will harm the health of the forests and the scenic beauty in both project areas. Standing Trees members have specifically chosen to recreate or manage businesses in these areas—some for many decades—because of the areas' healthy forests and scenic beauty, including the iconic views from Lake Tarleton and along the Great Gulf and

Appalachian Trails. These members' recreational and business interests are certain to be impacted by the proposed logging.

24.     Moreover, the impacts will disturb, displace, or otherwise harm wildlife, thereby limiting the wildlife-viewing opportunities for Standing Trees members in the project areas.

25.     Defendants' failure to fully disclose these impacts harms Standing Trees members by denying their right to meaningfully participate in the decision-making process.

26.     The interests of Standing Trees have been, and are being, adversely and irreparably injured by Defendants' failure to comply with federal law, and these injuries will continue until and unless the relief requested in this Complaint is granted.

27.     These injuries are actual, concrete injuries that are traceable to Defendants' decision to authorize the activities described in the decision notices for the projects.

28.     These injuries would be redressed by the requested relief.

**Defendant**s

29.     Defendant U.S. Forest Service is a federal agency within the Department of Agriculture. The Service, which manages the National Forest, issued decision notices on November 13, 2023, and February 7, 2024, that authorized the Tarleton and Peabody West projects, respectively. Those decision notices are attached to this Complaint as Exhibits 1 and 2.

30.     Defendant Derek Ibarguen is the Forest Supervisor for the National Forest, responsible for issuing the objection response letters for the Tarleton and Peabody West projects on September 27, 2023, and October 18, 2023, respectively. Defendant Ibarguen is sued in their official capacity.

31.     Defendant Brooke Brown is the District Ranger for the Pemigewasset Ranger District and the official who signed the Tarleton project Decision Notice on November 13, 2023. Defendant Brown is sued in their official capacity.

32.     Defendant Joshua Sjostrom is the District Ranger for the Androscoggin Ranger District and the official who signed the Peabody West project Decision Notice on February 7, 2024. Defendant Sjostrom is sued in their official capacity.

## LEGAL BACKGROUND

### Administrative Procedure Act (APA)

33.     This case is brought under the Administrative Procedure Act (APA). 5 U.S.C. §§ 551–59, 701–06.

34.     The APA allows associations like Standing Trees to challenge federal agency actions in the federal courts. *Id.* §§ 702, 704. The APA declares that a court "shall . . . hold unlawful and set aside agency action[s] . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

35.     As relevant here, an agency decision is arbitrary and capricious if the agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

36.     The APA provides for relief for claims brought under the National Environmental Policy Act and the National Forest Management Act.

## National Environmental Policy Act (NEPA)

37.     Congress enacted NEPA to promote government efforts that "will prevent or eliminate damage to the environment[.]" 42 U.S.C. § 4321. Federal agencies must review and publicly disclose the environmental impacts of their proposed actions. 40 C.F.R. § 1508.9(b).

38.     The Council on Environmental Quality (CEQ) promulgated implementing regulations. *Id.* §§ 1500–1508. The regulations' stated purpose is "to tell federal agencies what they must do to comply with the procedures and achieve the goals of [NEPA]," to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," and, "[u]ltimately," to achieve "better decisions" and "excellent action." 40 C.F.R. § 1500.1(a)–(c).[1]

39.     The Forest Service promulgated its own NEPA regulations. 36 C.F.R. Part 220. The Service is bound by these regulations in addition to CEQ regulations.

40.     NEPA requires federal agencies to prepare an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Agencies must supplement an EIS where "new information . . . show[s] that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered[.]" *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989) (quoting 42 U.S.C. § 4332(2)(C)).

---

[1] CEQ amended the regulations in 2020. The amendments "apply to any NEPA process begun after September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." 40 C.F.R. § 1506.13 (2020). Here, the amendments do not apply because the Service initiated both the Tarleton and Peabody West projects in 2019 and because the Forest Service consistently relied on CEQ's original regulations throughout its environmental review. *See* Tarleton Final EA and FONSI at 4; Peabody West Final EA and FONSI at 3. The original regulations apply here.

41.     If the need for an EIS is unclear, the agency must prepare an environmental assessment (EA) to determine whether the action may have significant impacts and thus require EIS preparation. 40 C.F.R. § 1508.9. If the agency determines the action will not have a significant impact, it issues a finding of no significant impact (FONSI). *Id.* § 1508.13.

42.     The agency must take a "hard look" at an action's impacts regardless of which environmental review process the agency conducts. *Kleppe v. Sierra Club*, 427 U.S. 390, 409 n. 21 (1976).

43.     As part of that review, NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources[.]" 42 U.S.C. § 4332(2)(E); *see also* 40 C.F.R. § 1501.2(c) (same).

44.     Agencies also must "quantify GHG emissions, compare GHG emission quantities across alternative scenarios, . . . and place emissions in relevant context[.]" National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196, 1201 (Jan. 9, 2023). This requires agencies to use the "best available science and data[.]" *Id.*

45.     Significance is determined by the action's context and intensity. 40 C.F.R. § 1508.27. Context refers to the action's setting. *Id.* § 1508.27(a). Intensity refers to the action's impact, which is informed by ten factors. *Id.* § 1508.27(b). As relevant here, those factors include the project's beneficial and adverse impacts; the unique characteristics of the project areas; the degree to which the actions will have environmental impacts that are likely to be highly controversial; whether the actions are cumulatively significant alongside other actions; and the

degree to which the actions may adversely affect an endangered species. *Id.* §§ 1508.27(b)(1),

(3), (4), (7), (9).

46.     To determine an action's context and intensity, agencies must first set a baseline

that "succinctly describe[s] the environment of the area(s) to be affected or created by the

alternatives under consideration." *Id.* § 1502.15. "The concept of a baseline against which to

compare predictions of the effects of the proposed action and reasonable alternatives is critical to

the NEPA process." CEQ, Considering Cumulative Effects Under the National Environmental

Policy Act, at 41 (Jan. 1997). Without establishing baselines, the Service cannot determine the

significance of an action's environmental impacts and, consequently, cannot comply with NEPA.

47.     Furthermore, an agency's EA must identify the direct, indirect, and cumulative

impacts of an action, including its ecological, aesthetic, economic, social, and health effects. *See*

40 C.F.R. §§ 1508.7 (defining cumulative impact), 1508.8 (defining environmental effects), and

1508.9(b) (requiring EAs to disclose the "environmental impacts of proposed action and

alternatives"). Direct impacts are those impacts that are "caused by the action and occur at the

same time and place." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in

time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

Cumulative impacts are "the impact[s] on the environment which result[] from the incremental

impact of the action when added to other past, present, and reasonably foreseeable future

actions[.]" *Id.* § 1508.7. They can result from "individually minor but collectively significant

actions taking place over a period of time." *Id*.

### National Forest Management Act (NFMA)

48.     NFMA governs the Forest Service's management of the national forests and

prescribes the process for management activities.

49.     First, the Forest Service must develop, maintain, and revise a land and resource management plan for each national forest. 16 U.S.C. § 1604; 36 C.F.R. § 219.2(b). These plans guide management activities forest wide, setting standards and guidelines, management goals and objectives, and monitoring and evaluation requirements.

50.     Second, the Forest Service must ensure that its site-specific management activities are "consistent" with the broader Forest Plans. 16 U.S.C. § 1604(i). Site-specific projects like those at issue here must adhere to applicable plan standards and guidelines.

## FACTUAL BACKGROUND

## I.     THE WHITE MOUNTAIN NATIONAL FOREST

51.     The Tarleton and Peabody West projects are among at least nine logging projects that have been or are proposed to be implemented in the National Forest within the span of a decade. To date, the Forest Service has not acknowledged the cumulative impacts of these projects in its environmental reviews.

### TABLE 1[2]

| PROJECT NAME | RANGER DISTRICT | DECISION DATE | ACRES TO BE LOGGED |
|---|---|---|---|
| Bowen Brook Integrated Resource Management | Pemigewasset | 05/20/16 | 2101 |
| Deer Ridge Integrated Resource Project (IRP) | Androscoggin | 08/01/16 | 993.25 |
| Wanosha IRP | Pemigewasset | 06/27/20 | 2405 |
| Cold River IRP | Saco | 11/17/20 | 189 |
| Tarleton IRP | Pemigewasset | 11/13/23 | 880 |
| Peabody West IRP | Androscoggin | 02/07/24 | 2220 |
| Hales Location Wildfire Resiliency Project | Saco | 04/01/24 (estimated) | 913 |
| Sandwich Vegetation Management Project | Saco | 05/01/24 (estimated) | 135 |
| Lost River IRP | Pemigewasset | 04/01/25 (estimated) | 1674 |

[2] These figures may underrepresent the true acres logged because they may not include logging designated as "pre-commercial" logging by the Forest Service.

## II.    TARLETON PROJECT

52.    The Forest Service asserted that the Tarleton project "is needed to help meet the goals and objectives for wildlife and vegetation described in the Forest Plan and to increase forest health, vitality, and resiliency within the project area, including the effects of climate change, and insect and disease outbreaks." U.S. Forest Serv., Tarleton Project Final Environmental Assessment and Finding of No Significant Impact at 6 (Nov. 2023) (Tarleton Final EA).[3] Such broad objectives can be achieved in myriad ways. Yet the Service arbitrarily reviewed only its initial proposal.

53.    On April 12, 2022, the Forest Service issued its draft EA and FONSI for the Tarleton project, on which Standing Trees submitted a timely comment. On March 16, 2023, the Forest Service released its final EA and FONSI and draft decision notice, to which Standing Trees timely objected. On September 27, 2023, the Forest Service rejected all objections.

### A.    Project Area

54.    The Tarleton project centers on Lake Tarleton, a clear, cold, and quiet mountain lake in Grafton County, New Hampshire. Long cherished for its wild beauty, the lake is near the westernmost edge of the White Mountain National Forest. Loons call through the mist, and the alpine tundra-topped Mount Moosilauke looms in the distance. The project area includes Kingswood Camp; Lakes Katherine and Armington; well-used camping grounds; spectacular hiking trails; unique and sensitive wildlife species; and stands of forest that are aging toward old-growth conditions. Nearly 200 species of songbirds call from the trees' branches, and bald eagles

---

[3] The Forest Service's environmental documents for the Tarleton project are available on the Service's website at https://www.fs.usda.gov/project/?project=56394. The Tarleton Final EA and FONSI is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1361269062428.

and other raptors fly about the canopies.



*Lake Tarleton with Mt. Moosilauke in the distance.*
*Photo courtesy of Standing Trees.*

55.     In the late 1990s, a planned resort inspired a grassroots effort to "permanently" protect Lake Tarleton from development. With the support of congressional leaders from New Hampshire and the federal government, the public gained ownership of the land around the lake, which then became part of the National Forest. The Lake Tarleton Coalition, some members of which are also Standing Trees members, continues the grassroots effort to uphold this conservation victory. Together, Standing Trees and the Lake Tarleton Coalition have earnestly engaged the Forest Service to consider alternatives to the proposed project on several occasions.

### B.     <u>"Alternatives" Analysis</u>

56.     Throughout its review of the Tarleton project, the Forest Service failed to discuss or otherwise consider alternatives to the proposed project.

57.     In its comment on the Tarleton draft EA, Standing Trees proposed one alternative that would have fewer and less significant impacts on numerous environmental resources than

the project as proposed. Standing Trees stressed that the Forest Service must consider alternatives that would authorize less logging as well as the crucial no-action alternative, which would authorize no logging.

58.     In its objection to the project, Standing Trees reiterated its proposed alternative and the evidence in the record of the significant environmental impacts overlooked by the Forest Service.

59.     Standing Trees' proposed alternative would increase wildlife habitat diversity and improve forest health through small-scale habitat restoration and the redesignation of land around Lake Tarleton as a "Scenic Area" under the Forest Plan. But the Forest Service dismissed this alternative for purportedly not meeting the project's purpose and being beyond the project's scope. U.S. Forest Serv., Tarleton Objection Response at 5 (Sept. 2023) (Tarleton Objection Response).[4]

60.     The final EA did not consider any alternatives. It contained a short section entitled "Consequences of No Action," which stated—without citing any support or further explanation or analyzing the potential benefits—that "taking no action would not meet the need to advance forest plan goals or wildlife habitat diversity objectives in the Tarleton [Habitat Management Unit]." Tarleton Final EA at 8.

### C.     Project Impacts

61.     In total, the Tarleton project would commercially log nearly 700 acres of forest, including mature forest, and reconstruct one and a half miles of road. The project will require years' worth of intrusion by workers and vehicles engaged in logging and roadwork.

---

[4] The Tarleton Project Objection Response is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1325681761761.

62.     Logging is proposed to take place within 300 feet of Lake Tarleton and within 500 feet of the Appalachian Trail. Logging would make it impossible for views along the Appalachian Trail to meet the Forest Plan's "high" Scenic Integrity Objective for up to 15 years.

63.     Without establishing adequate baselines or considering cumulative impacts, the Forest Service cannot claim to know whether the project's impacts will be significant. Specifically, the Service's assessment of climate change, water quality, endangered species, and scenic and other resources failed to capture the full significance of the project's environmental impacts for the reasons described below.

*1.  Climate and Carbon Storage*

64.     Regarding climate impacts, the final EA stated that "in the near-term, [the project] might contribute an extremely small quantity of [GHG] emissions relative to national and global emissions[,] . . . [and] any carbon initially emitted from the proposed action [will] have a temporary influence on atmospheric [GHG] concentrations, because carbon will be removed from the atmosphere over time as the forest regrows." Tarleton Final EA at 20. The Service also asserted that the projects would somehow yield a "long-term net benefit in terms of resiliency to climate change and GHG emission[s]." Tarleton Objection Response at 7. But the Service reached these conclusions without using the best available science, attempting to quantify the GHG emissions likely to result from their major decisions, or considering the cumulative effects of the project when assessed alongside similar, contemporaneous projects, *see* Table 1, *supra*.

65.     In its comment and objection, Standing Trees provided scientific evidence that (1) timber harvesting accounts for 86% of annual forest carbon loss in the northeastern U.S.; (2) the rate of carbon sequestration increases as trees age, with carbon storage maximized in unlogged stands; and (3) among land uses generally, timber harvesting has the greatest relative

impact on aboveground carbon storage regionally. The Service did not explain its decision to dismiss this science. Even if the Service dismissed the provided literature as not being the best, the Service did not provide a reasoned basis for dismissing it.

66.     Rather, the Forest Service dismissed this evidence for being general in nature, rather than site-specific, but the Service abandoned that rationale in other contexts, e.g., by relying on non-site-specific water quality data within the same document. Additionally, the Service claimed to "document[] consideration of the scientific papers brought forward by the public," but the response omits any consideration of the scientific evidence submitted by Standing Trees. Tarleton Objection Response at 3.

67.     Moreover, the Forest Service itself recognized the importance of protecting and restoring mature and old-growth forests for biodiversity, carbon storage, and climate resiliency. *See* U.S. Forest Serv., Climate Adaptation Plan at 13 (July 2022) (Climate Adaptation Plan). But the Service's conclusion here—that the goals of the Forest Plan can only be satisfied by the Tarleton project as proposed—was inconsistent with this internal management direction.

68.     The Forest Service also failed to acknowledge Executive Order 14072, which requires the Service to "retain and enhance carbon storage[.]" Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851, 24852 (Apr. 27, 2022).

69.     Furthermore, the Forest Service did not measure both project-specific and cumulative GHG emissions from other reasonably foreseeable actions, including the Service's own logging projects in the National Forest. *See* Table 1, *supra*.

70.     In sum, the Forest Service (1) did not use the best available science; (2) made the qualitative assertion that the project will have *de minimis* climate impacts without any quantitative, project-specific science to support it; (3) disregarded the Service's own science as

16

well as applicable executive direction; and (4) did not undertake the necessary cumulative impacts analysis.

*2.   Water Quality*

71.     Regarding water quality impacts, the final EA concluded that "[n]o measurable adverse effects to water quality or quantity are expected due to project implementation." Tarleton Final EA at 21.

72.     The Forest Service did not identify a baseline for water quality, without which there is simply no way to determine the significance of the project's environmental impacts. Rather, as Standing Trees raised in its objection, the Service relied on an assessment of water quality impacts over 50 miles away at the Albany South project site, concluding that the Albany South impacts analysis should be "broadly applicable" to the Tarleton project. *Id*. at 21.

73.     Although the Forest Service stated that herbicides may be used in this project, *see id*. at 18, the Service did not discuss the impacts of such herbicide application on water quality in the project area.

74.     The Forest Service also did not mention the impacts to water quality that might stem from the proposed construction of a boat launch on Lake Katherine in the final EA— namely, the heightened risk of introducing invasive species from other waterbodies—an important omission given Lake Katherine's particularly high water quality.

75.     In sum, the Forest Service (1) did not establish a baseline for water quality in the project area; (2) used mismatched science for site-specific analysis; (3) omitted any consideration of the impacts of herbicide treatment in the project area; and (4) did not consider the impacts of the proposed boat launch on Lake Katherine.

### 3. Northern Long-Eared Bat

76. The northern long-eared bat is classified as endangered under the Endangered Species Act. *See* Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 73488 (Nov. 30, 2022).

77. The northern long-eared bat depends on mature and old forests for roosting and foraging—preferably large-diameter trees with exfoliating bark, cavities, or crevices for roosting. The bats favor unfragmented habitat for foraging.

78. This project occurs within the northern long-eared bat's habitat, and according to data published in 2004, specimens have been captured in the project area. *See* U.S. Forest Serv., Tarleton Project Biological Evaluation at 9 (Sept. 2023) (Tarleton Biological Evaluation).[5]

79. The Forest Service "assumed" the bat's presence in the project area. *Id*. At the same time, however, without conducting any new surveys the Service claimed that there were "no known hibernacula or maternity roosts within the [project] area." *Id*. The Service relied on not knowing of any hibernacula or roosts in the project area to conclude that the project would not have direct effects on the bat. *Id*. This departs from the Forest Plan, which requires the Forest Service "contribute to conservation and recovery of [endangered] species and their habitats." Forest Plan at 1-8.

80. Together with recently approved and anticipated projects in the National Forest— including the Peabody West project—the Forest Service plans to eliminate or degrade several thousand acres of northern long-eared bat habitat. *See* Table 1, *supra*.

---

[5] The Tarleton Project Biological Evaluation is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1361273126290.

81.     But the Forest Service limited the scope of the project's cumulative impacts review to the Tarleton Habitat Management Unit and did not take similar, nearby projects into account. *See* Tarleton Biological Evaluation at 7.

### 4.  Scenic Resources

82.     Regarding scenic resource impacts, the Forest Service concluded that "[s]ome visual impacts from the proposal can be expected, however these impacts would be most apparently [sic] immediately following timber harvest and would fade and blend over time as the forest regenerates." Tarleton Final EA at 21.

83.     The project would involve logging on Appalachian National Scenic Trail lands (MA 8.3) and General Forest Management lands (MA 2.1).[6]

84.     As relevant here, the Forest Plan provides the following Scenery Management Standards and Guidelines:

- Standard S-1 for MA 8.3: "The [Appalachian Trail] is a Concern Level 1 Travelway, and middlegound and background areas on National Forest lands seen from the [Appalachian Trail] must be managed for scenery in accordance with Scenic Integrity Objectives[.]" Forest Plan at 3-52.

- Standard S-2 for MA 8.3: "All management activities will meet a Scenic Integrity Objective of High or Very High." *Id*.

- Guideline G-1 for MA 2.1: "[N]o more than 9 percent" of the area within landscapes viewed from the Appalachian Trail, among other significant viewpoints, should be subject to even-aged logging over a single 30-year period. *Id*. at 3-6. "Total area affected

---

[6] Management Areas (MA) are the group of land areas allocated to similar management goals. Forest Plan Glossary at 17.

during any one entry period with new ['even-aged' logging] should not exceed 4 percent of the acreage." *Id*.

85.     But the Forest Service failed to establish a baseline of previously logged acres, without which there is simply no way to determine the significance of the project's environmental impacts.

86.     For example, the Tarleton Scenery Specialist Report stated that "substantial harvesting happened from the mid 1980's through the mid 1990's throughout the Lake Tarleton viewshed." U.S. Forest Serv., Tarleton Scenery Specialist Report at 7 (Nov. 2023).[7] But the Service did not have specific information about "what type of harvest occurred and when it occurred." *Id.* In other words, the Service has not disclosed the extent of the impacts near the beginning of that 30-year range. This information is necessary to evaluate whether the project would exceed the 9 percent harvest threshold in the applicable Forest Plan guidelines.

87.     Finally, Standing Trees objected to the Forest Service's failure to select a viewpoint within Lake Tarleton. In its response to Standing Trees, the Service stated, "[v]iewpoints within the boundary of Lake Tarleton itself were not selected . . . because they would not be fixed points that could be precisely revisited for scenery monitoring over time." Tarleton Objection Response at 27. It is beyond dispute that geographic coordinates can be used to do just that.

88.     In sum, the Forest Service (1) did not disclose the extent of logging during the early and mid-1990s, which is necessary to determine whether the Service's actions would exceed the 30-year harvest threshold in the Forest Plan for viewpoints visible from the

---

[7] The Tarleton Project Scenery Specialist Report is viewable on the Service's website at
https://usfs-public.app.box.com/v/PinyonPublic/file/1361272101061.

Appalachian Trail; and (2) failed to articulate a credible rationale for not selecting a viewpoint within Lake Tarleton.

*5. Other Resource Impacts*

89.     Regarding recreational impacts, the Forest Service stated—while acknowledging the proposed logging's "confict[ing]" nature with MA 8.3 land use standards—that "potential noise impacts to hikers along the Appalachian Trail . . . would be minimized" due to a 500-foot buffer to the Appalachian Trail and through limiting logging to the winter. U.S. Forest Serv., Tarleton Recreation Specialist Report at 6; Tarleton Final EA at 21. The Service also claimed—with no analysis in the record—that "[p]otential noise impacts to winter recreation users . . . would be reduced from the lake with the 300 foot no-cut buffer." *Id.*

90.     Regarding soil health, the Forest Service likewise claimed that following "best management practices" alongside "design features related to this project" will ensure that only "non-detrimental" soil erosion, compaction, and nutrient cycling will occur in the project area. Tarleton Final EA at 22. But the Service made this claim without defining or substantiating how soil impacts would be "non-detrimental." Nor did the Service disclose cumulative impacts of soil erosion, compaction, and nutrient cycling across similar, contemporaneous projects.

91.     Regarding vegetation health, the Forest Service claimed that project goals include "increas[ing] age-class diversity" and "promot[ing] wildlife habitat objectives." Tarleton Final EA at 6. But the record does not contain any data on stand ages or early-successional habitat in either the project area or the National Forest in a format conducive to independent review. Thus, the Service did not—and cannot—show how the project advances its purported goals. Moreover, the Service did not acknowledge Executive Order 14072, which requires agencies to "conserve . . . mature and old-growth forests on Federal lands[.]" Strengthening the Nation's Forests,

Communities, and Local Economies, 87 Fed. Reg. 24851, 24851 (Apr. 27, 2022). The Order also directs the Service to manage the National Forest to "retain and enhance carbon storage[,] conserve biodiversity . . . enhance climate resilience, . . . [and] provide outdoor recreational opportunities[.]" *Id.* at 24852.

*6.   Cumulative Impacts*

92.    The Forest Service's cumulative impacts review consisted merely of the conclusion that "[t]he incremental impacts of this project when overlapped in time and space with other projects with similar impacts would be minor or less[,]" and that "[t]herefore, there would be no significant cumulative impacts as a result of implementing this project." Tarleton Final EA at 25.

93.    As noted, the Forest Service took a *de minimis* approach to GHG emissions, which truncated its review of climate impacts. The Service asserted that the project—alone, without regard to similar, contemporaneous logging projects in the very same National Forest— would "contribute an extremely small quantity of [GHG] emissions relative to national and global emissions[.]" *Id.* at 20.

94.    Similarly, the Forest Service truncated its review of all environmental impacts: The Service acknowledged that the project would "occur over an area totaling less than about one percent of the total acreage within the [National Forest] . . . over a 5- to 10-year period." Tarleton Final EA at 24. But other past, present, and reasonably foreseeable future projects in the National Forest are glaringly absent from the Service's review of cumulative impacts.

95.    Thus, the Forest Service did not—and could not—determine whether project impacts—together with the impacts from recent, ongoing, or reasonably foreseeable future projects in the National Forest—are cumulatively significant. Specifically, the Service failed to

consider the environmental impacts resulting from the Bowen Brook Integrated Resource Project, Deer Ridge Integrated Resource Project, Wanosha Integrated Resource Project, Cold River Integrated Resource Project, Peabody West Integrated Resource Project, Hales Location Wildfire Resiliency Project, Sandwich Vegetation Management Project, and Lost River Integrated Resource Project. *See* Table 1, *supra*.

96.     For the foregoing reasons, the Forest Service failed to take a hard look at the Tarleton project's environmental impacts.

### D.     Project Final EA and FONSI

97.     In its final EA and FONSI, the Forest Service failed to demonstrate that the project would not significantly affect the environment. This includes demonstrating whether the project would affect the environment to a significant extent that the Service has not already considered.

98.     The Forest Plan is a "strategic, programmatic document that does not make project-level decisions," and it envisions that the Service will make any necessary evaluations at the outset of project planning. Forest Plan at v.

99.     Here, the Forest Service did not make the necessary evaluations at the outset (or any other point) of planning the Tarleton project. Notably, this omission includes new information that was not available to the Service when it developed the Forest Plan. For example, the Forest Service disregarded its own recent research on the role of forests in climate adaptation. *See generally* Climate Adaptation Plan. Also, the northern long-eared bat was recently added to the federal endangered species list. The Service did not have the opportunity to consider such information in its decades-old Forest Plan. Nor did it consider the information here.

100.     Furthermore, in reviewing the significance of the project, the Forest Service summarily concluded that "the effects of the proposed action are limited in context[,]" declaring that the project would "occur over an area totaling less than about one percent of the total acreage within the [National Forest] . . . over a 5- to 10-year period." Tarleton Final EA at 24. Although that statement identified the scope of the project area, it failed to properly identify the geographic context for the Service's analysis, which would have been necessary to make an initial significance determination. *See* 40 C.F.R. § 1508.27(a).

101.     The Forest Service also failed to consider how the Tarleton project's "impacts that may be both beneficial and adverse" contribute to the project's significance. *Id.* § 1508.27(b)(1). The Service claims that the final EA "describes both the potential beneficial and adverse impacts of the Proposed Action in terms of context and intensity," Tarleton Final EA at 25, but that document contains no discussion of the well-studied risks posed by logging, which include the spread of invasive species, increased erosion, decreased water quality, soil compaction, and diminished capacity for carbon storage and sequestration.

102.     Additionally, the Forest Service failed to acknowledge that the "unique characteristics" of the Tarleton project area merited further analysis as part of an EIS. 40 C.F.R. § 1508.27(b)(3). Most notably, Lake Tarleton is the largest lake in the National Forest, but the Service asserts that the project area is "not unique" and that "similar areas can be found on several parts of the [National] Forest." Tarleton Final EA at 25.

103.     Moreover, the Forest Service summarily dismissed substantial disputes as to the size, nature, and effects of the action on the environment that are "highly controversial." 40 C.F.R. § 1508.27(b)(4). The Service asserted that "[the project team] considered current scientific research, including that submitted by the public, . . . and found no controversy related

to the predicted effects." Tarleton Final EA at 25. There were substantial disputes concerning, *inter alia*, the proper management of early-successional habitat; the capacity of mature forests to capture and store carbon; best management practices for climate adaptation and resilience; and the extent of intact forests' benefits for water quality.

104.    As noted, the Forest Service has failed to consider similar, contemporaneous projects. Therefore, the Service cannot claim to know whether the project will be "cumulatively significant[.]" 40 C.F.R. § 1508.27(b)(7).

105.    Finally, as discussed above, the Forest Service relied on not knowing of any hibernacula or roosts in the project area to examine the "degree to which the action may adversely affect" the endangered northern long-eared bat and its habitat as part of the Service's final EA for the project. *Id.* § 1508.27(b)(9).

### E.     Project Compliance with the Forest Plan

106.    The Tarleton project is inconsistent with the Forest Plan.

107.    As noted in Section II(C)(4), the Forest Service failed to quantify a baseline on which the Service might rationally base a conclusion that no more than 9% of the viewed landscape for a given Concern Level 1 Travelway viewpoint has been subject to regeneration-age logging in the past 30 years. This violates MA 2.1 Guideline G-1. *See* Forest Plan at 3-52.

108.    Regarding logging in old-growth forest or old-forest habitat, the Forest Service failed to publicly disclose information about the age of forest stands in the Tarleton project area, despite the Forest Plan's prohibitions on logging in old-growth forest or old-forest habitat.[8]

---

[8] *See* Forest Plan Glossary at 21 (including in the definition of "Old Forest Habitat" that "[n]o harvest will occur in stands identified to provide old forest habitat"); *see also* Forest Plan at 2-13 ("Timber harvest is prohibited in old-growth forest.").

Without such information, the public could not have either ensured (1) that project would actually avoid harvest in old-growth forest or in stands that provide old-forest habitat; or (2) that the project is necessary to meet the Forest Plan's age-class goals.

109.    The fact that the science on which the Forest Service relied is so outdated also conflicts with the Service's own Planning Rule, which requires plans to be "responsive[] to changing conditions[.]" 36 C.F.R. § 219.1(b)(14) (1982); *see also* 36 C.F.R. § 219.5(a) (requiring forest management that would allow the Service to "adapt to changing conditions, including climate change, and improve management *based on new information and monitoring*") (emphasis added). Here, not only has the Service failed to respond to new information regarding climate change and the northern long-eared bat in the National Forest since 2005, but it also refused to consider new information provided by Standing Trees.

110.    Furthermore, despite Standing Trees having offered numerous peer-reviewed scientific studies that were published more recently than the science on which the Forest Service relies, the Service failed to consider such science. The studies on which the Service relied objectively do not constitute the "latest" scientific knowledge. This departs from the Forest Plan, which requires the Service to manage the forest using "the latest scientific knowledge" Forest Plan at 1-3.

111.    The Forest Service stated that the project "may affect, but is unlikely to adversely affect" the northern long-eared bat. Tarleton Final EA at 19. But the Service failed to include any measures that are designed to contribute to the recovery of the bat. Nor did the Service propose any species-specific actions to provide the ecological conditions necessary for the bat's recovery.

112.    In sum, the final EA failed to (1) establish the baseline necessary to determine whether the project will comply with scenic guidelines; (2) publicly demonstrate that the Service

will not harvest timber in old-growth forests or stands with old-forest habitat; (3) consider new information; and (4) contribute to conservation and recovery of the northern long-eared bat.

### F.   Project Final Decision

113.   On November 13, 2023, the Forest Service authorized the Tarleton project after issuing its final EA and FONSI concluding that the project would not have a significant impact on the environment. As discussed above, this conclusion is arbitrary and capricious, and was made over Standing Trees' timely objection.

114.   Because the Forest Service may implement the project at any time, harm to Plaintiff's members' interests in protecting the Tarleton project area is imminent.

## III.   PEABODY WEST PROJECT

115.   The Forest Service asserted that "[t]he project is needed to provide a sustainable yield of high-quality timber products and to improve wildlife habitat diversity within the Peabody West [Habitat Management Unit], thereby helping to achieve the desired future conditions for wildlife and vegetation described in Chapter 1 of the Forest Plan." U.S. Forest Serv., Peabody West Project Final Environmental Assessment and Finding of No Significant Impact at 6 (Apr. 2023) (Peabody West Final EA).[9] Such broad objectives can be achieved in myriad ways. Yet—just as it did with respect to the Tarleton project—the Service arbitrarily reviewed only the initial proposal for the Peabody West project.

116.   On August 4, 2022, the Forest Service issued its draft EA and FONSI for the Peabody West project, on which Standing Trees submitted a timely comment. On April 27, 2023,

---

[9] The Forest Service's environmental documents for the Peabody West project are available on the Service's website at https://www.fs.usda.gov/project/?project=55659. The Peabody West Final EA and FONSI is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1200238908343.

the Forest Service released its final EA and FONSI and draft decision notice, to which Standing Trees timely objected. On October 18, 2023, the Forest Service rejected Standing Trees' objection.

### A.      Project Area

117.   The Peabody West project area, near Gorham, New Hampshire, is in the Presidential Range, north of the Great Gulf Wilderness and Mount Washington. The Appalachian Trail traverses the project area, which has long been cherished for its stunning mountain peaks, stands of mature hardwood forests, and awe-inspiring mountain hiking trails.



*Peabody West project area*
*Source: Peabody West Final EA (Forest Service photo by Jeff Williams)*

### B.      "Alternatives" Analysis

118.   Throughout its review of the Peabody West project, the Forest Service failed to discuss or otherwise consider alternatives to the proposed project.

28

119.    In its comment on the Peabody West draft EA, Standing Trees proposed one alternative that would have fewer and less significant impacts on numerous environmental resources than the proposed project. Standing Trees stressed that the Forest Service must consider alternatives that would authorize less logging as well as the crucial no-action alternative, which would authorize no logging.

120.    In its objection to the project, Standing Trees reiterated its proposed alternative and the evidence in the record of the significant environmental impacts overlooked by the Forest Service.

121.    The Forest Service dismissed Standing Trees' proposed alternative for failing to meet the project's purported purpose and need. U.S. Forest Serv., Peabody West Objection Response at 2 (Oct. 2023).[10]

122.    The final EA did not consider any alternatives. It contained a short section entitled "Consequences of No Action," which stated— without citing any support or further explanation or analyzing the potential benefits—that "taking no action would not meet the need to advance forest plan goals or wildlife habitat diversity objectives in the Peabody West [Habitat Management Unit]." Peabody West Final EA at 21.

### C.    Project Impacts

123.    In total, the Peabody West project would commercially log nearly 2,200 acres within primarily mature forest and construct or reconstruct nearly 10 miles of road. Over 600 acres of logging are proposed to take place in the Great Gulf Inventoried Roadless Area. Without establishing adequate baselines or considering cumulative impacts, the Forest Service cannot

---

[10] The Peabody West Project Objection Response is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1338855440652.

claim to know whether the project's impacts will be significant. Specifically, the Service's assessment of climate change, water quality, endangered species, and scenic and other resources failed to capture the full significance of environmental impacts for the reasons described below.

1.  *Climate and Carbon Storage*

124.    Much like the Forest Service's Tarleton project review, the Peabody West final EA stated that "in the short-term, [the project] might contribute an extremely small quantity of [GHG] emissions relative to national and global emissions[,] . . . [and] carbon would be removed from the atmosphere over time as the forest regrows. Therefore, effects . . . would be negligible." Peabody West Final EA at 24. But these speculative conclusions do not meet NEPA's "hard look" standard, which requires that federal agencies use the best available science, attempt to quantify the GHG emissions likely to result from their major decisions, and consider the cumulative effects of the project when assessed alongside similar, contemporaneous projects.

125.    In its comment and objection, Standing Trees provided scientific evidence that (1) timber harvesting accounts for 86% of annual forest carbon loss in the northeastern U.S.; (2) the rate of carbon sequestration increases as trees age, with carbon storage maximized in unlogged stands; and (3) among land uses generally, timber harvesting has the greatest relative impact on aboveground carbon storage regionally. The Forest Service did not explain its decision to dismiss this science. Even if the Service dismissed the provided literature as not being the best, the Service did not provide a reasoned basis for dismissing it.

126.    Rather, the Forest Service dismissed this evidence for being general in nature, rather than site-specific, but the Service abandoned that rationale in other contexts, e.g., by relying on non-site-specific water quality data within the same document. *See* Peabody West Final EA at 24.

30

127.    Moreover, the Forest Service itself recognized the importance of protecting and restoring mature and old-growth forests for biodiversity, carbon storage, and climate resiliency. Climate Adaptation Plan at 13. But the Service's conclusion here—that the goals of the Forest Plan can only be satisfied by the Peabody West project as proposed—was inconsistent with this internal management direction.

128.    The Final EA also failed to acknowledge Executive Order 14072, which requires the Forest Service to "retain and enhance carbon storage[.]" Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851, 24852 (Apr. 27, 2022).

129.    Furthermore, the Forest Service must measure both project-specific GHG emissions and cumulative emissions from other reasonably foreseeable actions, including the Service's own logging projects. But the Service did not.

130.    In sum, the Forest Service (1) did not use the best available science; (2) made the qualitative assertion that the project will have *de minimis* climate impacts without any quantitative, project-specific science to support it; (3) disregarded the Service's own science as well as applicable executive direction; and (4) did not undertake the necessary cumulative impacts analysis.

## 2.   Water Quality

131.    Regarding water quality impacts, the Forest Service claimed that there is "a high confidence of no measurable effect on water quality resulting from timber harvest" when the

basal area removed in a watershed containing a perennial stream does not exceed 20 percent. Peabody West Final EA at 24.[11]

132.     Here, the project would exceed that threshold with respect to 12 distinct watersheds, which "rang[e] in size from 9 acres to 698 acres." *Id.*

133.     The Forest Service purported that, because 7 of the 12 do not provide perennial fish habitat, "*there are no concerns about changes in water quality in these seven watersheds*." *Id.* (emphasis added). This declaration is inconsistent with the Forest Plan's direction, which applies regardless of the presence of fish.[12]

134.     After eliminating 7 of the watersheds from genuine consideration because they supposedly do not contain perennial fish habitat, the Forest Service conceded that, of the 5 remaining, the highest percent basal area removed is 27%. *Id.*

135.     Furthermore, echoing verbatim the Tarleton project EA, the Service inexplicably relied on non-site-specific analysis.

136.     Thus, the Forest Service never established a baseline for the actual project area's water quality.

---

[11] "Basal area" refers to "the area of the cross section of a tree at 4-1/2 feet above the ground. Generally expressed as total basal area per acre." Forest Plan Glossary at 5. Basal area is commonly measured to assess the density and productivity of a forest stand.

[12] *See generally* 2005 White Mountain National Forest Plan (making no mention of the value of perennial water streams where fish are present); *see also id*. at 1-17 to 1-18 (listing "Water Resources" goals as "water quality is maintained or improved to protect existing and designated instream water uses such as aquatic life," and "[w]atersheds will continue to provide high quality water for public water supplies, recreational activities, aquatic biota such as fish, and other purposes").

137.    In sum, the Forest Service (1) relied on reasoning that contradicts the Forest Plan to justify the Service's project; (2) used mismatched science to dismiss site-specific impacts; and (3) failed to establish the necessary baseline for water quality in the project area.

*3.   Northern Long-Eared Bat*

138.    As discussed in Section II(C)(3), northern long-eared bats have been documented throughout the National Forest.

139.    The Forest Service "assumed" the bat was present for project review. Peabody West Integrated Resource Project Biological Evaluation and Wildlife Report at 7 (Apr. 2023) (Peabody West Biological Evaluation).[13]

140.    At the same time, however, the Forest Service claimed that there were "no known hibernacula or maternity roosts within the [project] area." *Id.* The Service, without conducting any new surveys, relied on not knowing of any hibernacula or roost trees existing in the project area to conclude that direct effects on the bat would be limited to logging during summer and fall and tree removal related to bike-trail construction. *Id*. This departs from the Forest Plan, which requires the Forest Service "contribute to conservation and recovery of [endangered] species and their habitats." Forest Plan at 1-8.

141.    The Forest Service admitted—without further analysis or explanation—that there is a "risk of impacting maternity colonies with the degree of tree removal proposed." Peabody West Biological Evaluation at 7.

---

[13] The Peabody West Project Biological Evaluation is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1200243326958.

142.     Together with recently approved and anticipated projects in the National Forest—including the Tarleton project—the Forest Service plans to eliminate or degrade several thousand acres of northern long-eared bat habitat. *See* Table 1, *supra*.

143.     Just as it did with the Tarleton project, the Forest Service limited the Peabody West project's cumulative impacts review to the Peabody West Habitat Management Unit, without taking similar, nearby projects into account. *See* Peabody West Biological Evaluation at 6–7.

*4.   Scenic Resources*

144.     Regarding scenic resource impacts, the final EA concluded the project's scenic impacts "exceed the Forest Plan" for three large "even-aged" logging cuts, ranging in size from a 9-acre patch cut to a 26-acre clearcut. Peabody West Final EA at 22.

145.     The final EA stated that "three relatively large even-aged treatment units" exist in the project area: "a 26-acre clearcut . . . a 9-acre patch cut . . . and the expansion of an existing permanent wildlife opening to about 19 acres." Peabody West Final EA at 22.[14] These opening sizes vastly exceed the recommendations under Forest Plan guidelines, which limit "observed size[s]" to 4-5 acres for "high" scenic integrity areas and 10 acres for "moderate" scenic integrity areas. Forest Plan at 3-6 to 3-8.

---

[14] These lands are designated MA 2.1 and are subject to Forest Plan Guideline G-3. *See* Forest Plan at 3-7.

146.    Rather than analyzing alternatives with less logging that would nonetheless adhere to the Forest Plan, the final EA bypassed that necessary analysis and failed to disclose scenic impacts by instead relying on a future determination.[15]

147.    The Forest Service attempted to justify its guideline departures by asserting that "the larger acreage is intended to better meet project-level objectives for the Peabody West [Habitat Management Unit], and to move the forest toward desired conditions consistent with the Forest Plan." Peabody West Final EA at 22. The Service relied on two presumptions: first, that project-level goals can outweigh forest-wide management direction, and second, that failing to comply with Forest Plan management direction is permissible so long as the Service intends for such violations to move the forest *generally* toward Forest Plan desired conditions. These presumptions are inconsistent with the Forest Plan.

148.    In sum, the Forest Service failed to evaluate or credibly justify the project's significant proposed departure from Forest Plan guidelines regarding the maximum size of created openings.

*5.   Other Resource Impacts*

149.    Regarding recreational impacts, the Forest Service stated that "[o]verall, effects from closures or other restrictions on recreation activities would be minimal, localized, and would not persist past project implementation." U.S. Forest Serv., Peabody West Recreation Specialist Report at 2 (Sept. 2022).[16] But the Service plans to conduct logging and roadwork

---

[15] *See* Peabody West Final EA at 15 (stating that the "Forest Landscape Architect [will] review final layouts . . . to ensure that openings are well-distributed in the landscape to the maximum extent practical").

[16] The Peabody West Project Recreation Specialist Report is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/1200238994549.

during the winter as well as the summer and fall, the busiest seasons for hikers, campers, and other recreationists. Although the Service limited logging in units 67 and 78–80 to winter, it arbitrarily authorized summer and fall logging in or near units 65 and 68–74, which, like units 67 and 78–80, are adjacent to or overlap hiking trails. Peabody West Final EA at 14, 19.

150.    Regarding cultural resource impacts, the Forest Service summarily dismissed the impacts to both the water quality and eligibility for federal wild and scenic designation of the two eligible river segments in the project area, the Peabody River and the West Branch of the Peabody River, and failed to properly justify its deviation from the Forest Plan. The Service stated that "[a]bout 14 total acres are proposed for even-aged silvicultural treatment within 0.25 mile[s] . . . of the two eligible rivers." Peabody West Final EA at 26–27. Within these acres, the nearest logging units are as close as 0.1 miles to either river. *Id*. at 27. Despite "even-aged" logging taking place so close to rivers, the Service arbitrarily concluded that its project will only affect the rivers' eligibility for designation in the "short-term." *Id.*

151.    Regarding vegetation health impacts, the Forest Service claimed that the purpose of the project is to "advance Forest Plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources in the Peabody West Habitat Management Unit[.]" Peabody West Final EA at 1. But the Service did not disclose any data on stand ages or early-successional habitat in either the project area or the National Forest. Thus, the Service did not—and cannot— show how the project advances its purported goals. Moreover, the Service did not acknowledge Executive Order 14072, which requires agencies to "conserve . . . mature and old-growth forests on Federal lands[.]" Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851, 24851 (Apr. 27, 2022). The Order also directs the Service to manage the

National Forest to "retain and enhance carbon storage[,] conserve biodiversity . . . enhance climate resilience, . . . [and] provide outdoor recreational opportunities[.]" *Id.* at 24852.

152.    Regarding impacts on inventoried roadless areas (IRAs), the Forest Service concluded that the project would have "limited, short term effects on the Great Gulf IRA and would therefore not impact future eligibility for the Great Gulf IRA as potential wilderness." U.S. Forest Serv., Peabody West Roadless Effects Summary at 2 (May 2022).[17] At face value, this assessment still failed to account for the project's impacts on the remaining three "suitability" components of the Chapter 70 wilderness-evaluation process: (1) the future evaluation of wilderness characteristics; (2) analysis; and (3) recommendation. *See* U.S. Forest Serv., FSH 1909.12 – Land Management Planning Handbook Chapter 70 – Wilderness at 4–5.

153.    Although the Forest Service has indeed already assessed the Great Gulf IRA— and even if it did "reach[] definitive conclusions"—the Service irrationally concluded that, more than 20 years later, "the Peabody West project's analysis need not consider the Great Gulf IRA's suitability and potential for wilderness recommendation and designation by Congress[.]" Peabody West Objection Response at 15. Additionally, the Service admitted that it did not address impacts to many of such areas' unique characteristics, including their "high quality or undisturbed soil, water, and air." *Id*. at 16.

### 6.  Cumulative Impacts

154.    The final EA concluded that "[t]he incremental impacts of this project when overlapped in time and space with other actions with similar impacts would not result in significant cumulative impacts." Peabody West Final EA at 30.

---

[17] The Peabody West Project Roadless Effects Summary is viewable on the Service's website at https://usfs-public.app.box.com/v/PinyonPublic/file/992714716427.

155.     As noted, the Forest Service took a *de minimis* approach to GHG emissions, which truncated its review of climate impacts. The Service asserted that the project—alone, without regard to similar, contemporaneous logging projects in the very same National Forest— would "contribute an extremely small quantity of [GHG] emissions relative to national and global emissions[.]" *Id*. at 24.

156.     Similarly, the Forest Service truncated its review of all environmental impacts: The Service acknowledged that the project would "[include] about 3,000 acres . . . of lands administered by the WMNF[, and would] occur over several years." *Id*. at 28. But other past, present, and reasonably foreseeable future projects in the National Forest are glaringly absent from the Service's review of cumulative impacts.

157.     Thus, the Forest Service did not—and could not—determine whether project impacts—together with the impacts from recent, ongoing, or reasonably foreseeable future projects in the National Forest—are cumulatively significant. *See* Table 1, *supra*.

158.     For the foregoing reasons, the Forest Service failed to take a hard look at the Peabody West project's environmental impacts.

### D.     <u>Project Final EA and FONSI</u>

159.     In its final EA and FONSI, the Forest Service failed to demonstrate that the project would not significantly affect the environment. This includes demonstrating whether the project would affect the environment to a significant extent that the Service has not already considered.

160.     The Forest Plan is a "strategic, programmatic document that does not make project-level decisions," and it envisions that the Service will make any necessary evaluations at the outset of project planning. Forest Plan at v.

161.    Here, the Forest Service did not make the necessary evaluations at the outset (or any other point) of planning the Peabody West project. Notably, this omission includes new information that was not available to the Service when it developed the Forest Plan. For example, the Forest Service disregarded its own recent research on the role of forests in climate adaptation. *See generally* Climate Adaptation Plan. Also, the northern long-eared bat was recently added to the federal endangered species list. The Service did not have the opportunity to consider such information in its decades-old Forest Plan. Nor did it consider the information here.

162.    Furthermore, in reviewing the significance of the project, the Forest Service stated that "[t]he proposed project includes about 3,000 acres of the more than 800,000 acres of land administered by the WMNF." Peabody West Final EA at 28. Although this implies that the Service used the project area as the "context" for determining the project's significance in one respect, the Service then stated that "the potential environmental effects would be site-specific, localized to the project area, and would not be measurable at a regional or larger scale," implying that the project area cannot be used as the project's "context" in other respects. *Id*. The Service failed to properly identify the geographic context for the Service's analysis, which would have been necessary to make an initial significance determination. *See* 40 C.F.R. § 1508.27(a).

163.    The Forest Service failed to consider how the Peabody West project's "impacts that may be both beneficial and adverse" contribute to the project's significance. *Id.* § 1508.27(b)(1). The Service claimed that the final EA "considers both the potential beneficial and adverse impacts of the proposed action in terms of context and intensity," Peabody West Final EA at 29, but that EA contains no discussion of the well-studied risks posed by logging,

which include the spread of invasive species, increased erosion, decreased water quality, soil compaction, and diminished capacity for carbon storage and sequestration.

164.    Additionally, the Forest Service failed to acknowledge that the "unique characteristics" of the Peabody West project area merited further analysis to determine the project's significance. 40 C.F.R. § 1508.27(b)(3). Most notably, the Forest Service did not account for the unique characteristics of the Great Gulf Wilderness, the Great Gulf IRA, the Appalachian Trail corridor, eligible wild and scenic rivers, or potential northern long-eared bat habitat in the project area. Dismissing these unique characteristics, the Service asserted that the project area is "not unique[.]" Peabody West Final EA at 29.

165.    Moreover, the Forest Service summarily dismissed substantial disputes as to the size, nature, and effects of the action on the human environment that are "highly controversial." 40 C.F.R. § 1508.27(b)(4). The Service asserted that "[the project team] considered current scientific research, including that submitted by the public, . . . and found no scientific controversy related to the predicted effects." Peabody West Final EA at 29. To the contrary, there were substantial disputes concerning, *inter alia*, the proper management of early-successional habitat; the capacity of mature forests to capture and store carbon; best management practices for climate adaptation and resilience; and the extent of intact forests' benefits for water quality.

166.    As noted, the Forest Service has failed to consider similar, contemporaneous projects. Therefore, the Service cannot claim to know whether the project will be "cumulatively significant[.]" 40 C.F.R. § 1508.27(b)(7).

167.    As discussed above, the Forest Service relied on not knowing of the existence of bat hibernacula or roosts to examine the "degree to which the action may adversely affect" the endangered northern long-eared bat and its habitat. *Id.* § 1508.27(9).

40

### E.   Project Compliance with the Forest Plan

168.    The Peabody West project is also inconsistent with the Forest Plan.

169.    As noted in Section III(C)(4), the Forest Service failed to either adhere to Forest Plan direction concerning scenic resources or justify departing from such guidelines.

170.    Forest-wide Standard S-1 for Wild and Scenic Rivers directs the Forest Service to "[m]anage eligible rivers to maintain their classification and eligibility until Congress designates the segments or decides not to designate them[.]" Forest Plan at 2-32. The final EA did not acknowledge this standard, much less rationally justify deviating from it. Instead, the Forest Service summarily concluded—without providing any analysis—that the project's impacts will be "limited" and "short term." Peabody West Final EA at 27.

171.    Regarding logging in old-growth forest or old-forest habitat, the Forest Service failed to disclose information on the age of forest stands in the Peabody West project area, despite the Forest Plan's prohibitions on logging in old-growth forest or old-forest habitat. Without such information, the public could not have either ensured (1) that project would actually avoid harvest in old-growth forest or in stands that provide old-forest habitat; or (2) that the project is necessary to meet the Plan's age-class goals.

172.    The fact that the science on which the Forest Service relied is so outdated also conflicts with the Service's own Planning Rule, which requires plans to be "responsive[] to changing conditions[.]" 36 C.F.R. § 219.1(b)(14) (1982); *see also* 36 C.F.R. § 219.5(a) (requiring forest management that would allow the Service to "adapt to changing conditions, including climate change, and improve management *based on new information and monitoring.*") (emphasis added). Here, not only has the Service failed to respond to new information regarding

climate change and the northern long-eared bat in the National Forest since 2005, but it also refused to consider new information provided by Standing Trees.

173.     Furthermore, despite Standing Trees having offered numerous peer-reviewed scientific studies that were published more recently than the science on which the Forest Service relies, the Service failed to consider such science. The studies the Service relied objectively do not constitute the "latest" scientific knowledge. This departs from the Forest Plan, which requires the Service to manage the forest using "the latest scientific knowledge" Forest Plan at 1-3.

174.     Contrary to the Forest Plan, the Forest Service failed to include any measures that are designed to contribute to the recovery of the northern long-eared bat. Nor did the Service provide any species-specific plan components to provide the ecological conditions necessary for the bat's recovery.

175.     In sum, the final EA (1) failed to rationally justify its departure from the Forest Plan's scenic integrity objectives; (2) summarily dismissed the project's impacts on the eligibility of rivers in the project area for federal wild and scenic designation; (3) failed to publicly demonstrate that the Service will not harvest timber in old-growth forests or stands with old-forest habitat; (4) failed to consider new information; and (5) failed to contribute to conservation and recovery of the northern long-eared bat.

### F.     <u>Project Final Decision</u>

176.     On February 7, 2024, the Forest Service authorized the Peabody West project after issuing its final EA and FONSI concluding that the project would not have a significant impact on the environment. As discussed above, this conclusion is arbitrary and capricious, and was made over Standing Trees' timely objection.

177.    Because the Forest Service may implement the project at any time, harm to Plaintiff's members' interests in protecting the Peabody West project area is imminent.

## CLAIMS FOR RELIEF

### Claim 1: Failure to Consider Appropriate Alternatives Under NEPA and the APA

178.    Standing Trees incorporates the above allegations by reference.

179.    The Forest Service violated NEPA by failing to adequately consider appropriate alternatives during the preparation of the final EAs for the Tarleton and Peabody West projects. These decisions are arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

180.    The alternatives analysis—the "heart" of environmental reviews under NEPA—commands agencies to consider "appropriate" alternatives when preparing an EA. 40 C.F.R. §§ 1501.2(c), 1508.9(b); *see also* 42 U.S.C. § 4332(2)(E).

#### A)    Tarleton Project

181.    The Tarleton project is a major federal action that requires compliance with NEPA and its implementing regulations. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500–1508.

182.    The Forest Service's authorization of the Tarleton project was a final agency action for purposes of APA review. 5 U.S.C. § 704.

183.    In its comment on the EA for and its objection to the Tarleton project, Standing Trees proposed an alternative that would have reduced the size and scope of impacts to environmental resources. The Service dismissed the alternative for purportedly failing to achieve the project's purpose and need. Tarleton Objection Response at 5.

184.    The final EA does not consider any alternatives. It contains a short section entitled "Consequences of No Action," which states—without analyzing potential benefits—that "taking

no action would not meet the need to advance forest plan goals or wildlife habitat diversity objectives in the Tarleton [Habitat Management Unit]." Tarleton Final EA at 8.

185.    By failing to consider appropriate alternatives in preparing its EA or justify its consistent failure to genuinely explore alternatives and making a finding of no significant impact for the Tarleton project, the Forest Service violated NEPA.

186.    This failure to consider alternatives also violates the APA because it is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**B)      Peabody West Project**

187.    The Peabody West project is a major federal action that requires compliance with NEPA and its implementing regulations. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500–1508.

188.    The Forest Service's approval of the Peabody West project was a final agency action for purposes of APA review. 5 U.S.C. § 704.

189.    In its comment on the EA for and its objection to the Peabody West project, Standing Trees proposed an alternative to the existing proposal. The Service dismissed the alternative for purportedly failing to achieve the project's purpose and need and concluded that the Service satisfied any obligations to discuss alternatives by "describ[ing] the consequences of taking no action[.]" Peabody West Objection Response at 2.

190.    The final EA does not consider any alternatives. It contains a short section entitled "Consequences of No Action," which states—without analyzing potential benefits—that "taking no action would not meet the need to advance Forest Plan goals or the wildlife habitat diversity objectives in the Peabody West [Habitat Management Unit]." Peabody West Final EA at 21.

191.    By failing to consider appropriate alternatives in preparing its EA or justify its consistent failure to genuinely explore alternatives and making a finding of no significant impact for the Peabody West project, the Forest Service violated NEPA.

192.    This failure to consider alternatives also violates the APA because it is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

### Claim 2: Failure to Take a Hard Look Under NEPA and the APA

193.    Standing Trees incorporates the above allegations by reference.

194.    NEPA and its implementing regulations require the Forest Service to take a "hard look" at the environmental impacts of a project and its alternatives, including their direct, indirect, and cumulative impacts, when preparing an EA. 40 C.F.R. § 1508.9(b). Establishing baselines is critical to any NEPA review because without them, there is no way to determine the extent of the project's environmental impacts and, consequently, no way to comply with NEPA.

195.    Regarding GHG emissions, the Forest Service must also use appropriate tools and methodologies and the best available science to "quantity GHG emissions, compare GHG emissions quantities across alternative scenarios, . . . and place emissions in [the] relevant context[.]" National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change, 88 Fed. Reg. 1196, 1201 (Jan. 9, 2023). Additionally, "a statement that emissions from a proposed Federal action . . . represent only a small fraction of global or domestic emissions" does not satisfy NEPA because such a statement "is not a useful basis" for considering climate change impacts. *Id.*

196.    The Forest Service's Tarleton and Peabody West project reviews violate NEPA because they fail adequately to consider the direct, indirect, and cumulative environmental impacts of each project.

197.    These failures to take a "hard look" also violate the APA because they are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**A)    Tarleton Project**

198.    The Forest Service violated NEPA by failing to take the required "hard look" at the Tarleton project's environmental impacts, including impacts to the climate; water quality; the northern long-eared bat; scenic, recreational, and soil resources; and mature forest stands.

199.    Regarding water quality, the northern long-eared bat, and scenic resources, the Forest Service violated NEPA by relying on inapplicable or incomplete data. Establishing baselines is necessary to determine that the physical realities of the project area justify an agency's decision. By not identifying baselines, the Service fails to satisfy NEPA's requirement that agencies demonstrate a rational connection between the facts they find and the choices they make.

200.    The Forest Service also violated NEPA by failing properly to consider the direct, indirect, and cumulative environmental impacts from similar, contemporaneous projects in the same region, including the Peabody West project.

201.    These failures to take a "hard look" also violate the APA because they are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

**B)    Peabody West Project**

202.    The Forest Service failed to take the required "hard look" at the Peabody West project's environmental impacts, including impacts to the climate; water quality; the northern long-eared bat; scenic, recreational, and cultural resources; mature forest stands; and wilderness and inventoried roadless areas.

203.    Regarding water quality, the northern long-eared bat, and scenic resources, the Forest Service violated NEPA by relying on inapplicable or incomplete data. Establishing baselines is necessary to determine that the physical realities of the project area justify an agency's decision. By not identifying baselines, the Service fails to satisfy NEPA's requirement that agencies demonstrate a rational connection between the facts they find and the choices they make.

204.    The Forest Service also violated NEPA by failing properly to consider the direct, indirect, and cumulative environmental impacts from similar, contemporaneous projects in the same region, including the Tarleton project.

205.    These failures to take a "hard look" also violate the APA because they are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

### Claim 3: Unlawful Finding of No Significant Impacts

206.    Standing Trees incorporates the above allegations by reference.

207.    NEPA requires the Forest Service to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Agencies must prepare supplements to such statements where "new information . . . show[s] that the remaining action will affect the quality of the human environment . . . *to a significant extent not already considered*[.]" *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989) (emphasis added).

208.    New information has arisen with respect to, *inter alia*, climate change, endangered species, and vegetation health, and this information highlights significant project-related environmental impacts that the Forest Service has not already considered. Thus, the Forest Service cannot rely on its Forest Plan EIS to make a FONSI with respect to these projects.

209.     In determining whether a project is significant, the Forest Service must consider both the context and intensity of the action. 40 C.F.R. § 1508.27.

210.     Consideration of an action's "context" requires the deciding agency to analyze the action's significance to "society as a whole[], the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Both short- and long-term effects must be considered. *Id.* Assessing the significance of cumulative impacts—which, by definition, are comprised of constituent parts that may be individually insignificant—is impossible without identifying the geographic context, e.g., the National Forest or New England, within which such impacts are to be assessed.

211.     To determine the "intensity" of an action, the agency must evaluate the severity of the action's impact using certain factors enumerated in the regulations, as discussed below. *Id*. § 1508.27(b).

212.     The Forest Service's FONSIs for the Tarleton and Peabody West projects violate NEPA and the APA because the Service did not appropriately analyze the projects' context or intensity.

### A)     Tarleton Project

213.     The Forest Service did not properly identify the Tarleton project's geographic context, stating simply that it would "occur over an area totaling less than about one percent of the total acreage within the [National Forest] . . . over a 5- to 10-year period." Tarleton Final EA at 24.

214.     As discussed in Section II(D) *supra*, the Forest Service was obligated to evaluate "impacts that may be both beneficial and adverse," 40 C.F.R. § 1508.27(b)(1); the project's impacts on the "unique characteristics" of the Tarleton project area, namely Lake Tarleton itself, *id*. § 1508.27(b)(3); the extent to which the effects are rendered "highly controversial" by the

substantially disputed science in the record, *id.* § 1508.27(b)(4); the extent to which the Tarleton project contributes to significant impacts when considered alongside "other actions with individually insignificant but cumulatively significant impacts," *id.* § 1508.27(b)(7); and the "degree to which the action may adversely affect" the endangered northern long-eared bat and its habitat, *id.* § 1508.27(9). But the Service failed to do so.

215.    The Forest Service's FONSI for the Tarleton project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NEPA and the APA, because the Service neither properly identified the geographic context nor considered relevant intensity factors.

### B)    Peabody West Project

216.    As with the Tarleton project, the Forest Service did not properly identify the Peabody West project's geographic context. In its FONSI, the Service stated that the project "includes about 3,000 acres of the more than 800,000 acres of lands administered by the [National Forest]," Peabody West Final EA at 28, implying that the Service used the project area as the "context" to assess the project's intensity. Simultaneously, however, the Service acknowledged that the project's "potential environmental effects . . . would not be measurable at a regional or larger scale," *id.*, implying that the context the Service used to assess the intensity of *these* effects was different than the context used to assess *other* effects.

217.    As discussed in Section III(D) *supra*, the Forest Service was obligated to evaluate "impacts that may be both beneficial and adverse," 40 C.F.R. § 1508.27(b)(1); the project's impacts on the "unique characteristics" of the Peabody West project area, namely the Great Gulf Wilderness, Great Gulf IRA, and rivers eligible for wild and scenic designation, *id.* § 1508.27(b)(3); the extent to which the effects are rendered "highly controversial" by the

49

substantial scientific dispute in the record, *id*. § 1508.27(b)(4); the extent to which the Peabody West project contributes to significant impacts when considered alongside "other actions with individually insignificant but cumulatively significant impacts," *id*. § 1508.27(b)(7); and the "degree to which the action may adversely affect" the endangered northern long-eared bat and its habitat, *id*. § 1508.27(9). As with the Tarleton project review, the Service failed to do so.

218.    The Forest Service's FONSI for the Peabody West project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NEPA and the APA, because the Service neither properly identified the geographic context nor considered relevant intensity factors.

## Claim 4: Failure to Comply with the Forest Plan and NFMA

219.    Standing Trees incorporates the above allegations by reference.

220.    NFMA requires the Forest Service to ensure that its site-specific actions comply with the requirements of the Forest Plan. *See* 16 U.S.C. § 1604(i). The Forest Plan includes management direction for scenic integrity and water quality, as well as restrictions on timber harvest. It also requires the Service to manage the forest using "the latest scientific knowledge[.]" Forest Plan at 1-3. The Plan also requires the Service to "contribute to conservation and recovery of species and their habitats." *Id*. at 1-8.

221.    To be consistent with the Forest Plan, an EA must describe how the action: (1) either contributes to the maintenance or attainment of one or more goals, desired conditions, or objectives or at least does not foreclose the opportunity to do so over the long term; (2) complies with applicable standards; (3) either complies with applicable guidelines or is designed in a way that is as effective in achieving the purpose of the applicable guidelines; and (4) occurs in an area

deemed suitable for that type of action or for which the plan is silent with respect to the area's suitability for that type of action. 36 C.F.R. § 219.15(d).

222. When a project is inconsistent with an applicable Forest Plan component, the Service must do one of four things: (1) modify the action so as to make it consistent with the Plan; (2) terminate the action; (3) amend the Forest Plan so that the action becomes consistent with the Plan; or (4) enact a limited Plan amendment contemporaneously with the action's approval so that the action will be consistent with the Plan as amended. *Id.* § 219.15(c).

223. The Forest Service's deviations from the Forest Plan, discussed below, violate NFMA and the APA.

### A) Tarleton Project

224. As noted, the Tarleton project is inconsistent with the Forest Plan because the Forest Service fails to ensure compliance with the Plan's standards and guidelines for scenic integrity objectives, fails to disclose stand-age information, dismisses the latest scientific knowledge, and fails to contribute to the conservation and recovery of endangered species.

225. These failures violate NFMA's requirement that the Forest Service ensure that every element of the Tarleton project complies with the Forest Plan by either contributing to the maintenance or attainment of one or more goals, desired conditions, or objectives or at least not foreclosing the opportunity to do so over the long term; by complying with all applicable standards; by complying with or justifying the departure from applicable guidelines; and by occurring in a suitable area.

226. The Forest Service's authorization of the Tarleton project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NFMA and the APA, because the Service improperly deviated from the Forest Plan.

**B)**      **Peabody West Project**

227.    The Peabody West project is inconsistent with the Forest Plan because the Forest Service fails to ensure compliance with the Forest Plan's standards and guidelines for wild and scenic rivers and scenic integrity objectives, fails to disclose information on stand ages, dismisses the latest scientific knowledge, and fails to contribute to the conservation and recovery of endangered species.

228.    These failures violate NFMA's requirement that the Forest Service ensure that every element of the Peabody West project complies with the Forest Plan by either contributing to the maintenance or attainment of one or more goals, desired conditions, or objectives or at least not foreclosing the opportunity to do so over the long term; by complying with all applicable standards; by complying with or justifying the departure from applicable guidelines; and by occurring in a suitable area.

229.    The Forest Service's authorization of the Peabody West project was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of NFMA and the APA, because the Service improperly deviated from the Forest Plan.

## PRAYER FOR RELIEF

WHEREFORE, Standing Trees respectfully requests that the Court:

A.      DECLARE that Defendants violated the National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act in the respects set forth above when issuing the 2023 Decision Notices for both (1) the Tarleton Integrated Resource Project and (2) the Peabody West Integrated Resource Project;

B.      VACATE and set aside the Decision Notices for the Tarleton project and the

Peabody West project as unlawful agency actions under the Administrative Procedure Act;

C.      ENJOIN Defendants from proceeding with the Tarleton and Peabody West

projects until they have complied with the National Environmental Policy Act, National Forest

Management Act, and Administrative Procedure Act;

D.      AWARD Standing Trees its reasonable costs, litigation expenses, expert fees, and

attorney fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C.

§ 2412; and

E.      GRANT such further relief as the Court deems just and equitable.

Respectfully submitted, this the 16th day of May, 2024.

STANDING TREES, INC.

By its attorneys:


/s/ Christophe Courchesne                      /s/ Diana Csank
Christophe Courchesne                          Diana Csank*
NH Bar No. 20431                               Assistant Professor
Assistant Professor and Director               Environmental Advocacy Clinic
Environmental Advocacy Clinic                  Vermont Law and Graduate School
Vermont Law and Graduate School                164 Chelsea Street, PO Box 96
164 Chelsea Street, PO Box 96                  South Royalton, VT 05068
South Royalton, VT 05068                       (802) 831-1630
(802) 831-1630                                 (802) 831-1631 (fax)
(802) 831-1631 (fax)                           dcsank@vermontlaw.edu
ccourchesne@vermontlaw.edu                     *Admitted in New York; pro hac vice motion
                                               forthcoming


*Environmental Advocacy Clinic student attorneys Hannah Weisgerber, Logan Keen, Ashton
Danneels, Katlyn Schafer, and Angela Galik contributed to this Complaint.*