**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

STANDING TREES, INC.

     *Plaintiff*,

v.

UNITED STATES FOREST SERVICE, et al.,

     *Defendants*.

Case No.: 1:24-cv-00138-JL-TSM

**MEMORANDUM IN SUPPORT OF
STANDING TREES' MOTION FOR SUMMARY JUDGMENT**

Christophe Courchesne
NH Bar No. 20431
Assistant Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Counsel for Standing Trees, Inc.*

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

GLOSSARY ........................................................................................................................ viii

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 2

    TARLETON PROJECT ................................................................................................. 2

    PEABODY WEST PROJECT ....................................................................................... 5

JURISDICTION ................................................................................................................... 6

STANDING ........................................................................................................................... 6

STANDARD OF REVIEW ................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

I.     The Forest Service violated NEPA and the APA because it did not analyze alternatives . 10

        A.    The Service failed to analyze alternatives to log less or otherwise reduce the Projects' negative environmental impacts ............................................................ 10

        B.    The Service failed to analyze an alternative not to log, that is, a genuine no action alternative ............................................................................................................ 12

II.    The Forest Service violated NEPA and the APA because it failed to take a hard look at the Projects' environmental impacts and unlawfully found no significant impact ....... 14

        A.    The Service failed to look hard at the Projects' direct and indirect impacts ......... 16

              1.    Water quality ........................................................................................... 16

              2.    Northern long-eared bat ......................................................................... 18

              3.    Scenery & recreation ............................................................................... 18

              4.    Forest health ............................................................................................ 21

        B.    The Service failed to take a hard at the Projects' cumulative impacts ................. 25

        C.    The Service violated NEPA and the APA by issuing an unlawful finding of no significant impact ............................................................................................... 28

III.   The Forest Service violated NFMA and the APA because the Projects violate the Forest Plan ....................................................................................................................... 29

A.      The Service failed to make the Peabody West project consistent with     Forest Plan scenic standards ............................................................................... 30

B.      The Service failed to make the Peabody West project consistent with the Forest Plan wild and scenic river designation standard .................................................... 30

C.      The Service violated NFMA because it did not contribute to the conservation and recovery of endangered species ............................................................................. 31

CONCLUSION ........................................................................................................................... 32

## TABLE OF AUTHORITIES

**CASES**

**United States Supreme Court Cases**

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983) ..............................9, 14

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................................................9

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776 (1976)................................................15

*Horne v. Flores,* 557 U.S. 433 (2009) .......................................................................................6

*Hunt v. Washington State Apple Advert. Comm'n.*, 432 U.S. 333 (1977) ...................................6, 8

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976)..........................................................................14

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).........................................................6

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........................9

*Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994) ......................................................30

**Circuit Court Cases**

*Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995)........13

*Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) ........................................11, 12, 13, 14

*Calvert Cliff's Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971) .......................................................................................................................13

*Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284 (1st Cir. 1995)....9

*City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732 (2d Cir. 1983)...................................11, 12

*Conservation L. Found. v. Gen. Serv. Admin.*, 707 F.2d 626 (1st Cir. 1983)................................14

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) .....................................13

*Ctr. for Biological Diversity v. EPA*, 56 F.4th 55 (D.C. Cir. 2022) .................................................7

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008) ..................................................................................................................................27

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166 (10th Cir. 2023)...........12

*Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024 (10th Cir. 2001)..........................................13

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023)...............27

*Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273 (1st Cir. 1996).................................9, 10, 13, 14, 15

*Friends of Southeast's Future*, 153 F.3d 1059 (9th Cir. 1998)........................................................30

*Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068 (1st Cir. 1980) ...........................................15

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016) ......................21

*Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004)......25

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ...................................................................................9

*N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011)............................21

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1 (1st Cir. 2024) ........................................................................................................................................18

*Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79 (2d Cir. 1975) ...........................................11

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010) 20, 23

*Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953 (9th Cir. 2005) ..............30

*New Hampshire Motor Transp. Ass'n v. Rowe*, 448 F.3d 66 (1st Cir. 2006) ...................................9

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108 (9th Cir. 2004) ............................25

*Sierra Club v. Marsh*, 976 F.2d 763 (1st Cir. 1996)...................................................................9, 10

*Sierra Club v. Martin*, 168 F.3d 1 (11th Cir. 1999)......................................................................32

*Silva v. Lynn*, 482 F.2d 1282 (1st Cir. 1973) ...........................................................................15, 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032 (D.C. Cir. 2021) ........32

**District Court Cases**

*Appalachian Mountain Club v. Brinegar*, 394 F. Supp. 105 (D.N.H. 1975) ..........................15, 21

*Cape Hatteras Access Pres. All. v. U.S. Dep't. of Interior*, 344 F. Supp. 2d 108 (D.D.C. 2004)..14, 15

*Cascade Forest Conservancy v. Heppler*, No. 3:19-CV-00424-HZ, 2021 WL 641614 (D. Or. Feb. 15, 2021) ......................................................................................................................................21

*Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33 (D.N.H. 2019) ........................................................................................................9, 12, 13, 14, 16, 20, 25

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053 (D. Mont. 2023) ..........27

*Env't Def. Fund v. Corps of Eng'rs*, 348 F. Supp. 916 (W.D. Miss. 1972) ...................................23

*Kettle Range Conservation Grp. v. U.S. Forest Serv.*, No. 2:21-CV-00161-SAB, 2023 WL 4112930 (E.D. Wa. June 21, 2023) .......................................................................................18, 28

*N.W. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30 (D.N.H. 2007) .................14

*Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97 (D.N.H. 2008) ...26, 28

*WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41 (D.D.C. 2019).........................................26, 27

## STATUTORY AND REGULATORY AUTHORITIES

5 U.S.C § 701 .................................................................................................................................6

5 U.S.C § 702 .................................................................................................................................6

5 U.S.C § 703 .................................................................................................................................6

5 U.S.C § 704 .................................................................................................................................6

5 U.S.C § 705 .................................................................................................................................6

5 U.S.C § 706 ..............................................................................................................................6, 9

16 U.S.C. § 1271 ..........................................................................................................................31

16 U.S.C. § 1273(b) .....................................................................................................................31

16 U.S.C. § 1604(i) ......................................................................................................................29

28 U.S.C. § 1331 ............................................................................................................................6

28 U.S.C. § 1346 ............................................................................................................................6

28 U.S.C. § 2201 ............................................................................................................................6

28 U.S.C. § 2202 ............................................................................................................................6

28 U.S.C. § 2412 ............................................................................................................................6

36 C.F.R. § 219.15(b) ..................................................................................................................29

36 C.F.R. § 219.26 (1978).............................................................................................................32

36 C.F.R. § 220.7(b)(2) ................................................................................................................10

40 C.F.R. § 1508.7 ........................................................................................................................25

40 C.F.R. § 1508.9 ...................................................................................................10, 14

40 C.F.R. § 1502.21 .................................................................................................15, 22

40 C.F.R. § 1508.27(a) ...................................................................................................26

42 U.S.C. § 4332(C)(iii) .................................................................................................12

42 U.S.C. § 4332(2)(H) ............................................................................................10, 11

**OTHER AUTHORITIES**

36 Fed. Reg. 7724 (1971) ...............................................................................................11

2005 White Mountain National Forest, Appendix H Third and Fourth Order Streams WMNF Plan ...............................................................................................................................31

Council on Env't Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* (Jan. 1997) ....................................................................................................13

FOREST SERV., TELEPHONE GAP INTEGRATED RESOURCE PROJECT HABITAT MANAGEMENT UNIT ANALYSIS AND RATIONALE FOR HABITAT OBJECTIVES (July 2024) .................................................23

Letter from Chris French, Forest Serv. Deputy Chief, to Reg'l Foresters (Dec. 18, 2023)...........24

Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851 (Apr. 22, 2022)................................................................................................................24

U.S. Forest Serv., FSH 1909.12 – Land Management Planning Handbook Chapter 70 – Wilderness.....................................................................................................................20

## GLOSSARY

| | |
|---|---|
| Administrative Procedure Act | APA |
| Council for Environmental Quality | CEQ |
| Forest Service | Service |
| Greenhouse Gas | GHG |
| Inventoried Roadless Area | IRA |
| National Environmental Policy Act | NEPA |
| National Forest Management Act | NFMA |
| White Mountain National Forest | National Forest |
| White Mountain National Forest Plan | Forest Plan |

## INTRODUCTION

Plaintiff Standing Trees challenges the U.S. Forest Service's (Service) approvals of the Tarleton and Peabody West projects (Projects) in the White Mountain National Forest (National Forest).

Together, the Projects authorize nearly 3,000 acres of logging, twelve miles of related road construction and reconstruction, and intrusion into inventoried roadless areas and potential old forest habitat. For decades to come, the Projects will utterly transform wild, ecologically important, and iconic areas of the National Forest. Yet as explained below, the Service's environmental reviews of these Projects fail to meet fundamental requirements of the National Environmental Policy Act (NEPA), and the Projects violate the National Forest Management Act (NFMA) by contravening the Service's management plan for the National Forest (Forest Plan). NEPA required the Service to consider alternatives to the Projects, including a true no-action alternative and the reasonable and less-harmful alternatives Standing Trees itself repeatedly presented to the Service. The Service wholly failed to do so. The Service's analyses also fail to take the required "hard look" at the environmental impacts of the Projects on numerous resources in the project areas, or at the Projects' cumulative impacts considered with other projects in the National Forest. These failures fatally undermine the validity of the Service's conclusions that the massive amounts of logging and related activities authorized by the Projects would have no significant environmental impacts. And in violation of NFMA, the Service failed to design the Projects consistently with important Forest Plan requirements that protect natural resources.

For these reasons, Standing Trees respectfully moves this Court for summary judgment on all claims and requests that this Court vacate the Service's decisions to approve the Projects.

**STATEMENT OF FACTS**

Per Local Rule 56.1, material facts as to which there is no genuine issue to be tried are incorporated here, as follows:

Standing Trees submitted timely comments on and formal objections to the Projects. AR 12079 (Standing Trees Tarleton project comment); 13065 (Standing Trees Tarleton project objection); 4679 (Standing Trees Peabody West project comment); and 6124 (Standing Trees Peabody West project objection); *see also* Compl., ¶¶ 53, 116. The Service rejected the comments and objections, and declined to make material changes to the Projects. AR 12907; 6107. Then, upon finalizing environmental assessments and finding "no significant impact," the Service authorized the Projects on November 13, 2023, and February 7, 2024. AR 11934; 4869.

<u>TARLETON PROJECT</u>

*Project and alternatives.* In the late 1990s, members of Congress and the local community worked together to "permanently" conserve the land encircling Lake Tarleton, a stunning mountain lake long cherished for its wild beauty in Grafton County, New Hampshire. AR 12079; 13065. Now the Service claims the Tarleton project "is needed to help meet the goals and objectives for wildlife and vegetation described in the Forest Plan and to increase forest health, vitality, and resiliency within the project area, including the effects of climate change, and insect and disease outbreaks." AR 11973. Specifically, the Service proposes to log over about "690 acres." AR 11976. Logging will occur only 300 feet from Lake Tarleton, AR 11984, and 500 feet from the Appalachian Trail. AR 11988.

The Service did not identify a single alternative to meet the Tarleton project's broad objectives, arguing that "no specific number of alternatives is required or prescribed[.]" AR 12904. Standing Trees proposed an alternative with less logging, AR 13082, which the Service

dismissed for failing to achieve the purpose and need of the project. AR 12904. As for taking no

action and not logging, the Service claims that "would not meet the need to advance Forest Plan

goals or wildlife habitat diversity objectives in the Tarleton [Habitat Management Unit]." AR

11975. However, the Forest Service has the authority to review and implement alternatives to log

less or not at all or otherwise reduce the Project's negative environmental impacts.

   *Resource impacts.* Standing Trees' timely comments and objections identified

information gaps and inaccuracies in the Service's environmental review, as follows:

   Regarding water quality, rather than assessing the Tarleton project area, the Service relied

on the Albany South project site assessment, which is over 50 miles away from the Tarleton

project site. AR 11987–88. In doing so, the Service failed to acknowledge and explain the

Project's impacts to Lake Tarleton's superb water quality. *See* AR 13094; *see also* Decl. of Peter

Ascher, ¶ 9.

   Regarding endangered species, a 2004 study confirmed the presence of the endangered

northern long-eared bat in the project area. AR 13923. The Service "assume[s]" the bat continues

to be present. AR 13923. Mature and old forests in the project area are where the bat typically

roosts and forages. AR 3128–29. Yet no surveys of the bat's presence have been conducted since

a two-night excursion by the New Hampshire Fish and Game Department in 2019. AR 13923;

*see also* AR 9224. That is, the Service does not know of any roosts or hibernacula in the project

area—and therefore does not anticipate any direct impacts from the project to the bats—without

undertaking any effort to look for them. AR 13923.

   Regarding scenic resources, the Service did not analyze a viewpoint from Lake Tarleton,

claiming that it could not use a boat to navigate to a set of GPS coordinates on the surface of the

lake. AR 12926.

Regarding recreational resources, the Service claims that "potential noise impacts to hikers along the Appalachian Trail . . . would be minimized" with a 500-foot buffer and by limiting the logging to winter. AR 11988. The Service similarly claims that noise impacts to winter recreationists will be limited with a 300-foot buffer around Lake Tarleton. AR 11988. But Standing Trees members report hearing logging activity from more than a mile away at another logging site. *See* Exhibit A, Decl. of Peter Faletra, ¶ 13.

Regarding forest health, the Service did not provide data on stand ages during the public comment and objection periods. Compl., ¶ 91.[1] The data are crucial to verify the logging's impacts on forest health.

Regarding climate change, the Service did not measure the direct, indirect, and cumulative greenhouse gas (GHG) emissions arising from the Tarleton project in combination with the Peabody West project and other recent, ongoing, or reasonably foreseeable actions, including the Service's other logging projects in the National Forest. Compl., ¶ 69; AR 11987. Furthermore, the Service did not acknowledge or respond to the relevant scientific literature submitted by Standing Trees—in contrast to the Service's explicit analysis of other scientific literature before it. *Compare* AR 10547–71 *with* AR 10536–46. Crucially, the submitted but unacknowledged literature presents the latest scientific findings concerning the carbon capture and storage functions of mature and old forests—and corresponding updates to properly measure

---

[1] The Service publishes discernible stand age data in its environmental reviews for other projects. For example, the Service published stand age information in the Green Mountain National Forest. *See* Forest Serv., *Telephone Gap Integrated Resource Project Habitat Management Unit Analysis and Rationale for Habitat Objectives*, 8 (July 2024), https://www.fs.usda.gov/project/?project=60192 (Project Documents/02Scoping/Supporting Information).

the climate impacts of preserving versus logging these forests. AR 13065 (Standing Trees

Tarleton project objection); 6124 (Standing Trees Peabody West project objection).

*Cumulative impacts.* The Service did not analyze cumulative impacts on resources across

recent, ongoing, or reasonably foreseeable projects in the National Forest. AR 11992; 4906. The

Service did not identify the relevant projects for such analysis. The Service merely asserted that

"there would be no significant cumulative impacts as a result of implementing this project,"

without producing written, comparative analysis of relevant projects or their impacts. AR 11992.

## PEABODY WEST PROJECT

*Project and alternatives.* Located just north of the Great Gulf Wilderness and traversed

by the Appalachian Trail, the Peabody West project area has been long cherished for its stunning

mountain peaks, stands of mature and old forest, and awe-inspiring hiking and skiing trails. AR

6124. Now the Service claims the project "is needed to provide a sustainable yield of high-

quality timber products and to improve wildlife habitat diversity . . . thereby helping to achieve

the desired future conditions for wildlife and vegetation described in" the Forest Plan. AR 4877.

Specifically, the Service proposes to log about 2,220 acres, AR 4867, including about 600 acres

of land within the Great Gulf Inventoried Roadless Area (IRA), AR 4896. The Appalachian Trail

descends from the Great Gulf Wilderness—the Appalachian Trail, Mount Madison, and Carter

Mountain overlook the units proposed for clearcuts and other logging. AR 4896, 6500. The

Service also proposes nearly twelve miles of road construction or reconstruction. AR 4911. At

least six logging "units" contain stands that meet the definition for the "old forest" age class,

identified old growth habitat, or exemplary natural communities. AR 6282–86; 7834.

For the Peabody West project, the Service's approach to alternatives, water quality,

endangered species, scenic and recreational resources, forest health, climate change, and

cumulative impacts is virtually identical to its approach described above for the Tarleton project: neither environmental review engages in any comparison of choices indisputably available to the agency to log less or not at all or otherwise reduce these Projects' negative environmental impacts. AR 4876. The Service admits the Peabody West project violates its Forest Plan scenic standards. AR 4898. "Timber harvest operations could begin this winter (*i.e.*, mid-December 2024) at the earliest. Road reconstruction . . . could begin earlier, possibly in early fall 2024." Docket No. 8 at 7, ¶ 2. Standing Trees filed this action on May 16, 2024.

## JURISDICTION

This case challenges a final agency action that is reviewable under the Administrative Procedure Act (APA). 5 U.S.C §§ 701–706. This Court has jurisdiction over the action under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (United States as defendant). The Court may order relief under 28 U.S.C. §§ 2201 (declaratory judgment), 2202 (further relief), and 2412 (costs and fees), as well as 5 U.S.C. § 706 (vacatur).

## STANDING

On behalf of itself and its members, Standing Trees has standing to bring this lawsuit. Generally, standing requires an injury that is (i) "concrete, particularized, and actual or imminent; [(ii)] fairly traceable to the challenged action; and [(iii)] redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (quoting *Horne v. Flores,* 557 U.S. 433, 445 (2009)). A membership-based organization like Standing Trees must also show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members." *Hunt v. Washington State Apple Advert. Comm'n.*, 432 U.S. 333, 343 (1977). As

shown below and through the attached declarations of Standing Trees and several Standing Trees members affected by the projects, Standing Trees meets these requirements. *See Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 67 (D.C. Cir. 2022) (finding declarations acceptable to demonstrate satisfaction of standing requirements).

Standing Trees is a grassroots organization committed to safeguarding New England's forests, with a focus on public lands in New Hampshire and Vermont. Decl. of Zack Porter, ¶ 6. Standing Trees advocates fair policies and practices to ensure clean water, clean air, forest health, public health, and unfragmented habitat in the region. *Id*. The organization is representing its members, who engage in outdoor activities and have nature-based business interests, such as the youth outdoors camp, Kingswood Camp, that would be directly impacted by the Projects' negative environmental impacts.[2]

The logging and road construction proposed in the Projects will harm Standing Trees members' interests in the project areas. Specifically, the logging and roads will harm water quality, increasing the risk of algal blooms that make the water unsafe for recreation and unfit for aesthetic enjoyment.[3] The logging and roads will thus harm the recreational, aesthetic, and business interests of Standing Trees members.[4] The logging and roads will also harm the wildlife

---

[2] *See generally* Decls. of Zack Porter (on behalf of Standing Trees) (Exhibit A); Gerald Curran (Exhibit B); Elaine Faletra (Exhibit C); Peter Faletra (Exhibit D); Eric Jones (Exhibit E); Rebecca Lovejoy (Exhibit F); Jamie Sayen (Exhibit G); Nataliya Sundina (Exhibit H); Michael Wipfler (Exhibit I); Robert Wipfler (Exhibit J); Peter Ascher (Exhibit K); and Robin Sadek Ascher (Exhibit L).
[3] *See generally* Decl. of Zack Porter; *see also* Decls. of Peter Ascher, ¶¶ 7–11; Gerald Curran, ¶ 9; Elaine Faletra, ¶¶ 5–7, 14; Peter Faletra, ¶¶ 8–11; Eric Jones ¶ 7; Rebecca Lovejoy ¶ 8; Robin Sadek Ascher ¶¶ 9–12; Michael Wipfler, ¶ 17; and Robert Wipfler ¶¶ 7–9, 18.
[4] *See generally* Decls. of Zack Porter; Peter Ascher; Gerald Curran; Elaine Faletra; Peter Faletra; Eric Jones; Rebecca Lovejoy; Robin Sadek Ascher; Jamie Sayen; Nataliya Sundina; Michael Wipfler; and Robert Wipfler.

in the area, reducing the opportunities for wildlife viewing.[5] The logging and roads will also harm mature and old trees, literally cutting holes in the beautiful views in both areas.[6]

Standing Trees members have been coming to these areas for many years to enjoy healthy forests and scenic beauty, including the famous views from Lake Tarleton and along the Great Gulf and Appalachian Trails.[7] By not analyzing any alternatives or sufficiently disclosing the environmental consequences of the Projects, the Service has blocked Standing Trees members from meaningfully participating in its decision-making process.[8] Standing Trees members' interests have been harmed by the Service's actions and will continue to be unless or until the Service complies with the law.[9]

Standing Trees has organizational standing because protecting National Forest lands from environmental harms is germane to its organizational purpose, and Standing Trees represents the interests of its members, which individually would have standing to challenge the Service's actions, as discussed above. This lawsuit does not require their individual participation to assert claims against the Service or secure relief. *New Hampshire Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 71–72 (1st Cir. 2006) (citing *Hunt*, 432 U.S. at 343).

---

[5] Decls. of Zack Porter, ¶¶ 5, 9, 14–15, 19; Elaine Faletra, ¶¶ 6–8, 13, 16; Peter Faletra, ¶ 12; Eric Jones, ¶ 5; Rebecca Lovejoy, ¶ 7; Jamie Sayen, ¶ 9; Nataliya Sundina, ¶ 8; Michael Wipfler, ¶¶ 8, 17; and Robert Wipfler, ¶¶ 7, 10.

[6] *See generally* Decls. of Zack Porter; Peter Ascher; Gerald Curran; Elaine Faletra; Peter Faletra; Eric Jones; Rebecca Lovejoy; Robin Sadek Ascher; Jamie Sayen; Nataliya Sundina; Michael Wipfler; and Robert Wipfler.

[7] *See generally* Decls. of Zack Porter; Peter Ascher; Gerald Curran; Elaine Faletra; Peter Faletra; Eric Jones; Rebecca Lovejoy; Robin Sadek Ascher; Jamie Sayen; Nataliya Sundina; Michael Wipfler; Robert Wipfler; *see also* Decls. of Gerald Curran, ¶ 7; Jamie Sayen, ¶¶ 7–8; and Nataliya Sundina, ¶ 4.

[8] Decls. of Gerald Curran, ¶ 10; Elaine Faletra, ¶ 4; Peter Faletra, ¶ 4; and Rebecca Lovejoy, ¶ 4.

[9] *See generally* Decls. of Zack Porter; Peter Ascher; Gerald Curran; Elaine Faletra; Peter Faletra; Eric Jones; Rebecca Lovejoy; Robin Sadek Ascher; Jamie Sayen; Nataliya Sundina; Michael Wipfler; and Robert Wipfler.

## STANDARD OF REVIEW

In cases like this challenging agency compliance with the APA, NEPA, and NFMA, "[t]he court must undertake a thorough, probing, [in depth] review, and a searching and careful inquiry into the record." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir. 1996) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971)). Although deferential, this review "is not a rubber stamp." *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995). Specifically, upon finding agency action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," a court must "hold [the action] unlawful and set [it] aside." 5 U.S.C. § 706(2)(A).

An agency decision will violate the APA to the extent the agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In applying the arbitrary and capricious standard, the court must determine whether the Service "articulated a rational connection between the facts found and the choice made," *Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 56 (D.N.H. 2019) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983)), and whether the agency's decision and underlying analysis are "too unreasonable for the law to permit it to stand." *Conservation L. Found.*, 457 F. Supp. 3d at 56 (citing *Sierra Club v. Marsh*, 976 F.2d 763, 769 (1st Cir. 1996)); *see also Dubois*, 102 F.3d at 1288 (applying a "rule of reason" to determine whether agency's environmental review was adequate).

# ARGUMENT

The Service violated NEPA, NFMA, and the APA when it authorized the Projects. First, the Service failed to analyze alternatives. Second, the Service failed to take a hard look at the Projects' environmental impacts. Third, the Service failed to make the Projects consistent with the requirements of the Forest Plan. The Service's authorizations of the Projects are therefore unlawful and must be set aside.

## I.  The Forest Service violated NEPA and the APA because it did not analyze alternatives.

Environmental review under NEPA must include "the environmental impacts of the proposed action and alternatives[.]" 42 U.S.C. § 4332(2)(H); 40 C.F.R. § 1508.9;[10] *see also* 36 C.F.R. § 220.7(b)(2). The point of reviewing impacts in this comparative form is to define them sharply and provide a clear basis for choice among the actions available to the agency. Here, the Forest Service failed to analyze *any* alternatives and thus failed to compare the impacts of its Projects alongside alternatives to log less or no mature trees or to otherwise reduce the Project's negative environmental impacts. As discussed further below, this violates NEPA and the APA.

### A.  The Service failed to analyze alternatives to log less or otherwise reduce the Projects' negative environmental impacts.

NEPA requires an alternatives analysis when an agency's proposal "involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). This requirement is fundamental and applies to environmental assessments like those under review.

---

[10] Council on Environmental Quality (CEQ) amended the regulations in 2020. The amendments "apply to any NEPA process begun after September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." 40 C.F.R. § 1506.13 (2020). Here, the amendments do not apply because the Service initiated both the Tarleton and Peabody West projects in 2019 and because the Service consistently relied on CEQ's original regulations throughout its environmental review. *See* AR 11971; AR 4879.

*See Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 92–93 (2d Cir. 1975) ("[T]he development and discussion of a wide range of alternatives to *any* proposed federal action is so important that it is *independent of* and *of wider scope than* the duty to file the EIS[.]") (emphasis added); *see also* 36 Fed. Reg. 7724 (1971) (providing CEQ guidance that agencies should consider "alternative actions that will minimize adverse impact" "as early as possible" in the NEPA process).

Here, there are unresolved conflicts concerning the present and future alternative uses of the Tarleton and Peabody West project areas. *See Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988) (unresolved conflicts where conflicts arise between agency's and other "present and future uses" of project area resources). And as discussed above, the project areas contain truly magnificent resources. Lake Tarleton and the surrounding area include unique "use[s]" and "resources" that will be affected by the Tarleton project, including air, water, forest land, scenery, recreation, and wildlife habitat in which Standing Trees and its members have abiding interests. *See, e.g.*, Decl. of Peter Faletra, ¶¶ 8–11. Similarly, the Peabody West project area implicates the same "use[s]" of many of the same "resources." *See also City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 742 (2d Cir. 1983) (finding the requirement to consider alternatives applies to environmental assessments). Because the authorization of the Projects "opens the door to potentially harmful . . . activity," which would impact the use of available resources in the project area, the Service is required to consider alternatives beyond merely the proposed action. *Hodel*, 852 F.2d at 1229. Although it is true that a "less extensive search for alternatives is required" in an environmental assessment compared to an environmental impact statement, *some* analysis is nonetheless still required. *Conservation L. Found.*, 457 F. Supp. 3d at 57.

In response, however, the Service refused to analyze *any* alternatives, arguing that it need not look at any particular number of them. AR 12904; 6107. But that argument is beside the point: the law requires agency review of a "range of alternatives." 42 U.S.C. § 4332(C)(iii). The Service did not and cannot cite any record evidence that alternatives with less logging could not achieve the Projects' objectives. Furthermore, the objectives are broad. Faced with similarly broad objectives elsewhere, the Service itself has reviewed a range of alternatives. *See* AR 2229-2256 (Albany South project alternatives analysis); *see also City of New York,* 715 F.2d 732, at 743 ("The scope of alternatives to be considered is a function of how narrowly or broadly one views the objective of an agency's proposed action."). Consequently, here, the Service's refusal to look at *any* alternatives, including Standing Trees' proposed alternative to log less, rests on nothing more than an unsupported opinion that such alternatives would not meet the project objectives. The Service did not and cannot cite any support for the opinion, because it never performed the requisite assessment of the environmental impacts of logging less, or otherwise reducing the Projects' environmental impacts. Such arbitrary decision-making cannot stand.

### B.     The Service failed to analyze an alternative not to log, that is, a genuine no action alternative.

An agency's environmental review must identify the status quo—known as the "baseline" or "no action" alternative. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1185–86 (10th Cir. 2023). Specifically, the agency must describe existing conditions—both positive and negative—in sufficient detail to allow for meaningful comparison of the environmental impacts of alternative actions, including the agency's proposal. *See* Council on Env't Quality, *Considering Cumulative Effects Under the National Environmental Policy Act*, 41 (Jan. 1997) ("The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process."); *see also Alaska*

*Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723, 730 (9th Cir. 1995) (finding

the no action alternative "serves as the benchmark by which effects of all action alternatives are

measured"); *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001) (finding

the purpose of the no action alternative is to "compare the potential impacts of the proposed

major federal action to the known impacts of maintaining the status quo"); *Calvert Cliff's*

*Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)

("Th[e] requirement [to consider alternatives] . . . seeks to ensure that each agency decision

maker has before him and takes into proper account all possible approaches to a particular

project (including total abandonment of the project) which would alter the environmental impact

and the cost-benefit balance."). A genuine no action alternative will be "[i]nformed and

meaningful." *Hodel*, 852 F.2d at 1228. For example, agencies must use the same methodologies

to compare the proposed and no action alternatives so they can make an "informed and

meaningful choice" that coherently accounts for future conditions. *Cf. Ctr. for Biological*

*Diversity v. Bernhardt*, 982 F.3d 723, 735 (9th Cir. 2020) (rejecting environmental impact

statement because no action alternative failed to consider impact of foreign oil consumption).

Here, the Service's refusal to investigate baseline conditions, that is, a genuine no action

alternative without logging, is "too unreasonable for the law to permit it to stand." *Conservation*

*L. Found.*, 457 F. Supp. 3d at 56; *see also Dubois*, 102 F.3d at 1289 ("The agency . . . must

legitimately assess the relative merits of reasonable alternatives before making its decision.").

Rather than perform the requisite investigation, including of the potential benefits, the Service

speculates that "taking no action would not meet the need to advance forest plan goals or wildlife

habitat diversity objectives in the" Tarleton and Peabody West Habitat Management Units. AR

11975; 4897. The Service does not and cannot cite any support because there simply is none in

the record. Unsupported speculation, however, does not satisfy NEPA's requirement to

investigate the baseline in an "informed and meaningful" way, *Hodel*, 852 F.2d at 1228, and to

"legitimately assess" the Projects' "negative environmental impacts[.]" *Dubois*, 102 F.3d

at 1289–91.

Accordingly, the Service's failure to analyze alternatives, including the basic, baseline,

no-action alternative was arbitrary and capricious, in violation of NEPA and the APA.

## II.   The Forest Service violated NEPA and the APA because it failed to take a hard look at the Projects' environmental impacts and unlawfully found no significant impact.

NEPA and its implementing regulations require the Service to take a "hard look" at the

environmental impacts of the Projects, including direct, indirect, and cumulative impacts and to

make those impacts available for public review. *N.W. Bypass Grp. v. U.S. Army Corps of Eng'rs*,

470 F. Supp. 2d 30, 59 (D.N.H. 2007) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 409 n. 21

(1976)); 40 C.F.R. § 1508.9(b). To take a hard look, an agency must articulate a rational

connection between the facts found and decision made. *Conservation L. Found.*, 457 F. Supp. 3d

at 56 (citing *Baltimore Gas and Elec. Co.*, 462 U.S. at 105). Further, the agency must conduct a

site-specific analysis of its proposed action. *Conservation L. Found. v. Gen. Serv. Admin.*, 707

F.2d 626, 630–31 (1st Cir. 1983). "NEPA's strong language 'is neither accidental nor hyperbolic,'

but 'is a deliberate command that the duty NEPA imposes upon the agencies to consider

environmental factors not be shunted aside in the bureaucratic shuffle.'" *Cape Hatteras Access*

*Pres. All. v. U.S. Dep't. of Interior*, 344 F. Supp. 2d 108, 134 (D.D.C. 2004) (quoting *Flint Ridge*

*Dev. Co. v. Scenic Rivers Ass'n,* 426 U.S. 776, 787 (1976)).

Likewise, all NEPA reviews must make the agency's information on environmental

impacts available for public comment. This public comment provision is meant not only to

inform the public, but also to further inform and thereby assist the agency's decision-making.

*Dubois*, 102 F.3d at 1286–87; *see also Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1073 (1st Cir. 1980) ("NEPA seeks to achieve substantive environmental improvement by requiring full disclosure of the basis for agency action."); *Silva v. Lynn*, 482 F.2d 1282, 1284 (1st Cir. 1973) ("[NEPA] serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project."). Failure to transparently and accessibly share data upon which a final decision is made deprives the public of the opportunity to "test, assess, and evaluate the data and make an informed judgment as to the validity of the conclusions drawn therefrom," *Appalachian Mountain Club v. Brinegar*, 394 F. Supp. 105, 122 (D.N.H. 1975), and fatally undermines an agency's findings. *Dubois*, 102. F.3d at 1287; *see also* 40 C.F.R. § 1502.21. To this end, agencies must not incorporate by reference unless the referenced material is "reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. § 1502.21.

As applied here, the Service failed to take a hard look at the environmental impacts of the Projects in three critical respects: First, the Service failed to investigate and disclose site-specific conditions relevant to the Projects' impacts on water quality, the northern long-eared bat, and scenic and recreational resources. Second, the Service failed to disclose stand age information, which precluded the public from understanding whether the Service had sufficiently investigated the forest health conditions that are central to the Projects' purpose. Third, as a consequence of its just described failures, the Service had to resort to incomplete, inaccurate, or illogical descriptions of the Projects' impacts in its environmental assessments. Perhaps most glaringly, the Service ended its assessments by claiming that the Projects' incremental impacts would be "minor or less," as compared to unidentified "other projects with similar impacts," and that

"therefore, there would be no significant cumulative impacts as a result of implementing [each] project." AR 11992; 4906. Such bald claims do not fulfill NEPA and the APA's mandates of well-informed, reasoned decision-making. Nor do they support the Service's findings of no significant impact upon which it authorized the Projects.

>   **A.     The Service failed to take a hard look at the projects' direct and indirect impacts.**

>>   *1.     Water quality*

The Service failed to take a hard look at the Projects' water quality impacts because it did not actually look at the water quality within the impacted areas; rather, it made generic assertions based on its prior assessment of another distant site (the Albany South project). By contrast, in *Conservation Law Foundation v. U.S. Army Corps of Engineers*, this Court upheld a NEPA review that turned on water quality, noting that the agency had "[t]horoughly discussed the expected environmental impact *in [the project area]*." 457 F. Supp. 3d at 62 (emphasis added). The Court further noted that the agency surveyed the local ecosystem and discussed how its proposal would affect that ecosystem. *Id.*

Applying *Conservation Law Foundation* to this case, the Service would have had to investigate the ecosystems within its chosen areas for the Projects, and to have discussed how the Projects would affect these ecosystems. 457 F. Supp. 3d 33. But the Service did not. Standing Trees commented and objected that the Service cannot substitute the requisite site-specific assessment with inferences from the assessment of distant ecosystems at the Albany project site—fifty miles away from the Tarleton site, and eighteen miles away from the Peabody West site. AR 11987–88; 4900. The Service nonetheless insisted on this arbitrary approach. It never identified or explained how the ecosystem or water quality information from the distant Albany

site could be comparable for assessing the Projects. Nor did it identify or explain any practical reason for not conducting site-specific assessments for the Projects. AR 11987–88; 4900.

To be sure, there are site-specific issues that required the Service to look hard at the Projects' sites themselves. For example, Lake Tarleton is indisputably one of the largest, cleanest, and least developed lakes in the region. AR 12082. The increased runoff from logging into Lake Tarleton is a site-specific issue that the Service could not actually assess by reference to the Albany project site, which does not contain a comparably large, clean, undeveloped lake. AR 11995 (Tarleton Project area and overview of proposed activities) *compare with* AR 2204 (Albany South Integrated Resource Project vicinity map). Clearly, the Service failed to take the requisite hard look. Similarly, it failed the APA's rule of reason when it subsequently claimed that the logging proposed in the Tarleton project would have "no measurable effect" on water resources.

The same is true for the Service's cursory review of the Peabody West project site, which spans numerous watersheds, including the Peabody River and its West Branch, both of which are eligible for federal wild and scenic designation. The Service claims that there will be "no measurable effect" to water resources when logging is limited to a certain volume of trees within in a watershed. However, the Service proposes to exceed this limit in twelve distinct watersheds but then does not bother to measure or otherwise explain the resulting measurable effects. AR 4900. Instead, the Service arbitrarily dismissed from further discussion several impacted watersheds for supposedly lacking fish habitat. *Id*. For the remainder, the Service simply did not elaborate meaningfully on the impacts of its plan to log in excess of the no measurable effects limit. *Id*.

### 2. *Northern long-eared bat*

The Service failed to take a hard look at impacts to the northern long-eared bat because it did not conduct a survey for either project; instead, it made illogical assertions that the bats, though "assumed" present, would not be harmed. AR 9224. Specifically, the Service's review of this issue relied heavily upon the U.S. Fish and Wildlife Service's Biological Opinion. AR 3302–3358. The latter purports to assess 2,927 projects across twenty-eight national forests in only fifty-five pages—it contains no analysis specific to either project. AR 3302. Reliance can be arbitrary and capricious when an agency blindly adopts the biological opinion of a consulting agency without performing its own investigation. *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024).

Here, the Service's decision not to look for bats at either site was arbitrary. The most recent bat survey conducted in the National Forest was a two-night forest-wide bat survey from 2019. AR 13923; 9244. Without any further investigation at the sites, the Service asserts no known hibernacula or roosts exist there. *Id*. The Service assumes the bat's presence, and then concludes that, even if bats exist in the project area, impacts would be "[m]inimal." AR 4901. The Service's conclusion rests on an illogical justification. The Service violated NEPA because it cannot provide a reasoned conclusion from the data available. *See Kettle Range Conservation Grp. v. U.S. Forest Serv.*, No. 2:21-CV-00161-SAB, 2023 WL 4112930, at *10 (E.D. Wa. June 21, 2023) (finding the Forest Service violated NEPA where it failed to consider site-specific effects of the project on endangered species, including endangered bat species).

### 3. *Scenery & recreation*

The Service failed to take a hard look at the Projects' scenic and recreational impacts because it excluded from its review publicly-identified resources of outstanding scenic and

recreational value. The relevant discussion in the environmental assessments is brief and perfunctory: for example, for Peabody West, the Service limits itself to one paragraph in the "Recreational Effects Report," and baldly claims impacts will "be minimal, localized, and would not persist past project implementation." AR 6463.

Regarding scenic impacts, the Service fails to take a hard look at scenic impacts in the project areas. The Service failed to take a hard look at the Tarleton project because it failed to account for scenic impacts on Lake Tarleton itself. Lake Tarleton is the largest lake within the National Forest, and countless recreationists swim, canoe, ski, and more on the lake throughout the summer.[11] Despite the Lake's recreational importance, the Service asserted it was unable to select a scenic viewpoint on the surface of Lake Tarleton because it was not a fixed point. AR 12926. This is patently false: the Service possesses accurate GPS systems and could use a boat to navigate to a set of geographic coordinates on the surface of the lake. Furthermore, and as discussed in detail below, the Service failed to reconcile its requisite hard look with its decision to violate the Forest Plan. *See infra* Section III. A.

On the Peabody West project, the Service failed to disclose the project's relation to the Appalachian Trail. The Trail is about a mile from the edge of the nearest logging unit, making a large "U" around the project area. It is adjacent to the eastern, southern, and western edges of the project area. Logging units would be visible for miles from virtually every scenic vista along the trail looking out onto the Peabody West area. Despite these impacts, the Service fails to discuss any impact to the Appalachian Trail whatsoever. AR 6498–6506. The only reference to the Trail is by its initials in the name of one of the scenic viewpoints, "Osgood-AT." AR 6505. The Trail is not labeled on any scenic viewpoint map. *Id*. Its virtual exclusion from any discussion illustrates

---

[11] *See, e.g.*, Decls. of Elaine Faletra ¶¶ 6, 14; Eric Jones, ¶ 7; and Robert Wipfler ¶ 9.

the lack of attention the Service paid to the project's scenic impacts on the Trail. The Service's

cursory analysis does not satisfy NEPA's requirement to take a hard look.

Furthermore, the Peabody West project area abounds with recreational opportunities,

including the Great Gulf Trail and Great Gulf IRA. The project will log in stands near and

overlapping the Great Gulf Trail, a renowned scenic hiking route in the area. But there is no map

that overlays the logging units with labeled recreational resources, let alone a "forthright

acknowledgment of the negative [] impacts." AR 4892–96; *Conservation L. Found.*, 457 F. Supp.

3d. at 62. The Service is also proposing to log nearly 600 acres in the Great Gulf IRA, but there

is similarly no map that overlays the logging units with the resource. The public is left to scroll

back and forth between maps in the environmental assessments to piece together where logging

will occur, and whether logging overlaps with cherished trails and forest. *See Nat'l Parks &*

*Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1073 (9th Cir. 2010) (finding that

requiring the public to "put the pieces together" to understand an environmental resource issue

does not satisfy NEPA's public disclosure requirement). Moreover, regarding the Great Gulf IRA,

the Service cursorily dismisses the Peabody West project's impacts on the region without any

proper analysis. *See* U.S. Forest Serv., FSH 1909.12 – Land Management Planning Handbook

Chapter 70 – Wilderness at 4–5 (requiring consideration of: (1) the future evaluation of

wilderness characteristics; (2) analysis; and (3) recommendation).

Finally, these failures demonstrate the Service did not set baselines for recreational

impacts in the Peabody West project area. The Service's baseline consists of a cursory listing of

some recreational resources in a single paragraph—it references the parking lot for the Great

Gulf Trailhead, but not impacts to the trail itself. AR 4878. There is no elaboration or detail about

the trails or the Great Gulf IRA, for which there will be clear recreational impacts. Without

20

setting a baseline—at least some assessment of the existing conditions of the trails and their

offerings—there is no way to assess the impacts to those resources and no way for the Service to

comply with NEPA. *See e.g.*, *N. Plains Res. Council v. Surface Transp. Bd.*, 668 F.3d 1067,

1083–87 (9th Cir. 2011); *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101

(9th Cir. 2016) ("Establishing appropriate baseline conditions is critical to any NEPA analysis.");

*Cascade Forest Conservancy v. Heppler*, No. 3:19-CV-00424-HZ, 2021 WL 641614, at *17–20

(D. Or. Feb. 15, 2021).

### 4. Forest Health

The Service failed to take a hard look at forest health because it did not disclose

information to the public that was central to assessing impacts to forest health. For the Peabody

West project, the Service offered a post hoc rationalization. It also did not explain how stands the

Service has identified as containing old forest or old growth habitat were removed from the

project and provided no reason for why the Service should not follow government-wide and

internal guidance regarding old forest and old growth habitat.

First, the Service failed to take a hard look at the Projects' impacts on forest health and,

for Peabody West project, tried to rationalize this failure post-hoc. Proper timber management is

inextricably linked with forest health. AR 13104–08; 6129–36. The Service did not disclose

stand survey information during the public comment period, snatching the public's "vital"

opportunity to comment on the propriety of the Service's timber management. *See Appalachian

Mountain Club*, 394 F. Supp. At 121; *see also* AR 11785 (Standing Trees Tarleton comment); AR

13074, 13107 (Standing Trees requesting stand age data in its objection); AR 4687–88 (same in

its Peabody West comment); AR 6129–31 (same in its Peabody West objection). This stand

survey information is central to analyzing impacts to forest health and determining whether a

project is needed because it details the distribution of forest types and age classes present in the project areas. In other words, environmental impacts of logging cannot be assessed without knowledge of what trees will be cut and where. Any reliance on these undisclosed surveys is improper because "[n]o material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. § 1502.21.

Second, the Peabody West project offers a particularly illustrative example of the Service's failure to disclose stand survey information. For example, the Service references several withheld documents in support of its assertion that it is not logging in old growth or old forest habitat. AR 6115–16. At least one of these documents—the botanist's e-mail regarding the presence of old forest characteristics in multiple stands targeted in the Peabody West project area—did not exist at the time the decision was authorized. AR at 4527–29 (dating botanist's email two months after the Peabody West project was authorized).

The Service's assertions in its environmental assessment and objection response that it is not logging in "old forest" and "old growth habitat," AR 4880; 6116–17, are unsupported by the stand surveys, AR 7834; 6282–86. Indeed, the withheld survey data indicate that such habitat is present in at least six stands. AR 6282–86. Similarly, stand exam information from the Tarleton project indicates stands of old forest age class. AR 13899–911. Both projects fail to identify the presence of old forest habitat despite indications of its presence. AR 12353; 9287 (showing Table 4 in both reports omit any information on old forest). This is precisely the type of factual discrepancy the public disclosure and comment requirements are designed to timely identify and resolve.

The Service's patchwork of stand surveys and spreadsheets, which lack any connective tissue to link them, fails to foster NEPA's requisite informed decision-making and public participation. *See Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1073–74. Many of the documents cited appear to be raw outputs of data: they define no terms and contain no analysis, rendering them unfit for public review. *See Silva,* 482 F.2d at 1285 ("To that end, [environmental reports] 'must be written in language that is understandable to nontechnical minds and yet contain enough scientific reasoning to alert specialists to particular problems within the field of their expertise.'") (quoting *Env't Def. Fund v. Corps of Eng'rs*, 348 F. Supp. 916, 933 (W.D. Miss. 1972); *see also* Decl. of Zack Porter, ¶ 16. The Service is capable of providing this information to the public during the comment period in an accessible and transparent manner.[12] The Service's failure to provide stand survey data to the public in an accessible manner and explain a rational connection between its surveys and the decision to approve the Projects indicates the Service did not take a hard look at forest health.

Furthermore, underpinning the Service's arbitrary authorization of the Projects are the Service's claims that it is free to ignore government-wide direction, internal management advice concerning old forests, and scientific literature submitted by Standing Trees. The Service neglected to recognize Executive Order 14072, which mandates that the Service "retain and enhance carbon storage." Strengthening the Nation's Forests, Communities, and Local Economies, 87 Fed. Reg. 24851, 24852 (Apr. 22, 2022). The Service also internally

---

[12] The Forest Service has demonstrated its ability to produce stand age information in the Green Mountain National Forest. *See* FOREST SERV., TELEPHONE GAP INTEGRATED RESOURCE PROJECT HABITAT MANAGEMENT UNIT ANALYSIS AND RATIONALE FOR HABITAT OBJECTIVES, 8 (July 2024).

acknowledged the importance of protecting and revitalizing mature and old-growth forests for biodiversity, carbon storage, and climate resilience, yet refused to recognize this guidance in authorizing these Projects. AR 0733. Furthermore, the Service did not explain why Peabody West is not subject to internal Forest Service guidance requiring "any projects proposing vegetation management activities that will occur where old growth forest conditions . . . exist . . . be submitted to the National Forest System Deputy Chief for review and approval."[13] Finally, the Service also fails to acknowledge or discuss the scientific literature submitted by Standing Trees. The Service claimed to "document[] consideration of the scientific papers brought forward by the public," but failed to consider any of the scientific literature provided by Standing Trees for the Tarleton project.[14] AR 12902; *compare* AR 10547–71 *with* AR 10536–46. The Service failed to articulate a rational basis for refusing to consider Standing Trees' scientific literature.

The Service failed to take a hard look at the Projects' impacts on forest health, tried to subsequently provide post hoc rationalization for this failure, and disregarded national and internal guidance, management direction, and publicly submitted, peer-reviewed literature.

---

[13] Https://www.fs.usda.gov/sites/default/files/ReviewOfProposedProjectsWithManagementOfOldGrowthForestConditions-NFSDC.pdf.

[14] "In its comment and objection, Standing Trees provided scientific evidence that (1) timber harvesting accounts for 86% of annual forest carbon loss in the northeastern U.S.; (2) the rate of carbon sequestration increases as trees age, with carbon storage maximized in unlogged stands; and (3) among land uses generally, timber harvesting has the greatest relative impact on aboveground carbon storage regionally.  The Service did not explain its decision to dismiss this science. Even if the Service dismissed the provided literature as not being the best, the Service did not provide a reasoned basis for dismissing it." Compl., ¶¶ 65, 125.

**B.       The Service failed to take a hard look at the Projects' cumulative impacts.**

The Service's failure to look hard at cumulative impacts spans many resources and is

especially glaring with respect to climate impacts. As noted above and discussed further below,

the Service did not acknowledge the cumulative climate impacts of the Projects together or in

combination with other projects the Service itself has authorized or proposed in the National

Forest. Furthermore, the Service failed to quantify the Projects' GHG emissions and thus never

verified or explained how these emissions translate into cumulative impacts. Instead, the Service

opined arbitrarily that the Projects would lead to net benefits and improved climate resiliency

without any quantitative analytical support. AR 11954; 4900.

Cumulative impacts are those impacts that result from an action when added "to other

past, present, and reasonably foreseeable future actions," and which arise from "individually

minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

A cumulative impacts analysis must contain "quantified or detailed information," not just

"general statements about possible effects and some risk." *Conservation L. Found.*, 457 F. Supp.

at 58 (quoting *Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt.*, 387 F.3d 989, 994

(9th Cir. 2004)); *see also Klamath-Siskiyou Wildlands Center.*, 387 F.3d at 993–94 (9th Cir.

2004) ("The analysis 'must be more than perfunctory; it must provide a useful analysis of

the cumulative impacts of past, present, and future projects.'") (quoting *Ocean Advocs. v. U.S.

Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004)).

Here, the Service never acknowledged or explained why it did not disclose the

cumulative climate impacts of its own projects to log the National Forest,[15] going so far as to not

---

[15] Other projects that similarly propose logging or road construction include, but are not limited
to: Bowen Brook Integrated Resource Project, Deer Ridge Integrated Resource Project, Wanosha

mention Peabody West in the Tarleton environmental assessment, and vice versa. AR 11992; 4906.[16] Regardless, these projects are reasonably foreseeable and thus belong in the agency's cumulative impacts analysis. *Northwest Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 126 (D.N.H. 2008) (internal citations omitted) (agency " must evaluate the reasonably foreseeable significant effects of the proposed action.")

Further, the Service purported to find that the Projects' incremental impacts would be "minor or less," as compared to "other projects with similar impacts," and that "therefore, there would be no significant cumulative impacts as a result of implementing [each] project." AR 11992; *see also* 4906 ("The incremental impacts of this project when overlapped in time and space with other actions with similar impacts would not result in significant cumulative impacts."). But as noted above, whatever projects the Service considered, it never identified them. Nor did the Service document or further explain whatever comparative analysis it referenced. Thus, when the Service stated both Projects would result in no "significant cumulative impacts," it could not and did not cite any support in the record. AR 11992; 4906. This is an insufficient analysis of cumulative impacts.

Moreover, the Service failed to quantify the Projects' GHG emissions or, as discussed further below, sufficiently explain how these emissions translate into cumulative impacts. Courts widely agree that because climate emissions do not remain confined to a specific project area, it is important to analyze and discuss their impacts cumulatively. *See generally WildEarth*

---

Integrated Resource Project, Cold River Integrated Resource Project, Hales Location Wildfire Resiliency Project, Sandwich Vegetation Management Project, and Lost River Integrated Resource Project.

[16] Cumulative impacts analysis requires the agency to identify the relevant geographic context. 40 C.F.R. § 1508.27(a). Standing Trees maintains that the Service's choice to limit its review of forest health and endangered bats impacts to viewsheds and watersheds as opposed to the National Forest is arbitrary and capricious. AR 11986; 4897.

*Guardians v. Zinke*, 368 F. Supp. 3d 41, 76 (D.D.C. 2019) ("BLM's failure to quantify GHG

emissions rendered the environmental assessments' cumulative impact analyses inadequate.");

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th

Cir. 2008) (finding the environmental assessment inadequate because it failed to consider the

cumulative impacts of GHG on the environment); *Diné Citizens Against Ruining Our Env't v.

Haaland*, 59 F.4th 1016, 1044 (10th Cir. 2023) (finding BLM's environmental assessment

inadequate for failing to consider the cumulative impacts of GHG emissions). Applying the case

law, not to mention on point CEQ guidance, the Service needed to quantify the emissions from

each Project.[17] But it did not.

Rather, the Service merely speculates that the Projects' emissions will be "small." AR

11988; 4900. But courts reject analysis that stops at identifying the obvious, that the climate

crisis is a global problem, and that any singular project's contribution to it is necessarily small.

*Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053, 1075 (D. Mont. 2023).

Notably, in a similar case concerning the climate impacts of a Forest Service proposal, the court

found "logging causes immediate carbon losses, while re-sequestration happens slowly over

time, time that the planet may not have." *Id*. at 1076. Further, the court found the environmental

assessment in that case did not "sufficiently provide scientific evidence indicating why [the

benefit of new-growth carbon] would offset the carbon loss leading to an overall 'minor' impact

on the environment." *Id*. The environmental assessments here suffer from the very same defect:

---

[17] The CEQ issued guidance to assist agencies in quantifying GHG emissions. AR 0473–89,
0475 (recommending that "agencies quantify a proposed action's projected GHG emissions or
reductions for the expected lifetime of the action, considering available data and GHG
quantification tools that are suitable for the proposed action"). The Service must provide a
reasoned basis for refusing to follow the CEQ guidance. *But see* AR 12906; 6116 (claiming that
the "level of estimate" conducted in the environmental assessment was "consistent with the
[]standard approach at the time of analysis.").

in them, the Service claims new growth would offset any possible emissions from logging,

without sufficient explanation or scientific evidence. AR 11987; 13260–61; 4900; 6322–23.

Moreover, the Service failed to acknowledge and explain the relevant scientific literature

submitted by Standing Trees. AR 13050 (Standing Trees Tarleton project objection); 6124

(Standing Trees Peabody West project objection). All of the above-described failures render the

Service's look at cumulative impacts too unreasonable to stand.

### C. The Service violated NEPA and the APA by issuing an unlawful finding of no significant impact.

The Service failures, detailed above, to analyze alternatives or look hard at environmental

impacts resulted in its issuance of unlawful findings of no significant impact. Stated another way,

the Service's findings are unlawful because they were not predicated on any alternatives

analysis, but rather on cursory looks at environmental impacts, in violation of NEPA and the

APA. *See, e.g.*, *Kettle Range Conservation Grp.*, 2023 WL 4112930, at *12 ("The lack of

quantified or detailed information about the Sanpoil Project's impacts in this respect creates

substantial questions about whether the action will have a cumulatively significant

environmental impact.").

Here, the Service's findings of no significant impact are inadequate under the applicable

standard of review, which requires the Service to accurately identify the pertinent environmental

impacts, take a hard look at those impacts, and, if a finding of no significant impact is made, the

agency must be able to convincingly support this conclusion. *See Northwest Bypass Grp.*, 552 F.

Supp. 2d at 134 (further requiring sufficient mitigation of any significant impacts to support a

finding of no significant impact). The final environmental assessments and findings of no

significant impact failed to show that the Projects' impacts would not significantly affect the

environment and failed to take a hard look at the Projects' impacts. *Supra* Section II. A–B.

28

III.    **The Forest Service violated NFMA and the APA because the Projects violate the Forest Plan.**

Forest Service projects must be consistent with applicable forest plans. The Projects here are not. As made clear above, the Service's failure to disclose stand data belies its claim that it is abiding by the Forest Plan's prohibition on logging old growth or within old forest habitat. Furthermore, due to the Service's failure to consider scientific literature submitted by Standing Trees, the Service failed to account for the latest scientific knowledge, in violation of the Forest Plan. AR 3416 (requiring use of "latest scientific knowledge"). These failures render its NEPA analysis deficient and also demonstrate a failure to comply with NFMA. Moreover, the Service violated the Forest Plan in the following ways: first, the Forest Service deviated from the scenic standards in the Forest Plan. Second, the Service disregarded the Forest Plan's requirements regarding wild and scenic rivers. Third, and finally, the Service has failed to locate or develop conservation strategies for the northern long-eared bat in the project area.

NFMA requires that site-specific projects be "consistent" with the applicable forest plan. 16 U.S.C. § 1604(i); *see also* 36 C.F.R. § 219.15(b). A project is consistent with the forest plan when it (1) contributes to the maintenance or attainment of one or more goals, desired conditions, or objectives, or does not foreclose the opportunity to do so; (2) *complies with applicable standards*; (3) *complies with applicable guidelines*; and (4) occurs in an area that is "suitable" for that project. *Id*. at § 219.15(d) (emphasis added). The Forest Service may resolve an inconsistency between a project and the Forest Plan in several ways: by modifying either the project or the plan to make either consistent with the other, or by rejecting the project. *Id*.

The Forest Plan sets standards and guidelines for site-specific projects. These include standards on scenic integrity and water quality and restrictions on logging. The Forest Plan also requires the Service to "contribute to conservation and recovery of species and their habitats."

29

AR 3421. Importantly, "an agency's position that is contrary to the clear language of a Forest

Plan is not entitled to deference." *Native Ecosystems Council v. United States Forest Serv.*, 418

F.3d 953, 962 (9th Cir. 2005) (citing *Friends of Southeast's Future*, 153 F.3d 1059, 1069 (9th Cir.

1998)); *see also Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (finding that

no deference is due to an agency interpretation that contradicts regulation's plain language).

> **A.  The Service failed to make the Peabody West project consistent with Forest Plan scenic standards.**

The Forest Plan requires observed sizes of clearcut acreage to be limited to 4–5 acres for

"high" scenic integrity areas and ten acres for "moderate" scenic integrity areas. AR 3477, 3479.

Here, the Service will clearcut twenty-six acres in Unit 19, nine acres in Unit 20, and nineteen

acres in the wildlife opening. AR 4898. The Service suggests that its design element—"the

Forest Landscape Architect shall review final layouts in units 19 and 20 to ensure that openings

are well-distributed in the landscape to the maximum extend practical"—takes care of the Forest

Plan violation. AR 4891. But this is not possible. In Unit 19, the Landscape Architect cannot

"distribute" the *clearcut* acreage across the unit. Additionally, the Forest Service omits any

mention of mitigation measures in the nineteen-acre clearcut proposed to expand the wildlife

opening. *Id.* Overall, the Service's position is contrary to the stated intentions of the Forest Plan.

> **B.  The Service failed to make the Peabody West project consistent with the Forest Plan wild and scenic river designation standard.**

The Forest Plan requires the Service to "[m]anage eligible rivers to maintain their

classification and eligibility until Congress designates the segments or decides not to designate

them[.]" AR 3467. And the Service establishes a goal to "protect the wild, scenic, and

recreational values of eligible rivers to maintain their potential for Wild and Scenic River

designation." AR 3431. A river is eligible for protection if it is free-flowing and possesses at least

one of the outstanding remarkable values set forth in the statute. *See* 16 U.S.C. §§ 1271, 1273(b). The Service is required to include a buffer of 575 feet for fourth and larger order streams. AR 3460.

Here, the Service's proposed logging includes clearcutting on nearly fourteen acres of land within a quarter mile of both the Peabody River and the West Branch of the Peabody River, the two eligible river segments in the project area. AR 9349. These river segments are fourth order streams. *See* 2005 White Mountain National Forest, Appendix H Third and Fourth Order Streams WMNF Plan, H-3. More than that, over 350 acres of logging treatment will occur within a quarter mile of the Peabody River, and nearly eighty-five acres will occur within a quarter mile of the West Branch of the Peabody River. AR 9349. Despite the substantial amount of intrusion and logging that will take place near these eligible rivers, the Service finds that "[g]iven the scope and location of proposed project activities, the proposed action would have limited, short-term effects on potential outstandingly remarkable values but would not result in an irreversible or irretrievable change in the condition of the river corridor or its potential for designation in the future." AR 4903. Overall, the Service's position is without evidentiary basis and is contrary to the plain provisions of the Forest Plan, in violation of NFMA.

**C.     The Service violated NFMA because it did not contribute to the conservation and recovery of endangered species.**

Under the Forest Plan, the Service must investigate all project sites for the presence of threatened, endangered, or sensitive species prior to beginning any authorized ground-disturbing activity at the site. AR 3448. Surveys must be completed for all new ground-disturbing projects unless biologists determine threatened, endangered, or sensitive species occurrence is unlikely (e.g., no habitat exists). *Id.* The regulations state that "forest planning shall provide for the diversity of plant and animal communities . . . consistent with the overall multiple use objectives

31

of the planning area . . .[, and] [i]nventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present condition." *Sierra Club v. Martin*, 168 F.3d 1, 5 (11th Cir. 1999) (citing 36 C.F.R. § 219.26 (1978)).

In *Sierra Club v. Martin*, the court recognized that both NFMA and the Forest Plan required the Service to conduct surveys of endangered, threatened, or sensitive species in the project areas. 168 F.3d at 4–5. Similarly, here, the Forest Plan requires the Service to investigate project sites for the northern long-eared bat. But the Service has not made any effort to inventory the occurrence of northern long-eared bats in the project area. AR 13923; 9224 (recognizing the last attempt to locate northern long-eared bats was in 2019). Rather, the Service is assuming the bat's presence and then concluding that—even if they encounter several bats—impacts would be minimal. This conclusion does not follow from the Service's presumption of bat presence, let alone justify the Service's decision not to undertake site-specific investigations of the species.

Notably, the Service's approach to the northern long-eared bat's conservation and recovery is emblematic of the agency's broader "see no evil, hear no evil" approach to many of the Projects' environmental impacts. Under NEPA, NFMA, and the APA, this deficient level of environmental analysis cannot stand.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion for summary judgment and vacate the agency decisions to authorize the Projects. *See*, *e.g.*, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021).

Respectfully submitted, this the 3rd day of October, 2024.

STANDING TREES, INC.

By its attorney:

  /s/ Christophe Courchesne
  Christophe Courchesne
  NH Bar No. 20431
  Assistant Professor and Director
  Environmental Advocacy Clinic
  Vermont Law and Graduate School
  164 Chelsea Street, PO Box 96
  South Royalton, VT 05068
  (802) 831-1630
  (802) 831-1631 (fax)
  ccourchesne@vermontlaw.edu

*Environmental Advocacy Clinic student attorneys Hannah Weisgerber, Joe Anderson, and Willow Hogan, and assistant professor Diana Csank contributed to this brief.*

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2024, I served the foregoing document electronically through ECF upon all counsel of record.

/s/ Christophe Courchesne
Christophe Courchesne
*Counsel for Standing Trees, Inc.*