# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

STANDING TREES, INC.,

      Plaintiff,

   v.

UNITED STATES FOREST SERVICE, *et al.*,

      Defendants.

Case No. 1:24-cv-00138-JL-TSM

## DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................... 1

II.     LEGAL BACKGROUND ........................................................................... 2

        A.      National Environmental Policy Act ................................................. 2

        B.      National Forest Management Act .................................................... 3

III.    STANDARD OF REVIEW ........................................................................ 4

IV.     FACTUAL BACKGROUND ..................................................................... 5

V.      ARGUMENT ............................................................................................. 8

        A.      The Projects' alternatives analyses are not arbitrary and capricious ..................... 8

                1.      Analyzing the proposed action with a comparative no action
                        baseline satisfies NEPA ...................................................... 9

                2.      Plaintiff's suggested alternatives do not meet the Projects' purpose
                        and need ............................................................................... 10

                3.      Forest Service regulations do not require a stand-alone no action
                        alternative ............................................................................ 13

        B.      The Forest Service conducted a reasonably thorough evaluation of the
                Projects' environmental effects .................................................... 14

                1.      The Forest Service reasonably evaluated direct and indirect effects ........ 15

                        a.      The Forest Service analyzed impacts to water quality with its
                                percent basal area removal methodology ....................... 15

                        b.      The Forest Service prepared Project-specific biological
                                evaluations to examine impacts to the northern long-eared
                                bat ......................................................................... 18

                        c.      The Forest Service analyzed impacts to scenery and
                                recreation .............................................................. 19

                        d.      The Forest Service analyzed impacts to forest health ................. 22

                2.      The Projects reasonably evaluate cumulative impacts to climate ............ 26

        C.      The FONSIs are not arbitrary and capricious ................................... 30

        D.      The Projects comply with the Forest Plan ....................................... 32

VI.    CONCLUSION....................................................................................................... 35

## I.     <u>INTRODUCTION</u>

The White Mountain National Forest (Forest) spans nearly 800,000 acres of public land in New Hampshire and Maine. While the Forest is ecologically diverse, it is not pristine. Like many eastern forests, the Forest has – for centuries – been used for timber production and conversion to agriculture. Some lakes on the Forest are impaired with mercury contamination, acidity, or both. The Forest's recreational offerings are among the best in the United States and are enjoyed by millions of visitors each year. To balance these diverse and sometimes competing interests, the Forest is statutorily obligated to administer lands for outdoor recreation, timber, watershed, and wildlife and fish purposes. The goal of this multiple-use mandate is to sustain healthy, diverse, and productive ecosystems for present and future generations.

Parts of the Forest are not meeting these goals. The trees do not represent a diverse mix of species, age classes, or both, and are not meeting what the Forest determined is necessary for a healthy, diverse, and productive Forest. To address the divergence between current and desired conditions, the Forest Service authorized two projects: the Peabody West Integrated Resource Project (Peabody) and the Tarleton Integrated Resource Project (Tarleton).

In compliance with the National Environmental Policy Act (NEPA), the Forest Service analyzed the Projects' environmental effects in two Environmental Assessments (EAs). The EAs allowed for extensive public participation and demonstrate the Projects' compliance with the Forest Plan, as required by the National Forest Management Act (NFMA). Based on the EAs, the Forest Service issued two Findings of No Significant Impact (FONSIs) that document the Forest's determination that the Projects do not have significant environmental effects and thus do not require the preparation of Environmental Impact Statements (EISs). The Projects authorize several actions, including commercial and non-commercial vegetation treatments, wildlife

habitat improvements, and recreational enhancements. The Projects fulfill the Forest Service's

multiple-use mandate and will create a more diverse, healthier, and more sustainable Forest.

Plaintiff seeks to impede these important Projects through claims brought under NEPA

and NFMA. None of Plaintiff's claims have merit. All are reviewed under the Administrative

Procedure Act's (APA) deferential standard of review and the rule of reason. The demand for

endless analysis and needless detail does not meet Plaintiff's burden to show the Projects are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). The EAs, FONSIs, and supporting documents in the Administrative Record show

that the Forest Service reasonably explained its decisions and that the Projects comply with the

Forest Plan. The Court should grant summary judgment to the Forest Service on all claims.

## II.    LEGAL BACKGROUND

### A.    National Environmental Policy Act

"NEPA does not mandate any specific outcome; it only requires agencies to conduct

environmental studies." *Historic Bridge Found. v. Buttigieg*, 22 F.4th 275, 280 (1st Cir. 2022);

42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500-1508.[1] An EIS is required only when a proposed

action will "significantly affect[] the quality of the human environment." 42 U.S.C. §

4332(2)(C). An agency may prepare an EA to determine whether an EIS is required. 40 C.F.R. §

1501.4(b), (c). "An EA is meant to be less detailed than an EIS." *Safeguarding the Historic*

*Hanscom Area's Irreplaceable Res., Inc. v. FAA*, 651 F.3d 202, 217 (1st Cir. 2011). If an EA

---

[1] The Council on Environmental Quality (CEQ) issues regulations implementing NEPA. First promulgated in 1978, CEQ revised its regulations in 2020 and again in 2024. *See* 85 Fed. Reg. 43,304 (July 16, 2020) and 89 Fed. Reg. 35,442 (May 1, 2024). The Forest Service applied CEQ's 1978 regulations because they were in effect at the time the Forest Service analyzed and authorized the Projects. AR04879, 11931. Unless otherwise noted, all citations to the CEQ regulations in this brief are to the 1978 regulations.

"finds a significant impact, a full EIS must be prepared; if not the agency makes a [FONSI], which exhausts its obligation under NEPA." *Sierra Club v. Wagner*, 555 F.3d 21, 24 (1st Cir. 2009). "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to [e]nsure that the agency has considered the environmental consequences." *Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989).

**B.    National Forest Management Act**

Congress enacted NFMA in 1976 and directed the Forest Service to develop "one integrated plan" for each unit of the National Forest System, and to ensure that such plans "provide for multiple use and sustained yield" of forest resources. 16 U.S.C. § 1604(e), (f). Pursuant to that direction, the Forest Service established a system of staged decision-making. At the first stage, the Forest Service develops a Land Management Plan (forest plan). 16 U.S.C. § 1604(a); *Sierra Club*, 555 F.3d at 23. A forest plan establishes planning goals and objectives for management of national forest resources. 16 U.S.C. § 1604 (g)(1)-(g)(3). While forest plans establish management goals and broad standards and guidelines, they do not authorize any on-the-ground action. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729-30 (1998). At the second stage, the Forest Service proposes, analyzes, and approves project-level decisions, such as timber harvests or recreational enhancements. *See id.* "All projects within a forest must comply with the overall plan for that forest." *Sierra Club*, 555 F.3d at 23 (citing 16 U.S.C. § 1604(i)); *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 251 (D.N.H. 2008), *aff'd,* 555 F.3d 21 ("The Forest Plan is, then, somewhat analogous to a city's zoning ordinance.").

In reviewing a NFMA challenge under the APA's deferential standard of review, courts "give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans...." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020); *Lamb*

*v. Thompson*, 265 F.3d 1038, 1047 (10th Cir. 2001). A court may "conclude that the Forest

Service acts arbitrarily and capriciously only when the record plainly demonstrates that the

Forest Service made a clear error in judgment in concluding that a project meets the

requirements of the NFMA and relevant Forest Plan." *Lands Council v. McNair*, 537 F.3d 981,

994 (9th Cir. 2008), *overruled on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los

Angeles*, 559 F.3d 1046, 1052 n.10 (9th Cir. 2009).

### III.    <u>STANDARD OF REVIEW</u>

Neither NEPA nor NFMA provide a private right of action, so courts review the Forest

Service's approval of a final agency action under the APA. *Utah Envt'l Cong. v. Bosworth*, 443

F.3d 732, 739 (10th Cir. 2006). The Court's review is limited to the administrative record. *Fla.

Power & Light Co. v. Lorion*, 470 U.S. 729, 742 (1985); *Lovgren v. Locke*, 701 F.3d 5, 20 (1st

Cir. 2012). Under the APA, a court may not set aside a decision unless it is "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Melone

v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024). "Under this standard, we are required to determine

whether the agency's decision is supported by a rational basis, and if so, we must affirm." *River

Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009); *Assoc. Fisheries of Maine,

Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) ("Because the APA standard affords great

deference to agency decisionmaking and because [agency] action is presumed valid, judicial

review, even at the summary judgment stage, is narrow.").[2]

---

[2] Plaintiff filed twelve declarations with its opening brief. DN 41-2 through DN 41-13. While
Defendants do not object to the declarations to establish standing, they may not be considered in
evaluating the merits of Plaintiff's claims. *See* Pl.'s Mem. 3, 4, 11, 19, 23 (citing declarations
outside of its arguments on standing (at *id.* 6)). Plaintiff also refers to an extra-record website (at
*id.* 24, n.13). This website may not be considered for the merits of Plaintiff's claims, either.
*Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the

This case is brought under the APA and has been assigned to this district's Administrative Track, L.R. 40.1(a)(1). Complaint ¶ 33, DN 1 ("Compl."); DN 12-1, ¶1. Consequently, "material facts" cannot be admitted or opposed as they might in other civil actions with discovery and possible trial. *See* L.R. 56.1; *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013) ("APA review…involves neither discovery nor trial."). The following factual background provides an overview of the two Projects challenged in this action.

## IV.    FACTUAL BACKGROUND

The White Mountain National Forest (Forest) encompasses nearly 800,000 acres in northern New Hampshire and western Maine. AR3621.[3] The Forest was established under the Weeks Act of 1911, which authorized the Secretary of Agriculture to purchase cut-over and denuded land for the National Forest System "necessary to the regulation of the flow of navigable streams or for the production of timber." 16 U.S.C. § 515. As the first region to be widely settled in the United States, eastern forests have had a long history of intensive harvesting and conversion of forests to agriculture. AR13259. The first land purchased for the Forest was in 1914 near Benton, New Hampshire. AR3621. More recently, the lands comprising the Tarleton Project area were transferred to federal ownership in the late 1990s and early 2000s. AR11930.

The Forest is the largest public land area in New England. AR3624. The Forest offers a wide range of high-quality recreational opportunities and provides ecological services and wildlife habitat. AR3622. The Forest also continues to provide timber and other forest products, primarily for local and regional markets. AR3622. These diverse and sometimes competing

---

administrative record already in existence, not some new record made initially in the reviewing court."); *Lovgren*, 701 F.3d at 20 ("Our review is limited to the administrative record….").

[3] Record documents are identified with the prefix "AR" followed by a five-digit Bates number. Defendants lodged the Administrative Record on July 30, 2024 (DN 9) and additional documents on August 30, 2024 (DN 13), and corrected documents on October 31, 2024 (DN 15).

interests are managed according to the Forest Service's multiple-use mandate, which requires the Forest to be "administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. The 2005 Land and Resource Management Plan (Forest Plan) guides decisions to implement the Forest's multiple-use mandate and helps meet the Forest Service's mission "to sustain the health, diversity, and productivity of the nation's forests and grasslands to meet the needs of present and future generations." AR3616. The Forest Plan was developed under NFMA, the Forest Service's 1982 Planning Rule, and NEPA. AR3620.

Portions of the Forest currently are not meeting the Forest Plan's desired conditions. Relevant here are Peabody and Tarleton, two of the Forest's fifty-nine Habitat Management Units (HMUs).[4] Analyses of the two HMUs show that neither meets habitat composition and age class objectives. AR4877, 11973; *see* AR12350-53, 17907-14. For example, both Project areas lack young (regeneration-age) forest habitat, softwood species like spruce and fir, and open forest conditions more favorable to shade intolerant tree species – all of which would be more prominent but for historical disturbances like intensive logging. AR4877-78, 11973.

To move the Forest landscape towards desired conditions, the Forest proposed the Peabody Project in March 2019 and the Tarleton Project in October 2019. AR4868, 11931. Over four years and as required by NEPA, the Forest Service conducted a robust and open public process to develop and analyze the Project proposals. The Forest Service held open houses, solicited comments and objections from the public, conducted field and site visits, used Forest Service experts to analyze environmental effects, and revised and modified proposed activities.

---

[4] The Forest Plan defines "HMU" as a "block Forest land in which habitat composition and age class objectives will be established to help ensure that habitats are well distributed across the Forest and provide a framework for analyzing project impacts to wildlife habitat at a local scale. Blocks vary in size from about 6,000-49,000 acres and contain a variety of habitat types and land in a mix of Management Areas." AR3586.

AR4120-22, 4868, 11931-11934. The Forest Service analyzed the Projects' environmental effects in EAs, which culminated in FONSIs that documented why neither Project has significant effects within the meaning of NEPA and thus do not require EISs. AR4876-912 (April 2023 Peabody final EA and FONSI), 11968-12001 (November 2023 Tarleton final EA and FONSI).

Peabody is in the Androscoggin Ranger District along State Highway 16, a few miles south of Randolph and Gorham. AR4892 (Figure 1). The Project authorizes activities in a 3,000-acre Project area in the 15,500-acre Peabody HMU. AR4877. Activities include commercial and non-commercial vegetation treatments, expansion of a wildlife opening, road construction and reconstruction, and recreational improvements for mountain biking, skiing, and swimming. AR4867, 4881, 4892-95 (Figures 1-4).[5] All proposed silvicultural treatments would occur on Management Area (MA) 2.1 lands (General Forest Management), whose purpose includes providing high-quality sawtimber and other timber products on a sustained yield basis and providing a balanced mix of habitats for wildlife species. AR3474. No treatments are proposed in old forest or old growth habitats in the Project area. AR4880.

Tarleton is in the Pemigewasset Ranger District east of State Highway 25 around Lake Katherine and Lake Tarleton near the communities of Warren and Glencliff. AR11995 (Figure 1). Prior to the Forest's acquisition of the Project area in the late 1990s, the area was heavily harvested by private timber companies and contained tracts managed by the state. AR11973-74. The Project authorizes vegetation management, wildlife, and recreation activities on a 755-acre Project area in the 5,375-acre Tarleton HMU. AR11971, 11995-98 (Figures 1-4); *see* AR11976 (Table 1) (vegetation treatments), 11977-82 (defining treatments). All proposed silvicultural

---

[5] Modern timber management includes a variety of treatments that serve different purposes. The Peabody EA identifies the objective, prescription type, and acreage for the vegetation treatments. AR4881 (Table 1); *see* 4882-85 (defining treatments).

treatments would occur on either MA 2.1 lands or MA 8.3 (Appalachian National Scenic Trail) lands, the latter whose purpose is to manage the segment of the Trail in the Forest and provide for the conservation and enjoyment on the Trail and recreation opportunities. AR3516. None of the stands in the Project area are old forest or old growth habitat. AR12919. No proposed units within MA 8.3 are within the foreground (500 feet) of the Appalachian Trail, and thus meet Forest Plan scenic requirements for the Trail. AR11988-89; *see* AR3523.

The Forest Service District Rangers signed separate Decision Notices in November 2023 and February 2024 authorizing Tarleton and Peabody, respectively, to proceed. AR4867-69, 11929-34. Habitat restoration work unrelated to timber harvest began this summer in Tarleton. *See* DN 8 at 7, ¶ 2 (July 2024 Joint Case Management Plan). The Forest Service has awarded a timber sale contract for Peabody, but has not yet advertised or awarded a contract for the associated road work. The earliest timber operations could begin in a portion of Peabody is mid-December 2024, depending on contract timelines and conditions. *Id.* The earliest timber operations could begin in Tarleton is December 2025. DN 8 at 7. While not everyone supports the Projects, *see* Compl., the Projects enjoy strong support from the local community, state and local governments, and a wide array of interest groups. *See, e.g.*, AR4325 (Town of Gorham); 4719, 13132 (Appalachian Mountain Club); 10031-10032 (New Hampshire Department of Natural and Cultural Resources); 10806-07 (New Hampshire Department of Fish and Game).

## V.    ARGUMENT

### A.    The Projects' alternatives analyses are not arbitrary and capricious.

Claim One alleges the Forest Service violated NEPA because the Projects did not consider alternatives. Pl.'s Mem. in Supp. of Mot. for Summ. J. 10-14, DN 14-1 (Pl.'s Mem.) ; Compl., ¶¶ 178-192. Plaintiff is wrong. The Forest Service's detailed evaluation of the proposed

action and inclusion of no action as a comparative baseline satisfies NEPA's requirement to consider a reasonable range of alternatives.

1.    Analyzing the proposed action with a comparative no action baseline satisfies NEPA.

NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(E). For alternatives eliminated from detailed study, the agency need only "briefly discuss the reasons." 40 C.F.R. § 1502.14(a). "It is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion." *Friends of Animals v. Romero*, 948 F.3d 579, 591 (2d Cir. 2020). "[A]n agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 470 F. Supp. 2d 30, 62 (D.N.H. 2007) (citation and quotation omitted). An agency need not consider alternatives which are "infeasible, ineffective, or inconsistent with the basic policy objectives" for the management of the area. *Lovgren*, 701 F.3d at 37. "[T]he process of studying alternatives is not endless." *Seacoast Anti-Pollution League v. Nuclear Reg. Com'n*, 598 F.2d 1221, 1230 (1st Cir. 1979).

The Forest Service's NEPA regulations for EAs provide that "[n]o specific number of alternatives is required or prescribed." 36 C.F.R. § 220.7(b)(2). In an EA, the Forest Service may "document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented." 36 C.F.R. § 220.7(b)(2)(ii).

"In order to determine whether an alternative advances the project's purpose and need, an agency must consider the nature and scope of the proposed action." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023). Here, the primary purpose of the two Projects is to implement the management direction of the Forest Plan by advancing forest plan goals,

objectives, and desired conditions for vegetation, wildlife, and other resources. AR4877, 11972. Analyses of the current habitat conditions show that neither the Peabody nor the Tarleton HMUs are meeting Forest Plan MA 2.1 habitat composition or age class objectives. AR4877, 11973; *see* AR3433-34 (Forest Plan objectives for MA 2.1).

To implement the Projects' goals, the Forest Service analyzed in detail the proposed action (AR4880-88, 11976-83) and included in the effects analysis a no action alternative to contrast the effects of the proposed action (AR4897, 11975). Neither NEPA's implementing regulations nor the Forest Service's NEPA regulations require the agency to examine a specific number of alternatives. 40 C.F.R. § 1502.14; 36 C.F.R. § 220.7(b)(2). The consideration of a proposed action with a no action baseline – and no other alternatives – satisfies NEPA. 36 C.F.R. § 220.7(b)(2); *Earth Island Inst.*, 87 F.4th at 1065 ("We have repeatedly held that an agency satisfies NEPA when it considers only two alternatives – action and no action."); *Utah Env't Cong. v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir. 2006) ("[T]he Forest Service examined a reasonable range of alternatives and did not act arbitrarily when it considered only the no-action alternative and the modified proposed action.").

2.    <u>Plaintiff's suggested alternatives do not meet the Projects' purpose and need.</u>

Plaintiff does not challenge the reasonableness of the Projects' purpose and need statements. Instead, Plaintiff claims the Forest Service "failed to analyze alternatives to log less or otherwise reduce the Project's negative environmental effects." Pl.'s Mem. 10. The Forest Service considered Plaintiff's "Alternative 3" to Tarleton, a recreation and habitat-focused alternative that would prohibit timber harvest. AR10553 (comment #27). The Forest Service explained that Plaintiff's Alternative 3 was not reasonable because it did not meet the Project's purpose and need to address habitat composition and age class objectives for MA 2.1, which can

be adjusted only through timber harvest. AR12904 (identifying response to comment #27);

AR12353-55, 17911-13 (HMU Rationales). In Peabody, Plaintiff suggested an alternative that

also prohibited timber harvest in MA 2.1 and included some habitat enhancements, such as

introducing beavers or girdling trees. AR4845 (line #22 of spreadsheet, at the top of page). The

Forest Service explained, "this alternative functionally represents a partial implementation of the

full Proposed Action and would not meet the need as well as the full Proposed Action." *Id.*;

AR6107 (objection response for line #22). Contrary to Plaintiff's claim, Pl.'s Mem. 12, the

Forest Service did not "refuse" to look at other alternatives.[6] The Forest Service provided a brief

explanation why Plaintiff's alternatives did not meet the Projects' purpose and need. 40 C.F.R. §

1502.14(a). "[F]urther explanation was not required." *Lovgren*, 701 F.3d at 37.

Plaintiff does not meet its burden to show the Forest Service's range of alternatives is

arbitrary and capricious. No regulation requires a specific number – or even any – alternatives;

NEPA only requires an agency to examine "reasonable" alternatives (40 C.F.R. §§ 1502.14(a),

1508.9(b)), and Forest Service regulations expressly state that "[n]o specific number of

alternatives is required or prescribed." 36 C.F.R. § 220.7(b)(2). The Forest Service considered

Plaintiff's proposed alternatives and explained why they did not meet the Projects' purposes and

need. The Forest Service was well within its discretion to consider only the proposed action with

the effects of no action as a comparative baseline. *Friends of Animals*, 948 F.3d at 591.

---

[6] The Forest Service was receptive to constructive public comments and modified the proposed actions where possible. For example, in response to feedback about dispersed recreation in Tarleton, the Forest Service increased the no-cut buffer along Lake Tarleton from 100 to 300 feet. AR11971. The Forest Service modified Peabody to remove all activities from the Hermit Lake Complex, which contains facilities for year-round mountaineering. AR4806. The Forest Service also reduced forestry activities from the initial proposals by 49% for Peabody (4,500 to 2,220 acres) and by 21.5% for Tarleton (880 to 690 acres). AR4087, 9473.

*Defendants' Opening Brief*                                                                                    11

Plaintiff's cited authority does not show that the Forest Service' range of alternatives is arbitrary and capricious. Plaintiff selectively quotes NEPA for language about a "range of alternatives," but omits the key modifiers of "appropriate" and "reasonable." Pl.'s Mem. 10 and 12 (citing 42 U.S.C. § 4332(H) and 42 U.S.C. § 4332(C)(iii)).[7] Plaintiff's selective quoting of the statute also ignores NEPA's implementing regulations, which emphasize that alternatives must be reasonable. 40 C.F.R. §§ 1502.14(a), 1508.9(b). Two of Plaintiff's cases involve the range of alternatives in an EIS, not an EA. Pl.'s Mem. 12-13 (citing *Bob Marshall All. v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) and *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79 (2d Cir. 1975)). But, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Nw. Bypass Grp.*, 470 F. Supp. 2d at 62. For the two cases that concerned EAs, the courts upheld the range of alternatives. Pl.'s Mem. 12-13 (citing *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732 (2d Cir. 1983) and *Conservation Law Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 57 (D.N.H. 2019).

That the Forest Service included additional alternatives in a different forest health project's analysis does not show that *these* analyses are arbitrary and capricious, either. Pl.'s Mem. 12 (citing AR2229-56, the Albany South Project). In its comments on Peabody, Plaintiff cited the Albany South Project to argue the Forest Service should have considered an alternative that eliminated timber harvesting in a portion Project area. AR4845. The Forest responded, "this alternative functionally represents a partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action." *Id.* The Forest Service provided a

---

[7] *See* 42 U.S.C. § 4332(H) (agencies must "study, develop, and describe *appropriate* alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources") and 42 U.S.C. § 4332(C)(iii) (requiring "a *reasonable* range of alternatives to the proposed agency action").

rational explanation for why Albany South was not a useful comparison and why partial implementation was not a reasonable alternative in Peabody. 40 C.F.R. § 1502.14(a). That is all NEPA requires. Additionally, a different District Ranger authorized the Albany South Project than these two Projects. *Compare* AR2191 *with* AR4869, 11934. That different Forest Service officials have different management approaches does not show their decisions to analyze a different range of alternatives for these Projects is arbitrary and capricious.

      3.    <u>Forest Service regulations do not require a stand-alone no action alternative.</u>

Plaintiff also argues the Forest Service failed to analyze "a genuine no action alternative." Pl.'s Mem. 12. The Forest Service's NEPA regulations explicitly allow an EA to "document consideration of a no-action alternative through the effects analysis by contrasting the impacts of the proposed action and any alternative(s) with the current condition and expected future condition if the proposed action were not implemented." 36 C.F.R. § 220.7(b)(2)(ii). The plain language of this regulation – which Plaintiff does not address – disposes of its claim that the Forest Service had to consider a stand-alone no action alternative.[8]

In the final rule implementing this regulation, the Forest Service explained "[t]here is no specific CEQ requirement to include a no-action alternative in an EA and the language follows CEQ's EA guidance…." NEPA Procedures, 73 Fed. Reg. 43084-01, 43,092 (July 24, 2008). The Forest Service further explained, "[b]y contrasting the impacts of the proposal and alternatives with the current condition and expected future condition of the environment, the effects of a no-action alternative are considered." *Id.* at 43,093. Here, the Forest Service, in its best judgment, exercised this option to best serve the need of the Projects' analyses. *See id.*; *see also* AR6107

---

[8] None of Plaintiff's cases about a no-action alternative address 36 C.F.R. § 220.7(b)(2)(ii). *See* Pl.'s Mem. 12-14. While the regulation has been in effect since 2008, this claim appears to be an issue of first impression.

*Defendants' Opening Brief*                                               13

(objection response #1), 12904 (objection response #6), 10551 (response to comment #23). The consequences of no action in the EAs adequately describe the existing conditions of the Project areas and provide useful baselines from which to compare the effects of the proposed actions. AR4897, 11975; *see* AR11973-74, 17906-18 (describing existing conditions in the HMUs). A stand-alone no action alternative was not required. 36 C.F.R. § 220.7(b)(2)(ii).

In sum, the procedure the Forest Service used to examine the effects of the proposed actions with a no action comparative baseline satisfies NEPA and is not arbitrary and capricious. As the First Circuit held in *Seacoast Anti-pollution League*, "*Vermont Yankee* makes it clear that the NEPA requirement of studying alternatives may not be turned into a game to be played by persons who for whatever reasons and with whatever depth of conviction are chiefly interested in scuttling a particular project." 598 F.2d at 1230-31 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). While Plaintiff may want the Forest Service to consider additional alternatives, there is no requirement to do so and Plaintiff did not meet its burden to present a reasonable, but unexamined alternative. The Court should grant judgment for Defendants on Claim One.

**B.    The Forest Service conducted a reasonably thorough evaluation of the Projects' environmental effects.**

Claim Two alleges the Forest Service did not take a "hard look" at the Projects' direct, indirect, and cumulative impacts. Pl.'s Mem. 14-28; Compl., ¶¶ 192-205. Plaintiff alleges the Forest Service did not adequately examine effects to water quality, the northern long eared bat, scenery and recreation, forest health, and climate. Plaintiff's litany of complaints merely fly-speck the environmental analyses and do not show that the decisions are arbitrary and capricious.

NEPA requires agencies to evaluate the "reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C)(i)). In doing so, an agency must consider the

direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8. The court's only role is the ensure "the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976). Courts apply a "rule of reason" and "should not 'fly speck' an [environmental analysis] and hold it insufficient based on inconsequential or technical deficiencies." *Dubois v. Dep't of Agric.*, 102 F.3d 1273, 1287 (1st Cir. 1996). "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *United States v. Buzzards Bay*, 644 F.3d 26, 31 (1st Cir. 2011).

    1.    <u>The Forest Service reasonably evaluated direct and indirect effects.</u>

        a.    <u>The Forest Service analyzed impacts to water quality with its percent basal area removal methodology.</u>

The measure the Forest uses to assess the impacts of timber harvesting on water quality is the percent basal area removed in a watershed that contains a perennial stream. AR4900, 11987; *see* AR1-2 (flow charts showing steps of basal area calculation). Basal area is the cross-section of a tree at breast height (4.5 feet above ground), and is common way to measure the density of a stand. AR3578. When basal area removed in a watershed does not exceed 20%, there is high confidence of no measurable effect on water quality resulting from timber harvest. AR4900, 11988. The Forest Service explained its water quality methodology in the 2022 Albany South EA, which both Projects incorporate by reference. AR4900, 11987-88; *see* AR2331-49 (Albany South EA), AR6369-437 (Albany South Water Resources Report).

Of the fifty-seven watersheds in the Peabody Project area, the Forest Service determined basal area removal will exceed 20% in twelve watersheds. AR4900; AR6441-42 (57 watersheds,

with 12 highlighted in yellow). Of these twelve watersheds, seven do not provide perennial fish habitat, so the Forest found no concerns with changes in water quality. AR4900. The remaining five watersheds probably contain fish habitat, and the highest basal area removed is 27.3%. AR4900. In these five watersheds, changes of concern are a decrease in pH or an increase in aluminum. AR4900. But due to the dominant bedrock in the five watersheds (Two-mica granite), the effect on stream pH is expected to be minor and of short duration (one to three years). AR4900. And even at the 27% basal removal level, aluminum leaching is not expected to reach toxic thresholds. AR4900. Of the twelve watersheds in the Tarleton Project area, percent basal removal area ranges from 0.5% to 15.5%. AR13750. Three watersheds in the area (Lake Tarleton, Lake Katherine, Eastman Brook) are impaired with mercury contamination, acidity, or both. AR11987. Because removal does not exceed 20% in any watershed, no measurable adverse effects to water quality are expected from the Project. AR11988, 13750. Nor are any measurable increases in acidity or mercury expected. AR11987.

Both Projects comply with the Clean Water Act. AR4901, 11987. Both Projects also include design features to reduce potential negative effects from activities, such as implementing national and state best management practices, limiting ground-disturbing activities to appropriate seasons, and minimizing stream crossings where possible. AR4889, 11984. The Forest Service also approved a 300-foot buffer for activities around Lake Tarleton, four times greater than the 75-foot buffer suggested under best management practices. AR12912.

Plaintiff alleges the water quality analysis is deficient "because it did not actually look at the water quality within the impacted areas; rather, it made generic assertions based on its prior assessment of another distant site." Pl.'s Mem. 16. Plaintiff misinterprets the water quality analysis. The Project EAs did not rely on Albany South to replace the water quality analysis.

Rather, the EAs incorporated by reference the Albany South EA for more information about the percent basal removal methodology. AR4900, 11987-88; *see also* AR12910 (objection response explaining that "[t]he analysis protocols used for the Albany South project were used again for the Tarleton project because studies in the White Mountains indicate the validity of this method."). The Forest Service then used the percent basal removal methodology to conduct Project-specific assessments of impacts to water quality in the watersheds. AR4900, 11987-88.

Plaintiff also misinterprets this Court's prior holding in *Conservation Law Foundation*. In that case, the Court found that the effects analysis of a dredging project was not arbitrary and capricious because the Corps surveyed the aquatic ecosystem and discussed the specific impacts the proposed dredging activities will have on local species. *Conservation Law Found.*, 457 F. Supp. 3d at 62. The Court did not hold that on-the-ground surveys are required for an adequate water quality effects analysis. Moreover, the Army Corps and Forest Service are analyzing different ecosystems using their own methodology. Percent basal removal is how the Forest Service assesses impacts to water quality on the Forest.

Plaintiff may prefer sampling or some other undefined "site-specific assessment," but the Forest Service is entitled to rely on its own methodology when evaluating environmental effects. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Advocs. for Transp. Alts., Inc. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 304 (D. Mass. 2006) ("[T]he Court grants substantial deference to the agency's choices regarding methodology and technical analyses" (citing *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1446 (1st Cir. 1992))).

b.    The Forest Service prepared Project-specific biological evaluations to examine impacts to the northern long-eared bat.

At the request of the Forest Service, the U.S. Fish and Wildlife Service (FWS) reinitiated consultation and completed a programmatic biological opinion under the Endangered Species Act for the effects to the northern long-eared bat (*Myotis septentrionalis*) from planned and ongoing activities in the Eastern and Southern Regions of the Forest Service. AR3302-58.[9] FWS concurred with the Forest Service's determination that the Projects may affect but were not likely to adversely affect the bat. AR3302-03 (FWS letter); *see* 3398 (Peabody, #55659), 3399 (Tarleton, #56394). The Forest Service also evaluated effects on the bat through Project-specific biological evaluations (BEs). AR9238-58, 13915-61. The BEs took a conservative approach and assumed that bats were present even though no bats were captured during the most recent two-night survey conducted in 2019. AR9243-44, 13923. The Forest Service determined that the Projects may affect but are not likely to adversely affect the bat. AR9244, 13925.

Plaintiff's criticisms of the analyses on the bat have no merit. Pl.'s Mem. 18. The First Circuit holds that agency reliance on a biological opinion to document impacts to wildlife violates NEPA "if (1) the biological opinion is defective, or (2) the agency blindly relies on the biological opinion without conducting its own independent analysis." *Nantucket Res. Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 21 (1st Cir. 2024). Neither applies here. Plaintiff has identified no defects in the programmatic biological opinion, and the Forest Service conducted its own analysis of effects to the bat in the Project-specific BEs. AR9238-58, 13915-61. Plaintiff does not acknowledge the Projects' BEs at all. The Forest Service's EAs, BEs, and consultations with FWS satisfy the Forest Service's obligations to analyze effects to

---

[9] In November 2022, FWS reclassified the bat from threatened to endangered. AR3302. The reinitiated programmatic consultation addresses the change in the bat's listing.

Federally listed species and their critical habitat. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 650 (9th Cir. 2014) ("Congress specifically contemplated that an agency could comply with NEPA while discharging its duties under Section 7 of the ESA." (citing 16 U.S.C. § 1536(c)(1))).

As for surveys, the Forest Service relied on surveys conducted in 2019 that did not find any bats. Plaintiff does not claim that these surveys are unreliable, and even if "some of the data is 'old' does not mean that the data is unreliable." *Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239, 1258 (D. Idaho 2019), *aff'd*, 816 F. App'x 59 (9th Cir. 2020). More importantly, rather than conducting new surveys, the Forest Service assumed that bats were present – a far more conservative approach than looking for bats that may not be found. The Court must defer to the Forest Service's reasonable methodology that evaluated effects to bats by assuming their presence. *Town of Winthrop v. FAA*, 535 F.3d 1, 13 (1st Cir. 2008).

c. <u>The Forest Service analyzed impacts to scenery and recreation.</u>

The Forest Service conducted a reasonably thorough analysis of the Projects' effects on scenery and recreation. The Forest Service prepared scenery and recreation specialist reports for each Project and summarized the findings in the EAs. AR4887-88, 4897-98, 6462-64, 6498-506 (Peabody); AR11983, 11988-89, 13793-80, 13826-50 (Tarleton). The Forest Service identified four viewpoints in Peabody and nine viewpoints in Tarleton that best represented a Project area's viewshed. AR4898, AR4896 (map) (Peabody); AR11988, 11999 (map) (Tarleton). Using these viewpoints, the Forest Service modeled and adjusted the design of some of the timber units (*i.e.*, reducing size or changing prescriptions) to minimize visual impacts and to ensure Forest Plan compliance. AR4898, 11988-99. The EAs explain how the Projects contribute to providing quality and sustainable recreation experiences for visitors. AR4878-79, 4887-88, 11974-75,

11983, 11988. Both Projects include design features to reduce impacts to recreation, including an expanded 300-foot no-cut buffer for units next to Lake Tarleton. AR4890 (REC-1 through REC-5), 119894 (REC-1). The Forest Service also identified the location and prescription of timber units near recreation opportunities. AR4892-95 (Figures 1, 3, 4), 11995-97 (Figures 1, 2, 3).

Plaintiff complains that Tarleton's nine viewpoints were inadequate because the Forest Service should have included a floating viewpoint on Lake Tarleton itself. Pl.'s Mem. 19. As the Forest explained in its objection response, neither the Forest Service's Landscape Aesthetic Handbook (AR889-1134) nor the Forest Plan (AR3477-79) provide specific guidance for how to select viewpoints. AR12925 (#33). Forest Service specialists therefore used their knowledge of the Project area, mapping tools, and site visits to select the most representative viewpoints and then assess the Project's impacts on those viewpoints. *See* AR13826-50. This methodology is reasonable, well-informed, and entitled to deference. *Marsh*, 490 U.S. at 378. The Forest Service also explained that floating viewpoints had practical problems because they were not fixed and could not be precisely revisited for monitoring over time. AR12926. An agency decision can be found arbitrary and capricious if the agency "*entirely* failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (emphasis added). That is not the case here because the record shows the Forest Service considered, in tremendous detail, the Projects' effects on scenery.

Plaintiff also complains that the Forest Service did not inform the public about the location of Peabody's timber harvest units in relation to Great Gulf Trail and Great Gulf Inventoried Roadless Area. Specifically, Plaintiff complains the Forest Service did not prepare "overlay maps" obligating Plaintiff to "piece together where logging will occur." Pl.'s Mem. 20. This claim has no merit. The Forest Service provided several maps that show the location and

type of vegetation management in relation to recreational resources. AR4892-95 (Figures 1, 3, 4). The maps include roads, towns, streams and rivers, bike and ski trails, campsites, and other pertinent information that inform the public where Project activities will occur. *Id.* Figure 3 also *labels* the Great Gulf Trail in the lower lefthand corner. AR4894. The EA also incorporated the Peabody HMU Rationale by reference, and that analysis contains a map that shows the proposed units in relation to the Great Gulf Wilderness. AR17908. The Forest Service satisfied its procedural duties to reasonably inform the public of where Project activities will occur. 40 C.F.R. § 1500.1. Plaintiff's demand for overlay maps fly-specks the EA and would not contribute to a better-informed decision. *Dubois*, 102 F.3d at 1287.[10]

Finally, Plaintiff complains about scenic effects to the Appalachian Trail and recreational impacts baselines in Peabody. The Court's review of these two claims is barred by the doctrine of administrative exhaustion. The Forest Service's pre-decisional administrative review process requires that "[i]ssues raised in objections must be based on previously submitted specific written comments…the burden is on the objector to demonstrate compliance with this requirement…." 36 C.F.R. § 218.8(c). Objections not based on previously submitted written comments must be set aside. *Id.* § 218.10(a)(3). The reviewing officer rejected both claims, informing Plaintiff that its objections were not based on issues raised during scoping or any other designated opportunity for public comment. AR6113 (issues ## 8, 9). Plaintiff's failure to properly raise these claims during the Forest Service's mandatory objection process deprived the agency of the opportunity to consider the issues during the administrative process and thus bars

---

[10] With no elaboration, Plaintiff complains the Forest Service did not adequately assess impacts to the Great Gulf Inventoried Resource Area. Pl.'s Mem. 20. But the Forest Service completed a Wilderness and Roadless Areas Effects Analysis that explicitly addresses impacts to the Great Gulf Inventoried Roadless Area. AR6473-74; *see also* AR6120-21 (objection response #19).

judicial review. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004); *Massachusetts v. United States*, 522 F.3d 115, 132 (1st Cir. 2008); *Earth Island Inst.*, 87 F.4th at 1064.

Even if the Court were to consider these claims, two circuits have already dismissed such narrow-interested fly-specking. The First Circuit has already rejected claims that visual scarring – including from clearcutting – is significant within the meaning of NEPA. *Sierra Club*, 555 F.3d at 29. The Ninth Circuit holds that "NEPA does not require the Forest Service to cater to the preferred interests or preferences of one user group." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1460 (9th Cir. 1996). While Plaintiff may be dissatisfied with the Forest Service's analysis of impacts to recreation, other local recreation groups support the Projects. *See, e.g.*, AR4719, 13132 (Appalachian Mountain Club); AR4304-05 (Granite Backcountry Alliance); AR4313 (Friends of Tuckerman Ravine); AR4672-74 (Ruffed Grouse Society).

        d.    <u>The Forest Service analyzed impacts to forest health.</u>

The EAs and supporting documents analyze the Projects' impacts on forest health. Each Project seeks to improve wildlife habitat diversity within the respective HMU. AR4877-78, 11973-74. The EAs summarize and incorporate by reference the "Rationale for Habitat Objectives" for the respective HMU (HMU Rationale). AR4877-78 (citing 17906-18), 11973-74 (citing 12344-57). The Forest Service determined existing HMU conditions through field stand examinations, data analysis and modeling, and site visits. AR12350, 17910; *see* AR9203-18, 13977, 13988 (HMU conditions); AR7836, 13898-911 (field notes). As found in the HMU Rationales and summarized in the EAs, neither HMU currently meets MA 2.1 habitat composition and age class objectives. AR4877, 11973; *see* AR12350-53, 17907-14. The EAs explain in detail how the proposed activities address the discrepancy between current conditions and desired Forest Plan goals and objectives in each of the HMUs. AR4880-85, 11976-82.

Plaintiff does not dispute the Forest Service's conclusions that neither HMU is meeting

Forest Plan objectives for MA 2.1, nor that the proposed activities will move the HMUs toward

desired conditions. Pl.'s Mem. 21-24. Instead, Plaintiff makes a confusing argument about the

availability and accessibility of the raw stand surveys themselves.

Plaintiff first claims that the Forest Service "did not disclose the stand survey information

during the public comment period…." Pl.'s Mem. 21. However, both the *draft and final* EAs

clearly identified the HMU Rationales, and those Rationales identify stand surveys as one of the

sources the Forest used to assess forest health. AR4877-78, 11973-74, 12350, 17910; *see*

AR4803-04 (August 2022 Peabody draft EA), 11815 (April 2022 Tarleton draft EA). The draft

EAs, final EAs, and material incorporated by reference inform the public how the Forest Service

analyzed forest health. 40 C.F.R. § 1501.21; *Jones v. Nat'l Marine Fisheries Serv.*, 741 F.3d 989,

998 (9th Cir. 2013) ("[A]n agency may incorporate data underlying an EA by reference.");

*Friends of the Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1097 (D. Idaho 2022) ("The Forest

Service was not impeding agency or public review because the documents were available for

inspection."). *Appalachian Mountain Club v. Brinegar* does not apply. Pl.'s Mem. 21 (citing 394

F. Supp. 105, 121 (D.N.H. 1975)). There, the court found the failure to include traffic data in a

draft EA violated the Federal Highway Administration's own regulations. There is no

corresponding Forest Service regulation requiring the agency to disclose stand survey data.[11]

Plaintiff then claims the stand surveys are too confusing, "rendering them unfit for public

review." Pl.'s Mem. 23. As required by NEPA's implementing regulations, the EAs are written

---

[11] Further, anyone who wanted to see the stand surveys during the administrative process could
have requested them. In fact, Plaintiff made such a request – one year after the Forest Service
released the draft EA for Tarleton. The Forest Service responded within two weeks. AR12901;
*see* AR9885 (FOIA response dated April 14, 2023). That Plaintiff waited more than a year to
request data it now claims was "vital" to public review is not the fault of the Forest Service.

*Defendants' Opening Brief*                                                                23

in plain language that can be readily understood. 40 C.F.R. § 1502.8. This regulation only applies to an environmental analysis – such as an EIS or EA – not to all documents supporting an agency's decision. *Id.* (EISs); *see Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004) (applying 40 C.F.R. § 1502.8 to EAs). The stand surveys necessarily are intended for specialists to interpret, including members of public who claim to have the requisite expertise. *See* Decl. of Zack Porter ¶¶ 5, 6, DN 14-2 (claiming academic and professional training in public lands management and forestry). As for Plaintiff's claim that the information is a "patchwork of stand surveys and spreadsheets," Pl.'s Mem. 23, the EAs and HMU Rationales contain clear prose and easy to understand graphics that explain why neither HMU is meeting Forest Plan objectives and goals. AR4877-78, 11973-74, 12344-57, 17906-18.

Plaintiff also questions the Forest Service's determination that no vegetation management will occur in old forest or old growth habitat. Pl.'s Mem. 22. Plaintiff does not identify any stands it thinks both have these attributes and authorized timber harvest, nor explain how any limited harvest within such a stand would necessarily impact old growth. Plaintiff thus fails to show that the Forest Service's stand data is arbitrary and capricious. *Friends of Rapid River*, 427 F. Supp. 3d at 1258-59 (rejecting NEPA challenge because "Plaintiffs have not cited any information, authority, or studies illustrating that the Forest Service's stand exam information (old or new) is erroneous or unreliable."). Rather than identifying particular stands, Plaintiff refers to the Forest Service's objection response and an email from a botanist. These documents show that while a few units were initially included for treatments, they were *dropped* once old-growth characteristics were confirmed. AR4527, 6116.[12] The Court should reject Plaintiff's

---

[12] Contrary to Plaintiff's assertion, the botanist's email is not a post hoc rationalization because the Forest Service itself identified the misclassified stands and the explanation is part of the Administrative Record. *Sierra Club*, 555 F.3d at 27.

allegation of timber harvest in old forest or old growth habitat both because of Plaintiff's "cryptic and obscure" references to unidentified stands and because of the Forest Service's demonstrated "willingness to receive evidence on the matters." *Vt. Yankee*, 435 U.S. at 554.

Plaintiff claims the Forest Service ignored Executive Order 14072, which requires the agency to inventory old growth and mature forest habitat and then develop policies to institutionalize climate-smart management and conservation strategies. Pl.'s Mem. 23-24; *see* Executive Order 14072, 87 Fed. Reg. 24851, 24852 (Sections 2(b) and 2(c)). The Forest Service did not "ignore" the Executive Order; it explained that although the initial inventory has been released, no strategies have been developed and that Order does not promulgate a specific policy. AR12905; *see* 6116 (stating the Order does not apply at the project scale).

Finally, Plaintiff claims the Forest Service ignored scientific literature it submitted. Pl.'s Mem. 24. This argument fails for two reasons. First, NEPA's requirement to address "responsible opposing view[s]" applies to EISs, not EAs. 40 C.F.R. § 1502.10(b); *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1020 (9th Cir. 2012); *see Vt. Yankee*, 435 U.S. at 549 (a court should not "impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good."). Second, Plaintiff identifies no literature it believes should have been consulted, instead citing three vague propositions about timber harvest and carbon storage from its own Complaint. Pl.'s Mem. 24, n.14 (citing Compl. ¶¶ 65, 125). The Forest Service considered and addressed each of these propositions. AR4846-47, 4851, 10270-71; *see also* AR6115, 12906-07. Plaintiff's argument amounts to a complaint that the Forest Service did not specifically identify and respond to three pieces of literature buried in Plaintiff's voluminous submissions. But the Forest Service did not have to do so.

2.    <u>The Projects reasonably evaluate cumulative impacts to climate.</u>

"[P]roper consideration of the cumulative impacts of a project requires some quantified or detailed information, not just general statements about possible effects and some risk." *Conservation Law. Found.*, 457 F. Supp. 3d at 58 (citation omitted). But "quantified data in a cumulative effects analysis is not a per se requirement." *Ctr. for Comm. Action & Env't Just. v. FAA*, 18 F.4th 592, 605 (9th Cir. 2021). The Forest Service's NEPA regulations for cumulative effects do not require the agency "to catalogue or exhaustively list and analyze all individual past actions." 36 C.F.R. § 220.4(f). The touchstones of NEPA is that impacts need only "be discussed in proportion to their significance" and that EAs are "concise public documents" that "briefly provide sufficient evidence...." 40 C.F.R. §§ 1502.2(b), 1508.9(a), (b).

In 2019, the Forest Service completed a Forest-wide carbon assessment. AR5678-703. The assessment quantifies the amount of carbon stored in the Forest and how disturbances, management, and environmental factors have influenced carbon storage over time. *Id.* The Forest Service also completed Project-level carbon assessments. AR6322-27, 13259-65. The Project-level assessments incorporate by reference the Forest-wide quantitative assessment and place the extremely small contribution each Project has into context with Forest carbon storage and global climate change. The Project-level assessments note that the 2,220 acres of vegetation management on Peabody Project and 690 acres of vegetation management on Tarleton affect no more than 0.5% and 0.1% of the 800,000-acre Forest, respectively. AR13260. The Projects' effects focus on aboveground carbon stocks stored in live woody vegetation, which comprise about 35% of the total ecosystem carbon stocks of the Forest. AR6322, 13260. In the context of global climate change, the Projects' contributions to global greenhouse gases are negligible. AR6323, 13260. Additionally, any carbon initially emitted is temporary, both because a healthier

and more resilient forest will regrow and because the harvested wood transfers to the product

sector, where it may be stored for decades. AR6324, 13262. The EAs summarize and incorporate

by reference the analyses in the Forest-wide and Project-level assessments. AR4900, 11987.

Plaintiff claims the Forest Service's cumulative impacts analysis is deficient for two

reasons. First, it claims the Forest Service had to "disclose the cumulative climate impacts of its

own projects…." Pl.'s Mem. 25; *see id.* n.15 (naming seven projects). An agency may

"characterize the cumulative effects of past actions in the aggregate without enumerating every

past project that has affected an area." *Ctr. for Env't Law & Pol'y v. U.S. Bureau of*

*Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011); *see* 36 C.F.R. § 220.4(g) (cataloging past

actions is not required). The Forest-wide carbon report aggregates past projects, noting that

timber harvesting from 1990 to 2011 was the primary disturbance influencing carbon stocks.

AR5689. The record also identifies the date and type of past timber harvest in the Peabody

Project area. AR7912. The Tarleton Project area was heavily harvested before the Forest Service

acquired it in the late 1990s and early 2000s. AR11973-74. There have been no sales since.

Second, Plaintiff claims the climate analysis is deficient because it did not quantify the

Projects' effects on climate change. Pl.'s Mem. 26-28. "Qualitative analyses are acceptable in an

[environmental document] where an agency explains why objective data cannot be provided."

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d

1060, 1076 (9th Cir. 2012) (cleaned up). The Project-level assessments explain why the

extremely small amount of emissions cannot be reasonably quantified. AR6324, 13262.

None of Plaintiff's cases support their argument that the Forest Service must quantify the

greenhouse gases for these two forest management projects with negligible emissions. *WildEarth*

*Guardians v. Zinke* concerned the issuance of 473 oil and gas leases on more than 460,000 acres

*Defendants' Opening Brief*                                                                                      27

of federal land in three western states. 368 F. Supp. 3d 41, 55 (D.D.C. 2019). *Center for Biological Diversity v. National Highway Traffic Safety Administration* challenged a nationally applicable final rule for fuel economy standards for light trucks. 538 F.3d 1172, 1191 (9th Cir. 2008). *Diné Citizens Against Ruining Our Environment v. Haaland* concerned 370 applications to drill for oil and gas in northern New Mexico. 59 F.4th 1016, 1044 (10th Cir. 2023).

In the context of forest management projects, which involve the renewable and carbon-storing resource of timber, most courts have not required the Forest Service to quantify a project's effects on climate change. For example, the Ninth Circuit previously upheld an EA for a project that authorized timber harvest "to reduce likely fire intensity" that did not discuss climate change. *Hapner v. Tidwell*, 621 F.3d 1239, 1242, 1245 (9th Cir. 2010). In doing so, the court correctly noted that potential "[i]mpacts shall be discussed in proportion to their significance." *Id.* at 1245 (quoting 40 C.F.R. § 1502.2(b). At least two district courts have upheld the Forest Service's qualitative analysis of a forest management project's climate impacts. *Swomley v. Schroyer*, 484 F. Supp. 3d 970, 975-77 (D. Colo. 2020) *aff'd*, No. 20-1335, 2021 WL 4810161 (10th Cir. Oct. 15, 2021); *League of Wilderness Defs. v. Connaughton*, No. 3:12-cv-2271-HZ, 2014 WL 6977611, at *26-27 (D. Or. Dec. 9, 2014).

Plaintiff cites *Center for Biological Diversity v. United States Forest Service* (*Black Ram*) to support a different conclusion, but that case is readily distinguishable. Pl.'s Mem. 27 (citing 687 F. Supp. 3d 1053, 1075 (D. Mont. 2023)). *Black Ram* improperly disregarded binding precedent from *Hapner* and failed to defer to Forest Service expertise about the potential impacts of a forest resiliency project. *Marsh*, 490 U.S. at 378. This failure is reflected in the court's facile framing of the issue: "logging causes immediate carbon losses, while re-sequestration happens slowly over time, time that the planet may not have." *Black Ram*, 687 F. Supp. 3d at 1076. The

*Black Ram* court ignored that harvested timber continues to store carbon when converted to wood products, and ignored that the remaining and new trees that grow in the healthier forest will sequester more carbon than if left untreated. AR6324, 13262.

Plaintiff also claims "on point CEQ guidance" requires quantification of emissions. Pl.'s Mem. 27 and n.17. It does not. In January 2023, CEQ promulgated interim guidance to help agencies analyze greenhouse gas and climate change effects for proposed actions. AR473. The interim guidance applies to "new proposed actions," AR489, and so does not apply to either of the Projects' NEPA processes that were well underway. *See* AR4085, 9741. For on-going NEPA processes, agencies are to exercise their judgment when considering whether to apply the guidance. AR489. Though not required, both Projects explain how their analyses comply. AR6116, 12905-06. Notably, the interim guidance provides that "actions with only small GHG emissions may be able to rely on less detailed emissions estimates." AR479. When an agency cannot provide a reasonable range of emissions, "the agency should provide a qualitative analysis and its rationale for determining that a quantitative analysis is not possible." *Id.* The Project-specific analyses explain that in the near-term, the Projects might contribute an extremely small quantity of emissions relative to national and global emissions. AR6324, 13262. Additionally, any negligible increase would be balanced and possibly eliminated because the remaining and new trees will have higher rates of growth and carbon storage. AR6324, 13261.

While quantification of climate impacts may be useful for certain projects (such as energy facilities or oil and gas development), it is not required here. *Ctr. for Env't Law*, 655 F.3d at 1007. The Forest Service's qualitative assessment of the Projects' negligible effects on global climate change satisfies NEPA's requirement discuss impacts in proportion to their significance. 40 C.F.R. § 1502.2(b); *Hapner*, 621 F.3d at 1245; *Swomley*, 484 F. Supp. 3d at 976.

In sum, none of Plaintiff's challenges to the Projects analysis of direct, indirect, or cumulative effects have any merit. The Forest Service conducted a reasonable analysis of effects in proportion to their significance. 40 C.F.R. § 1502.2(b); *Balt. Gas & Elec. v. Nat. Res. Defense Council*, 462 U.S. 87, 97 (1983) ("[A]n agency must consider only every *significant* aspect of a proposed action"). Plaintiff's demand for irrelevant detail merely fly-specks the EAs and would not contribute to an informed decision. *Dubois*, 102 F.3d at 1287. As the Ninth Circuit recently held, "[i]t is always possible to quibble with an agency's explanation; a motivated litigant will be able to identify parts of any agency explanation that could have been more precise or thorough. But the arbitrary and capricious standard does not demand perfection." *Earth Island Institute v. Muldoon*, 82 F.4th 624, 637 (9th Cir. 2023). That Plaintiff disagrees with the Forest Service's analysis "is not a basis for deeming it invalid. The NEPA ensures that an informed decision is made, not that the decision is satisfactory to all those affected by it." *Lovgren*, 701 F.3d at 38.

## C.    **The FONSIs are not arbitrary and capricious.**

Claim Three alleges the Projects' FONSIs are unlawful. Pl.'s Mem. 28; Compl., ¶¶ 206-218. Plaintiff's barely articulated argument does not meet its burden to show that the Forest Service's conclusions on the Projects' lack of significant effects is arbitrary and capricious.

A FONSI "briefly present[s] the reasons why an action…will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13. Agencies consider both context and intensity to determine whether an action may "significantly affect" the environment. 40 C.F.R. §1508.27; *No East-West Hwy. Comm., Inc. v. Chandler*, 767 F.2d 21, 25 (1st Cir. 1985). "Context simply delimits the scope of the agency's action, including the interests affected." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014). Intensity refers to the "severity of impact," and the

regulations identify ten factors that agencies should consider. 40 C.F.R. §1508.27(b)(1)-(10). To prevail on a claim that the decision not to prepare an EIS is arbitrary and capricious, "plaintiffs must do more than simply identify potential shortcomings in the projects themselves or their environmental assessments/decision notices." *Sierra Club*, 581 F. Supp. 2d at 268.

The FONSIs identify the context of the proposed actions and address each of the ten intensity factors. AR4904-06 (Peabody), 11991-93 (Tarleton). The objection response provided additional explanation for why the Projects do not have significant effects. AR6107-08, 12902-03. The FONSIs thus satisfy NEPA because they briefly explain why the Projects do not have significant environmental effects and why EISs are not required. 40 C.F.R. §§ 1508.13, 1508.27.

Though Plaintiff's Complaint alleges deficiencies in the Projects' context analysis and five of the ten intensity factors, their opening brief does not provide any legal argument to support their claim. *Compare* Compl. ¶¶ 213, 216 (alleging failure to identify context), ¶¶ 214, 217 (alleging failure to consider intensity factors 1, 3, 4, 7, 9) *with* Pl.'s Mem. 28. Instead, Plaintiff summarily claims the Forest Service's "failures, detailed above…resulted in unlawful [FONSIs]." Pl.'s Mem. 28; *see also id*. at 26, n.16 (disagreeing with the context for forest health and bat impacts). The Court should find that Plaintiff waived Claim Three because "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *In re Jackson*, 988 F.3d 583, 590 (1st Cir. 2021) ("The mere mention of a challenge suffices only to waive it."). Even if the Court finds that Plaintiff preserved Claim Three, its catch-all argument falls far short of Plaintiff's burden to show that the FONSI's consideration of context or any of the ten intensity factors are arbitrary and capricious. *Sierra Club*, 581 F. Supp. 2d at 268. Further, as discussed above, the EAs that a hard look at the

Projects' environmental effects and fully support the Forest Service's conclusions that the

Project will not have any significant environmental effects within the meaning of NEPA.

**D.**     **The Projects comply with the Forest Plan**.

Claim Four alleges the Projects do not comply with the Forest Plan and violate NFMA.

Pl.'s Mem. 29-32; Compl, ¶¶ 219-229. Plaintiff alleges Peabody violates Forest Plan standards

for scenery and eligible Wild and Scenic Rivers and that neither Project contributes to the

conservation and recovery of the northern long-eared bat.[13] The Forest Service's EAs and

supporting documentation show that the Projects comply with all Forest Plan standards. *See, e.g.*,

4906, 11993 (FONSIs documenting compliance with Forest Plan).

Plaintiff first alleges the Peabody Project violates Forest Plan "scenic standards" for

Units 19, 20 and the wildlife opening. Pl.'s Mem. 30. Peabody is located entirely within MA 2.1

(General Forest Management). Contrary to Plaintiff's claim, there are no scenic *standards* for

MA 2.1, but there are seven *guidelines*. AR3477-79. This distinction matters, because a

"standard" must be followed and can only be changed through a Forest Plan amendment.

AR3438. A "guideline," on the other hand, also must be followed, "but permits operational

flexibility to respond to variations in conditions." *Id.* If a guideline is not followed, "the rationale

for doing so must be documented in a project-level analysis and signed decision." AR3438.

Relevant here is Guideline 3, which generally limits visible openings to 3-4 acres in

"high" scenic integrity areas in MA 2.1. AR3477. The Forest Service acknowledged that three of

the units have relatively large even-aged treatments and would exceed Guideline 3 for MA 2.1.

AR4898 (26 acres in Unit 19, 9 acres in Unit 20, and 19 acres in the wildlife opening); AR6521,

---

[13] Plaintiff also alleges that its NEPA arguments about stand data and scientific literature also
show NFMA violations. Pl.'s Mem. 29. These barely articulated arguments are waived. *Zannino*,
895 F.2d at 17; *In re Jackson*, 988 F.3d at 590.

4892 (classifying Units 19, 20, and the wildlife opening as areas of "high" scenic integrity). But the EA explained that the larger openings in these units will better meet Project-level objectives for the area and help move the Forest towards desired conditions consistent with the Forest Plan. AR4898. Additionally, to minimize visual impacts from this modification, the Forest Service incorporated a design element to distribute the openings in units 19 and 20. AR4898; *see* AR4891 (SCM-1). Consistent with Forest Plan requirements, the Forest Service explained the rationale for modifying MA 2.1 Guideline 3 for these three units and documented the modification in the Peabody Decision Notice. AR4867. Under the APA's deferential standard of review, the Court should defer to the Forest Service's established procedure – followed here – to modify Guideline 3. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. Plaintiff cites no authority that prevents the Forest Service from modifying Forest Plan guidelines as it did here.

Plaintiff also alleges that Peabody does not comply with Forest Plan standards for the Peabody River and West Branch of the Peabody River, which are eligible for designation as Wild and Scenic Rivers. Pl.'s Mem. 30-31. Plaintiff failed to exhaust its administrative remedies for this claim because it did not raise this issue during scoping or any other designated opportunity for public comment. 36 C.F.R. §§ 218.10(a)(3), 218.8(c); AR6119 (objection response #16). Plaintiff cannot raise this claim for the first time in litigation. *Public Citizen*, 541 U.S. at 764; *Massachusetts*, 522 F.3d at 132. Even if the Court could reach the merits of this claim, the Forest Service analyzed impacts to the two eligible rivers and determined that Project activities would not result in irreversible or irretrievable changes that could affect potential designation. AR4902-03 and AR4903 (Table 7).

Finally, Plaintiff alleges the Projects do not contribute to the conservation and recovery of endangered species, and specifically the northern long-eared bat. Pl.'s Mem. 31-32. Forest

Plan Rare and Unique Features Standard 1 requires, "all project sites must be investigated for the presence of TES [Threated, Endangered, Sensitive] species and/or habitat prior to beginning any authorized ground-disturbing activity at the site. TES *plant* surveys must be completed for all new ground-disturbing projects, unless biologists/botanists determine TES species occurrence is unlikely." AR3448 (emphasis added). The Forest Service complied with Standard 1 because it investigated both Project areas for the presence of the bat, through Project-specific BEs that assumed bats were present and through reinitiated programmatic consultation with FWS. *See supra*, Part V.B.1.b. The Court should defer to the Forest Service's reasonable interpretation of the investigation required by Standard 1. *Or. Nat. Desert Ass'n.*, 957 F.3d at 1035.

Plaintiff believes an investigation must include surveys. Standard 1's requirement to conduct surveys applies to *plants* – the key term omitted from Plaintiff's paraphrase. Pl.'s Mem. 31 (citing AR3448). This omission is fatal to Plaintiff's claim. Surveys are not required for bats.

*Sierra Club v. Martin* does not apply, either. Pl.'s Mem. 31-32 (citing 168 F.3d 1 (11th Cir. 1999)). In *Sierra Club*, the Eleventh Circuit found that seven timber sales on Georgia's Chattahoochee National Forest violated NFMA because "the Forest Service did not obtain, and therefore did not consider, population inventory and population trend data…*as required by the Forest Plan* and the Forest Service's own regulations." 168 F.3d at 3 (emphasis added). This Forest Plan has no requirement to conduct a population inventory for the bat. AR3448. Additionally, 36 C.F.R. § 219.26 (1982), the regulation relied on in *Sierra Club* and cited by Plaintiff here applies only to population monitoring for management indicator species, which are selected representative species used to estimate effects of the forest plan on forest ecosystems. *Sierra Club*, 168 F.3d at 5 n.7. The northern-long eared bat is not one of the Forest's management indicator species, AR17899-90, so this regulation does not apply.

*Defendants' Opening Brief*                                                                                                     34

In sum, Plaintiff has not met its burden to show that the Projects do not comply with Forest Plan standards. While Plaintiff may disagree, the Forest Service's interpretation of its own Forest Plan is entitled to deference. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035. The Court should grant summary judgment for the Forest Service on Claim Four.[14]

## VI.    CONCLUSION

Plaintiff has not met its burden to show that the Peabody or Tarleton Projects are arbitrary and capricious. The Projects satisfy the Forest Service's multiple-use mandate and will create a more diverse, healthier, and more sustainable Forest for present and future generations. The Court should grant summary judgment for Defendants on all claims and deny Plaintiff's motion for summary judgment in its entirety.[15]

Respectfully submitted,

Dated:  October 31, 2024.                    TODD KIM
                                             Assistant Attorney General
                                             Environment and Natural Resources Division
                                             United States Department of Justice

---

[14] Plaintiff pleaded, but did not argue, claims about impacts to soil resources (Compl. ¶ 198); cultural resources, wilderness, and inventoried roadless areas on Peabody (*id.* ¶ 202); new information that would require a supplemental NEPA analysis (*id.* ¶¶ 207-08); and consistency with Forest Plan requirements for using the latest scientific information (*id.* ¶¶ 220, 224, 227). These claims are waived. *Sullivan v. Neiman Marcus Grp., Inc.*, 358 F.3d 110, 114 n.1 (1st Cir. 2004) (issues not raised in an opening brief on appeal are waived).

[15] In passing, and with no analysis, Plaintiff asks the Court to vacate the Projects' decisions. Pl.'s Mem. 32. The Forest Service satisfied its statutory obligations under NEPA and NFMA. If the Court concludes otherwise, it should permit the Parties to brief remedy. A court has wide discretion to fashion an appropriate remedy. *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 541-42 (1987). Whether to vacate agency decisions "rests in the sound discretion of the reviewing court; and it depends *inter alia* on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations." *Cent. Maine Power Co. v. FERC*, 252 F.3d 34, 49 (1st Cir. 2001). Unless or until a specific violation is established, it will not be clear what a reasonable remedy might be.

/s/  John P. Tustin
Texas Bar No. 24056458
Senior Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Phone:    (202) 305-3022
Fax:        (202) 305-0275
john.tustin@usdoj.gov

JANE E. YOUNG
United States Attorney

## TABLE OF ACRONYMS

| APA | Administrative Procedure Act |
|-----|------------------------------|
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish & Wildlife Service |
| HMU | Habitat Management Unit |
| NFMA | National Forest Management Act |
| NEPA | National Environmental Policy Act |
| TES | Threatened, Endangered, Sensitive |