UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| STANDING TREES, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES FOREST SERVICE, *et al.*, <br><br> Defendants. | Case No.: 1:24-cv-00138-JL-TSM |

### *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS

The Amici, *see* contemporaneously filed Motion for Leave to File Amicus Brief by Amici, incorporated and referenced herein, filing as *amicus curiae,* support Defendants' claims and urge this Court to grant Defendants' Cross-Motion for Summary Judgment.

### THE INTERESTS OF THE *AMICUS CURIAE*

Although each of the Amici is a distinct entity with its own mission and/or vision, they all share the objective of responsible, science-based stewardship of the White Mountain National Forest ("WMNF") and the integrity of the forest management planning process.

The Tarleton Integrated Resource Project ("Tarleton") and Peabody West Integrated Resource Project ("Peabody") (collectively, the "Projects") are consistent with the Amici's shared values. They promote the responsible stewardship of the WMNF through compliance with the 2005 White Mountain National Forest Land and Resource Management Plan (the "Forest Plan") in accordance with the National Forest Management Act of 1976 ("NFMA") and the Forest and Rangeland Renewable Resources Planning Act of 1974 ("RPA"). These laws direct the U.S. Secretary of Agriculture to develop plans for units of the National Forest System. Among other things, these plans must: "provide for multiple use and sustained yield of the

1

products and services obtained therefrom . . . and, in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness" and "determine forest management systems, harvesting levels, and procedures in the light of all of the uses[,] . . . the definition of the terms 'multiple use' and 'sustained yield[,]' . . . and the availability of lands and their suitability for resource management." 16 U.S.C. § 1604(e). The Forest Plan meets these conditions.  It was adopted after extensive public participation resulted in a broad consensus amongst interested parties.  The Forest Plan was never appealed or otherwise litigated.

The Amici all support the "multiple use" approach to managing National Forest lands. In fact, several of the Amici collectively own and sustainably manage hundreds of thousands of acres of forested land.  For some Amici, this has been the case for over a century. Like the WMNF, Amici follow science-based silviculture for multiple uses, including habitat diversity, recreation, and sustainable timber resources. Thus, the Amici are uniquely positioned to speak on the Projects and their consistency with the Forest Plan.

## ARGUMENT

The Defendants gave careful, thoughtful consideration in approving the Projects, emphasizing the role of public participation and the benefits the Projects would bring to the WMNF by furthering the goals and objectives of the Forest Plan. Contrary to the Plaintiff's assertion that the Defendants neglected their duties, the Defendants subjected each Project to a years-long review process that culminated in proposals designed to best advance the interests of the WMNF. As explained in greater detail below: (1) the Projects benefit the WMNF by furthering the goals and objectives of the Forest Plan; (2) the Defendants conducted appropriate due diligence in considering possible alternatives; (3) the Plaintiff's pleadings contain

2

inaccuracies and mischaracterizations; and (4) the Defendants provided ample opportunity for public participation that had direct impacts on the Projects.

**I.     The Projects are necessary to advance the goals and objectives of the Forest Plan and will provide numerous benefits to the WMNF.**

The Forest Plan sets forth numerous goals and objectives for the WMNF. The Forest Service's overall objective for the WMNF is to "provide recreation and other opportunities, experiences, and benefits, some of which are not readily available elsewhere." Forest Plan at 1–3. The Forest Plan also provides goals and objectives tailored to specific concerns. Contrary to the Plaintiff's claim that the Projects do not comply with the Forest Plan (Compl. ¶¶ 11, 223), the Projects are *needed* to achieve the Forest Plan's goals and objectives, as set forth in the Peabody Decision Notice (the "Peabody NOD") and the Tarleton Decision Notice (the "Tarleton NOD"), with the Projects' proposed actions directly correlating to goals and objectives of the Forest Plan.

   *A.  Projects' Similar Contributions to Forest Plan's Goals and Objectives*

Both Projects propose silvicultural treatment, which furthers Forest Plan goals to "manage vegetation using an ecological approach to provide both healthy ecosystems and a sustainable yield of high quality forest products" and to "use timber harvesting as a tool to attain wildlife habitat and other resource objectives." Peabody NOD at 1; Tarleton NOD at 1; Forest Plan at 1-17. They also call for expanding/reconfiguring permanent wildlife openings, invoking goals that the WMNF "will use sustainable ecosystem management practices to provide a diversity of habitats across the Forest" and "[r]ecreation sites will be managed to allow for wildlife viewing, where appropriate, while minimizing the potential for human-wildlife conflicts." Peabody NOD at 1; Tarleton NOD at 1; Forest Plan at 1-20, 1-22. The Projects also suggest construction of new roads and reconstruction of existing roads. Peabody NOD at 1; Tarleton NOD at 1. This is consistent with the Forest Plan's goal to "provide a safe, efficient,

and seamless transportation and parking network that allows for current, continued, and projected management, use, and enjoyment of the Forest." Forest Plan at 1-16–1-17.

### B. Project-Specific Contributions to Forest Plan's Goals and Objectives

Peabody seeks to designate approximately 300 acres of backcountry ski zone with up to five skiable downhill routes, speaking to the Forest Plan's skiing goals and objectives like "maintain[ing] and provid[ing] quality alpine skiing and related opportunities on the Forest." Peabody NOD at 1; Forest Plan at 1–4. Peabody also calls for the designation of approximately six miles of mountain biking trail, which connects to the Forest Plan's goal to "provide a range of quality recreation activities and opportunities," as well as the WMNF's overarching goal. Peabody NOD at 1; Forest Plan at 1-3, 1-10.

For Tarleton, one proposed action is to adopt and redesign the Lake Katherine Boat Launch for hand-launched watercraft, which connects to the Forest Plan's goals to provide diverse, quality recreation opportunities. Tarleton NOD at 1; Forest Plan at 1-3, 1-10. The Lake Katherine proposal also envisions stabilizing the shoreline with rock to control erosion and installing drainage features to manage site run-off. Tarleton NOD at 2. These improvements correspond to the goal to "[p]rotect, restore, or improve riparian area conditions to benefit riparian dependent resources and values" and the objective to "[i]mprove watershed and soil condition on at least 25 acres per year." Forest Plan at 1-15, 1-18. As a final example from the Lake Katherine project, two picnic tables are proposed. Tarleton NOD at 2. Installation of picnic tables links with the goal that "[d]eveloped recreation will provide a variety of quality . . . day use, and other roadside recreation opportunities where the natural forest setting is an important part of the visitor's experience." Forest Plan at 1-13 (emphasis added).

The Forest Plan is replete with such examples. These few are offered to provide some limited specificity, within the confines of this brief. They show a clear throughline connecting the Forest Plan's goals and objectives and the actions proposed as part of the Project.

II.     **The Defendants adequately considered and addressed alternatives to the Projects.**

The Plaintiff argues that the Defendants did not adequately consider alternatives, particularly a no-action alternative, before approving the Projects. Compl. ¶¶ 3, 56–57, 60, 118–19, 179. In fact, the Decision Notices for the Projects reveal that the Defendants *did* adequately consider alternatives, including comparing the effects of the proposed actions with a no-action comparative baseline.

In the Tarleton NOD, District Ranger Brooke Brown, on behalf of the Forest Service, explained that "[n]o substantive alternatives were brought forward by the public *that met the purpose and need*." Tarleton NOD at 3 (emphasis added). The Forest Service also weighed the effects of the Tarleton project against a no-action baseline, concluding that "[w]hile taking no action would allow the natural successional processes to continue, it would *not advance the goals and objectives of the forest plan*." *Id.* (emphasis added). As a result, the Forest Service determined that taking no action was not viable. *Id.* Simultaneously, it concluded that the Tarleton project as proposed would benefit multiple resources (i.e., advance the goals and objectives of the Forest Plan), while having minimal impact on the environment. *Id.*

Likewise, in the Peabody NOD, District Ranger Joshua Sjostrom, on behalf of the Forest Service, "weighed the effects of the proposed action against taking no action" and determined that "[w]hile taking no action would allow natural successional processes to continue, it would *not advance the goals and objectives of the Forest Plan*." Peabody NOD at 2 (emphasis added). Therefore, the Forest Service concluded that taking no action would not be sufficient. *Id.*

5

Conversely, allowing the Peabody project to proceed would benefit multiple resources while having minimal impact on the environment. *Id.*

As these examples from the record show, the Defendants thoroughly considered alternatives, namely the consequences of taking no action. In fact, the Defendants acknowledged that the Projects evolved based on comments received from the public. The Defendants had an obligation to *consider* comments that were timely submitted, and the record reveals they did so. The fact that the Defendants did not adopt the no-action alternative does not mean it was not adequately considered.

The Forest Plan contains a plethora of goals and objectives that the Defendants are charged with implementing. Taking no action would mean the benefits outlined in the Projects would not be realized and the corresponding goals and objectives of the Forest Plan would not be advanced. Even a "less action" alternative may mean a commensurate reduction in the Projects' benefits, which could mean a reciprocal reduction in the advancement of the Forest Plan's goals and objectives. This is spelled out very clearly in the Decision Notices for the Projects. While the Plaintiff claims the Defendants have contravened their duties by approving the Projects, the alternative proposed by the Plaintiff would not achieve the multiple goals and objectives set out in the Forest Plan and would not be consistent with the Defendants' obligations under NMFA and RPA.

### III. The Complaint contains several inaccuracies and mischaracterizations about the Projects, the Forest Plan, and the WMNF generally.

While the Amici could spend much of this brief underscoring the inaccuracies contained in the Plaintiff's pleadings, Amici highlight only a few notable examples here. For one, the Plaintiff assert in error that "[t]he forests surrounding Lake Tarleton were added to the [WMNF] by citizen initiative in the late 1990s and the addition was for the purpose of stopping the threat

6

of future logging and development." Compl. ¶ 2. That is not true, as evinced by numerous contemporaneous documents. For example, in a letter dated February 19, 1998 from Robb R. Thomson, then Commissioner of the N.H. Dept. of Resources and Economic Development, to Donna L. Hepp, then Forest Supervisor of the WMNF, Commissioner Thomson describes how he looked forward to "developing a land use and management plan that will provide public recreation to these lands and water bodies [including Tarleton] and *appropriate wildlife and timber management opportunities*." *See* Declaration of Leahy, **Exhibit 1** (emphasis added) (hereinafter all references to exhibits attached to authenticating Declaration of Leahy will be to "Exhibit ___"). A Tarleton FAQ sheet, attached as **Exhibit 2**, includes a question about how Tarleton would be managed, with the response being that "[t]he Forest Service manages their properties for many uses, as specified under the [Forest Plan]. . . . In managing [Tarleton], the Forest Service will work to protect wildlife, recreation, timber, and watershed resources." Tarleton was added to the WMNF *prior to* the adoption of the 2005 Forest Plan, so it has been clear that Tarleton was meant to be governed by the Forest Plan and its multiple goals and objectives.

It is also important to contextualize the Plaintiff's emphasis on the Projects' nearly 3,000 acres of commercial logging. *See e.g.*, Compl. ¶¶ 1, 5. The WMNF contains approximately 800,000 acres, so 3,000 acres represents only about 0.375 percent of the total WMNF. According to the U.S. Forest Service, New Hampshire has an estimated 4,726,871 acres of forest land. Based on this figure, the Projects' 3,000 acres of logging constitutes only about 0.063% of New Hampshire's total forest land. Therefore, while 3,000 acres is certainly a sizable amount of land, it is a fraction of a percentage of the WMNF and New Hampshire's overall forest land.

The Plaintiff's discussion of climate change and carbon storage also misses the mark. *See generally*, Compl. ¶¶ 64–70, 124–130. Climate change/carbon storage is one of multiple components of forest management, but it cannot be the *only* consideration because forest management is a culmination of multiple goals and objectives (*see* Section I, *supra*). While important, climate change/carbon storage cannot come at the expense of all other goals and objectives in a multi-use forest such as the WMNF.[1]

It is also a gross oversimplification to say that logging is detrimental to the climate. Sustainably harvested forests—such as the Projects—continue to sequester carbon. Further, timber resources often have a lower carbon footprint than alternative products like concrete. Ultimately, while carbon storage from northern New England forests like the WMNF is helpful in combating climate change, solely focusing on carbon storage will not mitigate or reverse the effects from climate change and does not by itself lead to healthier forests. Further, all the WMNF's other goals and objectives cannot be sacrificed to favor only carbon storage, especially when the WMNF will *still* act as an important carbon sink with the Projects in place.  By the Plaintiff's logic, no logging should even occur in our National Forests.  Setting aside that this is a dubious scientific proposition, our National Forests are public lands expressly designated for a multiplicity of uses, including timber management.  16 U.S.C. 1604(e).

**IV.** **The Defendants met and exceeded public participation requirements, as evinced by the participation of several of the Amici.**

The Forest Service conducted extensive public participation processes for each Project, with the Defendants exceeding requirements and taking extra steps to ensure public participation

---

[1] Executive Order 14072 cited by the Plaintiff does call for retaining and enhancing carbon storage, but it also mandates that federal forests be managed to (among other things) "provide outdoor recreational opportunities" and "promote sustainable local economic development." Exec. Order No. 14072, 87 Fed. Reg. 24,851, 24,852 (Apr. 27, 2022). To be sure, the Executive Order in no way directs that climate resiliency/carbon storage come at the expense of a forest's other goals and objectives, as set forth in a forest management plan.

in the wake of the COVID-19 pandemic and associated restrictions. The Defendants did not arrive at the final version of the Projects on their own; the Projects morphed based on feedback from the public, including comments submitted by Amici and the Plaintiff.

According to the Tarleton NOD, public feedback began as early as October of 2019. Tarleton NOD at 3. It continued into 2020, with a scoping comment period commencing in January that led to modification of Tarleton's scope. *Id.* at 4. The formal 30-day comment period began in July of 2021, with notice sent to over 650 parties. *Id.* After further information sessions and field visits, Defendants initiated a second—not legally required—formal 30-day comment period. *Id.* Further meetings and information sessions were held throughout 2022. *Id.* The 600 comment letters received were reviewed and saved in the record. *Id.* Many adjustments were made to Tarleton based on public feedback, such as retention of white pine for bald eagle habitat, adding additional detail to the project's scenery effects analysis, adding a consequence of no action section, and reducing forestry activities by 21.5%. *Id.* at 4–5.

Public participation was similarly extensive for Peabody. Peabody was first introduced to the public in March of 2019. Peabody NOD at 2. A scoping comment period was initiated in December of 2019, with notice sent to over 450 parties. *Id.* The scope of the project, namely the recreation components, was modified based on this initial comment period. *Id.* Another scoping comment period was held in March of 2021 based on the updated proposal, with notice sent to over 650 parties. *Id.* The formal 30-day comment period commenced in August of 2022, with notice sent to over 560 parties. *Id.* The 68 comment letters submitted were each reviewed and added to the record. *Id.* Public comments were used to refine and modify the Peabody project. *Id.*

Several of the Amici submitted comments. On May 6, 2022, the Forest Society submitted Tarleton comments, attached as **Exhibit 3**. The Forest Society also toured Tarleton in May of

9

2022 and on July 23, 2024 and Peabody on July 25, 2024, with the Defendants. NHTOA lodged two sets of Tarleton comments, the first on November 1, 2021 and the second on May 11, 2022, as well as a set of Peabody comments (undated but believed to be Aug. 25, 2022), attached as **Exhibits 4–6**, respectively. RGS & AWS submitted Peabody comments on August 25, 2022, attached as **Exhibit 7**. AMC submitted Peabody comments on January 10, 2020 and September 2, 2022, attached as **Exhibits 8–9**, respectively. The Plaintiff also acknowledges participating in the public processes afforded for both Projects.  Compl. ¶¶ 17, 53, 116.

The comprehensive attention the Defendants gave to the public participation processes for the Projects demonstrates the care with which the Projects were handled. Far from abandoning their legal duties, the Defendants gave the Projects careful consideration, invited feedback from interested shareholders, and updated the Projects based on public comments and additional analysis.  The Plaintiff's dissatisfaction with the results does not mean that the process was faulty, inadequate, arbitrary or capricious.

## CONCLUSION

If the Court were to vacate the authorizations for the Projects, as the Plaintiff requests, the Forest Plan would not be implemented and the WMNF would suffer, contrary to the Forest Service's mandate and the Amici's collective goals of responsible stewardship and sound planning of the WMNF. Therefore, this Court should deny the Plaintiff's Cross-Motion for Summary Judgment and grant the Defendants' Cross-Motion for Summary Judgment.

Respectfully Submitted,

**THE SOCIETY FOR THE PROTECTION OF NEW HAMPSHIRE FORESTS**

By its Attorneys,

ORR & RENO, P.A.

November 14, 2024          By:     /s/ Jeremy D. Eggleton
                                   Jeremy D. Eggleton, Esq. (NH Bar #18170)
                                   45 South Main Street
                                   P.O. Box 3550
                                   Concord, NH  03302-3550
                                   Phone:  603-224-2381
                                   Fax:     603-224-2318

**And other joining Amici, represented by Attorney Eggleton for this Brief:**

**THE APPALACHIAN MOUNTAIN CLUB**

By: /s/ Nicole Zussman
Nicole Zussman
10 City Square
Boston, MA 02129
203-912-0421
nzussman@outdoors.org

**THE NEW HAMPSHIRE WILDLIFE FEDERATION**

By: /s/ James Morse
James Morse
54 Portsmouth Street
Concord, NH 03301
603-224-5953
admin@nhwf.org

**THE AUDUBON SOCIETY OF NEW HAMPSHIRE**

By: Douglas Bechtel
Douglas Bechtel
84 Silk Farm Road
Concord, NH 03301
603-224-9909
dbechtel@nhaudubon.org

**THE NEW HAMPSHIRE TIMBERLAND OWNERS' ASSOCIATION**

By: Jasen Stock
Jasen Stock
54 Portsmouth Street
Concord, NH 03301
603-224-9699
jstock@nhtoa.org

**THE NORTHERN FOREST CENTER**

By: <u>Rob Riley</u>
Rob Riley
18 North Main Street, Suite 204
Concord, NH 03301
603-229-0679
rriley@northernforest.org

**RUFFED GROUSE SOCIETY & AMERICAN WOODCOCK SOCIETY**

By: <u>/s/ Todd H. Waldron</u>
Todd H. Waldron
100 Hightower Boulevard, Suite 101
Pittsburgh, PA 15205
412-874-8702
toddw@ruffedgrousesociety.org

**THE GRANITE STATE DIVISION OF THE SOCIETY OF AMERICAN FORESTERS**

By: <u>/s/ Connor Breton</u>
Connor Breton
12 Beniah Lane, Unit A
Epping, NH 03042
603-833-7473
connor.breton@gmail.com

**THE NATURE CONSERVANCY**

By: <u>/s/ Hans P. Birle</u>
Hans P. Birle
159 Waterman Street
Providence, RI 02906
617-548-7981
hbirle@tnc.org

**CHARLES NIEBLING**

By: <u>Charles Niebling</u>
Charles Niebling
10 Queen Street
Boscawen, NH 03303
603-965-5434
charlieniebling@gmail.com

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing has been served, this day, electronically through ECF upon all parties of record.

                                      */s/ Jeremy D. Eggleton*