**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

STANDING TREES, INC.

     *Plaintiff*,

v.

UNITED STATES FOREST SERVICE, et al.,

     *Defendants*.

Case No.: 1:24-cv-00138-JL-TSM

**PLANTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION**

Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Counsel for Standing Trees, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................................. iii

GLOSSARY ....................................................................................................................... v

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 1

I.      The Service Failed to Consider Alternatives as NEPA Requires. ...................................... 1

      A.     The Service failed to consider "appropriate" alternatives. .................................... 2

      B.     Standing Trees' alternatives are reasonable. ......................................................... 4

      C.     The Service failed to conduct a full no-action analysis. ........................................ 6

II.     The Service Did Not Lawfully Evaluate The Projects' Environmental Effects.................. 7

      A.     The Service failed to assess the Projects' direct and indirect impacts. .................. 7

            1.     The Service failed to take a hard look at forest health and improperly incorporated key forest health information by reference. .......................... 8

            2.     The Service failed to explain its cursory water quality analysis............... 10

            3.     The Service failed to take a hard look at the Projects' impacts to the northern long-eared bat. ....................................................................... 12

            4.     The Service failed to adequately assess and inform the public of the Projects' scenic and recreational impacts.................................................. 13

      B.     The Service failed to analyze climate or cumulative impacts.............................. 15

      C.     The Service violated NEPA and the APA by issuing an unlawful finding of no significant impact. ....................................................................................... 18

III.    The Projects Violate the Forest Plan. ............................................................................. 18

CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

### United States Supreme Court Cases

*Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87 (1983) ..............................20

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004).........................................................15, 20

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ...........................................................................17

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989)...............................................................7

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .........................19

### Circuit Court Cases

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020)..............................................................17

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015)...................................................................19

*City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732 (2d Cir. 1993) ...................................2, 3

*Ctr. for Env't L. & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000 (9th Cir. 2011).............17

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023) ................16

*Dubois v. Dept. of Agriculture*, 102 F.3d 1273 (1st Cir. 1996) ............................................3, 6, 20

*Earth Island Institute v. U.S. Forest Service*, 87 F.4th 1054 (9th Cir. 2023) .................................7

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022)...........3, 10, 12, 18

*Friends of Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000)..........................................15, 20

*Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095 (9th Cir. 2016) ......................11

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ............................................15

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989 (9th Cir. 2004)..........16

*Lovgren v. Locke*, 701 F.3d 5 (1st Cir. 2012) ...............................................................................6

*Nantucket Res. Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1 (1st Cir. 2024) ...............................................................................................................................13

*U.S. v. Zannino*, 895 F.2d 1 (1st Cir. 1990)................................................................................19

*Utah Environmental Congress v. Bosworth*, 439 F.3d 1184 (10th Cir. 2006)................................7

*WildEarth Guardians v. Mont. Snowmobile Ass'n.*, 790 F.3d 920 (9th Cir. 2015) .....................8, 9

**District Court Cases**

*Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33 (D.N.H. 2019) ......................................................................................................................2, 3, 6, 11, 12

*Ctr. for Biological Diversity v. U.S. Forest Serv. (Black Ram)*, 687 F. Supp. 3d 1053 (D. Mont. 2023) .............................................................................................................................16

*Friends of Clearwater v. Petrick*, 588 F. Supp. 3d 1071 (D. Idaho 2022) .....................................8

*Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165 (D. Or. 2014)..................................10, 11

*Kettle Range Conservation Grp. v. U.S. Forest Serv.*, 2023 WL 4112930 (E.D. Wa. 2023) .........18

*Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97 (D.N.H. 2008) ...................18

*Sierra Club v. Wagner*, 581 F. Supp. 2d 2464, *aff'd* 555 F.3d 21 (D.N.H. 2008)...........................4

## STATUTORY AND REGULATORY AUTHORITIES

42 U.S.C. § 4332(H) ...............................................................................................................2

36 C.F.R. § 220.7(b)(2) ...........................................................................................................2

40 C.F.R. § 1502.8 ................................................................................................................13

40 C.F.R. § 1508.13 ..............................................................................................................18

40 C.F.R. § 1508.7 ................................................................................................................15

40 C.F.R. § 1502.21 ................................................................................................................9

40 C.F.R. § 1507.2(d) ..............................................................................................................2

40 C.F.R. § 1508.9(b) ..............................................................................................................2

## OTHER AUTHORITIES

88 Fed. Reg. 1196, 1201 (Jan. 9, 2023) ..............................................................................15, 17

# GLOSSARY

Administrative Procedure Act     APA

Appalachian Trail        AT

Biological Opinion        BiOp

Council on Environmental Quality    CEQ

Forest Service          Service

Greenhouse Gas         GHG

Habitat Management Unit      HMU

Inventoried Roadless Area      IRA

National Environmental Policy Act    NEPA

National Forest Management Act     NFMA

Tarleton and Peabody Projects     Projects

United States Fish and Wildlife Service  USFWS

White Mountain National Forest     Forest

White Mountain National Plan     Forest Plan

## INTRODUCTION

Plaintiff Standing Trees challenges the U.S. Forest Service's (Service) approvals of the Tarleton and Peabody projects (Projects) in the White Mountain National Forest (Forest). This case is about ensuring the Service complies with the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Administrative Procedure Act (APA). Together, the Projects authorize nearly 3,000 acres of logging, twelve miles of road construction and reconstruction, and intrusion into inventoried roadless areas (IRA) and stands that contain old forest habitat—all without the requisite environmental review in violation of applicable law.

In defense of this flawed and cursory review, the Service resorts to mischaracterizing Standing Trees' positions and alternatives, overstating the transparency and rigor of the Service's process, and asserting—based on a self-serving misreading of the relevant regulations and case law—that the Service adequately fulfilled its legal obligations. But the Service's "see no evil, hear no evil" approach here cannot stand. First, the Service failed to consider alternatives, including a true no action alternative, as required by NEPA and the Service's regulations. Second, the Service failed to take the required "hard look" at the Projects' environmental impacts on numerous resources, undermining its finding that neither has significant impacts. Third, the Service authorized the Projects despite noncompliance with the Forest Plan and NFMA.

For these reasons, the Court should grant Standing Trees' motion for summary judgment and deny the Service's cross-motion for summary judgment.[1]

## ARGUMENT

### I.    The Service Failed to Consider Alternatives as NEPA Requires.

As discussed in Standing Trees' opening brief, the Service's threadbare approach to

---

[1] The Service did not question Standing Trees' standing, the basis for which is set forth in its opening brief. *See* Pl.'s Mem. 6-8 (establishing associational standing for both Projects).

analyzing alternatives to the Projects failed to comply with NEPA. For the reasons that follow, the Service's efforts to excuse this fatal flaw in the Projects' NEPA analysis are without merit.

A.        **The Service failed to consider "appropriate" alternatives.**

Agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). "This requirement . . . extends to all such proposals, not just . . . impact statements." 40 C.F.R. § 1507.2(d), § 1508.9(b). The Service's regulations fully support this requirement, too. *See* 36 C.F.R. § 220.7(b)(2).

The Service points out that its regulations state that "[n]o specific number of alternatives is required or prescribed," Def. Mem. 10, but the regulations further elaborate. Specifically, § 220.7(b)(2)(i) states that "the EA need only analyze the proposed action and proceed without consideration of additional alternatives" in the event that "there are no unresolved conflicts concerning alternative uses of available resources[.]" But here, the Service never addressed the "unresolved conflicts" over Project area resources, including forest land, water, wildlife habitat, scenery, and recreation, that the Projects will affect. *See* Pl.'s Mem. 11.

As the Service points out, courts found agency alternatives analyses to be acceptable in *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 743–44 (2d Cir. 1993), and *Conservation Law. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 57 (D.N.H. 2019). Def. Mem. 12. These examples prove Standing Trees' point. In *City of New York*, the court explained that an alternatives analysis is guided by "how narrowly or broadly one views the objective of an agency's proposed action," deciding that the agency appropriately considered nine alternatives in its EA that each would secure highway transportation of radioactive materials. 715 F.2d at 743. Similarly, in *Conservation Law Foundation*, this Court affirmed the agency's alternative analysis that considered five alternatives because it supplied "reasonable,

2

common-sense explanations for rejecting alternatives." 457 F. Supp. 3d at 57. The Service

analyzed no actual alternatives here.

The Service contends that only its proposed actions could satisfy the Projects' purpose

and need. But it cannot be the case that the only reasonable or appropriate alternative is the

proposed action. The best evidence for the Service's error is in the Service's own actions to

modify the Projects during the review process: it increased the buffer around Lake Tarleton for

logging units in the Tarleton project and claims to have dropped segments of stands that contain

old growth forest in the Peabody project. AR 11971, 6116. *See also* AR 4406–08, 4509–10, 4511,

4513–14 (project modifications for Peabody). These actions underscore that—of course—in

Projects proposing to log thousands of acres, there are many alternatives to achieving the

Projects' objectives, and NEPA required the Service to consider a range of such alternatives and

their relative benefits and impacts in the public environmental assessment documents—not

through unilateral, singular decisions made outside public view. The Service's failures to

describe and evaluate any reasonable alternatives to its proposed actions are enough to render its

EAs inadequate. *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th

Cir. 2022) (holding agency's alternatives analysis did not satisfy NEPA's requirement to "give

full and meaningful consideration to all viable alternatives in [the agency's] environmental

assessment"); *cf. Dubois v. Dept. of Agriculture*, 102 F.3d 1273, 1287 (1st Cir. 1996) (viable but

unexamined alternative rendered NEPA review inadequate).

Where, as here, substantial logging will change the face of the Forest for decades to

come, with thousands of acres of environmental impacts, "an EA must still reflect consideration

of some range of alternatives[.]" *Conservation L. Found.*, 457 F. Supp. 3d at 57 (citation

omitted); *see also City of New York*, 715 F.2d at 742–43 (finding that reviewing courts have

insisted that the agency consider such alternatives to the proposed action as may partially or completely meet the proposal's goal). In fact, the Service has not cited a single case affirming its methodology here: analyzing no alternatives and providing only a one-sided discussion of the "consequences of no action." *See* Def. Mem. 13 n. 8, 14. As mentioned in Standing Trees' opening brief, Pl.'s Mem. 12, the absence of alternatives analysis here is an anomaly, *see also* AR 2229–51 (Albany South EA analyzing six distinct alternatives); *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 253–54 (D.N.H. 2008), *aff'd* 555 F.3d 21 (1st Cir. 2009) (reviewing Than and Batchelder projects, which considered four distinct alternatives each), and violated NEPA.

### B.    Standing Trees' alternatives are reasonable.

The Service's failure to consider alternatives was especially egregious because, as explained in Standing Trees' principal brief, Standing Trees presented and repeatedly sought analysis of reasonable alternatives to each Project. Pl.'s Mem. 12. Far from being unreasonable, as the Service now contends, Def. Mem. 10–13, Standing Trees' alternatives would have advanced the Projects' broad objectives and warranted detailed consideration under NEPA.

In its brief, the Service insists on mischaracterizing and dismissing these alternatives as opposing all logging and failing to address Forest Plan requirements. Def. Mem. 10; AR 4845.[2] The Service's goals for both Projects are to advance Forest Plan "goals, objectives, and desired conditions for vegetation, wildlife, and other resources[.]" AR 11972; 4877. And Standing Trees recognized the importance of these Projects' multiple uses; indeed, Standing Trees' alternatives *do not* prohibit all timber harvest but instead propose a different, less extensive set of silvicultural treatments. For example, for the Peabody project, Standing Trees proposed to meet

---

[2] Amici likewise mischaracterize Standing Trees' alternatives as failing to "achieve the multiple goals and objectives set out in the Forest Plan," or as "no action approach[es.]" Forest Society's Mem. 5-6; State of New Hampshire's Mem. 5.

Forest Plan objectives for wildlife habitat diversity by creating "*complex* early successional habitat rather than simplified regeneration-age forest through even-aged management." AR 4685–86. This alternative would also increase watercourses and wetlands buffers and avoid mature and old growth forest, restoring wildlife habitat for those species that are in desperate need of mature and old forest habitat that is rare across the region—chief among them, the northern long-eared bat. *See* AR 4685–86, 6160; AR 6178; AR 3128 (identifying mature forest as "an important habitat type for foraging [northern long-eared bats]"). Finally, this alternative proposed to avoid IRA impacts and protect IRA areas by guiding logging away from Forest Plan IRAs, encouraging an analysis of how logging would affect site-specific and broadly applicable roadless area values, or a future site-specific evaluation for Wilderness designation in a Forest Plan revision. AR 4685–86, 6160.[3] In accordance with the Service's broad statements of purpose and need, this alternative considers paths to moving the Forest toward Forest Plan goals.

Similarly, for the Tarleton project, Standing Trees' Alternative 3 also seeks to promote wildlife habitat for endangered species that rely on mature forests. AR 13085–86. It also supports fish habitat and restoration of historic apple orchards and former tree plantations. AR 13082. Here again, the Service mischaracterizes Alternative 3 as a prohibition on timber harvest. Def. Mem. at 10. But Alternative 3 only proposes to "omit[] the *unnecessary* harvest and treatment activities included in the current proposed action." AR 13082 (emphasis added).

In support of its alternatives, Standing Trees submitted extensive scientific data demonstrating that protecting mature forest, well on its way to developing old-growth forest characteristics, would advance the Forest Plan goals by promoting resilience to environmental

---

[3] The Service claims to have considered roadless area impacts through an attachment to the EA, Def. Mem. 21 n. 10; that attachment contains no real analysis, let alone careful consideration of the Peabody project's impacts on potential roadless area designations in the future.

and climate risks. AR 13105 (citing studies that describe that older forests can better withstand climate change stresses, particularly regarding timber growth rate and species richness). These studies, the Service arbitrarily decided, did not warrant acknowledgment. AR 10547–71 (omitting Standing Trees' submitted literature from "submitted literature" column). Under these circumstances, the Service's rejections of Standing Trees' alternatives were arbitrary and capricious, underscoring the Service's legal error in refusing to undertake any serious alternatives analysis for these Projects. *Contrast Conservation L. Found.*, 457 F. Supp. 3d at 57 (requiring "reasonable, common sense" reasons for rejecting alternatives).

**C.    The Service failed to conduct a full no-action analysis.**

The Service purports to have made a detailed evaluation of a no-action alternative as a comparative baseline. Def. Mem. 13. This is false. Contrary to NEPA, the Service failed to genuinely consider a true no-action alternative—that is, the Service made no mention of the positive impacts of no action. Indeed, the Service "must legitimately assess the relative merits of reasonable alternatives before making its decision" to proceed with the proposed actions. *Dubois*, 102 F.3d at 1289; *see also Lovgren v. Locke*, 701 F.3d 5, 36 (1st Cir. 2012) (requiring "information sufficient to permit a reasoned choice" among alternatives as to their environmental consequences). The Service failed to do so here when it omitted the environmental benefits of no action, including carbon storage and sequestration, enhanced water quality, and unfragmented habitat for certain endangered and threatened species. *Cf. Dubois*, 102 F.3d at 1286–87 ("It is absolutely essential . . . that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits *and* demerits of the proposed action and possible alternatives" (emphasis added)).

The Service seeks to justify its conclusory and incomplete discussions of the "Consequences of No Action" with reference to unpersuasive authorities that do not apply. In

*Earth Island Institute v. U.S. Forest Service*, the agency proposed a forest management project in an area "greatly at risk of high-intensity fires." 87 F.4th 1054, 1060 (9th Cir. 2023). The purported danger of failing to take action to address wildfire harms—threatening serious and immediate concerns like loss of life and property and ecological devastation—is undeniably different in kind from the potential consequences of deferring or limiting logging in these Projects, which present neither public safety nor other imminent risks. Likewise, *Utah Environmental Congress v. Bosworth*—involving management to purportedly mitigate a spruce beetle infestation in a much smaller area—does not bear on the adequacy of the Service's actions in these very different circumstances of the long-term implementation of the Forest Plan within management units of thousands of acres. 439 F.3d 1184, 1187 (10th Cir. 2006).

In sum, the Service's single-minded consideration of only the Projects themselves and the supposed adverse consequences of no action violates NEPA's alternative analysis requirements.

## II.    The Service Did Not Lawfully Evaluate The Projects' Environmental Effects.

As more fully discussed in Standing Trees' opening brief, the Project EAs also fail to meet NEPA's requirements in their consideration of the Projects' important and substantial environmental impacts on a range of resources. *See* Pl.'s Mem. 14–28. As explained below, these errors are fundamental flaws in reasoning, analytical rigor, and transparency, and are not merely "fly-specking" and a lack of "endless" and "needless" detail, Def. Mem. 2, 14; again, the Service's points in defense of its environmental reviews ring hollow.

### A.    The Service failed to assess the Projects' direct and indirect impacts.

The Service failed to take its requisite "hard look" at the environmental impacts of the Projects. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). The Service stifled public review by withholding key forest health information, conducted illogical non-site-specific water quality analyses, disregarded commonsense measures to protect endangered species, and failed

to adequately inform the public of the scenic and recreational impacts flowing from the Projects. Altogether, these errors render the analyses deficient under NEPA's "hard look" standard.

### 1. The Service failed to take a hard look at forest health and improperly incorporated key forest health information by reference.

The Service did not take a hard look at forest health because its analysis is deficient, and it withheld crucial information from the public. The Service asserts that the EAs incorporate the stand ages by reference from the HMU Rationale documents, which themselves reference stand surveys. Def. Mem. 23; *see also* AR 6117. But the Service improperly incorporated these and other documents that were not publicly available during comment periods. *See* AR 6116. After a confusing and opaque process, these withheld documents suggest ongoing risk that the Projects will destroy old forest age class and stands with old forest habitat, in violation of the Forest Plan and contrary to the Service's own EAs. AR 6117; Def. Mem. 22. And for the Peabody project, the Service relied on a post hoc rationalization to fill in gaps in its analysis. AR 6116.

Data and documents incorporated by reference must be "reasonably available for inspection by potentially interested persons within the time allowed for comment." 40 C.F.R. § 1502.21. The procedures describe what it means to comply with NEPA, even if "there is no corresponding [Service] regulation requiring the agency to disclose stand survey data." Def. Mem. 23; *see Friends of Clearwater v. Petrick*, 588 F. Supp. 3d 1071, 1097 (D. Idaho 2022) (incorporated documents must be available for public review during designated comment period).[4] "To fulfill NEPA's public disclosure requirements, the [Service] must provide to the public the underlying environmental data from which the [Service] develops its opinions and arrives at its decisions." *WildEarth Guardians v. Mont. Snowmobile Ass'n.*, 790 F.3d 920, 925

---

[4] The Service cites *Friends of Clearwater* for its assertion that it properly incorporated stand age data and surveys by reference. Def. Mem. 23. But there, the Service made the information available for inspection *during the comment period*. *See* 588 F. Supp. 3d at 1097. Not so here.

(9th Cir. 2015) (citations omitted).

Here, Standing Trees alerted the Service that such information was not available for public review during the comment and objection periods. AR 11785; AR 13074, 13107; AR 4687–88; AR 6129–31. Yet the Service never made the information available during a designated comment period.[5] In its response to Standing Trees' Peabody objection, the Service admits eight proposed cutting units overlap with 524 acres of old forest, which it misclassified as mature forest. AR 6117. For Tarleton, the Service never acknowledged that it concealed the presence of old forest age class or habitat by reporting it as mature age class forest, despite at least fourteen stands with years of origin that exceed their respective thresholds for old forest age class. AR 17852; AR 9969–78. The Service never discussed or justified this omission despite its implications for forest health, Forest Plan compliance, and carbon storage and sequestration. The Forest Plan prohibits harvest "in stands identified to provide old forest habitat." AR 6117.

Furthermore, for Peabody, these withheld documents show the Service identified six stands that contain old growth or old forest habitat, including three along the West Branch of the Peabody River. The survey documents three stands along the West Branch of the Peabody River that contain "late successional forest." AR 6287–89.[6] A map in the report shows stands 71, 72, and 75 are within the boundaries of cutting units 72 and 74. AR 6289 (second map on the page shows cutting unit 72 overlapping stands 74 and 75; and cutting unit 74 overlapping stands 71 and 72); *see also* **Exhibit A**. For Peabody, even now, the administrative record nowhere demonstrates that no logging will occur in old growth or *stands that contain* old forest habitat. In

---

[5] The Service admits that it produced this information for the Tarleton project almost a year after the public comment period closed. Def. Mem. 23 n. 11; *but see* 40 C.F.R. § 1502.21. Regardless of any FOIA, the Service ignored its clear obligation to make the information available, not just to Standing Trees, but to the public.

[6] This term connotes old forest habitat, but has no significance under the Forest Plan.

its objection response, the Service relies on an email that is a post hoc rationalization, and a spreadsheet tracking stand changes that it did not include in the administrative record. AR 6116. But the Service's denial of the email's timing, Def. Mem. 24 n. 12, is wrong, as it is dated June 26, 2023, two months after the Service authorized the Peabody project. AR 4527–29. Moreover, the email is a recitation from memory and provides no analysis. *Id.* The Service's opaque and confusing forest health analysis frustrated the public's participation in the NEPA review process. *See Env't Def. Ctr.*, 36 F.4th at 872 (finding that agency may not rely on "incorrect assumptions or data" in arriving at its conclusion of no significant impacts).[7] Despite twice correcting the administrative record to remedy omissions, the Service's assertion that the Peabody project does not target old growth and entire stands that contain old forest habitat remains unsupported.

**2.    The Service failed to explain its cursory water quality analysis.**

The Service failed to take a hard look at the Projects' impacts on water quality. Pl.'s Mem. 16–17. The Service wrongly claims that it used the Albany South EA solely for its "methodology." Def. Mem. 15. Rather, the Service relied on the Albany South EA more broadly to reach conclusions on the Projects' impacts. AR 11954 ("Because of the similar types of activities included in the Tarleton project, the potential impacts to riparian and aquatic resources and water quality discussed in the Albany South EA would be broadly applicable to the current proposal"); AR 4900 (same for Peabody). This approach utterly failed to establish a site-specific baseline for the Service's water quality analysis, flunking NEPA's "hard look" requirement. *See Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165, at *33 (D. Or. 2014) ("Without baseline data, the impact to groundwater remains uncertain because there is no information as to the current conditions of the actual Project area. As a result, there is no way to determine what effect

---

[7] Standing Trees' Executive Director never implied that he possessed specialized expertise to identify old forest habitat, as the Service misleadingly implies. Def. Mem. 24.

the action will have on the environment and thus, no way to comply with NEPA") (citations and quotations omitted).

In fact, the Albany South EA provides a site-specific water quality analysis with reference to important factors such as water temperature, various local species, stream connectivity, both direct and indirect cumulative effects on basal area, site-specific mapping, a scientifically supported discussion of effect indicators, and a comprehensive outline of existing conditions. AR 2330–53. Arbitrarily relying on the Albany South EA analysis without any site-specific information, the Projects' EAs fall markedly short of this standard. With the Albany South approach included as no more than a short cut, the EAs merely reference general standards for harvest levels based on basal area and the anticipated harvest percentages. AR 11954, 4900.

And the Service found that, even using its Albany South short cut, the Peabody project would exceed basal area impacts in numerous watersheds. AR 4900. Instead of addressing these impacts, the Service dismissed seven watersheds simply because they do not contain "perennial fish habitat." *Id*. This reasoning was arbitrary and unsubstantiated in either the Peabody or Albany South EAs. AR 4900, 2330–53; *see also Great Basin Res. Watch v. Bureau of Land Mgmt*., 844 F.3d 1095, 1103 (9th Cir. 2016) (finding that a "baseline estimate must be based on accurate information and defensible reasoning"). Likewise, without evidentiary support, the Service dismissed impacts to the five watersheds with fish habitat as "minor" with "[n]o measurable adverse effects." AR 11954, 4900.

The Service also improperly frames this Court's decision in *Conservation Law Foundation*. Def. Mem. 17 (discussing 457 F. Supp. 3d at 62–63). There, the agency surveyed the local ecosystem and "[t]horoughly discussed the expected environmental impact" in the project area. 457 F. Supp. 3d at 62. The agency also "provided a forthright acknowledgement of

the negative environmental impacts of the [project] on wildlife *in the affected area*." *Id*.

(emphasis added). Not here. The Service took only a cursory look at the Peabody project's basal

areas, soil, and bedrock analyses to determine there would be no water quality impact. AR

11954, 4900. The Service's water quality analyses violated NEPA's "hard look" requirement.

### 3. The Service failed to take a hard look at the Projects' impacts to the northern long-eared bat.

The Service improperly relied on the United States Fish and Wildlife Service's (USFWS)

Biological Opinion (BiOp) because it did not conduct a thorough investigation of its own. Pl.'s

Mem. 18. The Service's approach at Peabody is the height of arbitrariness: the Service took the

"conservative" approach of assuming the bat's presence, acknowledging the Projects could result

in direct and indirect harms, but then included no design element to protect the bat. *Id*.[8]

For the Peabody project, the Service assumed the northern long-eared bat is present, but

did not adopt any measures outlined in its 2015 biological assessment or the 2023 USFWS BiOp

to minimize the chance of taking pregnant females and pups, including avoiding active seasons.

AR 1566, 3357–58. While assuming the bats are present, the Project relies on not knowing of

any maternity roosts to feign compliance with USFWS's prohibition on harvest within 150 feet

of known occupied roost trees during the pupping season. AR 3309. In fact, the Service notes in

its biological evaluation that timber harvest during the bat's active season can cause direct harms.

AR 9244. Despite assuming the presence of the bat, the Service provided no explanation for why

it did not conduct surveys or radio telemetry to discover maternity roosts in the area, or avoid

direct impacts by limiting logging to only the hibernation season. *See* AR 3358 (USFWS BiOp

recommending such surveys); *see* AR 13920 (limiting logging in Tarleton project); *Env't Def.*

*Ctr.*, 36 F.4th at 872 (an agency may not rely on "incorrect assumptions or data" in arriving at its

---

[8] In its brief, Standing Trees did address the Project biological evaluations. Pl.'s Mem. 18, 29, 32.

conclusion of no significant impacts). Similarly, for the Tarleton project, the Service assumed the

bats' presence and took steps to avoid direct harm to the bat, but did not address indirect harms.

AR 14061. Despite the Service's "conservative" approach in assuming that bats were present, the

Service did not take any steps recommended by USFWS to identify roost trees for Tarleton. AR

3358. And the Service admits that removing roost trees when the bats are not present would

cause indirect harm because bats frequently reuse their roost trees. AR 13923.

For these reasons, the Service acted arbitrarily in relying on the BiOp because the Service

assumed the presence of the bats, but then proposed virtually no conditions to protect the bats.

The Projects relied on the illogical assumption that bats are present but will not be harmed. This

contradictory approach is exactly the blind reliance the First Circuit has said should be rejected.

*Contrast Nantucket Res. Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1,

21 (1st Cir. 2024) (affirming given agency's own thorough independent analysis).

### 4.    The Service failed to adequately assess and inform the public of the Projects' scenic and recreational impacts.

The Service also failed to analyze and inform the public about impacts to some of the

Forest's most iconic trails. For Peabody, the cutting units that overlap with stands containing old

forest habitat, *supra* at 9, also contain the Great Gulf. The Service does not discuss this impact

whatsoever despite its claim that it provided several maps that show the relationship between

logging and recreational resources. Def. Mem. 20–21. The Service must draft its documents "in

plain language and may use appropriate graphics so that decisionmakers and the public can

readily understand them." 40 C.F.R. § 1502.8. Here, the Service omitted information entirely,

including stand ages and both Forest Plan and Roadless Area Conservation Rule IRAs, or spread

the information across multiple maps that use different scales. AR 4892–4896 (Figures 1–5). The

map depicting the cutting units omits the labels of recreational resources. AR 4895. To make

13

sense of the maps, the public must flip back and forth between pages to compare maps of varying

scale with missing labels. The information provided does not comprehensibly disclose the scope

of logging and resources impacted; the Service even failed to include a zoomed in map for the

entire northern half of the Project's cutting units. *See* AR 4895. The Service asserts this claim is

"fly specking." Def. Mem. 21. It is not. The Service violated NEPA because its EA does not

make scenic and recreational impacts understandable to the public.

Furthermore, the Service failed to engage in any discussion of the specific impacts to the

Great Gulf Trail. Considering the dramatic change a single tree and group selection silvicultural

treatment would have, especially on this iconic trail that traverses old age class forest, old forest

habitat, and old growth, this omission illustrates the Service's failure to take a hard look at the

impacts logging would have on recreational resources.

For Tarleton, the Service continues to claim that it could not return to GPS coordinates on

the Lake; it never considered using its modeling software to study projected impacts for such a

viewpoint. Def. Mem. 20. This omission fails to address how scenic impacts would affect local

businesses like Kingswood Camp that rely on Lake Tarleton's stunning scenic beauty.[9]

The Service now claims Standing Trees' arguments regarding scenic impacts and

recreational baselines at Peabody are barred by the doctrine of administrative exhaustion. Def.

Mem. 21. But the Service is wrong. Standing Trees raised these in its comments. AR 4694

(noting lack of recreational baseline data); AR 4692–93 (noting the Service did not adequately

address scenic impacts); Pl.'s. Mem. 19. And regardless, where an agency has independent

knowledge of the issues, "there is no need for a commentator to point them out specifically in

---

[9] The Service acknowledged the Project would displace recreationists from the area, but did not
study the impacts on businesses that rely on the intact natural area. AR 11989; Pl.'s Mem. 7–8.

order to preserve its ability to challenge a proposed action." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004); *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 559 (9th Cir. 2000) (finding Service to be "aware" of problem where information was generated by Service itself). Here, the Service had independent knowledge of impacts to the Appalachian Trail (AT) because three of its four scenic viewpoints are on the AT. AR 4896. But the Service only referenced the AT a single time in its entire analysis, in the name of the "Osgood-AT" viewpoint. *Id*. It did not make clear that viewpoints are located on the AT. AR 6498. For these reasons, the Service did not take a hard look at the Projects' scenic and recreational impacts.

### B. The Service failed to analyze climate or cumulative impacts.

Despite seven recent, ongoing, and reasonably foreseeable projects that have come or are coming before the Service within the span of ten years, the Service refused to consider the cumulative effects of these projects alongside Tarleton and Peabody, including their greenhouse gas (GHG) emission impacts. Pl.'s Mem. 15–16, 25 n. 15, Def. Mem. 27. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1077 (9th Cir. 2002) (finding NEPA requires an agency to analyze the "impact of reasonably foreseeable timber sales" and future actions). The Service attempts to subvert its requirement to consider cumulative impacts by portraying the Projects' "contributions to global greenhouse gases" as "negligible." Def. Mem. 26. But the Service is required to consider "past, present, and reasonably foreseeable future actions[.]" 40 C.F.R. § 1508.7. These include "individually minor but collectively significant actions taking place over a period of time." *Id*. CEQ guidance clarifies that "NEPA requires more than a statement that emissions from a proposed Federal action or its alternatives represent only a small fraction of global or domestic emissions." 88 Fed. Reg. 1196, 1201 (Jan. 9, 2023).

The Service's excuses for failing to analyze the Projects' GHG emissions are unavailing. For one, the Service suggests that analyzing climate impacts would not be "useful" in this case.

Def. Mem. 29. But NEPA is not optional, especially given the dangers and importance of climate change as an issue within NEPA's scope. *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1035 (10th Cir. 2023) (citation omitted) ("The impact of [GHG] emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct").

Furthermore, the Service claims that "[a]ny initial carbon emitted is temporary." Def. Mem. 26. But it can take hundreds of years to recover the same level of carbon storage in the interim, and there will be significant forgone carbon sequestration. *Ctr. for Biological Diversity v. U.S. Forest Serv. (Black Ram)*, 687 F. Supp. 3d 1053, 1076 (D. Mont. 2023) ("Ultimately, [GHG] reduction must happen quickly and removing carbon from forests in the form of logging, even if the trees are going to grow back, will take decades to centuries to re-sequester") (quotations omitted). The Service's failure to analyze old forest age class, *supra*, Section II(A)(1), showcases a blatant disregard for the Forest's carbon sequestration benefits. The Service dismisses *Black Ram*, a highly persuasive recent decision out of the District Court for the District of Montana, Def. Mem. 28, which found the Service's treatment of the issue in that case lacking and unequivocally affirmed that global research confirms climate warming is an urgent threat to the planet. 687 F. Supp. at 1076 ("[L]ogging causes immediate carbon losses, while re-sequestration happens slowly over time, time that the planet may not have"). The Service next misinterprets a series of cases that do not in fact support the Service's position. It is well established that a proper cumulative impact analysis requires detailed, quantified information rather than general statements about potential effects and risks, such as the Service has provided here. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993-94 (9th Cir. 2004).

The Supreme Court and other courts' decisions have made clear that an adequate NEPA

analysis must comprehensively evaluate a project's potential impacts, particularly in relation to other ongoing or reasonably foreseeable projects. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) ("[W]hen several proposals . . . that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together"); *see also Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020) ("We have held that cumulative impact analyses [are] insufficient when they discuss[] only the direct effects of the project at issue on a small area or merely contemplates other projects but had no quantified assessment of their combined impacts") (cleaned up)). The Service must go beyond general statements and provide a thorough, detailed evaluation of all relevant environmental impacts, particularly those arising from recent, ongoing, and reasonably foreseeable projects. *Ctr. for Env't L. & Pol'y v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) ("[G]eneral statements about possible effects and some risk" insufficient "absent a justification regarding why more definitive information could not be provided") (citation omitted). The Service claims it can sufficiently perform a cumulative climate analysis without enumerating *every* past project. Def. Mem. 27. But the Service did not consider *any* of the cumulative impacts of recent, ongoing, and reasonably foreseeable projects. Pl.'s Mem. at 25.

Finally, the Service arbitrarily bypasses two critical pieces of guidance. First, the Service claims the CEQ climate guidance does not apply, despite the guidance urging agencies to use it for ongoing projects, even projects with a small amount of GHG emissions. Def. Mem. 29; *see also* 88 Fed. Reg. 1196, 1212 (Jan. 9, 2023). Second, the Service substantively ignores its own Climate Adaptation Plan, which highlights the importance of wilderness, roadless areas, and mature and old-growth forests for climate stability and biodiversity. AR 0733. The Service claimed climate risks were outside the Projects' scope and that its actions were "consistent" with

17

the Forest Plan but offered no further explanation. AR 12905, 6116. The Service's climate and cumulative impacts analyses do not fulfill NEPA's "hard look" requirement.

C.    **The Service violated NEPA and the APA by issuing an unlawful finding of no significant impact.**

The Service's unlawful findings of no significant impact stem from its failure to analyze alternatives and properly assess environmental impacts. *See, e.g.*, *Kettle Range Conservation Grp. v. U.S. Forest Serv.*, 2023 WL 4112930, at *12 (E.D. Wa. 2023) ("lack of quantified or detailed information about the Sanpoil Project's impacts in this respect creates substantial questions about whether the action will have a cumulatively significant environmental impact"). The agency must be able to support this conclusion with sufficient evidence and analysis. 40 C.F.R. § 1508.13; *see Env't Def. Ctr.*, 36 F.4th at 872; *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 134 (D.N.H. 2008) (agency must "sufficiently" mitigate any significant impacts to support finding of no significant impact). The Service's findings of no significant impact are insufficient *because* it failed to consider alternatives or take a hard look at the Projects' forest health, water quality, bats, scenic and recreational effects, and cumulative impacts. *Supra* Section II(A). Standing Trees is *not* insisting on an EIS, but rather seeking to ensure that the Service complies with bedrock NEPA principles.

III.    **The Projects Violate the Forest Plan.**

The Service violated NFMA and the APA because it authorized Projects that do not comply with the Forest Plan. Specifically, the Projects stray from Forest Plan requirements because the Service failed to (1) remove stands identified to provide old forest habitat from harvest units, (2) justify deviating from scenic guidelines, (3) support its finding that eligible wild and scenic rivers would not be jeopardized in the future, and (4) include any conditions to contribute to the conservation and recovery of the northern long-eared bat.

First, the Service's failure to disclose stand age data, *supra* Section II(A)(1), made it impossible for the public to know whether these Projects were compliant with the Forest Plan, including that the Service was not proposing harvest in old growth or stands with old forest habitat. The Service improperly asserts that Standing Trees waived this argument. Def. Mem. at 32 n. 13. Rather than present the stand data argument "in the most skeletal way," Standing Trees fully fleshed it out in the context of NEPA. *U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *see also Brown v. Nucor Corp.*, 785 F.3d 895, 918 (4th Cir. 2015) (finding no waiver occurred because plaintiff's arguments covered both issues); Pl.'s Mem. 21–24. As stated in Standing Trees' opening brief, the same facts and argumentation support the NFMA claim because these Projects are inconsistent with the Forest Plan, which prohibits any such logging. AR 3448, 3595.

Second, the Service's conclusory reasoning does not justify violating the Forest Plan's scenic guidelines for the Peabody project. AR 3410; *see also* Def. Mem. at 33.[10] The Service maintains that "the larger acreage is intended to better meet project-level objectives" and move the Forest toward the Forest Plan's desired conditions. AR 4898. But the Service offers no explanation for why one of the desired conditions of the Forest Plan, scenic integrity, must yield to another here. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency must "articulate a satisfactory explanation for its action").[11]

Third, the Service violated the Forest Plan wild and scenic rivers standard by summarily dismissing impacts to two river segments in the Peabody project area. AR 4902–03, 3467. The Service claims that the issue was not administratively exhausted. Def. Mem. at 33. But Standing Trees raised in its comments that the Service should avoid "potential detrimental impacts to

---

[10] Standing Trees' opening brief contained an error in an argument heading, Pl.'s Mem. 30; *cf.* Def. Mem. 32; the argument addressed the Service's violation of a scenic "guideline." AR 3477.

[11] Furthermore, the design element fails to genuinely address this violation. *See* Pl.'s Mem. at 30.

water quality due to runoff, sedimentation, and potential herbicide contamination; [and] loss or damage to historic and cultural resources located within the proposed action area[.]" AR 4684. Furthermore, the Service had independent knowledge of this issue. *Pub. Citizen*, 541 U.S. at 765; *Friends of the Clearwater*, 222 F.3d at 559. Here, the Service was on notice that its Projects would alter the rivers' eligibility but nonetheless violated by the Forest Plan by choosing to clearcut fourteen acres just a quarter mile away. *See* AR 4902–03.

Finally, the Service's assumption of the bat's presence does not satisfy its Forest Plan obligations. Def. Mem. at 34. As discussed in connection with the Service's failure to take a hard look at impacts to the bat under NEPA, *supra* Section II(A)(3), this assumption helps the Service shirk its requirement to consider relevant data and articulate a "rational connection between the *facts found* and the choices made[.]" *Dubois*, 102 F.3d at 1284 (quoting *Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983)). Here also, the Service's failure to conduct a survey demonstrates its failure to investigate the Project sites, evidenced by the BiOp's very own "conservation recommendations." AR 0471–72.

In these respects, the Service violated the Forest Plan and NFMA.

## CONCLUSION

For the foregoing reasons, Standing Trees respectfully requests this Court grant its motion for summary judgment, deny the Service's cross-motion for summary judgment, and vacate the agency decisions to authorize the Projects.[12]

---

[12] The Service suggests vacatur may not be an appropriate remedy, but "[a]s a general matter, an agency action that violates the APA must be set aside." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). *See also id.* (discretion to vacate depending on seriousness of deficiencies and disruptive consequences of vacatur). Until the Service complies with legal mandates, the Court should vacate the orders authorizing the Projects. *See* Pl.'s Mem. 6–8 (detailing harm to Standing Trees' members from Projects).

Respectfully submitted, this the 21st day of November, 2024.

STANDING TREES, INC.

By its attorney:

/s/ Christophe Courchesne
Christophe Courchesne
NH Bar No. 20431
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802) 831-1630
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*Environmental Advocacy Clinic student attorneys Hannah Weisgerber, Joe Anderson, and Willow Hogan contributed to this brief.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2024, I served the foregoing document electronically through ECF upon all counsel of record.

/s/ Christophe Courchesne
Christophe Courchesne
*Counsel for Standing Trees, Inc.*