*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 21, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
STANDING TREES, INC.                *
                                    *  1:24-cv-138-JL-TSM
            v.                      *  March 11, 2025
                                    *  10:05 a.m.
UNITED STATES FOREST SERVICE, et al *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF RECORDED
ORAL ARGUMENT ON MOTIONS FOR SUMMARY JUDGMENT
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

| | |
|---|---|
| For the Plaintiff: | Christophe G. Courchesne, Esq.<br>Vermont Law and Graduate School |
| For the Defendant: | John Tustin, Esq.<br>United States Department of Justice |
| For the Amici: | Jeremy David Eggleton, Esq<br>Orr & Reno PA |
| For the State of NH: | Christopher G. Aslin, Esq.<br>NH Attorney General's Office |

2

P R O C E E D I N G S

THE CLERK:  This Court is in session and has for consideration oral argument on motions for summary judgment in civil matter 24-cv-138-JL-TSM, Standing Trees, Incorporated vs. the U.S. Forest Service, et al.

THE COURT:  All right.  We're here on -- you know, it's a motion for summary judgment, but it's actually just a case that's tried on -- or that's -- you know, that's litigated on the administrative record.  So I think of it more as just a -- you know, this is not the trial, of course, but it's oral argument on the merits of the case.  And I'm not crazy about the term summary judgment for something like this because it's not a shortcut, but we all understand each other.

So why don't counsel identify themselves for the record and then we'll just get started.  We'll start with Standing Trees' counsel.

MR. COURCHESNE:  Your Honor, good morning. Christophe Courchesne, counsel for Standing Trees.

THE COURT:  Yup.  So you're the --

MR. COURCHESNE:  And, actually, I -- thank you for -- thank you for asking me.  I appreciate the Court's indulgence that we have our student clinicians from the Environmental Advocacy Clinic at Vermont Law and Graduate School who have assisted with this case over the last year and a half.

3

So I would like, if they would like to introduce themselves, it's up to you.

THE COURT:  Sure.  Yeah, welcome.

MR. COURCHESNE:  Terrific.

MR. ANDERSON:  Joseph Anderson.  I'm a 2L at Vermont Law.

THE COURT:  Welcome.

MS. WEISGERBER:  Hannah Weisgerber, a 3L at Vermont Law.

THE COURT:  Happy to have you.

You two in the back?

MS. DANNEELS:  Ashton Danneels, also a 3L at Vermont Law.

MR. BEHIMER:  Ben Behimer, 2L at Vermont Law.

THE COURT:  Great.

MR. TUSTIN:  Good morning, your Honor, John Tustin on behalf of the United States.

THE COURT:  All right.  Counsel in the back?

MR. EGGLETON:  Jeremy Eggleton, your Honor, with the law firm of Orr & Reno, on behalf of the private amici, your Honor, and I'm joined by Matt Leahy of the Forest Society.

MR. ASLIN:  Good morning, your Honor.  Chris Aslin from the Attorney General's Office on behalf of the state of New Hampshire.

THE COURT:  Thank you.

All right.  Let's proceed.  I have a paper copy of what looks like a slide presentation here.

MR. COURCHESNE:  Yes.  With your Honor's permission, I'd like to present some tables from the record --

THE COURT:  Sure.

MR. COURCHESNE:  -- to guide my discussion a bit since it's a -- it's a dense record with a lot of visuals, so I thought it would be helpful.

THE COURT:  Not a problem.

MR. COURCHESNE:  So, your Honor, it's been about a decade since I've been before you.

THE COURT:  Yeah.

MR. COURCHESNE:  I was at Conservation Law Foundation, then I was a stint at the Mass AG's office in Boston for a number of years.  I'm now the director of the Environmental Advocacy Clinic at Vermont Law and Graduate School.

THE COURT:  Excellent.

MR. COURCHESNE:  And I work with law students and they're really an integral part of the case team in our cases and the way we do them.  And so in this case, you know, the students have been -- took the lead in writing the briefs, working with our client, Standing Trees, and under my supervision.  And they've worked on the administrative objections, the complaint, the summary judgment papers.  So --

THE COURT:  So you've been working the case since it's been before the agency, even before -- before it got to court.

MR. COURCHESNE:  Before it got to court, exactly. The students worked on the administrative objections phase of the process.  The client worked on the comments on the environmental assessments --

THE COURT:  Right.

MR. COURCHESNE:  -- previous to that.  So it's been a -- a terrific experience.

THE COURT:  Law school's a lot better than when I went to law school.

MR. COURCHESNE:  They've done so much hard work on this case, your Honor.  It's really --

THE COURT:  Yeah, it's amazing.  I've got a daughter in law school and she's in court all the time, like all the time.  So, I don't know, it just -- I think I was born a few decades too early.

So, anyway, let's keep going.

MR. COURCHESNE:  Yes.  And so this case, your Honor, is about the Forest Service approval of two large logging projects in the White Mountains.  While there are other components of these projects that aren't at issue here, at their core, these are two huge logging projects with some logging roads as well, and thousands of acres of logging, many

miles of roadwork, and this will have major impacts on the National Forest.

I want to show you quickly a couple of the overview maps from these projects that are in the record.

So here are the two -- two maps for these two projects. It shows there, you know, this is -- can you see the -- oh, I'm sorry.

THE COURT: I can see them on the -- sure.

MR. COURCHESNE: Okay. Terrific.

These are substantial -- all these -- all these blocks that you see are treatment areas that some logging is proposed in both these areas. This will, you know, have significant impacts on the treasured resources of these areas and the people who enjoy these areas, including Standing Trees members.

So these are sort of -- this is the overview of the projects that are in the environmental assessments.

The next -- this is sort of the overview of where they are in context in the White Mountains. One's in the northeast corner and one's on the west side. But you can see there's a -- a variety of other logging projects that are proposed and that's part of our argument later, but I wanted to show you them in context.

THE COURT: Yup.

MR. COURCHESNE: So -- this is Lake Tarleton and

I've also -- I also wanted to include a quote from the record about Lake Tarleton which reflects that -- I think the views of Standing Trees members about this area from Senator Judd Gregg who said that "Many of us here today in 2000 worked hard for a number of years to reach the point where we are at today where we can proudly say this pristine New Hampshire wilderness has been saved."

So this was about Lake Tarleton, that beautiful lake, and the resources that it -- that are there.

It's really -- it's also true and it's also why it's so controversial, this quote, I think, because the Standing Trees members in the record, including I think we've got the Faletras at Exhibit C of my papers, the Aschers at Exhibits E and L of our papers, represent that they were told that this area would be preserved as a result of being acquired by the Forest Service.  And so that's a big driver for some of our members' feelings about these project -- this project at Tarleton.

THE COURT:  Wait.  What's a big driver?

MR. COURCHESNE:  That they feel that that area was promised to them to be --

THE COURT:  Oh.

MR. COURCHESNE:  -- preserved in a wilderness state as a certain quote suggests was the understanding of --

THE COURT:  So not just less logging, but no

logging, bottom line.

MR. COURCHESNE:  Bottom line, certainly not anything like the proposal that's on the table today to do really significant logging all around the lake.

So this is Peabody West, which is, you know, one of the iconic areas of the Presidentials, right in the shadow of the Presidentials.  This is in summer from the Imp lookout, which is sort of on the east side of Route 16, and then this is the winter view of the area from Wildcat.  These are both sort of Appalachian Trail views of the area.  So that's just the context, your Honor.

So I'm going to leave the -- I'll leave that picture up for now.

For reasons I'll explain, the Forest Service's approval of both projects violated NEPA and NFMA, the National Forest Management Act, and we're asking the Court under the APA to set aside these project approvals and to send the Forest Service back to the drawing board based on those errors.

So we think these reviews are among the most threadbare we've ever seen.  They're extremely -- extremely conclusory.  And you look at the other agency reviews that the Forest Service has done that are actually in this administrative record because they were included by reference or they were included in the record like at Albany South, which is really firmly at issue when we're talking about water

quality, or the mount -- the mount -- the Moat Mountain Trail project which is close to my heart because that's right behind a place that I stay in the White Mountains when I'm there.

There's really no comparison with those two environmental assessments that were done and the two that you have in front of you in terms of care, rigor, and reasoning, and the analysis here in these two projects is very, very one-sided.  It was often cursory and, really, the key issue is in some spots it just doesn't make sense, your Honor.  That's really the standard.  It was a -- kind of a brochure for what the Forest Service was doing.  If you -- if you read through these assessments, it was not an assessment.  So even with the deferential standard of review, we think that these assessments flunk.

So I want to emphasize we're here because of what the service did wrong here, not as -- not about vindicating our policy preferences that -- you know, for forest management.  We have good faith disagreements with lots of different parties, Standing Trees does, about the way these forests should be managed.  That's not really at issue.  That's not really before the Court.  We're talking about, really, you know, the -- in fact, you know, to that point, Standing Trees proposed alternatives in both projects that would have entailed some logging and the Forest Service rejected them.

So I will get -- I'll get to that point about our

alternatives, because it's important.  It's a subsidiary point to what -- our overall alternative point.

I'd like to talk quickly about standing, if I could, your Honor, because it's an important factor in these cases, and then proceed to the merits and emphasize sort of the key problems with the Forest Service's actions.

So let's start with standing.  The Forest Service did not contest our standing and we appreciate that it's a threshold question for the Court, however, and so we wanted to mention it and talk about it briefly.

Standing Trees' members live, work, recreate, enjoy the forest and the wildlife in these precise areas in the vicinity of both projects.  And at Lake Tarleton, Standing Trees members also run one of the area's signature summer camps and event venues.  It's a multimillion-dollar operation, a major employer in the area, and its only -- the area it enjoys and uses as part of its camp will be affected by this project.

In terms of standing, logging in the place and manner the Forest Service has proposed will change the Forest Service's -- the forest's appearance, its ecological health, and recreational opportunities.  And these are -- these are things that the Standing Trees members currently enjoy.  It's reflected in our standing declarations that we attached to our original --

THE COURT:  Sure.  But there's no challenge to

standing here, so ...

MR. COURCHESNE: There's -- no. And I'll just briefly sort of say I -- I think we satisfied the -- we satisfied the test. We've got injury in these particular areas. That's traceable to these approvals of these projects and it would be redressable with a decision setting aside these approvals under the APA.

THE COURT: I don't disagree, and I don't think the defendant -- I don't think the Forest Service does either.

MR. COURCHESNE: So turning to the merits then, your Honor, I wanted to take a step back to the way this is supposed to work.

The -- the Forest Service -- the Forest Service is supposed to develop this very broad plan for the forest. You see it throughout the papers talked about as the forest plan. And during the plan period, the forest management needs to follow the plan. That's the command of NFMA.

The plan, in essence, is the bible for the -- for these projects and for forest management. It governs -- you know, it has a lot of language that governs the forest and establishes zones for forest management.

So one of the biggest issues that the plan leaves open is what to do in these general management areas, these MA2.1 areas, that are not restricted as other areas are. So because there's a lot of options in those areas, each forest

management plan has to go through a NEPA review and it needs to do a great deal of site-specific work to determine what -- what the impacts are, what -- and we think what the alternatives to the proposal are.  And the forest plan doesn't purport to do that even though it's a very long document and it has an EIS attached to it.

So it's all the more -- you know, it's all the more important here, your Honor, to be looking at that -- these issues very closely because the Forest Service is -- the forest plan is now 20 years old.  That's five years past NFMA's 15-year, you know, really requirement for forest plans.  That's their life span.  And we're five years past that now.

THE COURT:  Have the operations started yet under these two projects?  Like is there actual logging going on?

MR. COURCHESNE:  Well, I'd like to ask the counsel for the government on that.

THE COURT:  What do you think?

MR. COURCHESNE:  We have not noticed in Lake Tarleton, which at Lake Tarleton I believe the representation was December of this year that logging will be -- will be starting.

At Peabody West, there were some preparations and a timber sale that has occurred, but we'd defer to the Forest Service in terms of --

THE COURT:  Mr. Tustin, what's the status?

MR. TUSTIN:  It's operational on Peabody, yes.  I was out there yesterday.  And as we noticed in our status -- as we noticed in our report in July that we told the Court and plaintiffs that operations would begin in December.  Operations should be halting in the next couple weeks, but they are operational at Peabody.

Tarleton has been delayed about a year so that there will be -- there is an anticipated sale for Tarleton in the spring of '26 with operations to begin in December '26.

THE COURT:  So operations means -- this is more just curiosity at this point, but operations means what, like --

MR. TUSTIN:  Timber harvest.

THE COURT:  -- trees being cut?

MR. TUSTIN:  Timber harvest, yes.

THE COURT:  Okay.  Go ahead, Counsel.

MR. COURCHESNE:  So to make that sort of point that we really are trying to get the really strong site-specific review of these projects and that's what we -- what NEPA requires and it's all the more important, given the age of the forest plan.

So there are three big problems that we wanted to highlight with you on the merits.  The first one -- the first one's alternatives and it's actually an interesting legal issue to start with.

THE COURT:  It's actually a what issue to start

with?

MR. COURCHESNE:  It's a really interesting legal issue to start with.  It's not an issue, we believe at the outset, of arbitrary and capricious review.  It's an issue of what the regulations and the statute require.

And so the obligation to consider alternatives comes straight from NEPA and that's why we wanted to show you this slide, showing you where it comes from.

And this is -- you know, to not consider alternatives in the way that the final EAs did in this project is legal error.  And so we have the statute requires it, the Forest Service regulations require it, and the case law requires it.

So it's also worth noting that the Forest Service approach here is a real outlier.  As our papers show, cases before the Court that have considered environmental assessment like the *Army Corps* case, Great Bay case that you heard in 2019, and all the other Forest Service projects in New Hampshire that are in the record and that we've -- we've seen routinely consider actual alternatives, the main point of dispute with the service appears to be their understanding of their own obligations.

The Forest Service says that its consequences of no action passages in the EAs are enough.  What they did in those discussions is say essentially doing nothing would be a

problem and --

THE COURT:  Right.

MR. COURCHESNE:  Because it would not meet the need for the project.  And that's deeply conclusory.  It also -- we think that NEPA and the regulations require more, whether you credit the fact that they -- this was an alternative analysis or not.

So here's the purpose section for the --

THE COURT:  Well, you -- but you -- you -- they claim that, you know, that -- they claim that no unresolved conflicts have been brought forward and you said that's an egregious misstatement.  What's egregious about it?  What's the misstatement?

MR. COURCHESNE:  Well, there were absolutely unresolved conflicts about the uses of the property, of these areas.  The public raised those concerns and even in the -- even in the bodies of the EAs, even if there were no -- even if there were no public comments suggesting that the Forest Service should have done something differently, we have sort of a conflict of scenery guidelines and the Forest Service's age class management goals at Peabody West.

And we have -- you know, there are -- that's just one example of how the Forest Service is taking some guidelines and saying, well, this value is more important than the other.  That's a -- that's an unresolved conflict under the statute.

And so that creates that problem under the statute and generates this alternatives analysis requirement.

The regulations that the Forest Service has promulgated in this space purport to answer what the Forest Service is supposed to do and it includes this discussion of unresolved conflict.

Actually, I think that the Forest Service, which, you know, will make its points here, but their contention is not that they don't have to do an alternatives analysis; their contention is that they relied on the second half of the regulation, which is this here.  They relied on the second prong that says they can document an alternative using this consequences of no action approach that they did.

THE COURT:  Yeah.

MR. COURCHESNE:  So they don't make an argument as to this issue of unresolved conflicts.

So they're really -- they're really focused on the idea that B22 blesses what they did and we just don't -- we just don't agree with that, if you look at the regulation.

So the -- you know, the focus of these are on planning and public disclosure.  The leading sentence of this regulation says that the EA shall briefly describe the proposed action and alternatives that meet the need for action.

The key point is that the alternatives that they analyze, if they need to analyze them, need to meet the project

need and that they -- they didn't do that here.  They say that the consequences of no action are that it won't meet the project needs.  So a no action alternative could not possibly satisfy the service's obligations to consider alternatives here.  And we think the case law interpreting NEPA here and around the country are in accord that some alternatives analysis is required.

So the question that is presented by the service's argument is does this second prong bless, as they contend, what they did in these two projects.  And, interestingly, the reason I said it was interesting is that in all the litigation over Forest Service projects over the years, it doesn't appear this has come up.  And I think that's telling, your Honor, that it hasn't come up.  There's been a lot of Forest Service projects and a lot of environmental assessments, especially in the west, and this issue has not yet come up even though these regulations are more than a decade old.

I think the -- the Forest Service cites the preamble to these regulations to try to get some better sense of what it means.  So we looked at the preamble and the preamble has a pretty telling reference.  It says that typically most Forest Service proposals will have alternatives.  It says that, you know, when there's consensus about the action, you don't need to do an alternatives analysis.  Otherwise, you need to develop alternatives that meet the project needs.

So that's why we talk about action alternatives and that you -- we think the regs require at least one of them and if you don't, then you don't satisfy that first sentence of the regs.

So that's our legal -- that's our legal argument, but we also think that even if you don't credit that argument, you can move to the question of whether it was arbitrary and capricious in context here.  And I think that, you know, our -- our position is that this decision to not engage in action alternatives analysis was arbitrary and capricious for two reasons.

One is that in the consequences of no actions sections of these EAs, they say nothing about the benefits of no action to water quality, wildlife, carbon, of allowing the national processes to unfold across the landscape, either in whole or in part, and no mention of the benefits of less intensive options at all.  No mention of the benefits to, say, the Kingswood Camp on Lake Tarleton, for example, if this project didn't go forward as proposed.  That's fatally inadequate under the requirement that's stated in *Dubois,* the case from the First Circuit in 1996 that says you have to consider the merits and demerits from an environmental perspective under NEPA.

And that consequences of no action section was not robust.  It's a paragraph.  It is, as I said, a brochure for

the project and why it's needed. It's not an -- it's not an analysis.

So that's the -- that's one reason. You know, I think, secondly, such a choice, given the record, is also, you know, arbitrary and capricious. There were a rich -- there were -- there were a rich array of alternatives proposed, including by Standing Trees. Both projects -- so there's a contention now there aren't any alternatives to the proposed actions. Well, the Forest Service was doing its own alternatives analysis outside the NEPA process and shrinking these projects over the course of their review without making them alternatives.

And they also made other changes to the recreation proposals. They decided to exclude some areas from logging over the course of the environmental assessment process and they're very proud of that in their statements about how they reduced the logging areas.

THE COURT: Yeah.

MR. COURCHESNE: That's proof positive that there were alternatives. It's really -- it's really -- there were alternatives to what they proposed.

So that's just a commonsense rule of reason point that we would make, that there are absolutely more protective alternatives that were evident from the record and not considered.

Our alternatives would have had less -- less impact on the forest for both projects.  The Forest Service in considering alternatives -- our alternatives said, no, thanks, essentially, in that they said they don't meet the project needs.  But, importantly, they did not document that in the EAs themselves.

So we think that's a -- that's a big reason why it was arbitrary here to not consider alternatives.

I'll move on to the next -- unless the Court has questions about alternatives, I'd like to move on to hard look.

THE COURT:  Hard look?

MR. COURCHESNE:  Yeah.

THE COURT:  All right.

MR. COURCHESNE:  So as we think about the hard look question, it's again guided by that rule of reason and the Forest Service's fundamental obligation to engage in nonarbitrary decisions.

THE COURT:  You know, I'm debating in my mind whether we should do these one at a time.

MR. COURCHESNE:  Yeah.

THE COURT:  You know, hear from counsel regarding alternatives and then move to hard look, go back and forth so it's not sort of like this mountain we've got to climb each time.  You know what I mean?

MR. COURCHESNE:  Yes.  And that would be fine with

us, your Honor.

THE COURT:  Okay.  Thank you.

So alternative analysis.

MR. TUSTIN:  Yes, sir.

Could you please take this down, the visual?

MR. COURCHESNE:  Yes, I will.

MR. TUSTIN:  Good morning, your Honor.  John Tustin on behalf of the Forest Service.

I'd like to acknowledge several members of the district and the supervisor's office that came out today.  So they are very interested in this Court's proceedings and what we're discussing here today.

THE COURT:  Understood.

MR. TUSTIN:  Before I discuss alternatives, I'd just like to give a brief overview, if you don't mind.

THE COURT:  Of course.

MR. TUSTIN:  So, your Honor, this case concerns two integrated resource projects, and that integrated word is quite important for this forest because it -- it shows how the forest is fulfilling its mandate under the National Forest Management Act to provide for multiple use and sustained yield of forest resources, which includes wildlife, timber, recreation.

And this forest here, the White Mountain National Forest, it's a Weeks Act forest, which means -- the Weeks Act was passed in 1911 for eastern forests to acquire disturbed

lands to -- primarily for water quality, but also now for other purposes under the National Forest Management Act and the Multiple-Use and Sustained-Yield Act.

The forests in the areas really show New Hampshire's agricultural past. The mature forests in the project are from farmland that are cut more than a hundred years ago, and what has regrown are just different species, composition, and different age classes than what is desired in the forest plan and, importantly, what the Forest Service needs to do to provide not only for current generations, but for future generations who will depend on this forest for its multiple uses. And these projects here are designed to sustain a healthy, diverse, and productive ecosystem.

Plaintiffs raised two legal claims under the National Environmental Policy Act, NEPA, or the -- and the National Forest Management Act, or NFMA. We'll talk about them in turn, but since we're talking about NEPA, I just really want to emphasize that NEPA is a procedural statute. It does not have any -- it does not mandate a specific outcome. So long as the agency conducts analyses, the Court should defer to the Forest Service's reasoned and informed decision. And, here, the environmental assessment shows the Forest Service really did take a hard look and assess the project's impacts and provided for ample public comment.

These projects began in 2019, they'd been in

development for five years before they were authorized, and as I mentioned about 20 minutes ago, they are operational now. So there are people out there removing the timber, restoring the ecosystem, improving the wildlife habitat.

Turning to alternatives, we've talked about the two points here. The first issue is whether or not there is an action or no action alternative and also how the Forest Service examines their proposed alternatives. The range of alternatives is within the agency's discretion and the Forest Service regulations expressly provide that no specific number of alternatives is required or prescribed.

This is just a --

THE COURT: Yeah.

MR. TUSTIN: -- 36 CFR 220.7.

THE COURT: Yup.

MR. TUSTIN: All right. So this is what we're -- this is what is guiding the Forest Service -- Forest Service alternatives here.

And as we note in our brief, the Forest Service analyzed in detail a proposed action, that's at 4880 to 88 in one of them, and 1197 -- 11976 to 83 in Tarleton. They also included the effects analysis as a comparative known -- as a comparative baseline.

Now, what these -- the first point is whether or not the Forest Service had to consider multiple alternatives or an

explicit no action alternative.  We cited cases that say you do not have to do that and there's binding -- there's precedent from the First -- from the Ninth Circuit and Tenth Circuit that say as long as there is an action and a no action alternative, the Court -- that satisfies it.  You don't have to have multiple action alternatives because, as the First Circuit held in *Seacoast*, it's really endless.  You can always think of ways to have a different range, a different spectrum, to decide things.

But NEPA, especially for environmental assessments, it's not to make paperwork.  That's not the purpose of the statute.  It's just to provide an informed basis for the Forest Service to make a decision.

Now, the issue here is whether or not the Forest Service is allowed to include the no action alternative in the baseline as opposed to an expressly analyzed no action alternative that analyzes everything.  And the regulations are quite clear the Forest Service may.

Now, as we noted in our brief, this is an issue of first impression, so we agree with plaintiffs that this is an interesting issue for the Court.  But just because we can't find an example in case law does not mean the Forest Service's decision to rely on that is arbitrary and capricious.

So I'd just like to walk through the regulation to just respond to plaintiff's points here.

THE COURT: Yeah.

MR. TUSTIN: So we've talked about the opening portion of the part B -- part A that just says that you have to describe the alternatives analysis here and that no specific number is -- is required or prescribed.

Plaintiff spent a lot of time discussing part 1 about unresolved conflicts, but, your Honor, this doesn't have ands or ors or semicolons after each one of these subparts, so each one stands alone. Part 1 for the unresolved conflicts, that is not an issue here. This is when there is no -- no action analysis at all. If you're doing something to administrate a site or -- not a categorical exclusion, but there may be some situations in which there's no possible way to have a -- an alternative.

That does not apply here and as the plaintiffs discussed in their responsive brief, focusing solely on 2, subpart 1. But as we noted in our brief, we are relying on 2, subpart 2, which plaintiffs really did not respond to at all in their papers in the briefs. So the argument you heard today from Mr. -- from the plaintiff's counsel is new argument that was not addressed in the papers. And because they didn't do that, one way for the Court to find in favor of the Forest Service is waiver. They did not address our express argument in reliance on 2, subpart 2.

But, more importantly, the plain language say that

you don't have to do a no action alternative.  You can look at the effects analysis just by -- in the baseline.  And that is what the Forest Service did here.  In the baseline, they relied on that at 480 -- 48897 in Peabody and 1197 in Tarleton.

And the regulations are quite clear that that is sufficient, that satisfies the regulation, and under the arbitrary and capricious standard, that is not arbitrary and capricious.

THE COURT:  Looking at the EA for Tarleton, though --

MR. TUSTIN:  Yes.

THE COURT:  -- it says, in addition to increasing forest, tree, and wildlife habitat diversity, that without management action, no improvements to shoreline or aquatic habitat at Lake Katherine would occur, resulting in a higher -- here's the thing -- higher water temperature, less cover for aquatic animals, and stormwater, right, that would run off into the lake before it could be adequately filtered.

And the -- you know, that -- that makes sense to me just reading it, but you're -- there's no citation to anything, nothing, to support any of that.  What am I to make of that?

MR. TUSTIN:  Well, I think that what you should make of that is that that is setting forth the baseline position, the baseline condition.  And those other supports which are incorporated by reference, all the water specialists' reports,

27

the other wildlife reports, those are available in the record and those are discussed in greater detail when they're analyzed in the action.

But what the Forest Service has done here is it's given the baseline. And it says that if we don't do anything, this age class composition is going to continue to worsen. The wildlife habitat is not going to provide for the needs. We're not going to provide timber and wood products for the economy and for local workers. That if you do nothing -- I mean, that might be fine for some people, but that's certainly inconsistent with what the forest -- what the forest plan requires for a sustainable ecosystem and wood products for not just now but for future generations.

And in some -- in most environmental assessments, the no action alternative would have been discussed to go through each of the resources and say, if we do nothing, this happens. But that really is not necessary because the Forest Service regulations say that. And also in the Federal Register that we cited in our -- in our brief, 73 Federal Register 43084, that's sort of -- they give a little more flavor about how the -- that by having the no action in the baseline, the Forest Service issued a final regulation that says you do not have to have a separate no action alternative.

THE COURT: Go ahead.

MR. TUSTIN: All right. So turning to the other --

the other alternatives argument is whether or not there are reasonable alternatives the Forest Service did not consider, and we maintain the answer is no.

In our brief we discussed how the alternatives is based on the purpose and need of the project.  The Forest Service provided a purpose and need.  That is uncontested.  So there is no dispute that the forest -- there is no dispute in this case that the purpose and need is impermissibly narrow.

And so what plaintiffs needed to do or, actually, what the Forest Service did here is that they -- it looked at the no action alternative in the baseline and their proposed action alternative.  Under NEPA and under -- under case law, that satisfies the Forest Service's burden.

If plaintiffs believed there was a reasonable action alternative that the Forest Service did not consider, it is their obligation to prevent -- to provide that to the Forest Service for consideration and they did not do that here. They -- they did provide alternatives, but the Forest -- the Forest Service, consistent with its regulations, it briefly discussed those and explained why it did not satisfy the purpose and need.

And, for example, in Tarleton, they said that they had a -- plaintiffs had a recreation and habitat-focused alternative, but the Forest Service explained at -- at 10553 that just focusing on recreation and habitat does not meet the

purpose and need to adjust the age class composition, which is just the age of stands -- the age of stands of trees in the area.

They also -- plaintiffs also had an alternative for Peabody that prohibited timber harvest and the Forest Service explained this does not implement the purpose and need.

And I think the central issue here, if we're looking at plaintiff's alternatives, I would direct the Court to *Vermont Yankee* from the Supreme Court and *Seacoast Antipollution League* from the First Circuit that you can't have a vague alternative.  They can't just say don't do unnecessary timber harvests.  What does unnecessary timber harvests mean?

Plaintiffs bear the burden under *Vermont Yankee* and *Seacoast* to provide specific alternatives.  They can't have cryptic and obscure references in the administrative proceedings and then sue in court to have that decision invalidated.  And they simply have not done that here.  They did not promote -- they did not provide a concrete alternative that the Forest Service could analyze and consider to explain why.  And alternatives, it's not endless.  *Seacoast* says that you can't just make this into a game to have more alternatives that you can look at.

So, here, for the alternatives, the Forest Service, just to sum up, no action is not required.  They did that in the baseline as expressly allowed by the regulation and the

Forest Service also considered and responded to plaintiff's alternatives that did not meet the purpose and need.

THE COURT: Understood. All right.

Standing Trees counsel, hard look. I guess you might want to respond to something you just heard.

MR. COURCHESNE: Yeah, I'd like to say just a couple things.

THE COURT: Take a couple minutes on that if you want.

MR. COURCHESNE: The -- the first point is, I think, that the -- if you look at our papers, I don't think there's a -- I don't think there's an argument that we waived this argument that the no action alternative was insufficient. It's replete in our papers and I wanted to mention that.

I do think that the broader point, that first sentence of this regulation that's on the screen, from our perspective, is -- it really does answer the question. It says that meet the need for action. And that is -- that's -- that's very clear. It reflects the Forest Service's practice in many other projects where they do develop projects that meet the need for action and we think that's required here.

The -- sort of the all-or-nothing approach the Forest Service is taking to this review and in counsel's comments that our -- our alternatives were not reasonable belies the fact that our alternatives did include logging, as I

mentioned at the outset.  They might not have included the full extent of the logging that's proposed, but the clearest example that that's reasonable is that the Forest Service determined over the course of the project that some of the logging that they had originally proposed was unnecessary, so they -- they dropped it from the project.  So it's -- it just doesn't make common sense that -- it just defies common sense that there aren't alternatives that involve less logging than the Forest Service has presented that would meet the project need, which is sort of the requirement here.

Okay.  So let me -- let me move on to hard look.

So forest health is the first issue I wanted to address.  This is really important because as you just heard, the Forest Service contends these projects are needed because the project -- the forest is not healthy for lack of younger stands.

At the other end of the spectrum, as the forest plan really makes clear, impacts to the oldest stands in habitat in the forest are very problematic to the forest's health, to the capacity of the forest to be resilient to extreme weather, to clean water, to carbon storage, to wildlife, you name it.  And, in fact, for those very reasons, the forest plan prohibits logging in stand -- in what's called old forest habitat. Knowing what types of forest and where the service proposes to log are vital to understanding the basis for these projects and

why they're going forward.

So we think that's a really important issue the Forest Service needs to take a hard look at. And certainly the project documents talk in general about the lack of certain age classes in the forests as a problem, but it's stated in sort of raw acres and percentages in a few tables and I'll show you a couple of those in a second.

And it's extremely confusing. There was very little way for the -- for the public to understand exactly what the Forest Service was trying to do here in terms of meeting its need, stated need. Until we got the full records for these projects, we didn't have the information on the age or the habitat types of individual stands within the project areas. We cried foul at this at every opportunity and asked for those to be disclosed as part of the project documentation.

The Forest Service blames us, by the way, for not FOIAing these documents out of the gate. It's not that they would have been that helpful given what we received in our FOIA responses, but this isn't really about us. It's about the integrity of the project documentation and the reasoning of the EAs and it's about the public as a whole, not just us.

So let me illustrate just how hard it is to make sense of what the Forest Service is doing here and -- and why we think the Forest Service is just wrong in their papers on their assurances about its impacts on stands with old forest

33

habitat and old growth -- and old growth forests.

So the forest plan, it's confusing but it lays out these age classes for forest habitat that are based on the year and it also lays out a strict rule that no harvest will occur in stands identified to provide old forest habitat. So that's not, you know, old forest habitat itself. It's stands that -- where that occurs. And stands has a meaning under the forest plan and I don't think the service disagrees with the way that that is depicted in all the maps.

So old growth is a -- is a rarer thing. You know, that's about 200 -- more than 200 years old and harvest there is also prohibited by the forest plan. But the key -- the key provision of the forest plan that we're concerned about is that -- is this big one, no harvest will occur in stands identified to provide old forest habitat.

So these are -- this is what's in the EAs for these projects. Actually, you know, they're in the habitat management unit rationale documents that are attached.

And so what we see here is that these are the -- this is what the Forest Service keeps saying, but it isn't clear. It doesn't say anything about old forest in these documents, doesn't say anything about old forest age class, and so we're really left to -- to figure out what's going on. It -- it lumps in mature forest and old forest.

And this is a problem for both projects, not just

Peabody West, where we'll spend a little time in a moment. It's a problem for both projects because it's about what the Forest Service disclosed about its analysis on forest health.

THE COURT:  Yeah.

MR. COURCHESNE:  So there's no map anywhere that shows these age classes.  We asked.  They said there wasn't any.  This is a -- this really undermines their analysis.  So we're sort of left to go with what the Forest Service did map out and provided.

So I'll highlight Peabody West, which is the focus of some back-and-forth in the briefs, so I want to go over that for a moment.

We can zoom in on the logging units in the southern part of the project.  This is the -- this is a map from the EA showing the logging units and it, you know, shows a zoom-in on the southern part of the project in particular.  And it -- you know, we need to -- this is really, just to put a -- this in context, this is a truly beautiful area.  This is right along the Great Gulf Trail and the gateway to the Great Gulf Wilderness.  It's right in the northeast shadow of the Presidentials that's depicted in those pictures.  It's a -- it's a -- it's a -- the entry to wilderness.  So that's the context for this particular area.

We're going to add in another layer of numbers from the record, which are the stands themselves, and, you know, we

see -- we see that this is a map that we had to, you know, dig through.  These are not the same numbers as the logging units. Logging units cross stand boundaries, so these stand boundaries are sort of in the record on this map.  And we had to -- we had to -- we actually had to dive really deep within the administrative record to find this map, but here they are.

So what -- what kind of forest is this?  It's the same area that was depicted on the project map.  The service told us in our -- in its response to our objection that we should look at the botany survey document.  That was not -- that was -- that's just in the administrative record.  It wasn't part of the package of documents that the public saw.

THE COURT:  Yeah.

MR. COURCHESNE:  It -- so we did, and here's what we found.  It really -- and there's some references here to the administrative record pages where this -- where these appear, where these excerpts from the botany survey appear.  What we see is that stand 71, stand -- you know, this is -- this is a depiction of stand 71 and this -- and this is what it's described as, late succession of old growth, exemplary natural community.  That's what the Forest Service says these stands are and that they have these really remarkable, exceptional characteristics, some very old, really large trees, providing exceptional, very rare habitat conditions.

So we're sort of look -- we're sort of looking at

this -- this is -- the only little nuance in this -- we've looked at this very carefully.  We think that that -- if you look at the stand map and you look at this map from the botany survey, we think 72 in the botany survey should actually be stand 73.

But so we're looking at these maps, we're trying to compare them, and what we see is this.  This is our comparison of them.  This just -- this is the zoom-in.  And what we see is that in these areas, unit 74 is in stand 71; unit 74 is in stand 73; unit 72 is in stand 73; and unit 72 is in stand 75. All of those stands have old forest habitat.  That violates the forest plan's prohibition of harvest in stands with old forest habitat.

So that's our detective work, your Honor.  That's what we tried to do with the -- with the maps in the record. We see this -- and it's sort of -- you can sort of see the -- in particular how there's that west branch of the Peabody River and there's an area which is kind of carved out north of the river.  That appears to be something they call a botany reserve in some of the documents, but the problem is that the stand extends beyond that botany reserve into the cutting units.

So the stand is effect -- you know, may -- it's unclear whether the cutting units actually hit the old forest habitat and I think the Forest Service says that a couple times, like we're not cutting in any old forest habitat.  Well,

they can't cut in stands with old forest habitat.  It's a really key difference that the forest plan makes.  And that makes sense because a stand is -- is an area that they've mapped as having a sort of a consistency and you want to avoid that if you're trying to protect an important resource.

THE COURT:  Your point is it's not -- it's not really a defense to say we are -- we're within the stand but we're avoiding the old forest.

MR. COURCHESNE:  Correct, under the forest plan as it's drafted.

So, you know, what the Forest Service admits is that in -- you know, in their objection response, they do say that, you know, they're cutting in a lot of old forest age class. They -- they don't, you know, in stands with old forest age class.  They don't deny that.  But this is what they -- I think they're wrong about.  The Forest Service is saying they're not violating the forest plan.

They gave you in their reply something that was just a spreadsheet of units and we couldn't really make heads or tails of it in terms of whether -- where the Forest Service was operating.  We're looking at this map.  It says they're cutting there.  It's in those stands.  So that's -- we think the situation is kind of unacceptable and doesn't make a lot of sense and it suggests is pretty clear forest plan violation.

So we think that this doesn't constitute reasoned

38

decision-making under NEPA and advise -- it flunks that obligation to take a hard look at this resource.  And we see some forest plan violations in Peabody West as proposed.  So that's -- that's actually not just a NEPA violation.  It's also a NFMA violation that we allege in our complaint.

So, if you'd like, I can move on to other -- other topics.  This was a bit of a deep dive, but we felt it was really important, your Honor, to -- to sort of try to make sense of these competing claims about what was being harvested.

THE COURT:  Understood.  You -- say whatever you want to say about the hard look --

MR. COURCHESNE:  Yeah.

THE COURT:  -- hard look impacts.

MR. COURCHESNE:  So the other -- the other points on hard look, we don't think that the Forest Service's review of cumulative impacts of these projects was adequate, so that's the next topic, and these are thousands of acres of logging. These projects -- there are projects underway that I showed you at the very beginning that are authorizing many -- many more acres of logging.

In -- in these projects, they didn't even consider the other one -- you know, they didn't even consider both projects in the same document.  So they didn't even acknowledge that these other projects were taking place in these environmental assessments and I think that's a real problem

when you have parallel projects, all those projects on that map that are going forward at the same time, and the cumulative impacts analysis doesn't address that.

The -- the -- you know -- in particular, you know, this is a -- this is a single national forest with a -- it's pretty tight relative to other national forests.  So it -- it seems -- it seems unreasoned to look at each of these projects without acknowledging the others and that that flunks the sort of standard for cumulative impacts analysis under NEPA.

We also think that -- we wanted to mention the greenhouse gas emissions review of these projects.

THE COURT:  Why doesn't it work the other way?

MR. COURCHESNE:  Huh?

THE COURT:  Why doesn't the tightness actually work the other way?  Right?  I mean, if -- you know, in -- in -- if an area in the White Mountain National Forest is probably like a small speck on a larger national forest somewhere else, maybe it's -- it's exactly why you shouldn't focus on cumulative impacts.

Do you follow what I'm saying?  Because you're going to be within -- you know, you're going to be within what would basically amount to a single area in a larger forest.  Do you follow me?

MR. COURCHESNE:  I do.  I do.

I think that the reason that we take this position

40

is that the cumulative impacts on some resources are -- you know, the projects affect them in common.

So for -- greenhouse gas emissions is, of course, the biggest one.  It doesn't -- it doesn't -- these are happening at the same time and they do have cumulative impacts. They're all happening and so we think that that's an omission that's a problem.

But the other one that I wanted to point out, which is really redolent in the record with the Albany South EA, which is sort of the water quality issue --

THE COURT:  Yes.

MR. COURCHESNE:  -- that we can talk about, but they did it and -- they did a cumulative impacts analysis that covered 64,000 acres for the water quality analysis for that project --

THE COURT:  Yeah.

MR. COURCHESNE:  -- which expands well beyond that project area, certainly -- maybe not the entire forest, but certainly a large area.

And what the Forest Service has said here without any analysis is that there just aren't any cumulative impacts and we don't think that's enough, under -- especially under the standards in the cases we've cited that go back to *Kleppe vs. Sierra Club* in the late '70s of the Supreme Court.  We're like, this is a really important obligation under NEPA, EA, EIS, what

have you.

And I think that the -- you found in the *Army Corps* case that the cumulative impacts analysis that the Army Corps did in that case was adequate.

THE COURT:  Was that the jet plow case?

MR. COURCHESNE:  Yes.

THE COURT:  All right.

MR. COURCHESNE:  And we don't think that this analysis, if you compare those, it even comes close to meeting that standard.

So as to greenhouse gas emissions, we just wanted to say that, you know, we've made -- we've cited cases in our papers about how the service is obligated to do more than it did here, which is essentially just say it's a really small project and it won't have a big impact and it's minimal in the context of global emissions.  We think that reasoning is invalid and has been rejected by a number of courts.

And just to point out that Black Ram case, which is *Center for Biological Diversity vs. Forest Service* from Montana, the Forest Service disagreed in its papers with the analysis in that case which was pretty squarely on point and rejected the type of service -- type of analysis of greenhouse gas emissions that was in place here.

And it -- I just wanted to point out that there was a decision in that case on appeal, that the Forest Service made

an appeal from that decision, which the -- which counsel for the Forest Service criticizes and they did not appeal the greenhouse gas issue. And they did win on some of the grizzly bear issues that were at issue in that case, but they didn't appeal the greenhouse gas emission issue, which they're criticizing here before you.

So I just wanted to make that point. We think it's a persuasive ruling that sort of explains why it's important to consider even minimal -- even small projects and it's especially important in the context of this broader cumulative impact point, which you've got 10 or 12 projects going on around this, around the forest, and if the Forest Service makes a choice not to quantify any of them, then there could absolutely be a significant cumulative impact of those projects in terms of their carbon effects.

So let me just move to water quality and a couple of other things quickly, if we -- if you'd like, or if you have questions about cumulative impacts, I could --

THE COURT: No.

MR. COURCHESNE: On water quality, we think the error is that they relied on the Albany South project for both -- both of these project reviews. They -- my best -- my best reference for this, your Honor, is to look at that Albany South water quality analysis. It was -- it was not really a methodology that they applied here faithfully. That EA is

replete with site-specific analysis, and it includes pages and pages of it, looking at streams and watersheds in that area, again, that larger cumulative impact zone as well, and it just doesn't compare with the analytical rigor here for these projects. There's not a -- you know, not only in that case were there five action alternatives and a no action alternative in that -- in that -- even analyzed solely for water quality in that water quality analysis, you'll see that there are specific provisions about small tributaries, brooks, very specific features in the Albany South area. And the Forest Service's approach here was to say that's -- we're just incorporating that by reference, that's fine, that's what we're going to apply here, without looking at all those brooks and tributaries and all those issues in the two projects.

And that's really problematic from the perspective of we've got a very different set of resources in those three projects. We've got a wild and scenic river in Peabody West and we've got Lake Tarleton, this sort of magical, large lake in the western part of the White Mountains, and that's just very different than Albany South.

And it's very interesting, the -- the point that you raised earlier about sort of the consequences of no action, of not doing the recreational upgrades at Lake Katherine and some of the work around Lake Katherine, they talked a lot about the impacts that are being avoided by their work on that project,

but there is not a commensurate, you know, attention to the actual water quality impacts of the logging in the -- in these areas.

It feels even more arbitrary when you look at the fact that in the Peabody West project, the service is proposing to log well in excess of that Albany South threshold. And they have a brief explanation of it, but we don't think it passes analytical muster. It just doesn't make sense that you wouldn't -- you -- you're going well beyond this all-important literature value of 20 percent basal removal, and then you don't actually look at the things that are going to be affected by that over 20 percent removal.

So that's the water quality issue. We think that was arbitrary.

Moving on to the bat, the northern long-eared bat.

THE COURT: Yup.

MR. COURCHESNE: The service hasn't even looked for the bat on the ground and it relies on this one two-night excursion in 2019. There was a visit to Lake Tarleton for two nights, but the Peabody West doesn't appear to be included in that.

It points to the biological evaluations that the service did about impacts to the bat. You -- I think if you look at the few pages that they cite in the biological evaluation, you'll see kind of what we mean and why we're

concerned. This is actually a forest plan issue, too, because we think that they have an obligation under the forest plan to investigate the presence of the species and to promote the conservation and recovery of the bat.

Just relying on this 2019 excursion and then approaching the bat in the way that they did, this is -- this does not constitute, you know, reasonable investigation under the forest plan; it doesn't constitute a hard look under NEPA.

And I think there's a telling point here. Between the two projects, the service's analysis was inconsistent. So at Tarleton, there's no summer harvesting proposed. And one of the reasons for that in the -- in the EA is that, well, we'll avoid impacts to the bat, which is off hibernating, you know, and which is -- which is off hibernating in the winter and is in the trees in the summer. And -- but they didn't make that choice at Peabody West and they didn't explain why. They just said it was fine. So I think that's a -- that's an example of where they're not meeting the rigorous standard, the standard of rigor that the -- that NEPA requires.

We also make some points about recreational impacts and roadless area impacts and we think these are also examples of arbitrary decision-making. Really, in terms of the recreational impacts, what we -- I'm trying to make sure that I'm -- I'm not going too far over my allowance of time here.

But it really made it --

THE COURT: We'll take what time you folks need today. Don't worry.

MR. COURCHESNE: So the -- the -- on this issue, the specialist recreational reports are fully conclusory and, in fact, if you look at Peabody West versus Tarleton, you'll see a difference. There's really not a good way to figure out what the impacts on these trails in the White Mountains are. They're -- we don't know what the ages of the impacted stands are, as we talked about in forest health, and so as you're traveling along these trails, there's only a few viewpoints selected and the scenery impacts to those viewpoints are actually beyond what the forest plan allows in their guidelines.

And so we don't think that was adequately explained, you know, what are the impacts to, for example, the Appalachian Trail, what are the impacts to the Great Gulf Trail, what are the impacts to those trails around Lake Tarleton. We just don't see that in these recreational reports.

We did raise these issues sufficiently at the commenting stage. We talked about how there was not sufficient recreational baselines and that's really -- that's really -- that really says it. And so it was wrong for the supervisor to reject our objection on this in the administrative process.

There's no -- there's no dispute that we raised roadless areas. The Forest Service's response on roadless

areas is just we shouldn't worry about it.  And -- which is belied by their approach in other projects where they actually create alternatives that avoid roadless -- inventory roadless areas, just to actually do that analysis and see whether they can meet their project needs without encroaching into those. Those are important because they are eventually something that Congress can consider designating as wilderness.  And if you do a massive logging project in those areas, the Forest Service says, well, you know, in a decade or so it'll be back and we'll have those roadless characteristics again.  And I just don't think that's -- that doesn't make a lot of sense.  These roadless areas are apprised for their wilderness characteristics and doing the intensive logging that's required there really does impair those -- impair those characteristics.

And so our point on that really is that they've admitted there'll be hundreds of acres of impacts in those -- in those inventoried roadless areas and we really think that they -- they say in terms of roadless effects doesn't -- you know, doesn't hit protected roadless areas, so there's no problem, and we think that they needed to do more analysis there.

Finally, I think it's really important to recognize in closing on NEPA that the forest plan and its EIS didn't do this analysis for any of these projects and it did not specifically authorize these projects.  And as I said earlier,

you know, the plan is 20 years old, reflecting decades-old science on things like greenhouse gas emissions and very little consideration of issues like climate change and carbon.

And so we think that, to kind of close out the NEPA point, we've raised all these issues with the NEPA analysis and our assertion is that that makes the EAs invalid and it also makes the FONSIs, the findings of no significant impact, analysis, those -- those FONSIs invalid.

We've made arguments on endangered species, unique areas, cumulative impacts, for all the factors that are at issue in the FONSI analysis, and those go directly to the validity of the FONSI.

So our point is that we just did not rotely go through the FONSI regs, instead relying on our other objections to the EAs.  So that's our -- that's our point on the findings of no significant impact.

So that's the -- that's the conclusion of our NEPA discussion and happy to answer the Court's questions and then we can go to the final point, which is the NFMA violations, which is much briefer.

If you'd like us to do that now, I can.  If it's -- it's pretty brief.

THE COURT:  No, I'll hear from counsel.

MR. COURCHESNE:  Okay.  Thank you, your Honor.

THE COURT:  Hard look and impact.

MR. TUSTIN:  Yes, your Honor.

I'm going to try to juggle some stuff, including my computer.

So just to begin, your Honor, I'd like to give the Court, in discussing hard look and impacts, the overview of NEPA is that you really only have to -- the Forest Service needs to evaluate reasonably foreseeable environmental effects by the agency action.  And it's procedural.  *Robertson* and the Supreme Court says that, and *Historic Bridge Foundation vs. Buttigieg* in the First Circuit also says that.

And when you're reviewing what the Forest Service did, you apply a rule of reason and you should not slice back the environmental analysis.  That's from the First Circuit in *Dubois*.

I'll address the issues that plaintiffs -- in the order the plaintiffs addressed them, beginning with forest health.

So, here, plaintiffs really are raising two complaints about the information provided about forest health, availability and accessibility.  The assessment of the forest health stands is clearly laid out in the habitat management unit rationales for both the projects.  That's at 17906 for Peabody and 12344 for Tarleton.  And these rationales really go through and explain why what is present is not consistent with what the Forest Service wants to do in the forest plan and why

these projects are necessary to move these habitat management units towards the desired condition that will provide for current and future generations. And the environmental assessments explain how these proposed treatments will address the discrepancy between the existing and the desired conditions.

The argument here is really about the availability and accessibility of the raw standard surveys. So the availability of the habitat management unit rationales were clearly identified in the environmental assessments and available to anyone who wanted them. And in the habitat management unit rationales, they identified stand surveys as one source of information that the Forest Service looked at to determine whether or not the -- the conditions were what were desired. And the underlying data was incorporated by reference and is available. That is expressly allowed by NEPA's regulations. Anyone could have requested this information. The assessments were available online, the habitat management units were expressly identified, and if someone wanted to take a deeper dive into that data, they could have asked for it. But plaintiffs didn't. They waited until the year after the assessments were out and submitted a FOIA request. So it was available to anyone who asked it.

There is no question that this data is unreliable. For the accessibility portion, this data is confusing and

that's why -- let me show you what it looks like here.  This is in the record at -- and we -- we've provided excerpts in our brief.  Okay.  It's this -- it's kind of a mess of a table.

So, you know, I had to zoom in to see it, but, again, these are intended to be for the record.  Right?  So this table is a mess, but you can look at it when you want to and use it in your review and the -- sorry.  The record citation is 7420 -- no.

7835, that is the stand table.  And that stand table is -- is really for people who have an in-depth knowledge to identify what is here, but it -- if the public wanted it, they could have asked for it.  And I think that's really fundamental here as to where plaintiff's confusion lied.

Now -- lies.

Now, in their brief or in their presentation, they provided this excerpt here where they have gone through and identified what they think the stand is, what -- where they think the stands are.  This is from 7425 in the record.  But these arrows are not in the record documents, so it is plaintiffs who added the record document.  The record document looks like this with no arrows.

So 7425 is a document in the record here and plaintiffs are applying their interpretation of the stand data today in their presentation is not the record and really is not proper for the Court to review.  And as we discussed in our

52

reply brief, this really is a misunderstanding that could have been cleared up outside of litigation.

So on page 13 of our reply, this is the excerpt the plaintiff cited to here.

THE COURT:  Uh-huh.

MR. TUSTIN:  So what they are doing, it's actually quite a simple explanation that has caused a lot of confusion here that is -- should have been cleared up prior to litigation.

They are saying that the stand data information from the stand surveys is the same thing as the stand ID number from the stand data information.  It is not.  The harvested units for the computation is 34, and 34 shows that 72, 71, 75, are not identified for timber harvest.  They have different numbers.  The numbers are different.

Now, while they both say one is stand ID and one is stand, that is confusing, but it's not -- plaintiffs are just wrong at this point.  They have not identified any stands in old growth habitat that are identified for timber harvest, as we explain in detail on page 13 of our reply brief, and that was the exhibits that I was showing that -- zooming in to show where their confusion lies.

The second point of confusion that really permeates this case is this commingling of mature forest habitat, old forest habitat, and old forest growth.  The forest plan has

specific definitions for these at 3592 in the record.

So there are different definitions for mature forest habitat, which are essentially older trees that are -- you know, depending on the species, they can be 40 to 80 years old or older, but old growth has more of them and old growth forest habitat, which is the most critical here, it's not just old trees.  It has complex structures, trees that have fallen down, you know, multiple generational stands within -- multiple successional stages within the stand.  And when I was out there yesterday near Gorham, we walked through all three of these.

Now, I had the benefit of having forest service experts with me, but I think even the untrained eye can see the difference between just because you have an old tree somewhere does not mean that it's an old forest habitat or old growth habitat.  And the Forest Service is not harvesting any trees in old growth habitat.

We have repeatedly asked the plaintiffs to identify stands that have -- that they believe are both being harvested and have an impact on old growth forest habitat, and they have not been able to do that and they have not done that here.

All right.  So turning to their second point, which was cumulative effects, the touchstone of NEPA -- did your Honor have any questions on stand data?  I know there's a lot of moving around, but before I proceed to other --

THE COURT:  No, not on stand data.

MR. TUSTIN:  For cumulative effects, the touchstone is that they really only need to be discussed in proportion to their significance.  Here, for their -- both the past project and for the carbon assessments, the complaint about the past projects is that they did not look at the specific projects individually.  That is not required.  NEPA clearly allows for aggregation.  That's 30 CFR 220.4(g) or Center for Environmental Law and Policy for the Ninth Circuit.  They don't have to list all their projects to look at what is happening in the baseline and what is happening in the aggregate.

The Forest Service here, for carbon, they did two levels of analysis.  They did a forest-wide carbon assessment from 2019 that has a quantitative assessment of carbon in the forest.  It explains how disturbances and management influence the storage and it explains that wood products store carbon.

Then the Forest Service also completed project-level carbon assessments that places the scale of these projects in context, which is the touchstone of NEPA, to look at it in proportion to the significance here.

For Peabody, it's less than half a percent of the acreage of the forest, that's any kind of timber harvest, and in Tarleton it's less than .1 percent.  And even the -- these timber harvests here, the aboveground disturbances, the aboveground tree removal, is just 35 percent of the total ecosystem carbon stocks of the forest.  So you're really

looking at a very small impact on carbon.

But it's not just that you're -- you're not releasing the carbon into the atmosphere. You're not burning the trees right away. These trees become wood products, they become sawmills, they -- they have a variety of purposes that continue to store the carbon. And in its place it is a more productive and healthier ecosystem that stores more carbon that is left.

Plaintiffs cited to several cases. They are very focused on the Black Ram case, which I litigated in Montana. We did not prevail on the climate change portion and we did not appeal because we pick our battles. We appealed more important things to the agency at that time because we really viewed the climate analysis in Black Ram as an outlier. We think it's inconsistent with *Hapner vs. Tidwell*, which is binding Ninth Circuit precedent.

We also cited the Court to decisions from the District of Colorado and District of Oregon that say for landscape level for a site-specific action and forest management, you don't have to have these enormous assessments of carbon. It's not like you're building a refinery or some of the cases that plaintiffs rely on. A timber management project is quite different. You're not releasing carbon right away. You're storing it.

So Black Ram, it's out there, we think it is wrong,

and we have provided the Court with other cases to cite and rely upon if it's so inclined.

All right.  Turning to the third argument, which was water quality, again, the Forest Service only needs to analyze things that impact their significance and in relation to other areas.

The Forest Service here looked at the impacts to water quality by looking at the basal methodology.  So the -- the basal -- the tree -- the basal stand area, if you're at a tree four and a half feet up, you look at the breast height, that provides the stand data and then it's a substitute for the stand density.  You know, the more basal area you have, the more trees you have in an area.  And the Forest Service knows through its own methodology that is explained in detail in the Albany South that if you remove less than 20 percent of the basal area in an area -- basal stand area in a project area, you're very likely -- unlikely to have any significant impacts on water quality.

And, here, it did -- it looked at both.  It looked at both the Tarleton area and in Peabody.  Peabody is at four-nine a hundred and sixty-four forty-one 6441; Tarleton is in the 13750.

So it applied its established methodology to determine whether or not there are impacts to the water.

And I would like to note that, you know, while Lake

Tarleton might be perceived as pristine to some people, it is impaired by mercury and acidity.  So it is not a pristine water body.

THE COURT:  Mercury what?

MR. TUSTIN:  Mercury and acidity.

THE COURT:  Oh, acidity.

MR. TUSTIN:  Acidic, yeah.

So Lake Tarleton is an impaired watershed, but the Forest Service still looked at the impacts of removing trees.  And in Tarleton, none -- none of the projects removed more than 20 percentage of the acreage.

THE COURT:  Well, the -- the point in the EA about some of the watersheds not providing perennial fish --

MR. TUSTIN:  Yeah.

THE COURT:  -- right?  So there's no concerns about water quality.  Is that -- is that all the water quality's tied to, perennial fish habitat?

MR. TUSTIN:  No.  So there -- there are two issues here.

So for -- for the basal methodology, you're looking at impacts on perennial streams.  So Peabody does not have any in excess of 20 -- I'm sorry.  Tarleton does not have any in excess of 20 percent.  But Peabody has 12 watersheds that exceed -- 12 stands that exceed 20 percent in those watersheds.

But, here, what they did, because the water needs to

be year-round, they can exclude perennial -- they can exclude non-perennial -- they -- they can exclude perennial streams because those are not year-round.

So here it needs to have a year-round impact for the water quality and seven of the 12 are not year-round, so they don't need to be -- they say that -- they said there's no impact based on the Forest Service's established methodology.

THE COURT:  Seven out of the 12 are not what?

MR. TUSTIN:  Are -- seven do not have perennial fish habitat.

THE COURT:  Right.

MR. TUSTIN:  So 12 exceed 20 percent.

THE COURT:  Okay.

MR. TUSTIN:  Seven of those do not have perennial fish habitat; five of them do.  And the -- and those five that do exceed 20 percent and have perennial fish habitat, they range from 23 to 27 percent.  And the Forest Service explained that the changes of concern are pH in bedrock, so this doesn't have the -- it -- the impacts are not expected to reach the threshold.

But, critically, this discussion of impacts, this is not a NEPA violation.  If the Forest Service identifies and discloses what the impacts are, that is the procedural information that is satisfied.  There is no forest plan violation here.  Plaintiffs are not alleging a Clean Water Act

violation.

So NEPA is procedural.  You do not have to select the environmentally preferred alternative.  So long as the Forest Service considers and discloses, which it did here, it can take an action -- an action that some people may perceive to have a deleterious effect on the environment.

So the Forest Service looked to water quality.  While it may have an impact on 12 watersheds, it explained its reasoning, it explained what those impacts are.  That is not a NEPA violation, to say that you don't like the impacts that are coming from here.

The third point of --

THE COURT:  I thought the third was the bats.

MR. TUSTIN:  The bats, yes.  Okay.  Actually, three was water quality, yes, so --

THE COURT:  Go ahead, yeah.

MR. TUSTIN:  That's fine.  I'll make sure I touch all of these.

So turning to the bats, the -- there's binding precedent in the First Circuit that we would direct the Court's attention to, *Nantucket Residents*, 100 F.4th at 21.  Here it explains that if the biological opinion is defective or if the agency blindly relies on the biological opinion, then there's a -- then there's a violation.  But that's -- it's not cured.  There is a biological opinion.  There are no complaints about

it.  The Forest Service is not blindly relying on it.  It did a project-specific biological evaluation for each of the projects at 9238 and 13915.  So the Forest Service -- under this First Circuit precedent, there's no NEPA violation because it did its own work.

The complaint here is the Forest Service didn't do surveys.  It doesn't have to.  It -- because it assumed the facts were present.  And this is a far more conservative approach --

THE COURT:  Yeah.

MR. TUSTIN:  -- than taking surveys that may not find bats which was in 2019.

THE COURT:  That's what I thought, but I wanted to make sure I was right about that.  Yeah.

MR. TUSTIN:  Yeah.

THE COURT:  It seems like it -- it gives the benefit of the doubt.

MR. TUSTIN:  It does.

THE COURT:  Yeah.

MR. TUSTIN:  Because had they relied just -- had they -- you know, cited the 2019 surveys; they said, we didn't find any bats.  Had they just relied on the 2019 surveys, they could have said, we didn't -- we didn't find any bats, we don't need to have any protective measures.  But they did not do that.  They said, we have these surveys, we didn't find

anything, but we're going to assume they're here.

So they found that there are multiple protective measures that are included.  It is not correct that the project does not contain those, but even if it didn't, that is not a NEPA violation because the Forest Service considered and disclosed impacts to bats.

And I would like to point out that we mention in our reply, you know, that these -- plaintiffs are very focused on roosting habitat, which are these standing trees or these old snags, they're called, that provide places for bats to sleep and have nests, but that's not the only portion of bat habitat.

The roosting habitat -- there's ample roosting habitat in these trees to remain.  And -- but there is also the foraging habitat component that this project does help with. It -- as we've cited studies that bats, you know, they fly around when they're looking for insects.  So they want to fly along edges, they want to fly along structures.  And this project improves foraging habitat for the bats.  So it maintains adequate and ample roosting habitat and it improves the foraging habitat for the bats.

I believe the final point was scenery and recreation.

THE COURT:  Yup.

MR. TUSTIN:  Just to touch on a point, a couple things here.

We explained in detail why the viewpoints for Tarleton is a methodology question. I don't believe there are any questions about that. But I do want to rebut plaintiff's claim that they adequately preserved their arguments for the Appalachian Trail and the recreational baseline. These two comments are barred by administrative exhaustion. The Forest Service has a very clear regulation at 36 CFR 218.8(c) that requires issues raised in objections to be raised in previous submitted written comments.

We asked plaintiffs -- you know, plaintiffs bear the burden here, what -- how are they tying their comments from their scoping and from the EA to their objections and they didn't. They're -- we identify in our reply, at 11, their comments don't mention the Appalachian Trail at all. They complain about recreation, not the impact of timber harvest on recreation.

So if you're complaining about inadequate recreation, that is what they did in their comments, but they didn't complain about the impacts of timber harvest on recreation, which is what they want to do here.

So that is barred by the Forest Service regulation, but even if the Court were to consider it, visual scarring is not significant in the meaning of NEPA. That's the First Circuit in *Sierra Club*, and the Ninth Circuit has the helpful case, *Bicycle Trails,* that says you don't have to cater

to the recreation interests of one group.

I believe I've touched on everything for hard look unless the Court has any questions.

THE COURT:  You touched on the things I had questions about.

MR. TUSTIN:  Okay.  Thank you.

THE COURT:  Okay.  All right.  Why don't we -- we're not using a court reporter today.  We're just recording the proceeding.  Usually at 90 minutes I take a little bit of a break for the court reporter, but we don't have to do that today.  Let's just keep going.

MR. COURCHESNE:  So, thank you, your Honor.

Just a quick point about this -- this slide which we presented and the other slide that was a little bit earlier in our presentation that is straight from the -- straight from the record.

We just put the numbers, showed the numbers, the blue numbers that are the stand values.

THE COURT:  Yeah, I was --

MR. COURCHESNE:  Okay.

THE COURT:  Yeah.

MR. COURCHESNE:  So to talk a little bit, I had just a couple very quick responses to the -- to the hard look statements that counsel made.

The -- one is that there is a -- there was a

statement that -- you know, that the carbon impact analyses were adequate and that they would be beneficial. And one thing that the -- is an example of how this is not a detailed analytical report is that we actually have no idea what the forest products are going to be for these -- for these projects. They very well could be firewood that is burnt. But there's no analysis of what that might do for the carbon analysis. Some of these projects do use -- do become firewood and that certainly would create a lot more carbon emissions than the Forest Service is assuming from their assumption that, well, the forest will -- forests will grow back. Those would be immediately burned and lost.

And so I just wanted to make that point. There's really no analytical assurance in the record for a lot of the assertions in the carbon report and that's a big part of our problem and a big part of the Black Ram reasoning as well is that you need defensible emissions estimates which are doable now, the Forest Service does them, and they could have done them for this project in combination with these other projects that are proposed. We think that's the standard now. It may not have been the standard in 2005. We think that's the standard now for reasoned decision-making under NEPA.

So --

THE COURT: What's the authority for the proposition, though, that it's the standard now, just that

they're possible?  I mean --

MR. COURCHESNE:  No.  I'd say that the combination of the Black Ram case and the other cases we've cited in our brief essentially establish that you need to quantify these emissions.  And that's true in EAs or in EISs.  That was really squarely an issue in the Black Ram case.  It's also something that the Council on Environmental Quality issued guidance in 2023 which we urged the Forest Service to take into account, and the Forest Service's response was we don't need to, which is really their response to a lot of our concerns along the way.  And at some point they can do that and at some point that becomes arbitrary and so we're alleging that crosses the line in these areas.

I'd just say on the bat issue that it's really that inconsistency is really -- they do assume the bat presence, but that doesn't actually seem to result in any change in any of the decision-making.  They assume it's a -- they assume it's around, but because they don't know where the roost trees may be or where the roost -- roost tree habitat might most likely be, they don't really have any data or information upon which to make their ultimate decision that there is an unlikely effect on the bat.  That's our -- that's our point -- point there.  It's -- they're acting, actually, inconsistency -- inconsistently with that assumption when they basically say that roost trees in -- in Peabody aren't as important as in

Tarleton, for example, where they're banning harvesting during the summer.  So that inconsistency strikes us as -- as -- arbitrary.

THE COURT:  Right.

MR. COURCHESNE:  -- in measures of protection.

So let me move on to the forest plan violations which we've alleged.

THE COURT:  Yup.

MR. COURCHESNE:  So I think that the first one we've talked a lot about, so I won't belabor it.  It's the forest health -- it's the forest health violation of the old forest habitat requirement that they can't harvest in stands with old forest habitat.

And I'm still confused by counsel's presentation on this point.  We identified the stands that are in the record where the botanist's survey says they're going to harvest.  Those stands have old growth habitat and old forest habitat and are a stand -- and the stands that that habitat is in are targeted for harvest based on the actual project map.  It was -- I don't know what that spreadsheet means.  It's not explained anywhere.  If that is what we would have gotten -- that's what we got, you know, in Tarleton, it's just indecipherable in terms of what they're actually doing where.  And we asked that question, you know, repeatedly.

THE COURT:  Yeah.  You're talking past each other on

this.

MR. COURCHESNE:  Yes.

THE COURT:  And it's going to be up to me to see if I can figure it out.

MR. COURCHESNE:  So the -- we allege that's a forest plan violation and we also allege that that lumping together of the mature and old forest habitat so they can't -- or I should say that old forest age class and mature age class on those habitat management unit documents, that that doesn't allow them to make a decision under the -- under NFMA that they're complying with the forest plan for these projects.

So the -- we certainly have alleged, you know, at Peabody West, we'll talk a little bit about the forest plan violations that are related to the scenic integrity requirements.

The scenic integrity requirements of the forest plan limit clear-cutting, especially in areas of very high scenic value, and the project violates this limitation by authorizing a number of significant clear-cuts.  It admits as much.  I think there's no dispute on it.  But they say that the forest -- the forest goals -- the forest plan goals take precedence over this scenic violation of the guideline.

THE COURT:  Uh-huh.

MR. COURCHESNE:  We think that this is a -- this is a project-specific goal that they've developed.  The forest

68

plan sets out age class goals for the whole forest and the forest service has interpreted that we need to have a certain amount of age class, regeneration of age class, in this management area.  And the Forest Service has interpreted that as to each habitat management unit and as to each project, and that's why there's -- HMU rationale documents exist.  The goal that they have for these projects, in fact, at Peabody West, is twice the overall forest plan goal for regeneration habitat.

So we think they're essentially arbitrarily preferencing those goals that they've developed for this particular project over the scenic guideline of the forest plan and we think that they did so in an arbitrary fashion as a result.  They -- they only just said, as they have in a number of case law, that wouldn't -- that doesn't meet our need.  And in light of that clear violation of the guideline, we don't think they explain that in any type of way that would justify that forest plan guideline violation.

As I mentioned, you know, I think that the service's approach to the northern long-eared bat and their conservation obligations, we think they were required to conduct an investigation.  That's what the forest plan says.  The biological evaluations in these two projects do not constitute investigations of the locations of the bat, where the habitat is, and what would need to be protected.  So we think that's a forest plan violation.

And I'll just mention briefly the final issue that we identified, which was the subject of some back-and-forth in the briefing, was the eligible wild and scenic rivers standard.

And the project proposes many hundreds of acres of logging within a quarter-mile of two eligible rivers and more than a dozen acres of clear-cuts in that area as close to a tenth of a mile from the river. The service then says that there will be only limited short-term effects and does not explain why. It just does not make sense. It certainly did not explain how these impacts to these rivers comply with the forest plan.

Now, the forest -- the service, as it said in a couple of these instances, says that our comments that we filed on the draft EAs didn't preserve this issue. And what we would say in response to that is kind of twofold. One is we think that we did raise these issues in our comments on the draft EA at a much earlier stage of the process and then we --

THE COURT: Yeah.

MR. COURCHESNE: -- developed and refined those problems that we identified in the objections, which are much more complicated and are, you know, 50 to 60 single-spaced pages of detailed legal objections that our -- that our clinic worked on.

We think that the Forest Service was definitely on notice of these problems as they are passages of these

environmental assessments.  And we've cited some cases for the proposition that this -- this is sufficient for administrative exhaustion and that the Forest Service was aware of this issue, these issues, as well.

So we don't take as cramped a view of our obligations very early in the process.  That's probably understandable.  Forest Service wants to hold us to this really, really challenging standard to present all of our potential legal issues with these approvals, you know, in the 30-day comment period on a draft EA.  And we raised a lot of different issues, including these issues of scenic integrity, of recreation, and we think we did so adequately.

Again, we raise -- we raised issues of compliance with the forest plan, water quality habitat impacts, the dangers of clear-cutting and the impacts to wilderness values.

So we think that the Forest Service in all these cases under the forest plan was obligated to consider these effects and impacts in more detail.  These were not mysterious issues to the Forest Service.

Because I'll just -- I think I can close out my remarks just with a brief -- brief couple sentences about remedy.

THE COURT:  Yup.

MR. COURCHESNE:  We believe it's simple under the case law.  Because the Forest Service broke the law here in the

ways that we've identified, the EAs and the FONSIs should be vacated and the matters remanded to the agencies to correct the errors, to take some other course of action.  The service -- you know, or to take some other course of action.  They could actually, and I think this is important.  They could go back and do the analysis in a way that met the NEPA standards we've identified.  And if they had done the analysis --

THE COURT:  It would be a different outcome, you said.

MR. COURCHESNE:  Well, it could be, or to a different outcome.  It's not -- it's not inherent in our claim that they come to a different outcome.

THE COURT:  Okay.  That's my question.

MR. COURCHESNE:  It's really -- it's really important.  We think that the analysis is really -- the analysis is important and it -- it -- if it justifies their actions, it could be legally valid.

Now, we contend that if they did the analysis, you know, in the way that we've defined, then it would be likely that they would come to another outcome, but we can't actually assert with certitude that the analysis will come out any particular way.  Now, we think there's enough of a -- of a risk that they haven't considered these issues carefully enough and that once they -- once they will, the outcome will be different.

72

So the issue on remedy is that this is the default remedy in cases like this. If there's an unlawful approval, vacatur is the -- is the remedy. And I will say, your Honor, if there are questions about remedy and we get there, we would be, you know, I think, more than willing to provide further information on why vacatur is the right reason, but we believe we've done so adequately in our papers so far.

THE COURT: Understood.

MR. COURCHESNE: All right, your Honor. Thank you very much.

THE COURT: Not at all.

MR. TUSTIN: Thank you, your Honor. I'll be brief.

Before I turn to the National Forest Management arguments, I just want to respond very briefly to an argument made during their response about the 2023 guidance from the Council on Environmental Quality. Two points here, we address this in our briefing, that it only applies to new actions -- new proposed actions and because these projects were underway that did not apply.

But perhaps more relevant is that it was rescinded on January 20th of 2025 in executive order 14154, so that guidance is to longer in effect. And while it was in effect at the time of the projects, it did not apply because it only applied to proposed actions and now that guidance is gone.

On the National Forest Management Act claim, here

there are substantive requirements.  The National Forest Management Act is for forest planning, the forest plan is the zoning ordinance, and the project-specific actions must comply with that zoning ordinance at the second stage here.  And the Forest Service satisfies those requirements.

I'll begin with the stand data.  Very briefly, you know, in our brief, we don't think that plaintiff can raise a me too argument based on their NEPA arguments because the National Forest Management Act has substantive requirements that are different from those analyzed under the National Environmental Policy Act and under *Zannino*, barely articulated arguments in their brief are waived.

Second, turning to the scenery component, the plaintiff's argument here discussed forest plan requirements, but the forest plan is quite specific.  They're not called requirements.  There are standards and there are guidelines.  You know, they have very different things that must satisfy -- a standard must be satisfied and there are several, 43477.  There are no scenic standards for management area 2.1.  That's at 3477 to 79 in the forest plan.

What there are, there are guidelines.  There's seven guidelines for scenery for this management area but these guidelines allow for operational flexibility.  It's what the Forest Service should attain and they are supposed to attain them, but they -- in a project they can explain why they're not

74

being followed so long as there's documentation.  It does not require a forest plan amendment.

What the Forest Service did here is for these three areas in Peabody, these units that will exceed the acreage allowed for openings, it explained that we think -- that the Forest Service thinks that requirements for providing for healthy forests, for stand -- healthy stands and for wildlife is more important than the standard and they have, therefore, given a rational explanation for why they have decided to exceed the guideline and that satisfies the forest plan and forest plan standards.

Now, there is no support for plaintiff's argument here that scenery somehow is predominant or should take precedence over here.  One, you know, the Forest Service is multiple use, which I alluded to in my opening remarks, and has to provide for a variety of impacts.  But if you really want to dig down on it, scenery is not one of the five enumerated things listed in 16 U.S.C. 1604.  Wildlife and recreation and timber harvests are three of those and scenery is not among those.

So the Forest Service balanced its requirements under the forest plan.  Here, for these three units, it determined these guidelines should be exceeded and they gave a rational explanation for that.

The bats, the Forest Service did conduct the

75

investigation required by the forest plan.  It looked at the biological evaluations, looked at the BiOp, looked at the biological opinion, it looked at the 2019 surveys.  That satisfies the requirement of the investigation.  But in plaintiff's brief they really doubled down on surveys, but bats are not plants.  The survey requirement only applies to plants.  The case they cite discusses management indicator species, which is not a bat in this forest.  So the Forest Service satisfied its substantive obligations to investigate for the bat.

THE COURT:  What case is that you're referring to?

MR. TUSTIN:  So in their brief they cited to *Sierra Club v. Martin* in the Eleventh Circuit.

THE COURT:  Yeah.

MR. TUSTIN:  Okay.  And they say this supports their argument that you have to do a bat survey.  That's not right.  Because *Sierra Club*, it -- that forest plan required you to do an investigation into species for inventory data and surveys.  The White Mountain National Forest plan does not.

And, also, the regulation at issue in *Sierra Club* from the Eleventh Circuit was 36 CFR 219.26, which applies to what are called management indicator species, which the Forest Service uses to -- almost as a proxy for forest health.  But the bat is not a management indicator species.  And that's at 78 -- 17899 to 90.

So if the bat were a management indicator species, there could have been an argument that this regulation applied, but that isn't even a brief -- this cases they rely heavily on does not apply.  Bats are not plants.  Surveys are not required.

Turning to --

THE COURT:  Let me ask you this question.

MR. TUSTIN:  Yes.

THE COURT:  This is about -- there's a lot of environmental experts in this room right now, you know, at counsel table and watching.

One of the things I'm -- I never quite -- this is not apropos of this decision.  It's more in general.  Right?

You read the different federal cases regarding not just like under Endangered Species Act or things that implicate species like this and this one happens to be about the long-eared bat.  But, I mean, it -- I'm always struck, you know, that they'll -- the cases about the snail darter or the spotted owl or whatever it is.  But how is this species identified that becomes important in the project?  Like why this case -- of all the species that must live, right, near these two bodies of water, why the long-eared bat?  How does that become -- how does that present itself --

MR. TUSTIN:  Well, that's what plaintiff --

THE COURT:  -- if anybody knows?

MR. TUSTIN:  That's what the plaintiff's focused on. There are thousands --

THE COURT:  Yeah, I know.  I'm asking -- I'm sort of asking you why.

MR. COURCHESNE:  Well, your Honor, I can just say that the endangered species are --

THE COURT:  Is it --

MR. COURCHESNE:  -- are relatively limited number of species that are affected by timber harvest and so this particular species was an issue -- was an issue early in the project development as it was threatened and then it became increasingly endangered and --

THE COURT:  I see.

MR. COURCHESNE:  -- it was listed as endangered under the standards of Fish and Wildlife Service.

And so that's really where it took on a heightened importance in this case.

It's also -- the other issue is that the Fish and Wildlife Service did basically an eastern forest-wide biological opinion --

THE COURT:  Yeah.

MR. COURCHESNE:  -- for this bat and the impacts of --

THE COURT:  Ah.

MR. COURCHESNE:  -- projects.

THE COURT:  So there's data out there.

MR. COURCHESNE:  There is.  There is data out there.  And the -- the opinion analyzes all of these questions and it comes to the conclusion that basically 3- or 4,000 Forest Service projects can go forward.  That's -- there is a -- there is a whole probable other case that other parties might make to challenge that biological opinion or its sufficiency under the Endangered Species Act --

THE COURT:  That's not your mission there.

MR. COURCHESNE:  No.  Our point is that this is just -- this is important, the Forest Service acknowledges that it's important, and they did not do a good enough job here.

THE COURT:  I get it.

MR. COURCHESNE:  Yeah.

THE COURT:  Go ahead, Counsel.

MR. TUSTIN:  There is -- there is no ESA claim here.  So they could have brought an ESA claim.  They did not.

THE COURT:  Understood.

MR. TUSTIN:  It's about --

THE COURT:  That was just my question.

MR. TUSTIN:  Yeah.  That's a good question.

But there is no ESA claim, but it's the procedure of how the Forest Service analyzed the impacts of bats.  And it did.  And you even see it in the project record that when the bat was up-listed from threatened to endangered, the Forest

Service paused to complete the biological opinion for the eastern and the southern forests.  And then also it did the evaluations and got concurrence from the Fish and Wildlife Service.  So it stopped what it was doing and took a pause and looked at the impacts to the project.  And that satisfies NEPA.

So turning to the rivers issue, there are two segments, the Peabody and west branch of the Peabody, that are eligible for designation as wild and scenic rivers.  As with the ESA claim, there is no claim under the Wild & Scenic Rivers Act.  They could have brought a claim about alleged impairments or preventing from designation in the future, but they did not perceive a substantive claim under that act.

What is at issue here is whether the Forest Service took a reasoned look at the project's impacts on these two segments that are eligible for designation.  They did not -- they -- our first argument that -- in their briefing, in their administrative comments, where plaintiff was represented by counsel, they never raised this issue in any public comment period.  The comment period they talk about is about the no action alternative and does not even mention the Wild & Scenic River Act or forest plan requirements.  You can't have an extremely vague argument and try to sandwich in a litigation claim.  That is precluded under the Forest Service's waiver and exhaustion regulations.

So they didn't do it.  They were represented by

counsel.  They can't just simply raise something new now and they couldn't even if they were *pro se*.

But more importantly, on the merits it also fails because the Forest Service analyzed the impacts at 4902 to 03 that this project would not have irreversible and irretrievable changes that could affect the potential designation by Congress and the future of these two segments of the river.

I'll touch very briefly on remedy unless the Court has any questions about the National Forest Management Act.

THE COURT:  What are you going to touch briefly on?

MR. TUSTIN:  Remedy.

THE COURT:  Yup.

MR. TUSTIN:  And I know that we have counsel from our intervenors, the amicus parties, that also --

THE COURT:  I think I wanted to get back to wild and scenic rivers for a minute.

MR. TUSTIN:  Sure.

THE COURT:  I had a note in my -- looking at the administrative record, 4903, it -- it says that project activities would not result in irreversible or irretrievable changes, but there doesn't seem to be a -- what's the basis for that assertion?

MR. TUSTIN:  Right.  So the basis of -- so this is getting into the context of the Wild & Scenic River Act.  So --

THE COURT:  Yeah.

MR. TUSTIN:  -- what -- there are -- these rivers are eligible -- only Congress can designate a river as wild and scenic.  But what the forest has done and what the Wild & Scenic River Act does -- requires is for there -- for potential rivers that might be designated in the future, you can't -- you have to preserve their possibility for future designation --

THE COURT:  Okay.

MR. TUSTIN:  -- by Congress.

And so to do that you need to look at whether or not there are irreversible and irretrievable impacts to free-flowing conditions or to what the Wild & Scenic River Act calls outstandingly remarkable values.

THE COURT:  And are irretrievable and irreversible, are those defined terms under the act or the regs, or like --

MR. TUSTIN:  I believe those are in the Wild & Scenic River Act, but I -- I don't have a citation for you.

THE COURT:  In the act, but, like, are they defined?

MR. TUSTIN:  I don't -- I don't have an answer to that question.

THE COURT:  Okay.

MR. TUSTIN:  But the case law certainly -- like, I mean, if you look back at the history of the Wild & Scenic River Act, it -- originally it was started, I think, in the early '70s or late '60s to prevent -- to -- in response to dams; like dam construction in the American west and elsewhere

were impeding the flow of rivers.  So Congress stepped in to say you can't just build a dam -- for certain rivers, you can't just build a dam and stop the flow.

But it wasn't just about the free-flowing conditions.  It was also about what they called outstandingly remarkable values or ORVs.  And these could be habitat scenery, recreation, whatever a river is designated.

THE COURT:  Yup.

MR. TUSTIN:  And that is what they want to preserve the possibility for future designation in the Wild & Scenic River Act.

THE COURT:  So where does the position come from then that -- that these two projects would not result in irreversible or irretrievable changes?

MR. TUSTIN:  That would be in the scenery reports. The environmental assessment references the scenery report there, that -- that is our statement to the -- to the environmental assessment here at 4902, but the Court also looks at the record for water quality impacts, which is another quality here for the Peabody and Peabody West that -- that it is sufficient here, the analysis on the potential impacts.

THE COURT:  All right.

MR. TUSTIN:  And, again, this was waived because it was never raised in their comments.

If the Court finds a violation -- we don't think you

should, we believe the Forest Service did a robust analysis that satisfies NEPA and NFMA -- we would ask for additional briefing. *Century Power* from the First Circuit says you have to balance the equities. So if there is a violation, we believe the Court should balance the equities, which I think provides a nice segue to the amicus who I know want to talk about their clients' interests here.

So unless the Court has any more questions for me, I'm happy to rest.

THE COURT: Understood.

MR. TUSTIN: Thank you.

THE COURT: I'll give you the last word if you want it. If you're good, you're good. I just don't want to cut you off.

MR. COURCHESNE: I appreciate it. It would be helpful, your Honor, since the amicus parties are speaking, if I could have the last word after that. Is that the Bar rule?

THE COURT: I wasn't planning on hearing from the amicus parties.

MR. COURCHESNE: Okay.

THE COURT: But if you're dying to speak to me, I'll listen to you --

MR. COURCHESNE: I didn't mean to --

THE COURT: -- but it wasn't part -- it wasn't part of my plan, to be honest.

MR. COURCHESNE:  Okay.

THE COURT:  But that doesn't mean I won't.

MR. EGGLETON:  No, your Honor.  I mean, if you don't want to hear from us --

THE COURT:  It's not that I don't want to hear from you.  It's just that I hadn't planned on it because it's generally not what I do.  But I read your materials carefully and if there are things you want to react to or talk to me about, you know, Mr. Eggleton, you're always welcome here.

MR. EGGLETON:  I don't think I need to say anything, your Honor.  We definitely make our case in the brief.

The only -- I guess the only thing I would say, your Honor, is that the array of amici that I represent in this case is very broad.  It includes conservation organizations, recreation organizations, advocacy organizations, wildlife organizations, and they all don't see eye to eye on every issue, as you might imagine.

THE COURT:  Of course.

MR. EGGLETON:  And in this case, we're all in agreement and in support of the Forest Service decision.

And the only other point I would make is that this was an exhaustive record.  There's more than 18,000 documents in it.  And the notion that somehow the ball was hidden in this process I think is not correct.

Thank you.

THE COURT: Understood. Okay. Did the law students in the room notice that, though? Lawyers do that all the time: I have nothing to say, except I'm going to say this.

But Mr. Eggleton's, you know, a well-respected practitioner here and he doesn't overdo it and I appreciate that.

All right, look. I think I'm good on these -- thank you for the presentations. We've been studying this hard at a very busy time and I ought to have a -- I ought to have a decision out here for you in relatively short order.

I -- I'll -- I'm going to -- just to give you a preview, I -- so far, I have not been overall persuaded of Standing Trees' position, but you've given me a couple things to think about today and a couple things to look at more closely, and I'm going to do that.

All right. All right then. Thank you, counsel. We're adjourned.

THE CLERK: All rise.

(Proceedings concluded at 12:00 p.m.)

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is true and accurate to the best of my

ability and belief.


Submitted: 4/21/25          */s/  Liza W. Dubois*
                            LIZA W. DUBOIS, RMR, CRR