UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Standing Trees, Inc.</u>

      v.                                    Case No. 1:24-cv-138-JL-TSM
                                     Opinion No. 2025 DNH 099

<u>United States Forest Service, et al.</u>

**<u>MEMORANDUM ORDER</u>**

Plaintiff Standing Trees, Inc. challenges the U.S. Forest Service's authorization of the Tarleton Integrated Resource Project and Peabody West Integrated Resource Project under the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), and the Administrative Procedure Act (APA). The parties cross-moved for summary judgment based on the administrative record. This court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343 as this action arises under the Constitution and laws of the United States.

The court is not called upon to consider the propriety of the Tarleton and Peabody projects. The question presented is whether the defendants U.S. Forest Service, White Mountain National Forest Forest Supervisor Derek Ibarguen, District Ranger for the Pemigewasset Ranger District Brooke Brown, and District Ranger for the Androscoggin Ranger District Joshua Sjostrom, collectively the Forest Service, followed the correct procedures and applied the correct statutory and regulatory standards in approving the resource management projects. After considering the administrative record and briefing

by the parties and amici,[1] and holding oral argument, the court grants summary judgment

for the Forest Service.

## I.    Applicable standard

The plaintiff brought its claims under the NEPA, NFMA, and APA.  Neither NEPA

nor NFMA provides a private right of action, so courts review the Forest Service's

approval of a final agency action under the APA. *Utah Envt'l Cong. v. Bosworth*, 443

F.3d 732, 739 (10th Cir. 2006). The court's review is limited to the administrative record.

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (citing *Camp v. Pitts,* 411

U.S. 138, 142 (1973)); *Lovgren v. Locke*, 701 F.3d 5, 20 (1st Cir. 2012).  "Under the

APA, we may not set aside an agency decision unless it is 'arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law,' or 'unsupported by substantial

evidence.'"  *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (quoting 5 U.S.C. §§

706(2)(A), (E)).

> "A decision is arbitrary and capricious 'if the agency has
> relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs
> counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in
> view or the product of agency expertise.'"

*Id*. (quoting *Craker v. DEA*, 714 F.3d 17, 26 (1st Cir. 2013), quoting *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43(1983)).  "Under this standard,

we are required to determine whether the agency's decision is supported by a rational

---

[1] Several conservation agencies and the State of New Hampshire filed amicus briefs in support of the defendants.

basis, and if so, we must affirm." *River Street Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009); *see also Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995) ("While this is a highly deferential standard of review, it is not a rubber stamp; in order to avoid being deemed arbitrary and capricious, an agency decision must be rational."). "Because the APA standard affords great deference to agency decisionmaking and because [agency] action is presumed valid, judicial review, even at the summary judgment stage, is narrow." *Assoc. Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997).

"APA review…involves neither discovery nor trial." *Atieh v. Riordan*, 727 F.3d 73, 76 (1st Cir. 2013). "[T]he focal point for judicial review [under 5 U.S.C. § 706(2)(A)] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Consequently, "material facts" cannot be admitted or opposed as they might in other civil actions with discovery and possible trial. The "validity" of the agency's action must "stand or fall…on the administrative record made." *Id.* at 143.

## II.    Standing

Standing Trees has standing to bring this lawsuit, and the defendents did not argue otherwise. It is a membership-based conservation organization with a focus on forests on public lands in New Hampshire and Vermont.[2] Standing Trees advocates for regional policies promoting "clean water, clean air, forest health, public health, and unfragmented

---

[2] Pl.'s Mem. Mot. Summ. J. Ex. A (doc. no. 14-2) (Decl. of Zack Porter (on behalf of Standing Trees)), ¶ 6.

habitat."[3]  The organization represents its members, such as Kingswood Camp, a youth outdoors camp, who engage in outdoor activities and have nature-based business interests, which the projects could impact.[4]

Standing requires an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (citing *Horne v. Flores,* 557 U.S. 433, 445 (2009)).  A membership-based organization like Standing Trees must also show: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n.*, 432 U.S. 333, 343 (1977).  Based on declarations of Standing Trees and several of its members affected by the projects, Standing Trees meets these requirements.  *See Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 67-68 (D.C. Cir. 2022) (finding declarations acceptable to demonstrate satisfaction of standing requirements).

## III.    Background

### a.   National Environmental Policy Act

NEPA "promotes its sweeping commitment to 'prevent or eliminate damage to the

---

[3] *Id*.
[4] *See generally* Pl.'s Mot. Summ. J. Ex. A-L (doc. nos. 14-2 through 14-13) (Decls. of Zack Porter (on behalf of Standing Trees), Gerald Curran, Elaine Faletra, Peter Faletra, Eric Jones, Rebecca Lovejoy, Jamie Sayen, Nataliya Sundina, Michael Wipfler, Robert Wipfler, Peter Ascher, and Robin Sadek Ascher).

environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action." *Conservation L. Found. v. U.S. Army Corps of Eng'rs*, 457 F. Supp. 3d 33, 43 (D.N.H. 2019) (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989)) (quoting 42 U.S.C. § 4321). "NEPA itself does not mandate particular results, but simply prescribes the necessary process" that an agency "consider all significant environmental impacts before choosing a course of action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Sierra Club v. Marsh*, 872 F.2d 497, 502 (1st Cir. 1989).

As part of this process, NEPA regulations require an agency to prepare an in-depth Environmental Impact Statement (EIS) for "every major Federal action significantly affecting the quality of the human environment." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 16 (2008) (citing 42 U.S.C. § 4332(2)(C)) (cleaned up). "An agency is not required to prepare a full EIS if it determines—based on a shorter environmental assessment (EA)—that the proposed action will not have a significant impact on the environment." *Id.* (citing 40 CFR §§ 1508.9(a), 1508.13); *see also Conservation L. Found.*, 457 F. Supp. 3d at 43. In that case the agency must also prepare a Finding of No Significant Impact (FONSI). 36 C.F.R. § 220.7(b)(3)(i). "There is no universal formula for what an EA must contain and consider," but the regulations state that they should "'include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.'" *Id.* (quoting *Friends of Congaree Swamp v. Federal Highway Admin.*, 786 F. Supp. 2d 1054, 1062 (D.S.C. 2011) (quoting

40 C.F.R. § 1508.9)).

Courts analyze the validity of a FONSI under a four-factor test:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Conservation L. Found.*, 457 F. Supp. 3d at 61 (citations omitted). But the "role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one." *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555 (1978). As the Supreme Court recently emphasized,

> "[W]hen assessing significant environmental effects and feasible alternatives for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry . . . Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness."

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. ---, 145 S. Ct. 1497, 1513 (2025).

**b. National Forest Management Act**

The NFMA directs the Forest Service to develop "one integrated plan for each unit of the National Forest System," and to ensure that such plans "provide for multiple use and sustained yield" of forest resources. 16 U.S.C. § 1604(e), (f). The land management

plans, also called forest plans, establish planning goals and objectives for management of National Forest resources. 16 U.S.C. §§ 1604(a), 1604(g)(1)-(g)(3).  While forest plans establish management goals and broad standards and guidelines, they do not authorize actions or projects, which are proposed, analyzed, and approved by the Forest Service once a forest plan is in place.  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729-30 (1998).  "All projects within a forest must comply with the overall plan for that forest."  *Sierra Club v. Wagner*, 555 F.3d 21, 23 (1st Cir. 2009) (citing 16 U.S.C. § 1604(i)).  "The Forest Plan is, then, somewhat analogous to a city's zoning ordinance."  *Sierra Club v. Wagner*, 581 F. Supp. 2d 246, 251 (D.N.H. 2008).

NFMA challenges are reviewed under the APA.  In reviewing a NFMA challenge, courts "give great deference to the Forest Service's interpretation of its own regulations.'"  *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1134 (10th Cir. 2007) (quoting *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 738 (10th Cir.1993)).  A court may "conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan."  *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) (quoting *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008), *overruled on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 n.10 (9th Cir. 2009).

### c.  White Mountain National Forest

The White Mountain National Forest (WMNF) encompasses nearly 800,000 acres

in New Hampshire and western Maine, and is the largest public land area in New

England.[5]  Established in 1914, the land has a history of intensive harvesting and

conversion of forests to agriculture.[6]  The WMNF offers recreational opportunities and

provides, among other things, wildlife habitat and timber.  The Forest Service manages

these potentially competing interests according to its multiple-use mandate, which

requires that the Forest is "administered for outdoor recreation, range, timber, watershed,

and wildlife and fish purposes." 16 U.S.C. § 528.  To guide its decisions while

implementing the multiple-use mandate, the Forest Service developed the 2005 Land and

Resource Management Plan for the White Mountain National Forest (the "Forest Plan")

under NFMA, the Forest Service's 1982 Planning Rule, and NEPA.[7]  Standing Trees

does not challenge the Forest Plan itself in this litigation.

　　　　Portions of the Forest, including the Peabody West and Tarleton habitat

management units (HMUs),[8] currently do not meet the Forest Plan's desired conditions

for habitat composition and age class objectives.[9]  For example, Forest Service analyses

show that they both lack "regeneration-age" forest habitat, softwood species like spruce

and fir, and open forest conditions more favorable to shade intolerant tree species which,

but for historical disturbances like intensive logging, would be more prominent.[10]

---

[5] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 5 (citing AR3621, AR3624).

[6] Id. (citing AR13259).

[7] Id. at 5-6 (citing AR3620).

[8] A habitat management unit is a "block of Forest land in which habitat composition and age class objectives will be established to help ensure that habitats are well distributed across the Forest and provide a framework for analyzing project impacts to wildlife habitat at a local scale." Id. at 6 n. 4 (citing AR3586).

[9] Id. at 6 (citing AR3433-34, AR11973, AR12350-55, AR17907-14.

[10] Id. (citing AR4877-78, AR11973)

### d. Peabody and Tarleton Projects

The Forest proposed the Peabody and Tarleton Projects in 2019 with the aim of "advancing forest plan goals, objectives, and desired conditions for vegetation, wildlife, and other resources."[11]  The Peabody project is located in the Androscoggin Ranger District, largely west and north of the Peabody River and the West Branch of the Peabody River.[12]  The project authorizes activities in a 3,000-acre project area, including parts of Great Gulf Inventoried Roadless Area, with silvicultural treatments proposed on 2,220 acres.[13]  Project activities include "commercial and non-commercial [silvicultural] treatments, expansion of a wildlife opening, road construction and reconstruction, and recreational improvements for mountain biking, skiing, and swimming."[14]  The Peabody EA identifies the objectives and proposed prescription and acreage for the silvicultural treatments.[15]  The proposed silvicultural treatments aim to:

> "provide commercial wood products; create small and large openings in the forest to allow regeneration of trees and other vegetation and increase wildlife habitat diversity; provide additional growing space to enhance crown and bole development; and encourage the establishment of shade-intolerant species in the understory…[as well as] retaining existing disease-free, mast-producing trees for wildlife; discouraging beech regeneration; removing decadent, poor-quality trees to capture economic value; and removing beech saplings during treatment to reduce their

---

[11] AR11972; *see also* AR4868 ("I weighed the effects of the proposed action against taking no action. While taking no action would allow natural successional processes to continue, it would not advance the goals and objectives of the Forest Plan. Therefore, taking no action would not meet the need for the project.").

[12] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR4892 (Figure 1)).

[13] *Id.* (citing AR4877); Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 5.

[14] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR4867, AR4881, AR4892-95 (Figures 1-4)).

[15] AR4881 (Table 1).

dominance in the new stands."[16]

All proposed silvicultural treatments would occur on Management Area (MA) 2.1 "General Forest Management" lands, whose purpose includes "providing timber products and a balanced mix of habitats for wildlife species."[17]  The majority of the treatments will take place in mature forests, which make up the vast majority of the forest on the MA 2.1 land in the Peabody West HMU.[18]

The Tarleton project is located in the Pemigewasset Ranger District, bordering Lake Katherine and Lake Tarleton.[19]  The federal government acquired the land comprising the project as recently as the late 1990s and early 2000s.[20]  Before the Forest bought the land, the area was heavily harvested by private timber companies and contained tracts managed by the state of New Hampshire.[21]  The Tarleton Project authorizes vegetation management, wildlife, and recreation activities on a 755-acre project area in the 5,375-acre Tarleton HMU.[22]  Objectives for the silvicultural treatments in the Tarleton EA are largely identical to those in the Peabody EA, mentioned above.[23]  All proposed silvicultural treatments would occur on either general forest management lands or MA 8.3 (Appalachian National Scenic Trail) lands and must align with the

---

[16] AR4881.

[17] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR3474).

[18] *See* AR17915 (table with existing tree age class conditions on MA 2.1 lands in the Peabody West HMU showing that between 73 and 96 percent of all habitats are mature growth forest).

[19] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR11995 (Figure 1)).

[20] AR11930.

[21] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR11973-74).

[22] *Id.* (citing AR11971, AR11995-98 (Figures 1-4), AR11976 (Table 1) (vegetation treatments), AR11977-82 (defining treatments)).

[23] AR11976-77.

designated purpose and requirements for the land.[24]  The Forest Plan directs the Forest Service to manage MA8.3-designated land, which surrounds the portion of the Appalachian Trail that "traverses the state of New Hampshire and the White Mountain National Forest," to provide for "recreation," "conservation," and "enjoyment."[25]  The Forest Service asserts that no units proposed for treatment within Appalachian Trail lands are within 500 feet of the trail itself, and thus meet Forest Plan scenic requirements.[26]

e. **Project approval process**

The Forest Service conducted a public process over four years to develop and analyze the Project proposals, including "[holding] open houses, solicit[ing] comments and objections from the public, conduct[ing] field and site visits, use[ing] Forest Service experts to analyze environmental effects, and revis[ing] and modif[ying] proposed activities."[27]  Standing Trees submitted timely comments on and formal objections to the Projects.[28]  The Forest Service rejected the comments and objections, and, according to Standing Trees, declined to make material changes to the Projects.[29]  Then, upon finalizing environmental assessments and finding "no significant impact," the Forest Service released FONSIs documenting why, in its view, neither project requires an EIS.[30]

The Forest Service District Rangers signed decision notices authorizing the

---

[24] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7-8.
[25] AR3516.
[26] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 8 (citing AR11988-89, AR3523).
[27] *Id.* at 6.
[28] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 2 (citing AR12079 , AR13065 , AR4679, AR6124).
[29] *Id.* (citing AR12907, AR6107).
[30] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 7 (citing AR4876-912 (April 2023 Peabody final EA and FONSI), AR11968-12001 (November 2023 Tarleton final EA and FONSI)).

Tarleton and Peabody projects in November 2023 and February 2024, respectively.[31]
Habitat restoration work unrelated to timber harvest began in summer 2024 in Tarleton.[32]
The Forest Service awarded a timber sale contract for Peabody, but, at the time of the
hearing, had not yet advertised or awarded a contract for the associated road work.

## IV.    Discussion

Standing Trees argues that the Forest Service violated NEPA, NFMA, and the
APA in three ways when it authorized the Peabody and Tarleton projects:  first, it failed
to analyze alternatives, including a "no action" alternative;  second, it failed to take a
"hard look" at the projects' environmental impacts; and third, it failed to design the
projects consistently with the requirements of the Forest Plan.

### a.    Alternatives analysis

Standing Trees claims that the Forest Service failed to analyze alternatives to "log
less" or otherwise reduce the Projects' negative environmental impacts, including by
failing to analyze a genuine a no-action alternative.[33]  The EAs for both the Tarleton and
Peabody projects document consideration of an action and no-action alternative, in that
they contrast the impacts of the proposal with the current condition and expected future
condition of the environment.[34]  *See* 36 C.F.R. § 220.7(b)(ii) ("The EA may document
consideration of a no-action alternative through the effects analysis by contrasting the
impacts of the proposed action and any alternative(s) with the current condition and

---

[31] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 2 (citing AR4867-69, AR11929-34).
[32] Joint Case Mgmt. Plan (doc. no. 8), at 7.
[33] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1), at 10, 12.
[34] AR4897, 11975, 11973-74, 17906-18 (describing existing conditions in the HMUs).

expected future condition if the proposed action were not implemented.").

"No specific number of alternatives is required or prescribed" in an EA.  36 C.F.R. § 220.7(b)(2).  When "an agency makes an informed decision that the environmental impact will be small…a 'less extensive' search [for alternatives] is required." Conservation L. Found., 457 F. Supp. 3d at 57 (quoting Highway J Citizens Grp. v. Mineta, 349 F.3d 938, 960 (7th Cir. 2003)).  "Under the NEPA, agencies must consider only reasonable alternatives, meaning alternatives bounded by some notion of technical and economic feasibility, and only alternatives that would bring about the ends of the proposed action."  Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior, 123 F.4th 1, 22 (1st Cir. 2024), cert. denied sub nom. Responsible Offshore Dev. v. Dep't of Interior, No. 24-966, 2025 WL 1287066 (U.S. May 5, 2025), and cert. denied sub nom. Seafreeze Shoreside Inc. v. Dep't of Interior, No. 24-971, 2025 WL 1287076 (U.S. May 5, 2025) (cleaned up).  The Ninth Circuit Court of Appeals, for example, has "repeatedly held that an agency satisfies NEPA when it considers only two alternatives—action and no action."  Earth Island Inst. v. U.S. Forest Serv., 87 F.4th 1054, 1065 (9th Cir. 2023) (citing N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1154 (9th Cir. 2008); see also Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1245-49 (9th Cir.2005) (agency complied with NEPA where the agency considered only a no-action and preferred alternative in EA).  An agency "must at least consider a preferred alternative and a no action alternative, and give full and meaningful consideration to all reasonable alternatives."  Earth Island Inst., 87 F.4th at 1065 (cleaned up) (emphasis in original).

13

### i. No-action alternative

The Forest Service, following 36 C.F.R. § 220.7(b)(ii), contrasted the impacts of its proposed projects with the current and expected future conditions in the areas, if the proposed projects were not implemented.  According to Forest Service analyses, the conditions in the Tarleton and Peabody HMUs, where the projects are located, do not currently meet the Forest Plan's standards for tree and wildlife habitat diversity.[35]  For example, the Peabody Project's HMU rationale document notes that because of the WMNF's intense timber harvest history, many of the forest stands in the project area no longer support the natural vegetation that would be expected for that ecological land type, or have any regeneration-age-class forest, resulting in declining populations of wildlife species that rely on regenerating forest habitat.[36]  The Forest Service's analysis concludes that "taking no action would result in lower diversity of tree species, ages, and structures in the project area and the [HMUs] overall," and "wildlife habitat diversity would continue to decline."[37]  The EA for Tarleton notes, in addition to increasing forest tree and wildlife habitat diversity, that "[w]ithout management action, no improvements to the

---

[35] *Id.*

[36] AR17910-12 (Peabody West Integrated Resource Project HMU Rationale). *See also* AR17916-17 (Tables 7-9), showing that while the Forest Plan calls for nearly 200 acres of regenerative-age habitats in the Peabody HMU MA2.1 land area, none currently exist.

[37] AR4897, 11975.  In an amicus brief, the State of New Hampshire offers its position: "the proposed activities are essential for wildlife habitat management and overall forest health…the New Hampshire Fish and Game Department supports the proposed active forest management to maintain and regenerate certain habitat types in support of a variety of wildlife species.  Even if there were no economic benefit associated with these activities, the State would prefer the proposed Peabody West and Tarleton management activities over a no-action alternative purely from an ecological perspective."  State of New Hampshire Amicus Curiae Br. (doc. no. 22) at 2-3 (citation omitted).

shoreline or aquatic habitat at Lake Katherine would occur," resulting in higher water temperature, less cover for aquatic animals, and stormwater that would run off into the lake before it could be adequately filtered for pollutants.[38]  By analyzing the current and future expected conditions of the Peabody and Tarleton project areas without any interventions, and demonstrating that the proposed interventions are necessary to bring the condition of the lands into compliance with the Forest Plan, the Forest Service sufficiently documented consideration of a no-action alternative.

### ii.  Other alternatives

Standing Trees, citing 42 U.S.C. § 4332(H), argues that the Forest Service was required to conduct a full analysis of their proposed alternatives to "log less"[39] because the agency's proposal "involves unresolved conflicts concerning alternative uses of available resources."[40]  An agency must "give full and meaningful consideration to all

---

[38] AR11975.

[39] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 12.

[40] *Id.* at 10-11.  The Forest Service stated in a in a Freedom of Information Act (FOIA) response to a Lake Tarleton Coalition member that "[n]o reasonable alternatives" and "[n]o unresolved conflicts have been brought forward at this time," AR13082, which Standing Trees called an "egregious misstatement."  *Id.*  The court asked counsel at oral argument to specify what "unresolved conflicts" exist, beyond the conclusory statement in the briefs that the project areas "include unique 'use[s]' and 'resources' that will be affected by the Tarleton project, including air, water, forest land, scenery, recreation, and wildlife habitat in which Standing Trees and its members have abiding interests."  Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 11.  Counsel for Standing Trees repeated the claim that unresolved conflicts exist but did not specify what they were.  Standing Trees cites to *Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988) for the proposition that the Forest Service is required to consider alternatives beyond the proposed action because it "opens the door to potentially harmful…activity."  Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 11.  But that case is distinguishable from this.  In that case, the court found that the agency's proposed action—selling mineral leases on national forest land—would affect the area's suitability for wilderness designation in the future because the "sale of leases cannot be divorced from post-leasing exploration, development, and production."  *Hodel*, 852 F.2d at 1229.  But Standing Trees has not demonstrated that similar circumstances exist here.

reasonable alternatives." *Earth Island Inst.*, 87 F.4th at 1065 (citations omitted).  "An alternative is reasonable if it 1) advances the project's purpose and need, and 2) is significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Id.* (cleaned up).

Standing Trees proposed alternatives to both projects.  In its comments on Peabody, it cited the Albany South Project to argue the Forest Service should have considered an alternative that eliminated timber harvesting in a portion of the project area, and proposed that the Forest Service meet Forest Plan objectives by creating "complex early successional habitat rather than simplified regeneration-age forest through even-aged management."[41]  The Forest Service argues that Standing Trees' proposal "functionally represents a partial implementation of the full Proposed Action and would not meet the need as well as the full Proposed Action,"[42] in part because age class composition, a key objective for the projects to bring the HMUs up to Forest Plan

---

No projects are proposed in designated wilderness or Roadless Area Conservation Rule areas. AR6473.  The Peabody project proposes about 600 of the total 17,000 acres (about 4 percent) of the Great Gulf Inventoried Roadless Area for treatment, of which 80 acres would receive even-aged treatment.  AR6473.  No new roads are proposed in the area.  AR6474.  The Forest Service evaluated potential impacts to the Great Gulf Inventoried Roadless Area and found that the proposed project would have "limited, short term effects" but would not impact future eligibility for the area's designation as a potential wilderness.  *Id.*; *see also,* AR6121.  As the Forest Service made clear in their responses to comments by Standing Trees, the areas chosen for the projects had already been evaluated and deemed unsuitable for wilderness designation, so the projects would not affect the area's suitability for future wilderness designation.  AR12903-04; AR6120-21.

[41] AR4845, AR4686; s*ee also,* AR13082 (asking the Forest Service to "omit[] the unnecessary harvest and treatment activities included in the current proposed action.").

[42] AR4845.

standards, "can be adjusted only through timber harvest."[43]  This explanation makes

sense; as the Forest Service explains in the Peabody EA, uneven-age management

techniques like group and single tree selection create gaps in the forest of up to two acres.

Larger gaps allow for shade-intolerant trees to grow, which, over time, would "lead to

complex vertical and horizontal vegetative structure,"[44] but regeneration-aged forest is

only created at up to two acres at a time.  Conversely, even-age treatments like

clearcutting and patch cutting produce the greatest amount of early-successional habitat

and regeneration-age tree structure, one of the stated purposes of the Peabody project.[45]

The abundance of light and warming of the forest floor resulting from clear cutting would

lead to herbaceous cover, the growth of shade-intolerant trees, and regeneration of certain

hardwood trees.[46]  As the Peabody HMU rationale document points out, certain types of

wildlife depend on the early-successional and young forest habitat created by clear- and

patch cutting.[47]  For example, a comment letter from the Ruffed Grouse Society &

---

[43] Defs.' Mem. Mot. Summ. J. (doc. no.16-1) at 10-11; *see also* AR4845, AR12904, AR6107, AR10553.

[44] AR4810.

[45] *See* AR17910-12.

[46] AR4808.

[47] AR17910-12;  *see also,* WMNF Ecological Approach (AR12701-13) ("Most of the wildlife species on the WMNF need more than one forest age-class to meet their life requirements. Many use both mature and regenerating forest, or even mature forest and permanent openings. A few birds require permanent openings or the earliest stages of regenerating forest to meet most of their needs. There are no vertebrate animals or vascular plants in this area that are old growth forest obligates. There are a few invertebrate animals, nonvascular plants, and lichens that may require old growth conditions, but more information is needed to determine if these species are old growth obligates. Most plant species do well either in mature or regenerating forest, not both. The WMNF has species that need each of these habitats, and others that rely on upland or wet openings.  Therefore, maintaining ecological sustainability requires that we provide a mix of habitats across the landscape…A number of the species dependent on openings and regenerating forest habitats have experienced substantial population declines in recent decades due to the

American Woodcock Society supporting the proposed silvicultural treatments in the Peabody project states that "[n]umerous bird and wildlife species require forest habitat diversity and are declining…[including] the Ruffed grouse, American woodcock, Golden-winged warbler, Spruce grouse and New England cottontail," and recommends "actions include incorporating young forest habitat conditions across landscapes."[48]  The letter notes that "there is tension between scenery impacts and vegetative practices like even-aged silviculture," and offers support to the project to "mitigate these tensions and ensure forest habitat conditions aren't overly compromised by aesthetic considerations."[49]

        Standing Trees did not provide evidence or a concrete, specific explanation of how "complex early successional habitat creation" would meet the Peabody project goals for forest age class composition.  In short, without more evidence distinguishing Standing Trees' proposal from the even- and uneven-aged management techniques already planned by the Forest Service, the court credits the Forest Service's explanation that Standing Tree's proposed alternative represents a partial implementation of the full proposed action, which it was not required to evaluate fully.  *See Earth Island Inst.*, 87 F.4th at 1065 ("NEPA [does not] require agencies to evaluate 'mid-range' alternatives between action and no action."); *Aertsen v. Landrieu*, 637 F.2d 12, 21 (1st Cir. 1980) ("HUD did

_____

reforestation of farmland, changes in harvest practices, and loss of forest and farmland to development."
[48] AR4672-74.
[49] *Id*.; *see also,* WMNF Ecological Approach (AR12711) ("All experts questioned agree that the Forest could provide even more young forest habitat than is proposed in the current Forest Plan while maintaining ecological sustainability of mature and old forest habitats on the landscape. By contrast, a segment of the public is strongly opposed to regeneration harvest on the Forest.")

not discuss the purely hypothetical use of the site for high-cost housing, stores, schools, churches, parks, or other purposes. But no one had made a realistic proposal for such other purpose. Thus the only unresolved conflict concerning an alternative … was a continuation of the status quo. That alternative HUD plainly considered. The department had no obligation to go further."); *see also Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004-05 (9th Cir. 2013) (finding that such alternatives are not "necessary to foster informed decisionmaking and public participation").

Similarly, in response to the proposed Tarleton project, Standing Trees' suggested alternative involves "omitting the unnecessary harvest and treatment activities" and instead "consider[ing] small-scale habitat restoration" and recreation "improvements," including amending the Forest Plan to designate a new scenic area where timber harvesting would be prohibited.[50]  As with its suggested Peabody project alternative, Standing Trees' proposal for how to accomplish the projects' habitat composition goals is vague;[51] Standing Trees does not proposed anything more specific than to omit "unnecessary" harvesting and consider "small-scale" silvicultural treatments.   As with the Peabody project, because the alternatives proposed by Standing Trees did not "advance the project's purpose and need," or they did so in a way that represented a "partial implementation" of the full proposed action, the Forest Service was not required

---

[50] AR13082.  Standing Trees specifically stated at oral argument that it *does not* challenge the existing Forest Plan in this litigation.
[51] Like the Peabody project, the Tarleton rationale document states that the area lacks regeneration age forest, which is created by even-aged harvesting.  The Tarleton project seeks to increase the amount of regeneration-age forest.  *See* AR12351-56.

to conduct a fulsome analysis of the proposals.  *See, e.g. Lovgren*, 701 F.3d at 37

(holding that an agency need not consider alternatives which are "infeasible, ineffective,

or inconsistent with the basic policy objectives" for the management of the area);

*Landrieu*, 637 F.2d at 21; *see also Seven Cnty. Infrastructure Coal*, 145 S.Ct. at 1512

("Black-letter administrative law instructs that when an agency makes those kinds of

speculative assessments or predictive or scientific judgments, and decides what qualifies

as significant or feasible or the like, a reviewing court must be at its 'most deferential.'").

### b.  "Hard look" at impacts

Standing Trees claims that the Forest Service failed to take a "hard look" at the

environmental impacts of the projects as required by the NEPA and the APA.  This

includes the direct, indirect, and cumulative effects of a project.  In particular, Standing

Trees claims that the Forest Service failed to investigate and disclose site specific

conditions relevant to the projects' impacts on water quality, the northern long-eared bat,

scenic and recreational resources, forest health, and climate.

When an agency has authorized a project subject to NEPA's procedural

requirements, "the only role for a court is to insure that the agency has considered the

environmental consequences; it cannot interject itself within the area of discretion of the

executive as to the choice of the action to be taken."  *Conservation L. Found.*, 457 F.

Supp. 3d at 54 (quoting *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S.

223, 227–28 (1980)).  "Inherent in NEPA … is a 'rule of reason.'"  *Seven Cnty.

Infrastructure Coal*, 145 S. Ct. at 1513.  "[Courts] apply a rule of reasons because [they]

should not 'fly speck' an [EA] and hold it insufficient based on inconsequential or

technical deficiencies." *Conservation L. Found.*, 457 F. Supp. 3d at 57 (quoting *Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273, 1288 (1st Cir. 1996)). "An agency decision is acceptable even if there will be negative environmental impacts resulting from it, so long as the agency considered these costs and still decided that other benefits outweighed them." *Id.* at 54 (quoting *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005)); *see also Conservation L. Found. v. Ross*, 374 F. Supp. 3d 77, 111 (D.D.C. 2019) (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009)) ("Agency actions with adverse environmental effects can [] be NEPA compliant where 'the agency has considered those effects and determined that competing policy values outweigh those costs.'").

*Water quality*. Standing Trees asserts that the Forest Service did not look at the water quality within the impacted areas using site-specific analysis, but rather made generic assertions that water quality would not be significantly impacted based on assumptions from the Albany South project—a different, unrelated site.[52] The court finds that the Forest Service took a sufficiently hard look at specific site impacts based on the Albany South methodology.

"Courts pay agencies 'an extreme degree of deference' when decisions 'involve complex judgments about sampling methodology and data analysis that are within the

---

[52] Pl.'s Reply (doc. no. 27) at 10. Standing Trees focused in its briefing and oral argument specifically on the effects on water quality from the timber harvesting activities and did not address the arguments it raised during the comment period about impacts of other proposed activities on water quality. *See* Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 16-17; AR13094-98; AR12910-12. The court therefore limits its analysis to water quality impacts stemming from timber harvesting activities.

agency's technical expertise.'" *Ross*, 374 F. Supp. 3d at 89 (quoting *Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 956 (D.C. Cir. 2007)); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Advocs. for Transp. Alts., Inc. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 304 (D. Mass. 2006) (citing *Town of Norfolk v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1446 (1st Cir. 1992)) ("[T]he Court grants substantial deference to the agency's choices regarding methodology and technical analyses"). Here, the Forest Service conducted an analysis, based on its own methodology, which considers the project-specific watersheds, harvest amounts, harvest types, and geological features.

For both the Tarleton and Peabody projects, the Forest Service used an "analysis protocol" developed in Albany South, another tree harvesting project in the White Mountain National Forest, to analyze whether the projects were likely to have measurable impacts on water quality in the surrounding areas.[53] The protocol uses a measure of the "percent basal area removed in a watershed that contains a perennial stream"[54] to assess whether the tree harvest is likely to impact the watershed. Basal area is the cross-section of a tree at breast height (4.5 feet above ground) and is a measure of tree stand density.[55] Based on studies cited in the Albany South project, timber harvest levels in the White

---

[53] AR4900, 11987-88; *see also* AR12910.
[54] AR4900.
[55] Defs.' Mem. Mot. Summ. J (doc. no. 16-1) at 15.

Mountain National Forest below 20 percent of the basal area of a watershed do not have a measurable impact on the watershed's water quality.[56]  According to the Forest Service this makes percent basal area removal a "viable" indicator for whether a project should have adverse effects on water quality.[57]

The Albany South project is in the eastern part of the White Mountain National Forest, 18 miles from the Peabody project area and 50 miles from the Tarleton project area.[58]  The Albany South EA, incorporated by reference in the administrative record for both projects, discusses extensively the expected effects of the project on water quality and hydrology.  The Forest Service states in the Peabody and Tarleton EAs that the "potential impacts to riparian and aquatic resources and water quality discussed in the Albany South EA would be broadly applicable to the current proposal,"[59] but it does not provide specific reasons why, such as land or watershed similarities.  Instead it states that "studies in the White Mountains" show the validity of the method of using a  20 percent basal area removal threshold in the White Mountain National Forest.[60]  The Forest Service also described the State and Forest Plan standards and best practices that it would implement during the project to minimize, and potentially even improve, water quality in the project areas.[61]  Given the projects' geographic proximity and the studies showing the validity of the approach in the White Mountain National Forest, it is not arbitrary and

---

[56] AR11988.
[57] AR2331, AR6382.
[58] AR11987–88; AR4900.
[59] AR4900, AR11987.
[60] AR12910.
[61] AR12911-12.

capricious to find that the methodology used in the Albany South project would be

applicable to the Tarleton and Peabody projects, even if the EAs lack specific

comparisons between the Albany South water quality findings and the Tarleton and

Peabody projects. *Advocs. for Transp. Alts., Inc.*, 453 F. Supp. 2d at 304. ("[T]he Court

grants substantial deference to the agency's choices regarding methodology and technical

analyses."); *Seven Cnty. Infrastructure Coal*, 145 S. Ct. at 1515 ("The bedrock principle

of judicial review in NEPA cases can be stated in a word: Deference.")

 Using its selected methodology, the Forest Service conducted site-specific

analysis. For instance, the Peabody EA explains that:

> "In the proposed action, percent basal area removed exceeds 20
> percent in 12 watersheds, ranging in size from 9 acres to 698 acres.
> Of these 12 watersheds, seven do not provide perennial fish habitat,
> so there are no concerns about changes in water quality in these
> seven watersheds. Five watersheds in the project area are probable
> to contain fish habitat and exceed 20 percent basal area removal. Of
> these five watersheds, the highest basal area removed is 27.3
> percent."[62]

The Peabody EA conducts additional analysis of the potential changes in water quality

for the five watersheds of concern in the project, finding that the changes that would be

of concern to aquatic ecosystems are a decrease in pH or an increase in aluminum. It

then analyzes the impact of the projects on water pH and aluminum, finding that the

expected effects on pH would be "minor" and on aluminum leaching to not approach

toxic thresholds.[63]

---

[62] AR4900.

[63] *Id.*

The Tarleton EA shows project-specific analysis in that it calculates the percent of basal area removed in project site watersheds, finding that "the highest amount of harvest in a watershed as part of this project would be 15.5 percent basal area removal, while the project would remove 4.2 percent of the basal area in the Lake Tarleton watershed and 2.4 percent of the Eastman Brook watershed."[64]  It goes on to conclude that "[n]o measurable adverse effects to water quality or quantity are expected,"

The agency did not produce baseline data for water quality in the area, as suggested by Standing Trees, relying instead on water quality data obtained by the State of New Hampshire.[65]  Nevertheless it adequately analyzed expected site-specific impacts using the methodology it devised in another project, and its analysis falls well within a "broad zone of reasonableness."  *See Seven Cnty. Infrastructure Coal*, 145 S.Ct. at 1513 ("Courts should afford substantial deference and should not micromanage [] agency choices so long as they fall within a broad zone of reasonableness.").

***Northern long-eared bat***.  Standing Trees contends that the Forest Service failed to conduct site-specific surveys on the northern long-eared bat, instead relying on a 2019 bat survey of the WMNF and a biological opinion done by the U.S. Fish and Wildlife Service.[66]  The Forest Service, acknowledging that bats and bat roost trees may be present in project areas, assumes impacts would be minimal, and moreover, that the projects could actually improve northern long-eared bat habitat.  Though it took no

---

[64] AR11988.
[65] *See* Pl.'s Reply (doc. no. 27) at 10; AR12912; *see also* AR17673.
[66] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 18.

measures to identify and protect roost trees in the project design, the Forest Service was not required to do more.

"We review biological opinions under § 706 of the Administrative Procedure Act." *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 100 F.4th 1, 12 (1st Cir. 2024). "[W]hen reviewing a lead agency's reliance on a consulting agency's biological opinion, we must ask whether the reliance itself was arbitrary and capricious. Reliance can be arbitrary and capricious if the underlying biological opinion was deficient, or if the agency blindly adopted the biological opinion without conducting its own independent investigation." *Id.* (cleaned up).

Standing Trees points to no deficiencies in the U.S. Fish and Wildlife Service's biological opinion, other than its breadth (it "purports to assess 2,927 projects across twenty-eight national forests in only fifty-five pages.") and lack of analysis specific to each project.[67] In addition to obtaining the biological opinion (which included the two project areas), the Forest Service conducted project-specific biological evaluations for both projects.[68] Both evaluations include discussions of potential impacts to the northern long-eared bat that go beyond the U.S. Fish and Wildlife Service's biological opinion by, among other things, including findings from other studies.[69] Although only two bats were identified in the area during a 2019 study conducted by the State of New Hampshire, the Forest Service assumed that bats were present. The project-specific

---

[67] *Id.*
[68] AR9238-58 (Peabody BE), 13915-61 (Tarleton BE).
[69] *See, e.g.* AR9244 (biological evaluation citing Sease and Prout study, detailing direct and indirect impacts on bat populations).

biological evaluations note that the projects included a "risk of impacting [the bats'] maternity colonies with the degree of tree removal proposed," they nevertheless conclude that "the cumulative loss of roosting habitat is [] not anticipated to be adverse [to the overall population level of northern long-eared bats] because the [bat] is not considered to be limited by the availability of such habitat."[70]  The evaluations also discuss other direct and indirect impacts, including the "beneficial" indirect impact to bats' foraging habitat that may result from project activities.[71]

Finally, while acknowledging that the projects may impact bat roosts, the Forest Service has the discretion to weigh the identified impacts and "decid[e] that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350 ("It would not have violated NEPA if the Forest Service, after complying with the Act's procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd."); *Historic Bridge Found. v. Buttigieg*, 22 F.4th 275, 280 (1st Cir. 2022) ("NEPA does not mandate any specific outcome; it only requires agencies to conduct environmental studies.").

In this case, the Forest Service adequately studied the northern long-eared bat by relying on a U.S. Fish and Wildlife Service's biological opinion and conducting biological evaluations of its own for each project.  The agency could still comply with NEPA even if it found that the bats were likely to face much more serious environmental

_____

[70] *Id*.
[71] *Id*.

consequences from the projects, but here, it reasonably relied on various studies showing that only two bats had been identified in the project area, the bats can roost in multiple habitats that would be unaffected by the projects, and that the projects may actually benefit the bat's foraging habitat. *See Seven Cnty. Infrastructure Coal*, 145 S.Ct. at 1513 ("Courts should afford substantial deference and should not micromanage [] agency choices so long as they fall within a broad zone of reasonableness.").

***Scenic and recreational resources***.  Standing Trees asserts that the Forest Service failed to take a hard look at the Projects' scenic and recreational impacts because it excluded from its review publicly-identified resources of outstanding scenic and recreational value.  Standing Trees claims that, for the Tarleton project, the Forest Service should have selected a floating viewpoint from the surface of Lake Tarleton, and for the Peabody project, the Forest Service failed to analyze and inform the public about impacts to trails in the White Mountain National Forest, including the Appalachian Trail and the Great Gulf Trail.  The court nevertheless finds that the Forest Service took the necessary hard look at the projects' scenic and recreational impacts.

Finding that the scenic impacts of the projects were an "issue warranting detailed analysis," the Forest Service prepared scenery and recreation specialist reports for each Project and summarized the findings in the EAs.[72]  The Forest Service identified four viewpoints in Peabody and nine viewpoints in Tarleton that, it states, "best represented a

---

[72] AR4887-88, AR4897-98, AR6462-64, AR6498-506 (Peabody); AR11983, AR11988-89, AR13793-80, AR13826-50 (Tarleton).

Project area's viewshed,"[73] based on Forest Service specialists' "knowledge of the Project area, mapping tools, and site visits."[74]   Using these viewpoints, the Forest Service modeled and adjusted the design of some of the timber harvesting units to "minimize visual impacts and to ensure Forest Plan compliance," including increasing the no-cut logging buffer around Lake Tarleton.[75]   The Forest Service also followed Forest Plan guidelines to ensure that the scenic effects from the Appalachian Trail complied with Forest Plan standards for areas around the trail.

No tree harvesting project would be without scenic impacts.  As with other environmental impacts, the Forest Service's methodology and selection of viewpoints is entitled to deference.  *Town Of Winthrop v. F.A.A.*, 535 F.3d 1, 13 (1st Cir. 2008) ("Agencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must give deference to that decision.") (cleaned up). This includes not selecting a viewpoint from the surface of Lake Tarleton.  The court finds the Forest Service's claim that "[v]iewpoints within the boundary of Lake Tarleton itself were not selected because they would not be fixed points that could be precisely revisited for scenery monitoring over time" to be unrealistic, as GPS coordinates could have been used to select a fixed point within the lake.  But the fact that the Forest Service chose not to use a lake-surface viewpoint for its analysis does not mean that it "entirely failed to consider an important aspect of the problem."  *See Motor Vehicle Mfrs. Assn. of*

---

[73] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 19 (citing AR4898, AR4896 (map), AR11988, AR11999 (map)).
[74] *Id.* at 20 (citing AR13826-50).
[75] AR4898, 11988-99.

*U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

When it came to the Peabody project, the Forest Service specifically evaluated impacts to the Great Gulf Wilderness,[76] and did a scenery analysis based on four viewpoints.  The EA notes that the planned clear-cuts would exceed the size guidelines under the Forest Plan for areas with high scenic integrity, but explains that the larger acreage (54 acres over three patches) was intended to better meet the project's objectives and move the land toward desired conditions under the Forest Plan.[77]  Again, the Forest Service is entitled to deference for its decision that policy interests outweigh potential environmental impacts.  *Conservation L. Found.*, 374 F. Supp. 3d at 111 ("Agency actions with adverse environmental effects can thus be NEPA compliant where the agency has considered those effects and determined that competing policy values outweigh those costs.") (quotation marks omitted).  The EA also discusses mitigation measures that the Forest Service took to limit scenery impacts, including reducing the size of some treatments and implementing a specific design element "to ensure that openings are well-distributed in the landscape to the maximum extent practical."[78]

In *Sierra Club v. Wagner*, the First Circuit upheld similar FONSIs by the Forest Service on timber projects in the White Mountain National Forest, explaining that the projects' visual effects on potential designated wilderness area would not be irreversible or irretrievable and that the visual effects of clear cutting would begin dissipating almost

---

[76] AR6473-74 (finding no lasting effects to the Great Gulf Wilderness).
[77] AR4898.
[78] AR4891.

from the start. 555 F.3d at 29. Similarly, here, because the agency's methodology for choosing viewpoints was rational and the agency made a "reasonably complete discussion" of the projects' scenic impacts and mitigation measures, it has met its "hard look" obligation under NEPA. *See Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1073 (9th Cir. 2010) (citing *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 473 (9th Cir. 2000)) (holding that the agency took a "hard look" where the EIS contained "a 'reasonably complete' discussion of this mitigation measure," and noting that the court "[is] not authorized to substitute [its] judgment for that of the agency.").

*Forest health*. Standing Trees claims that the Forest Service failed to disclose stand age information, precluding the public from understanding whether the Service had sufficiently investigated the forest health conditions that are central to the projects' purpose. The court disagrees. The Forest Service adequately disclosed information that would inform the public about how it analyzed forest health and would allow public comment on the proposed timber harvest areas.

An "old" forest is distinct from "old growth forest," which is itself distinct from "old forest habitat," as defined by the Forest Plan. "Old" forest stands are classified based simply on the age of the trees. The classification depends on the type of tree in the stand: for instance, stands of northern hardwood trees over 119 years are in the "old" age class, while stands of aspen or birch trees only need to be 70 to be classified as "old."[79]

---

[79] AR6117.

An "old growth forest" is a stand of at least 10 acres with three or more age classes and an "abundance of trees at least 200 years old."[80] "Old forest habitat," as that term is used in the Forest Plan, does not have an age-class definition, it refers to a qualitative state of structural complexity.[81] The Forest Plan prohibits tree harvesting in old growth forest or "stands identified to provide old forest habitat."[82] Thus, while a stand may have trees in the "old" age class, it does not necessarily follow that the stand is characterized as old growth or old forest habitat.

The Forest Service used ecological surveys and other studies, incorporated by reference, to analyze the project areas and make recommendations for even- and uneven-age harvesting.[83] The proposed project areas are shown in maps in the draft EAs and the ecological and botany surveys identifying old growth habitat were cited in the Forest Service's responses to comments.[84] The Forest Service specifically represented that the stands at issue (namely stands 71, 72, and 75 in Compartment 34 of the Peabody project) are not selected for treatment.[85] The administrative record shows that Forest Service employees studied stands throughout the project areas, and, on finding old growth habitat, or forest conditions trending toward old growth habitat, the Forest Service excluded those areas from receiving silvicultural treatments.[86] Emails in the record

---

[80] AR3595.
[81] *Id.*
[82] *Id.*, AR3448.
[83] *See, e.g.* AR6117, AR6264, AR4802 (draft EA), AR4877 (EA).
[84] *See* AR6117.
[85] *See* Defs.' Reply (doc. no. 31) at 13 (citing AR7834-35, chart showing stand IDs selected for treatment).
[86] AR6116.

confirm that the Forest Service, after conducting studies involving gathering stand data and history data and taking tree cores on standardized plots, revised its proposals for where treatment would occur once it confirmed that some proposed treatment areas had old growth characteristics.[87]  For example, the maps, botany survey, and chart cited by the Forest Service show that the identified late successional forest in stand 71 in the Peabody project was not selected for treatment, contrary to Standing Trees' claims.[88] The Forest Service's revisions to its original proposed treatments demonstrate its "willingness to receive evidence on the matters." *Vermont Yankee Nuclear Power Corp.,* *435 U.S. at 554*.

Standing Trees further contends that the charts showing stands selected for treatment are difficult for non-technical readers to understand, and that the Forest Service failed to disclose stand information during the comment period.[89]  Although the stand data is difficult to understand and was not immediately available without a request, both the draft and final EAs identified the HMU Rationale documents, which in turn cite stand

---

[87] AR4527, AR6116.
[88] *See* AR4895, AR7425, AR6287, AR7834-35.
[89] Standing Trees also contends that the internal email from a Forest Service botanist, mentioned above, explaining the outcome of forest analysis, which identified old growth habitat and recommended dropping those areas from treatment, as a "post-hoc rationalization" that "did not exist at the time the decision was authorized."  Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 29-30.  The Forest Service suggests that, as the decision notice authorizing the Peabody project is dated February 7, 2024, several months after the June 26, 2023 email, the email predates the decision to authorize and is not post-hoc.  *See* AR4527, 6116.  The court is persuaded that the email is not "post-hoc rationalization," but instead, as discussed above, an explanation of the steps the Forest Service took to ensure that no silvicultural treatments took place in old forest habitat.

surveys as one of the sources the Forest used to assess forest health.[90]  Standing Trees

requested and received the stand surveys.[91]  The surveys are written for technical users

within the Forest Service and difficult for laypeople to understand, but Standing Trees did

not seek clarification of the documents.  *Friends of the Clearwater v. Petrick*, 588 F.

Supp. 3d 1071, 1097 (D. Idaho 2022) ("The Forest Service was not impeding agency or

public review because the documents were available for inspection.").

    ***Cumulative impacts***.  Standing Trees argues that the Forest Service failed to look

at projects' cumulative impacts, particularly with respect to the projects' greenhouse gas

emissions.

    The Forest Service is required to consider "the incremental impact of the action

when added to other past, present, and reasonably foreseeable future actions[.]"

*Safeguarding the Historic Hanscom Area's Irreplaceable Res., Inc. v. F.A.A.*, 651 F.3d

202 (1st Cir. 2011) (quoting 40 C.F.R. § 1508.7).  These include "individually minor but

collectively significant actions taking place over a period of time."  *Nw. Bypass Grp. v.*

*U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97 (D.N.H. 2008) (quoting 40 C.F.R. §

1508.7).  But the Supreme Court cautions that,

> "In analyzing those scope questions, it is critical to
> disaggregate the agency's role from the court's role. So long
> as the EIS addresses environmental effects from the project at
> issue, courts should defer to agencies' decisions about where
> to draw the line—including (i) how far to go in considering
> indirect environmental effects from the project at hand and
> (ii) whether to analyze environmental effects from other

---

[90] *See* AR4803-04 (August 2022 Peabody draft EA), 11815 (April 2022 Tarleton draft EA);
AR4877-78, AR11973-74, AR12350, AR17910.
[91] AR12901; *see* AR9885 (FOIA response dated April 14, 2023).

projects separate in time or place from the project at hand."

*Seven Cnty. Infrastructure Coal*, 145 S. Ct. at 1513.

With respect to greenhouse emissions, the Forest Service conducted a forest-wide carbon assessment and two project-specific carbon assessments.[92]  The former was a quantitative assessment while the latter were qualitative assessments.  The forest-wide assessment describes the effect of timber harvesting in the White Mountain National Forest on carbon emissions from 1990 onward.[93]  The project-specific assessments disclose potential impacts of the projects, discuss potential positive and negative impacts of the projects on greenhouse gas emissions, and ultimately provide a detailed and reasoned basis to support the Forest Service's finding that the Projects' impacts on greenhouse gas emissions and global climate change would be negligible.[94]  Although the assessments do not delve into all of the indirect impacts of the projects (for instance, Standing Trees faults them for failing to quantify the impact if the harvested timber were all sold and burned as firewood), or quantify the total estimated amount of greenhouse gas emissions, they are sufficiently detailed for the significance of the projected impacts.

---

[92] AR5678-703 (Forest-wide carbon assessment); 6322-27, 13259-65 (Project-level carbon assessments).  Standing Trees previously relied on guidance from the Council on Environmental Quality stating that "federal agencies must disclose and consider the reasonably foreseeable effects of their proposed actions including the extent to which a proposed action and its reasonable alternatives…would result in reasonably foreseeable GHG emissions that contribute to climate change," which "requires more than a statement that emissions from a proposed Federal action or its alternatives represent only a small fraction of global or domestic emissions." 88 Fed. Reg. 1196, 1200-01 (Jan. 9, 2023).  That guidance was withdrawn in May 2025, after oral argument was held in this case.  90 Fed. Reg. 22,472 (May 28, 2025).  The court therefore does not consider the guidance.

[93] AR13259; AR5679.

[94] AR6323, AR13260.

*See id.;* 40 C.F.R. § 1502.2(b) ("Environmental impact statements shall discuss effects in proportion to their significance. There shall be only brief discussion of other than important issues. As in an environmental assessment and finding of no significant impact, there should be only enough discussion to show why more study is not warranted.").  As noted in the Tarleton assessment and reiterated by the Society for the Protection of New Hampshire Forests in its comment letter, the largest source of GHG emissions in the forestry sector is deforestation, or removing all the trees to convert forested land to other uses.[95]  The Peabody and Tarleton projects are not deforestations, and as the assessments note, may make the areas more resilient to effects of climate change like wildfire, drought, insects, and disease, by reducing stand density and promoting regrowth through thinning and removal.[96]  And as the assessments and commenters noted, the climate impacts of the projects will begin to diminish immediately as new trees grow.

Courts in other circuits have found that it is less important to measure the impact of timber harvesting in small logging projects than it is to measure extraction impact in oil, coal, and gas-type projects because the biomass fuel stocks regenerate more quickly and act as a carbon sink, decreasing the net carbon dioxide emissions of the project. *See, e.g. Swomley v. Schroyer*, 484 F. Supp. 3d 970, 976 (D. Colo. 2020), *aff'd,* 2021 WL 4810161 (10th Cir. Oct. 15, 2021) (finding that a short, less detailed analysis of carbon

---

[95] AR10896.  The Society for the Protection of New Hampshire Forests wrote the letter supporting the Tarleton project during the comment period, after which it conducted a field visit to the Tarleton project with Forest Service employees (AR9723).  The Society was one of 10 amici to contribute to an amicus brief in support of the defendant.  Amicus Brief Society for Protection of New Hampshire Forests (doc. no. 25).
[96] AR13261.

impacts was sufficient for a logging project of 1,600 acres); *Hapner v. Tidwell*, 621 F.3d 1239, 1245 (9th Cir. 2010) (logging project involving "a relatively small amount of land" and thinning rather than clearcutting trees did not require discussion of global warming in EA).  Standing Trees points to *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 687 F. Supp. 3d 1053 (D. Mont. 2023), *aff'd in part, rev'd in part and remanded sub nom. Ctr. for Biological Diversity v. United States Forest Serv.*, 2025 WL 586358 (9th Cir. Feb. 24, 2025), in which a court found insufficient an EA that used "cookie-cutter and boilerplate" analysis of the emissions impacts of a logging project of 3,902 acres, including logging in old growth stands and clearcutting of 1,783 acres.  *Id.* at 1075.  In finding the analysis inadequate, the court relied on binding Ninth Circuit precedent under which "the USFS is required to determine 'the extent to which this particular project's [carbon emissions] will add to the severe impacts of climate change.'"  *Id.* (quoting *350 Montana v. Haaland*, 50 F.4th 1254, 1266 (9th Cir. 2022)).[97]

Here, the projects will involve logging on around 3,000 acres across *both* projects, with even-age treatment (clear-cutting and patch-cutting) on about 325 acres total.[98]  This case involves about 900 fewer acres of treatment than the project discussed in *Ctr. for Biological Diversity*, no logging in old-growth habitat, and less than a quarter of the amount of clear-cutting (about 325 acres versus 1,783 acres).  Peabody and Tarleton together involve almost twice the overall land area as the project analyzed in *Swomley*,

---

[97] Standing Trees also relies on oil and gas drilling lease cases, one of which involved releasing methane. In those cases, the fact that the projects would lead to significant GHG emissions was uncontroversial and the need for further study more evident.
[98] AR4881; AR11976.

but they do not clearly result in such increased greenhouse gas emissions as to require detailed quantitative assessments. 40 C.F.R. § 1502.2(b) ("Environmental impact statements shall discuss effects in proportion to their significance…there should be only enough discussion to show why more study is not warranted."). Although the studies are qualitative rather than quantitative and do not discuss every possible impact of harvesting wood, the analyses fall within the bounds set by 40 C.F.R. § 1502.2(b).

Finally, though the Forest Service did not expressly analyze all of the literature Standing Trees presented, "an agency need not respond to every single scientific study or comment." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021 (9th Cir. 2012). And even if a plaintiff disagrees with the agency's responses, "that disagreement does not render the Forest Service's review and comment process improper." *Id.*

### c. Consistency with Forest Plan

Apart from its NEPA challenges, Standing Trees brings several complaints under the NFMA, alleging that the projects violate the NFMA because they do not comply with the WMNF Forest Plan.[99] The plaintiff alleges that Peabody violates Forest Plan standards for scenery and eligible Wild and Scenic Rivers, and that neither Project contributes to the conservation and recovery of the northern long-eared bat. The court disagrees. The Forest Service's EAs and supporting documentation show that its interpretation and application of Forest Plan standards is not arbitrary and capricious.[100]

Although the First Circuit Court of Appeals has not expressly specified the

---

[99] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1), at 29-32.
[100] *See, e.g.*, AR4906, AR11993 (FONSIs documenting compliance with Forest Plan).

standards applicable to Forest Plan-based challenges, other circuit courts give the Forest

Service ample latitude in ensuring the consistency of its actions with Forest Plans: "We

will conclude that the Forest Service acts arbitrarily and capriciously only when the

record plainly demonstrates that the Forest Service made a clear error in judgment in

concluding that a project meets the requirements of the NFMA and relevant Forest Plan."

*Oregon Nat. Desert Ass'n*, 957 F.3d at 1035 (quoting *The Lands Council*, 537 F.3d at

994). "[T]he Forest Service's interpretation and implementation of its own Forest Plan is

entitled to substantial deference." *Id.* (quoting *Native Ecosystems Council v. Weldon*, 697

F.3d 1043, 1056 (9th Cir. 2012)); *see also Utah Envtl. Cong.*, 483 F.3d at 1134

(quoting *Bar MK Ranches,* 994 F.2d at 738) ("[W]e give great deference to

the Forest Service's interpretation of its own regulations, and we will only reject those

interpretations when they are 'unreasonable, plainly erroneous, or inconsistent with the

regulation's plain meaning.'"); *Cherokee Forest Voices v. U.S. Forest Serv.*, 182

Fed.Appx. 488, 494 (6th Cir. 2006) ("Substantial deference is due to the Forest Service's

interpretation of a Forest Plan.").

  In reviewing the Forest Service's project authorizations, courts in the Ninth Circuit

use a "clear error of judgment" standard. *Forest Guardians*, 329 F.3d at 1098 (quoting

*Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 573 (9th Cir. 1998)).

  ***Scenic standards***. Standing Trees alleges that the Peabody project violates Forest

Plan "scenic standards" because some of the visible openings from proposed clear- and

patch-cuts exceed the acreage allowed by the Forest Plan.[101]  This contention is

inaccurate.  Peabody is located entirely within MA 2.1 (General Forest Management)

lands, for which for which the Forest Plan has scenery management "guidelines," but not

"standards."[102]  This distinction matters, because in a Forest Plan, a "standard" must be

followed while a "guideline" "permits operational flexibility to respond to variations in

conditions."[103]  If a guideline is not followed, "the rationale for doing so must be

documented in a project-level analysis and signed decision."[104]

Relevant here is Guideline 3, which limits visible openings to 4-5 acres in "high"

scenic integrity areas in MA 2.1 land.[105]  The Forest Service acknowledged that three of

the treatment units have relatively large treatments and would exceed the guideline in

size (26 acres in Unit 19, nine acres in Unit 20, and 19 acres in the wildlife opening),[106]

but also argued that, because the project area conditions did not meet Forest Plan

standards for age class composition objectives, "it is not possible for the project area to

be consistent with both MA 2.1 habitat management direction and MA 2.1 scenery

management direction."[107]  Consistent with Forest Plan requirements, the Forest Service

explained the rationale for modifying MA 2.1 Guideline 3 for these three units and

documented the modification in the signed Peabody Decision Notice.[108]  Under the

---

[101] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1), at 30.
[102] AR3477-79.
[103] AR3438; *see also* *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) ("forest plan[] 'standards,' [] are considered binding limitations").
[104] *Id.*
[105] AR3477.
[106] AR4898.
[107] AR6113.
[108] AR4867.

APA's deferential standard of review, the court defers to the Forest Service's established procedure to modify Forest Plan guidelines. *Or. Nat. Desert Ass'n*, 957 F.3d at 1035 (in reviewing a NFMA challenge, courts "give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans.")

**Wild and Scenic Rivers**.  Standing Trees also alleges that the Peabody project does not comply with Forest Plan standards for the Peabody River and the West Branch of the Peabody River, which are eligible for designation as Wild and Scenic Rivers.[109] The Forest Plan requires the Service to "[m]anage eligible rivers to maintain their classification and eligibility until Congress designates the segments or decides not to designate them[.]"[110]  As Standing Trees notes, the Forest Plan also includes a guideline directing the Forest Service to include a 575 foot (slightly over 0.1 mile) "Riparian Management Zone" along fourth order and larger streams.[111]  The guideline directs that in these riparian management zones, "uneven-aged silvicultural practices should be used."[112]

The Forest Plan does not specify whether the Forest Plan's requirements mean that eligible rivers must be managed to maintain eligibility *at all times* up to the point at which Congress decides on the segments' designation, or whether the Forest Service may undertake forest management practices that could affect, for a period, a river's potential eligibility.  Here, the Forest Service analyzed impacts to the two eligible rivers and

---

[109] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1), at 30-31.
[110] AR3467.
[111] AR3460.
[112] AR3459.

determined that, "[g]iven the scope and location of proposed project activities, the proposed action would have limited, short-term effects on potential outstandingly remarkable values but would not result in an irreversible or irretrievable change in the condition of the river corridor or its potential for designation in the future."[113]  The project follows the Forest Plan guideline to include Riparian Management Zones near the rivers in that the 14 acres of even-aged treatments proposed near the rivers are more than 0.1 miles away from the rivers.

The Forest Service's interpretation and implementation of the Forest Plan, which calls for management of the WMNF subject to multiple uses, is entitled to substantial deference.  *See Or. Nat. Desert Ass'n*, 957 F.3d at 1035; *Cherokee Forest Voices*, 182 Fed. Appx. at 494.  The Forest Service interpreted the Forest Plan to allow for forest management that would not have a lasting impact on the rivers' eligibility for Wild and Scenic designation in the future.  This interpretation is reasonable, especially in light of the design measures the Forest Service plans to use to mitigate some impact on the rivers, in line with Forest Plan guidelines,[114] and the fact that the project area will immediately begin to revert to pre-project conditions.

***Northern long-eared bat***.  Separate from its complaints brought under NEPA, Standing Trees alleges that the Forest Service violated the WMNF Forest Plan[115] by failing to "inventory the occurrence of northern long-eared bats in the project area."[116]

---

[113] AR4902-03 and AR4903 (Table 7).
[114] AR4890, AR4902.
[115] AR 3448.
[116] Pl.'s Mem. Mot. Summ. J. (doc. no. 14-1) at 32.

Standing Trees claims that the Forest Service is required to conduct surveys for all new ground-disturbing projects unless biologists determine that threatened, endangered, or sensitive species occurrence is unlikely (because, for example, no habitat exists).[117]

The Forest Service correctly points out that the Forest Plan requires surveys only for threatened, endangered, or sensitive *plant* species, and that for endangered animal species, the Service is only required to "investigate" the project sites.[118] As discussed above, the Forest Service complied with the Forest Plan because it investigated the effects of both projects on the bat, through project-specific biological evaluations and through consultation with the U.S. Fish and Wildlife Service. *See supra*, Section IV.b. The biological evaluations noted that 2019 surveys had identified only two bats in the project areas, and found that while the projects may affect bats' roosting habitat, new clearings could improve bats' foraging habitat. *Id.* The Forest Service's interpretation of Forest Plan standards for investigating the northern long-eared bat was reasonable. *Utah Envtl. Cong.*, 483 F.3d at 1134 ("[W]e give great deference to the Forest Service's interpretation of its own regulations, and we will only reject those interpretations when they are 'unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning.'").

## V.    Conclusion

"[T]he central principle of judicial review in NEPA cases is deference…The ultimate question is not whether an [environmental assessment] in and of itself is

---

[117] *Id.* at 31.
[118] Defs.' Mem. Mot. Summ. J. (doc. no. 16-1) at 34 (citing AR3448).

inadequate, but whether the agency's final decision was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1511-14.  In light of the size and likely impacts of the projects, the Forest Service here has met its obligations to address alternatives, take a hard look at impacts, and explain its reasoning under NEPA, and to comply with the WMNF Forest Plan under the NFMA and the APA.  The court grants summary judgment in favor of the defendants.

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

Dated: August 20, 2025

cc: Counsel of Record